No. 26-12692

IN THE

# United States Court of Appeals
# for the Eleventh Circuit

PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR.,
ERIC TRUMP, THE TRUMP ORGANIZATION, LLC,

*Plaintiffs-Appellants*,

ALEJANDRO BRITO, DANIEL EPSTEIN,

*Interested Parties-Appellants*,

v.

INTERNAL REVENUE SERVICE,
U.S. DEPARTMENT OF THE TREASURY,

*Defendants*,

THIRTY-FIVE FORMER FEDERAL JUDGES,

*Interested Parties-Appellees.*

On Appeal from the United States District Court for the Southern District of
Florida, Case No. 1:26-CV-20609, District Judge Kathleen M. Williams

**TIME SENSITIVE MOTION FOR STAY OF SANCTIONS ORDER AND
FEE PROCEEDING BY APPELLANTS PRESIDENT DONALD J. TRUMP,
DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION,
LLC, ALEJANDRO BRITO, AND DANIEL EPSTEIN**

*(Counsel's Information on Inside Cover)*

Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
(305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Rachel A.H. Horton
DLA PIPER LLP (US)
1650 Market Street
Suite 5000
Philadelphia, PA 19103
(215) 656-3300
rachel.horton@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
(610) 405-5531
jhalpern@jhlegalpllc.com

*Counsel for Appellants President Donald J. Trump,*
*Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC,*
*Alejandro Brito, and Daniel Epstein*

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rules 26.1 and 28(a)(1) of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for Appellants hereby certify on behalf of Appellants that the following is a full and complete list of the trial judges and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

1) Aburos, Tal – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein

2) Biazzo, Corey J. – *Pro se* Amicus in the District Court

3) Bingham, Lauren C. – Counsel for Amicus in the District Court CREW

4) Bissell, Retired Chief Judge John W. – Appellee and Amicus in the District Court

5) Blanche, Todd – Attorney General, U.S. Department of Justice

6) Boisture, Pooja A. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

7) Bonta, Rob – Amicus, Attorney General of California, Lead Signatory for Twenty-Three State Attorneys General Amici

8) Bradley, Conor – Counsel for Appellees Retired Judges Michael Luttig

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

9) Bridgman, Glenn – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

10) Brito, Alejandro – Appellant and Counsel for Plaintiffs in the District Court

11) Brito, PLLC – Counsel for Plaintiffs-Appellants

12) Brook, Davida – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

13) Brown, Retired Judge Geraldine Soat – Appellee and Amicus in the District Court

14) Cai, Angela – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

15) Carullo, Nick – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

16) Castillo, Retired Chief Judge Rubén – Appellee and Amicus in the District Court

17) Citizens for Responsibility and Ethics in Washington (CREW) – Amicus in the District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

18)  Clemon, Retired Chief Judge U.W. – Appellee and Amicus in the District Court

19)  Common Cause – Amicus in the District Court

20)  Corp, Ian Michael – Counsel for Plaintiffs-Appellants

21)  Cox, Retired Judge Susan E. – Appellee and Amicus in the District Court

22)  Debevoise & Plimpton LLP – Counsel for Amicus in the District Court

23)  Democracy Defenders Action – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

24)  Democracy Forward Foundation – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

25)  Denlow, Retired Judge Morton – Appellee and Amicus in the District Court

26)  DLA Piper LLP (US) – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein

27)  Dow, Randy R. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

28)  Duncan, Retired Judge David K. – Appellee and Amicus in the District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

29) Eisen, Norman L. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

30) Epstein & Co. LLC – Counsel for Plaintiffs-Appellants

31) Epstein, Daniel Z. – Appellant and Counsel for Plaintiffs in the District Court

32) Farchadi, Kayvan A. – Counsel for Amicus in the District Court CREW

33) Finnegan, Retired Chief Judge Sheila – Appellee and Amicus in the District Court

34) Fogel, Retired Judge Jeremy – Appellee and Amicus in the District Court

35) Francis IV, Retired Judge James C. – Appellee and Amicus in the District Court

36) Gay, Faith E. – Amicus in the District Court

37) Gelber Schachter & Greenberg, P.A. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

38) Gertner, Retired Judge Nancy – Appellee and Amicus in the District Court

39) Gleeson, John – Amicus in the District Court

40) Gold, Retired Judge Steven M. – Appellee and Amicus in the District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

41) Goldgar, Retired Judge A. Benjamin – Appellee and Amicus in the District Court

42) Green, Nicholas R. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

43) Greenberg, Gerald E. – Counsel for Amici in the District Court, Former Government Officials & Public Interest Organizations

44) Grimm, Retired Judge Paul W. – Appellee and Amicus in the District Court

45) Haier, Aaron E. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

46) Halpern, Josh – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein

47) Henderson, Retired Judge Thelton – Appellee and Amicus in the District Court

48) Henry, Retired Chief Judge Robert Harlan – Appellee and Amicus in the District Court

49) Hewitt, Jillian – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

50) Holwell, Retired Judge Richard J. – Appellee and Amicus in the District Court

51) Horton, Rachel A.H. – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein

52) Hoshijima, Tsuki – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

53) Huvelle, Retired Judge Ellen Segal – Appellee and Amicus in the District Court

54) Internal Revenue Service – Defendant

55) Jasrasaria, Jyoti – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

56) JH Legal PLLC – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein

57) Jonas, Stephen A. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

58) Jones III, Retired Judge John E. – Appellee and Amicus in the District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

59)  Joshi, Nandan – Counsel for Amicus in the District Court Public Citizen

60)  Keneally, Kathryn – Amicus in the District Court

61)  Khan, Ayesha – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

62)  Kirn, Harald H. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

63)  Klugh, Richard C. – Counsel for Plaintiffs-Appellants

64)  Koskinen, John – Amicus in the District Court

65)  Lett, Hon. Enjolique A. – U.S. Magistrate Judge

66)  Liao, Cynthia – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

67)  Luttig, Retired Judge Michael – Appellee and Amicus in the District Court

68)  Lynn, Retired Judge Barbara M. G. – Appellee and Amicus in the District Court

69)  Mann, Retired Judge Roanne L. – Appellee and Amicus in the District Court

70)  Manne, Neal S. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

71)  Matz, Retired Judge A. Howard – Appellee and Amicus in the District

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

Court

72)   Michel, Retired Chief Judge Paul – Appellee and Amicus in the District

Court

73)   Milelli, Rosario – Nonparty

74)   Munger Tolles & Olson LLP – Counsel for Amicus in the District Court

75)   Nelson, Justin A. – Counsel for Appellees Retired Judges Michael Luttig

and Nancy Gertner

76)   Newman, Lisa – Counsel for Amici in the District Court Former

Government Officials & Public Interest Organizations

77)   O'Malley, Retired Judge Kathleen – Appellee and Amicus in the District

Court

78)   O'Neil, David A. – Amicus in the District Court

79)   Ogden, David W. – Counsel for Appellees Retired Judges Michael Luttig

and Nancy Gertner, and Amici in the District Court 93 Members of the

U.S. House of Representatives

80)   Olson, Nina – Amicus in the District Court

81)   Oprison, Christopher G. – Counsel for Plaintiffs-Appellants President

Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump

Organization, LLC, Alejandro Brito, and Daniel Epstein

82)   Owsley, Retired Judge Brian – Appellee and Amicus in the District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

83) Perryman, Skye L. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

84) Platkin LLP – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

85) Platkin, Matthew J. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

86) Pro, Retired Judge Philip M. – Appellee and Amicus in the District Court

87) Project On Government Oversight – Amicus in the District Court

88) Public Citizen – Amicus in the District Court

89) Ramanathan, Ravi – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

90) Rennie, Russell – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

91) Rivero Mestre LLP – Counsel for Appellees Thirty-Five Former Federal Judges, and Amici in the District Court 93 Members of the U.S. House of Representatives

92) Rivero, Andrés – Counsel for Appellees Thirty-Five Former Federal

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

Judges, and Amici in the District Court 93 Members of the U.S. House of Representatives

93) Roberts, Retired Judge Victoria A. – Appellee and Amicus in the District Court

94) Rothenberg, Gilbert – Amicus in the District Court

95) Savage, Zach – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

96) Scheindlin, Retired Judge Shira A. – Appellee and Amicus in the District Court

97) Selendy Gay PLLC – Counsel for Amicus in the District Court

98) Selendy, Philippe Z. – Amicus in the District Court

99) Shackelford, Jr., Stephen – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

100) Sheehan, Daniel C. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

101) Shih, Daniel J. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

102) Smith, Retired Judge Fern M. – Appellee and Amicus in the District Court

103) Stephens III, Glenn – Requested Intervenor in District Court

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

104)  Stoughton, Corey – Amicus in the District Court

105)  Sus, Nikhel S. – Counsel for Amicus in the District Court CREW

106)  Susman Godfrey L.L.P. – Counsel for Appellees Retired Judges Michael

Luttig and Nancy Gertner

107)  Tenjido-Eljaiek, Daniela – Counsel for Appellees Thirty-Five Former

Federal Judges, and Amici in the District Court 93 Members of the U.S.

House of Representatives

108)  The Trump Organization, LLC – Plaintiff-Appellant

109)  Thurston, Robin F. – Counsel for Amici in the District Court Former

Government Officials & Public Interest Organizations

110)  Tinder, Retired Judge John D. – Appellee and Amicus in the District

Court

111)  Trump Jr., Donald J. – Plaintiff-Appellant

112)  Trump, Eric – Plaintiff-Appellant

113)  Trump, President Donald J. – Plaintiff-Appellant

114)  Ungaro, Retired Judge Ursula – Appellee and Amicus in the District

Court

115)  United States Department of the Treasury – Defendant

116)  Verrilli, Jr., Donald B. – Amicus in the District Court

117)  Walsh, Daniel R. – Counsel for Amici in the District Court Former

*President Donald J. Trump v. Thirty-Five Former Federal Judges*
No. 26-12692

Government Officials & Public Interest Organizations

118)  Ward, Retired Judge T. John – Appellee and Amicus in the District Court

119)  Williams, Hon. Kathleen M. – U.S. District Judge

120)  Wolf, Retired Judge Mark L. – Appellee and Amicus in the District Court

121)  Woodward, Jr., Stanley E. – Associate Attorney General, U.S.

Department of Justice

122)  Yeakel, Retired Judge Lee – Appellee and Amicus in the District Court


Counsel for Appellant The Trump Organization, LLC certifies that The

Trump Organization, LLC has no parent corporation, and that no publicly traded

company or corporation holds a 10% or more interest in The Trump Organization,

LLC.

No publicly traded company has an interest in the outcome of this appeal.

C-12 of 12

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ...................................................................C-1

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION ........................................................................................1

RELEVANT BACKGROUND ......................................................................5

    A.    Long-Running Illegal and Politically Motivated Conduct Precipitated This
        Action.................................................................................................5

    B.    Procedural History Leading to the Improper *Sua Sponte* Sanctions. ..........6

    C.    The District Court's Sanctions Order. ......................................................7

I.    Movants Are Likely to Succeed on Appeal. .......................................................10

    A.    The District Court's Unprecedented Adversity Theory Is Wrong and,
        Regardless, Cannot Support Sanctions.....................................................11

    B.    Statutory Remedies Do Not Depend on Who Sits in the White House. ...15

    C.    The District Court Wrongly Imposed Sanctions Without Notice, Evidence,
        or Individualized Findings........................................................................16

    D.    The Speech Injunction Is an Unconstitutional Prior Restraint and Exceeds
        Any Sanctions Authority. .........................................................................18

II.    The Movants Are Suffering Irreparable Harm Right Now.............................19

III.    The Public Interest Supports a Stay of the Sanctions Order and Related
    Proceedings. .......................................................................................................21

CONCLUSION.............................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aloe Vera of Am., Inc. v. United States*,
699 F.3d 1153 (9th Cir. 2012) ...............................................................14

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)..................................................................................19

*BE&K Constr. Co. v. NLRB*,
536 U.S. 516 (2002).................................................................................19

*Biden v. IRS*,
No. 1:23-CV-02711 (D.D.C. Sept. 18, 2023)........................................13

*Bryant v. Ford*,
967 F.3d 1272 (11th Cir. 2020) ..............................................................17

*Buckler v. MacGregor*,
634 F. App'x 694 (11th Cir. 2015) ..........................................14, 15, 21

*Capital Cities Media, Inc. v. Toole*,
463 U.S. 1303 (1983)...........................................................................4, 22

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023) ...............................................................12

*CBS, Inc. v. Davis*,
510 U.S. 1315 (1994)...............................................................................19

*Clinton v. Jones*,
520 U.S. 681 (1997).................................................................................12

*Donaldson v. Clark*,
819 F.2d 1551 (11th Cir. 1987) ..............................................................14

*Garcia-Mir v. Meese*,
781 F.2d 1450 (11th Cir. 1986) ..............................................................10

ii

*Griffin v. IRS*,
   730 F. Supp. 3d 1312 (S.D. Fla. 2024) ................................................................12

*Hafer v. Melo*,
   502 U.S. 21 (1991) ...............................................................................................12

*Int'l Brotherhood of Teamsters Local 947 v. NLRB*,
   66 F.4th 1294 (11th Cir. 2023) ............................................................................22

*Kaplan v. DaimlerChrysler, A.G.*,
   331 F.3d 1251 (11th Cir. 2003) ......................................................................17, 18

*Kleiner v. First Nat'l Bank of Atlanta*,
   751 F.2d 1193 (11th Cir. 1985) ................................................................10, 20, 21

*LabMD, Inc. v. FTC*,
   678 F. App'x 816 (11th Cir. 2016) .......................................................................10

*Labrador v. Poe*,
   601 U.S. 1110 (2024) ..............................................................................................4

*Lewis v. Clarke*,
   581 U.S. 155 (2017) ..............................................................................................12

*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988) ..............................................................................................23

*Mahmoud v. Taylor*,
   606 U.S. 522 (2025) ..............................................................................................19

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980) ..............................................................................................22

*In re Mroz*,
   65 F.3d 1567 (11th Cir. 1995) ..............................................................................16

*Nken v. Holder*,
   556 U.S. 418 (2009) ..............................................................................................10

*Peer v. Lewis*,
   606 F.3d 1306 (11th Cir. 2010) ............................................................................15

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
  851 F.3d 1218 (11th Cir. 2017) ...............................................................18

*Safe Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*,
  No. 1:25-CV-00139, 2026 WL 900051 (D. Md. Apr. 2, 2026) ........................12

*Shahar v. Bowers*,
  120 F.3d 211 (11th Cir. 1997) ...............................................................17

*Tillis v. Brown*,
  12 F.4th 1291 (11th Cir. 2021) ...............................................................23

*United States v. Biden*,
  No. 23-CR-00061 (D. Del.) ...................................................................13

*United States v. ICC*,
  337 U.S. 426 (1949)............................................................................12

*United States v. Nixon*,
  418 U.S. 683 (1974)........................................................................10, 12

## Statutes and Rules

5 U.S.C. § 8128 ................................................................................16

26 U.S.C. § 7431 .................................................................5, 12, 15, 16

28 U.S.C. § 2675 ..............................................................................16

Fed. R. Civ. P. 11 .....................................................................*passim*

Fed. R. Civ. P. 60 ...........................................................................1, 6

Fed. R. Evid. 201 ............................................................................17

## Constitutional Provisions

U.S. Constitution, Article II.............................................................2, 7

U.S. Constitution, Article III.......................................................*passim*

U.S. Constitution, First Amendment ..........................................4, 8, 19, 20

iv

## INTRODUCTION

This appeal arises from the district court's extraordinary abuse of its sanctions power.  In this action, Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC sued the Internal Revenue Service and the Department of the Treasury, pursuant to a congressionally-authorized remedy, over the undeniably unauthorized and illegal disclosure of their confidential tax-return information to the press.  After reaching a settlement with the IRS and Treasury, Plaintiffs voluntarily dismissed the action, which the court so-ordered.

After thirty-five former judges moved under Rule 60 to improperly reopen the case, falsely alleging fraud on the court, the court wrongly decided that the President cannot sue the Federal Government in his personal capacity, and that this prohibition somehow extended to his sons, who are private citizens, and his business, which he is no longer running.  The court did not cite any law supporting this extraordinary, unjust ruling.  Even worse, the court improperly treated the filing of the Complaint as proof of collusion and bad faith, neither of which existed.  The court imposed a sweeping, unconstitutional, and unlawful gag order on Plaintiffs and Defendants (together, "Parties"), and their "affiliates," and harsh, improper professional penalties on Plaintiffs' counsel Alejandro Brito and Daniel Epstein ("Attorneys"), all without the legally required notice, evidence, or individualized findings.  The order under review is unsupported and rests on error built on error.  Exhibit A,

1

Doc.106 ("Sanctions Order").[1]    The court misquoted the Supreme Court, misidentified a court and dissenting judge, and repeatedly misattributed legal and news sources.  The court's hurried and wrongful use of the coercive sanctions power threatens, among other fundamental tenets of American jurisprudence, the legal profession, the development of the law, and public confidence in the Judiciary.  This Court should grant an immediate stay pending appeal.

The theory underlying the Sanctions Order is wrong.  President Trump sued in his personal capacity, alongside his sons and The Trump Organization, to vindicate their own statutory rights over the theft and release of their tax information. The IRS and Treasury represented the United States' separate interests.  The court wrongly held that Article II collapsed those distinct interests into "one, a fully realized unitary interest," somehow eliminating adversity altogether.  Doc.106 at 37-38.  That was error.  The court then attempted, but failed, to convert that disputed constitutional conclusion into supposed proof that the litigation was collusive, which was not the case.  The court incorrectly called the issue "unprecedented," appointed six *amici* to brief it, and devoted nearly thirty pages to resolving it.  After all that, the court still declared its conclusion "so obvious and so insurmountable" that

---

[1] Page references are to the header generated by the district court's e-filing system. References to docket entries, designated by Doc.#, refer to district court docket entries.

advancing a different view warranted a gag order and career-altering punishment of the Attorneys. *Id.* at 38. That, again, was error.

The process was no better than the theory. The court wrongly imposed a punishment that no party requested through a sanctions proceeding that was never lawfully commenced. The Attorneys received no notice their professional standing and ability to practice were at stake. The court failed to identify for Plaintiffs or their Attorneys much of the conduct it erroneously considered contemptuous. No individualized finding established that the Plaintiffs or their Attorneys knowingly made a false statement or acted in bad faith, neither of which actually took place.

Instead, having wrongly concluded that any President's lawsuit against the Government is inherently non-adversarial, the court discarded ordinary adjudicative safeguards. It improperly took judicial notice of press reports and relied on extrarecord research, conjecture about professional relationships, and collective attribution. Based on that improper record, it forbade the President, the Government, and broad categories of associated persons from even referring to the Settlement Agreement—*a sweeping, unconstitutional prohibition, which is a prior restraint that violates the First Amendment, on referencing an issue that is the subject of daily national debate*—referred Mr. Brito to The Florida Bar, barred Mr. Epstein from appearing *pro hac vice* in the Southern District of Florida for one year, and invited volunteer *amici* to seek fees.

3

A stay would harm no one. The underlying lawsuit was dismissed with prejudice. Defendants declined to oppose relief. Preserving the *status quo ante* would require no party to surrender a right or alter its conduct. Refusing a stay, by contrast, would wrongly leave an unconstitutional speech restraint and career-altering professional sanctions in force while this Court considers an appeal that is overwhelmingly likely to succeed. The public interest favors preserving confidence in careful and neutral judicial decisionmaking—especially where the court imposed sanctions just two days before Attorney General Todd Blanche's confirmation hearing, and through a process bearing the hallmarks of "rushed, high-stakes, low-information" adjudication. *Labrador v. Poe*, 601 U.S. 1110, 1119 (2024) (Gorsuch, J., concurring).

On July 31, 2026, Plaintiffs and their Attorneys (collectively, "Movants") initially filed an expedited motion for a stay. However, the court refused to afford that motion expedited treatment. Doc.120. Briefing will not be complete on that motion *until August 21*, and it is unclear when an order will issue. In the interim, the court's sweeping gag order, which purports to prohibit the Parties and their "affiliates" from referencing the Settlement Agreement, is a continuing affront to the First Amendment. Doc.106 at 47; *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1304 (1983) (Brennan, J., in chambers). Therefore, it is impracticable to wait for the court to correct its improper, unsupported, and unprecedented sanctions.

4

Movants respectfully request that this Court stay the district court proceedings pending appeal.

## RELEVANT BACKGROUND

### A.    Long-Running Illegal and Politically Motivated Conduct Precipitated This Action.

Plaintiffs sued the IRS and the Treasury under 26 U.S.C. § 7431 for the unauthorized disclosure of their confidential tax-return information. Doc.1. From 2019 through 2020, former IRS employee-contractor Charles Littlejohn deliberately obtained Plaintiffs' tax returns and disclosed them to left-leaning media. *Id.* ¶¶ 6-7. He obtained his IRS position with the objective of accessing President Trump's tax information, used his government access to target Plaintiffs, and fed the stolen materials to reporters. *Id.* ¶¶ 35-37, 53-58, 65, 67.

The IRS exercised extensive control over Littlejohn's work, access, training, and compliance obligations. *Id.* ¶¶ 22-30. Nevertheless, years of warnings to the IRS about critical data-security deficiencies went unaddressed, allowing Littlejohn to steal vast quantities of confidential taxpayer information, and evade detection for years. *Id.* ¶¶ 32-33, 37-39. The Trump Organization eventually received IRS notices stating that confidential information of **418 affiliated entities** was illegally stolen and released to the press. *Id.* ¶ 84.

Littlejohn pled guilty and received the statutory maximum sentence of sixty months' imprisonment. *Id.* ¶ 35; Doc.106 at 4. The sentencing judge found that

5

Littlejohn targeted President Trump as part of a three-year criminal scheme, and that he intended to harm at least some of the taxpayers whose information he stole. Doc.1 ¶¶ 71-72. The IRS itself admitted that "it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure," *id.* ¶ 12, when it could and should have done so.

Plaintiffs learned of the specific disclosures at different times. President Trump received notice on January 29, 2024; Donald Trump Jr. and Eric Trump received notices on December 16, 2024; and The Trump Organization received notices between December 2024 and 2026. *Id.* ¶¶ 5, 76, 78, 80, 82.

**B.      Procedural History Leading to the Improper *Sua Sponte* Sanctions.**

On January 29, 2026, Plaintiffs timely filed the Complaint. Doc.1. On April 17, the Parties jointly sought additional time for Defendants to respond, explaining they were negotiating a potential resolution of this action. Doc.40 at 2. On April 24, the court ordered briefing on whether an Article III case or controversy existed, which was clearly the case. Doc.41 at 4. Five days later, it appointed six *amici* from three law firms to address that question. Doc.43.

On May 18, Plaintiffs voluntarily dismissed the action with prejudice. Doc.52. The dismissal extinguished the claims. The court cancelled the jurisdictional briefing deadline and closed the case. Doc.62.

Nine days later, thirty-five former judges moved under Rule 60 to improperly reopen the case, alleging fraud on the court. Doc.63. They sought vacatur of the

6

dismissal or, alternatively, leave to appear as *amici*.  They did not seek Rule 11 sanctions, professional discipline, monetary penalties, a bar referral, or an injunction.

On May 29, the court directed Plaintiffs to address "(1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" Doc.65 at 3.  The court did not order Defendants to respond.  Nor did the court issue a Rule 11 show-cause order to Mr. Brito or Mr. Epstein, identify any conduct by either Attorney as potentially sanctionable, or disclose that monetary sanctions and restrictions on future speech were under consideration.  *See generally id.*  Plaintiffs responded.  Doc.89.

### C.    The District Court's Sanctions Order.

On July 13, 2026, the court issued the 56-page Sanctions Order.  Doc.106. Remarkably, even though the Settlement Agreement was "not before" it, the court used its own wrongful conclusions about that Agreement to improperly impose sanctions and bar reference to the Agreement by Plaintiffs and other individuals.  *Id.* at 47 & n.63.

Each of the court's findings of collusion, improper purpose, and bad faith flowed from a single predicate legal error: that presidential supervision under Article

II supposedly eliminated Article III adversity. *Id.* at 37-38. That is wrong. The court took no evidence supporting its accusation of collusion. It identified no pre-filing settlement, no false allegation, no direction by President Trump controlling Defendants' litigation decisions, and no individualized proof that any Plaintiff, Mr. Brito, or Mr. Epstein knowingly acted improperly. Instead, the court improperly relied on press reports, extrarecord research, regular professional relationships, and speculation about motive. *See, e.g., id.* at 3-9, 31. It also erroneously dismissed the independent claims of Donald Trump Jr., Eric Trump, and The Trump Organization as merely "parenthetical" and deemed, again in error, the claims untimely without addressing when each Plaintiff received notice of the particular disclosures. *Id.* at 22 n.29.

The court entered a sweeping, unconstitutional gag order binding the Parties and broad categories of affiliates, referred Mr. Brito to The Florida Bar, barred Mr. Epstein from seeking *pro hac vice* admission in the Southern District of Florida for one year, and invited *amici* to seek fees. *Id.* at 46-47, 52-53. The impermissibly overbroad injunction prospectively and categorically bars the Parties from "referring to" the Settlement Agreement, as well as "using, offering, admitting, or citing any of its provisions" in any proceeding, the very definition of a prior restraint that violates the First Amendment. *Id.* at 47. The court also purported to bar then-Acting Attorney General Blanche from referencing the Settlement in any official

8

proceeding—while his confirmation as Attorney General was pending and Senators were actively questioning him about it.

The Sanctions Order was riddled with multiple errors. It materially misquoted *Cooter & Gell v. Hartmarx Corp.*, misidentified both the court and dissenting judge in *Keepseagle v. Perdue*, used the wrong docket number for *Jackson v. United States*, gave the wrong citation for *Trump v. Clinton*, cited the syllabus rather than the majority opinion in *Seila Law*, misidentified a Wall Street Journal author and URL, and repeatedly mangled case names, government titles, and source attributions. *Id.* at 10, 15-16, 19, 21 n.27, 25 n.32, 30, 32 n.45, 34, 42.

Movants filed a timely notice of appeal on July 31, 2026, and moved for a stay from the district court. Doc.114. Movants sought expedited consideration, explaining that prior restraints "suppress[] protected speech and petitioning activity that no later appellate ruling can restore." *Id.* at 17. Defendants advised that they would not oppose the motion. On August 1, the court requested that appointed *amici* defend its own *sua sponte* Sanctions Order. Their response is due August 14. Doc.120. The thirty-five former judges defended the improper sanctions, embracing the supposed lack of adversity as the "most crucial[]" predicate for the extraordinary ruling. Doc.117 at 9. The court failed to rule on an expedited basis, wrongly stating that Movants "have not shown good cause for an expedited ruling." Doc.120 at 1.

9

**DISCUSSION**

A stay pending appeal is appropriate when the movants show (1) likelihood of success in the appeal; (2) irreparable harm without a stay; (3) a stay will not substantially injure other interested parties; and (4) the public interest supports the stay. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). When the second, third, and fourth factors favor relief, a movant need present only a "substantial case on the merits." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); *LabMD, Inc. v. FTC*, 678 F. App'x 816, 819 (11th Cir. 2016). Because that standard is easily satisfied here, this Court should issue a stay.

## I.    Movants Are Likely to Succeed on Appeal.

The Sanctions Order rests on fundamental legal errors, each one warranting reversal. *First*, its central substantive premise is incorrect: Presidential supervision does not eliminate Article III adversity, especially where the President is suing to vindicate his personal rights. *See United States v. Nixon*, 418 U.S. 683, 693, 696-97 (1974). The court cited no law supporting its erroneous conclusion that the President somehow loses his right to bring suit against the Federal Government in his personal capacity for cognizable injuries that he has suffered, much less that his sons or business lose their right to bring such suit. The very disagreement over an "unprecedented" constitutional question in this case confirms that the Sanctions Order must be reversed. *Second*, the court wrongly tried to supply proof of

10

misconduct through procedures that violated due process, Rule 11, and the Federal Rules of Evidence: inadequate notice, an extrarecord "factual" inquiry, and no individualized findings tied to any Movant's conduct or state of mind. *Third*, the court's resulting injunction compounds those errors by imposing a sweeping, unconstitutional prior restraint on speech and petitioning in proceedings far beyond this case. Because Movants are likely to succeed on the merits, this Court should issue a stay.

### A. The District Court's Unprecedented Adversity Theory Is Wrong and, Regardless, Cannot Support Sanctions.

This case presented a concrete statutory dispute between parties with distinct legal and financial interests. A convicted felon illegally stole and disclosed Plaintiffs' confidential tax information through his work for the IRS. The IRS admitted "that it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure." Doc.1 ¶¶ 12, 71-72. President Trump sued in his personal capacity for injury to his own information; Donald Trump Jr., Eric Trump, and The Trump Organization asserted separate claims arising from the illegal disclosures of their information. *Id.* ¶¶ 76-85. Any recovery belonged to those private Plaintiffs—not to the Presidency or the Executive Branch.

Plaintiffs' claims were substantial. The Complaint alleged extensive IRS control over Littlejohn's work, access, supervision, and compliance obligations. *Id.* ¶¶ 7, 22-30. Two courts addressing the same criminal scheme have held that

11

materially similar allegations plausibly established that Littlejohn was an "employee of the United States" under § 7431. *Griffin v. IRS*, 730 F. Supp. 3d 1312, 1318 (S.D. Fla. 2024); *Safe Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*, No. 1:25-CV-00139, 2026 WL 900051, at *11 (D. Md. Apr. 2, 2026). Plaintiffs invoked the remedy Congress supplied and later resolved their claims through settlement with Defendants.

The court clearly erred in holding that presidential supervision made President Trump and the Government "one," rendering the action "non-adversarial, collusive, and jurisdictionally improper." Doc.106 at 37-38. In a personal-capacity action, "the real party in interest is the individual, not the sovereign." *Lewis v. Clarke*, 581 U.S. 155, 162-63 (2017); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Presidency likewise remains distinct from "the individual who happens to be the President." *Clinton v. Jones*, 520 U.S. 681, 701 (1997).

The Supreme Court has recognized adversity between the United States and a President asserting personal interests. *Nixon*, 418 U.S. at 693. That finding is consistent with basic tenets of adversity. *See, e.g.*, *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023) (en banc) (asking whether each side has "a real interest in the legal positions" it advances and whether one side actually controls the other or its representation); *United States v. ICC*, 337 U.S. 426, 430-31 (1949) (looking beyond governmental overlap to the concrete dispute regarding "who is legally

12

entitled to sums of money"). Here, private Plaintiffs sought compensation for private injuries, while the IRS and Treasury represented, through the Department of Justice as is the process, the United States' distinct interests in federal law and public funds. Presidential supervision did not merge those capacities.

The court's unprecedented, unsupported theory is untenable as to President Trump, while also being wildly inapplicable as to Donald Trump Jr., Eric Trump, and The Trump Organization, which are private non-governmental parties. None of those private Plaintiffs has ever exercised any authority over the IRS or Treasury. Yet the court wrongly dismissed their claims as "parenthetical," because of shared counsel, family or corporate ties, and a common litigation position. Doc.106 at 22 n.29. That was further error. Article III does not extinguish private statutory rights through association with a President. When Hunter Biden sued the IRS during President Biden's term for alleged unauthorized disclosure of his tax-return information, no court doubted that the controversy was real, much less issued sanctions. *See Biden v. IRS*, No. 1:23-CV-02711 (D.D.C. Sept. 18, 2023). When President Biden's Justice Department indicted and prosecuted the President's son, no judge deemed the case or the proposed settlement collusive, even though the defendant's father supervised the prosecuting Branch. *See United States v. Biden*, No. 23-CR-00061 (D. Del.). Adversity turns on concrete, opposing interests—not a family tree or an organizational chart. The court's opposite holding was legal error.

13

Once it incorrectly deemed adversity impossible, the court wrongly recast ordinary litigation facts—the timing of settlement, counsel's relationships, attendance at Littlejohn's plea hearing, and the Government's litigation choices—as evidence of collusion.  All of that was wrong.  None of these facts show a fictitious suit, a pre-filing scheme, or improper purpose.

The court made the same error regarding the statute-of-limitations issue.  The Complaint alleged separate discovery dates through 2026, yet the court wrongly treated the attendance of President Trump's counsel at the plea hearing as notice to every Plaintiff of every disclosure.  Doc.1 ¶¶ 76-86; Doc.106 at 4-5.  Where neither the IRS nor a third party informed a taxpayer of the *specific* disclosures, the taxpayer did not receive notice sufficient to trigger the limitations period.  *See Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1160 (9th Cir. 2012).  The court's legal error incorrectly converted disputed defenses into proof of (nonexistent) subjective bad faith.

The Sanctions Order cannot stand because it improperly punishes Movants for advancing a *bona fide* legal position merely because the court disagreed with that position.  *See Donaldson v. Clark*, 819 F.2d 1551, 1561 (11th Cir. 1987) (en banc) (Rule 11 protects "doctrinal development, novel legal arguments, [and] cases of first impression"); *Buckler v. MacGregor*, 634 F. App'x 694, 697 (11th Cir. 2015) (sanctions lie only where a claim has "no reasonable chance of success" and "cannot

be advanced as a reasonable argument to change existing law"); *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (sanctions are reserved for claims that are "objectively frivolous"). The court's appointment of six *amici* and long, tortured analysis of the adversity issue betray just how far from "obvious" and "insurmountable" the conclusion was. Doc.106 at 9-38, 53 n.69.

The court's unlawful, improper approach, if allowed to stand, which should not take place, would chill advocacy, cripple the adversarial process, and act to halt development of the law. *Buckler*, 634 F. App'x at 697 (explaining that Rule 11 deters "frivolous lawsuits" rather than "novel legal arguments"). The damage to the legal profession is so profound that at least one, self-described as liberal-leaning, Constitutional law professor has publicly declared that he will "refuse to teach" this opinion to his students.[2] A stay must issue.

**B.    Statutory Remedies Do Not Depend on Who Sits in the White House.**

The court's theory also collides with the statute Congress enacted. Section 7431 creates a claim against the United States. The Article III controversy it frames does not depend on who occupies the White House. 26 U.S.C. § 7431(a)(1). The unlawful disclosures occurred—and the Government's liability attached—when the

---

[2] Robert Schmad, *Liberal Law Professor Breaks with Obama Judge over Trump Lawyer Crackdown: "I Refuse to Teach" It*, Fox News (July 18, 2026), https://www.foxnews.com/politics/liberal-law-professor-breaks-obama-judge-over-trump-lawyer-crackdown-i-refuse-teach.

IRS allowed Littlejohn to plunder Plaintiffs' files. President Trump's subsequent election changed neither the underlying wrong nor the statutory remedy. Section 7431's text and structure confirm that the remedy operates regardless of the officeholder: it redresses unlawful conduct through ordinary judicial review.

Congress knows how to route claims against the Government away from the courts, and how to single out the President, when it wants to. *See, e.g.*, 28 U.S.C. § 2675(a); 5 U.S.C. § 8128(b). Section 7431 does none of those things. It contains no administrative exhaustion requirement and no bar on review. The court supplied a nonexistent presidential carve-out anyway, without ever grappling with the statute's text. On its reasoning, a President tortiously injured inside a federal building would be the one person in America without a remedy. Nothing in Article III compels that unjust result.

C. **The District Court Wrongly Imposed Sanctions Without Notice, Evidence, or Individualized Findings.**

The sanctions also fail because they wrongly transgressed any sense of fair process. Due process requires "fair notice that [the] conduct may warrant sanctions and the reasons why," together with a meaningful opportunity to defend against the charge. *In re Mroz*, 65 F.3d 1567, 1575-76 (11th Cir. 1995). Rule 11(c)(3) likewise requires a court acting *sua sponte*, where a higher standard applies, to order the particular attorney, firm, or party to show cause as to why "conduct specifically described in the order" violated Rule 11(b). The court did neither.

The court only directed Plaintiffs to respond to allegations of collusion, deception, lack of adversity, and fraud on the court. Doc.65 at 2-3. But it never ordered Mr. Brito or Mr. Epstein to show cause, identified no sanctionable conduct by either lawyer, and gave no notice that professional discipline, a District-wide practice prohibition, monetary sanctions, or a sweeping injunction were under consideration. Nor did it identify many of the grounds later invoked, including counsel's professional relationships, the damages demand, the Compensation Clause, or future use of the Settlement Agreement. *See generally id.*; *see, e.g.*, Doc.106 at 35 (unilaterally addressing Compensation Clause). It was erroneous for the court to impose hugely consequential sanctions on undisclosed grounds. *See Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1256-57 (11th Cir. 2003).

The court filled the evidentiary void with material incapable of proving subjective bad faith. It relied on press reports and independent research to decide disputed questions of motive, intent, internal deliberations, and litigation strategy. Doc.106 at 3 n.3, 7-9, 20-21, 26-27, 29, 33, 36, 43. For example, the court conceded that it could only "surmise" Mr. Epstein's motive. Doc.106 at 31. A court may not surmise or use newspaper articles to build an adverse record of contestable facts. Fed. R. Evid. 201(b); *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). Nor did the court provide the opportunity under Rule 201(e) to contest those materials. *See Bryant v. Ford*, 967 F.3d 1272, 1275 (11th Cir. 2020).

The Sanctions Order also lacks the individualized findings these sanctions demand. *Sua sponte* Rule 11 sanctions require a "higher standard" that is "akin to contempt." *Kaplan*, 331 F.3d at 1255. Inherent-power sanctions require proof of each person's subjective bad faith. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1224-25 (11th Cir. 2017). Yet, the court identified no false statement by either Attorney (which did not exist), no knowledge of a pre-filing agreement (which also did not exist), no direction to Government counsel (which did not occur), and no finding concerning what any individual Plaintiff knew or intended. Attributing a collective purpose to every Plaintiff and two Attorneys under these circumstances is error that merits a stay.

**D.    The Speech Injunction Is an Unconstitutional Prior Restraint and Exceeds Any Sanctions Authority.**

The injunction unconstitutionally bars the President, private Plaintiffs, federal officials, and broad categories of associated persons from "referring to" the Settlement Agreement, or "using, offering, admitting, or citing any of its provisions" in any official proceeding. Doc.106 at 47. It is so sweeping that, theoretically, Movants risk violating it merely by appealing it, which underscores how violently the Sanctions Order violates the Constitution. When a court sanctions parties for advancing a legal position and then forbids the speech necessary to challenge that sanction, your very legal system is in danger.

The Sanctions Order is a content-based prior restraint subject to a "heavy presumption" of invalidity. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). Yet, the court here did not make First Amendment findings, identify great and certain harm, or consider a narrower remedy. *See CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers). The court also admitted that the Settlement Agreement's validity and enforceability were "not before" it, Doc.106 at 47 n.63, yet it purported to dictate what parties may say about the Settlement Agreement in other tribunals. *See BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25, 532-33 (2002). That is reversible error at least twice over.

Rule 11 also forecloses the injunction. Sanctions must be "limited to what suffices to deter repetition" of the identified misconduct. Fed. R. Civ. P. 11(c)(4). The alleged violation concerned filing the Complaint; this injunction unlawfully attempts to regulate future speech about a later agreement, in unrelated proceedings, by persons never found to have done anything wrong. The Sanctions Order, including the injunction, cannot stand.

## II.    The Movants Are Suffering Irreparable Harm Right Now.

The Sanctions Order is inflicting constitutional and professional injuries that no later reversal can repair. A stay will mitigate this damage. First, the prior restraint clearly supports a stay because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud*

*v. Taylor*, 606 U.S. 522, 569 (2025) (internal quotation marks omitted). The Sanctions Order wrongly restricts the sitting President, the Government, private parties, and counsel from speaking in official proceedings about a matter of obvious public concern during an important period of public debate. Doc.106 at 47. These First Amendment injuries alone require a stay.

Second, the professional sanctions on the Attorneys inflict equally irreparable harm because the court's findings carry an immediate judicial imprimatur. Mr. Brito was referred to disciplinary authorities, tarnishing his reputation, and imposing career-altering consequences no later reversal can fully undo. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1200 n.14 (11th Cir. 1985) (disciplinary action "portends adverse effects upon counsel's careers and public image"). A stay would suspend the force of those findings and prevent the harm from compounding during appellate review. In addition, the separate one-year *pro hac vice* ban against Mr. Epstein may run its full course before appellate review concludes, making reversal hollow without a stay. Doc.106 at 47.

A stay is warranted to prevent the continuation of irreparable harm. The gag order suppresses protected speech and petitioning *now*. The *pro hac vice* ban restricts counsel's practice *now*. The bar referral inflicts professional stigma and collateral consequences *now*. The fee proceeding is derivative of and intertwined with the wrongful Sanctions Order. Every day the Sanctions Order remains

20

operative expands its dangerous chilling effect on lawyers asked to advocate disputed or politically charged positions.

## III.    The Public Interest Supports a Stay of the Sanctions Order and Related Proceedings.

The public interest strongly favors suspending the Sanctions Order because it punishes legal advocacy, suppresses speech, improperly disciplines counsel without due process, and restricts Plaintiffs and the Government in future official proceedings.   A stay will preserve meaningful appellate review and prevent irreversible harm while this Court considers the appeal.

*First*, the Sanctions Order threatens the legal profession by turning good-faith advocacy into a disciplinary risk.  *Sua sponte* sanctions imposed without notice, admissible evidence, or individualized findings threaten lawyers with the possibility that politically charged arguments exposes them to punishment whenever a court disagrees.  The Sanctions Order does nothing to advance the law or to articulate ethical principles for the bar.  It is, instead, a rebuke of well-researched, remedial federal litigation—issued because the court disagreed with the theory and its proponents.  That threat extends far beyond Movants; it chills advocacy, weakens adversarial testing, and stunts the development of the law.  *See Buckler*, 634 F. App'x at 697.  A stay prevents that chilling effect from taking root, while this Court reviews and likely reverses the Sanctions Order.

21

*Second*, the injunction categorically forbids Movants from even "referring to" the Settlement Agreement, and separately bars any use of its provisions in official proceedings. Doc.106 at 47. That gag order wrongly silences the sitting President, the Government, private parties, and counsel on a matter of obvious public concern at a politically consequential moment—and denies the public the right to hear their views. *See Capital Cities*, 463 U.S. at 1304. The right to petition is "one of the most precious of the liberties safeguarded by the Bill of Rights." *Int'l Brotherhood of Teamsters Local 947 v. NLRB*, 66 F.4th 1294, 1306 (11th Cir. 2023). The decision below unlawfully suppresses public debate, constrains government advocacy, and dictates what future tribunals may hear.

*Third*, the public has a fundamental interest in sanctions imposed through fair, careful, and neutral procedures. Due process preserves "both the appearance and reality of fairness," and the public conviction "that justice has been done." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). The proceedings here delivered the opposite: undisclosed theories, baseless accusations of bad faith, and career-altering sanctions—rushed out just two days before then-Acting Attorney General Blanche's confirmation hearing, in an opinion littered with obvious legal, factual, and technical

errors.  The timing—which some have regarded as "suspicious,"[3] coupled with the opinion's unusual error rate—risks "undermining the public's confidence in the judicial process."  *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).  The public interest in impartial justice strongly favors a stay while this Court carefully considers the court's errors.

*Finally*, the stay should extend to the derivative fee proceedings.  This Court has pendent appellate jurisdiction over the fee entitlement issue, which is "inextricably intertwined" with the appealable and erroneous Sanctions Order.  *See Tillis v. Brown*, 12 F.4th 1291, 1297 (11th Cir. 2021).  Here, any fee award rises or falls with the Sanctions Order, and litigating the amount while this Court reviews the predicate, erroneous bad-faith finding would be wasteful.

The public interest decidedly favors a stay of all further proceedings in the district court pending review and reversal by this Court.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court grant a stay of all proceedings pending appeal.

---

[3] Michael A. Fragoso, *Blanche, Cornyn, and the Weaponization Fund*, National Review (July 22, 2026), https://www.nationalreview.com/bench-memos/blanche-cornyn-and-the-weaponization-fund/.

August 12, 2026

Respectfully submitted,


Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com

*/s/ Christopher G. Oprison*
Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Rachel A.H. Horton
DLA Piper LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
rachel.horton@dlapiper.com

*Counsel for Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

I hereby certify, on this 12th day of August 2026, that this motion complies with the Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.      This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this motion contains 5,200 words.

2.      This motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Times New Roman.

*/s/ Christopher G. Oprison*
Christopher G. Oprison

August 12, 2026

No. 26-12692

IN THE

# United States Court of Appeals for the Eleventh Circuit

PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC,

*Plaintiffs-Appellants*,

ALEJANDRO BRITO, DANIEL EPSTEIN,

*Interested Parties-Appellants*,

v.

INTERNAL REVENUE SERVICE, U.S. DEPARTMENT OF THE TREASURY,

*Defendants*,

THIRTY-FIVE FORMER FEDERAL JUDGES,

*Interested Parties-Appellees.*

On Appeal from the United States District Court for the Southern District of Florida, Case No. 1:26-CV-20609, District Judge Kathleen M. Williams

**DECLARATION OF CHRISTOPHER G. OPRISON IN SUPPORT OF TIME SENSITIVE MOTION FOR STAY OF SANCTIONS ORDER AND FEE PROCEEDING BY APPELLANTS PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC, ALEJANDRO BRITO, AND DANIEL EPSTEIN**

*(Counsel's Information on Inside Cover)*

Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
(305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
(610) 405-5531
jhalpern@jhlegalpllc.com

Rachel A.H. Horton
DLA PIPER LLP (US)
1650 Market Street
Suite 5000
Philadelphia, PA 19103
(215) 656-3300
rachel.horton@dlapiper.com

*Counsel for Appellants President Donald J. Trump,*
*Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC,*
*Alejandro Brito, and Daniel Epstein*

## DECLARATION

I, Christopher G. Oprison, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, and Appellants Alejandro Brito and Daniel Epstein ("Attorneys," and, together with Plaintiffs, "Movants").  I submit this declaration in support of Movants' Time Sensitive Motion for Stay of the Sanctions Order and Fee Proceeding pending appeal (the "Motion").

2.    A true and correct copy of the Sanctions Order that is being appealed is attached hereto as **Exhibit A**, *Trump, et al. v. I.R.S., et al.*, No. 26-CV-20609, Doc.106 (S.D. Fla. July 13, 2026).

3.    Defendants Internal Revenue Service and U.S. Department of the Treasury advised they would not oppose the Motion.  It is anticipated that the 35 former judges that filed an opposition to Movants' stay request in the District Court will oppose the Motion.

4.    Plaintiffs filed the Complaint on January 29, 2026, pursuant to 26 U.S.C. § 7431, seeking damages for the unauthorized disclosure of their confidential tax return information by former IRS employee-contractor Charles Littlejohn.

5.    A true and correct copy of the Complaint is attached hereto as **Exhibit B**, *Trump, et al. v. I.R.S., et al.*, No. 26-CV-20609, Doc.1 (S.D. Fla. Jan. 29, 2026).

6. Plaintiffs voluntarily dismissed the action with prejudice on May 18, 2026, and the case was closed. Doc.52; Doc.62. On May 27, 2026, 35 former judges moved under Federal Rule of Civil Procedure 60 to improperly reopen the case, without seeking Rule 11 sanctions, professional discipline, monetary penalties, a bar referral, or an injunction. Doc.63.

7. On May 29, 2026, the District Court directed "Plaintiffs [to] file a response to the Motion (DE 63) on or before June 12, 2026, detailing their position on the matters set forth in the Motion, including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.' (DE 63 at 13, citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2870 (3d ed.))." Doc.65 at 3.

8. A true and correct copy of the Court's May 29 Order is attached hereto as **Exhibit C**, *Trump, et al. v. I.R.S., et al.*, No. 26-CV-20609, Doc.65 (S.D. Fla. May 29, 2026).

9. On July 31, 2026, Movants filed a timely notice of appeal, and filed an expedited motion seeking a stay of the District Court proceedings. Doc.113; Doc.114.

10. The District Court refused to afford expedited consideration to the motion to stay. Doc.120.

11. A true and correct copy of the Court's August 5 Order is attached hereto as **Exhibit D**, *Trump, et al. v. I.R.S., et al.*, No. 26-CV-20609, Doc.120 (S.D. Fla. Aug. 5, 2026).

12. For the reasons explained in the accompanying Motion, Movants respectfully request a stay of the Sanctions Order and the derivative fee proceedings pending appeal. The Sanctions Order is operative now, and continues to unlawfully and wrongly restrain speech, restrict counsels' practice, and inflict professional stigma. Defendants do not oppose the requested relief, and the underlying action has been dismissed with prejudice. As a result, preserving the *status quo ante* would not require any party to relinquish a right or alter its conduct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 11th day of August, 2026.

/s/ Christopher G. Oprison
Christopher G. Oprison
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
chris.oprison@dlapiper.com

*Counsel for Appellants President
Donald J. Trump, Donald J. Trump Jr.,
Eric Trump, The Trump Organization,
LLC, Alejandro Brito, and Daniel
Epstein*

4

# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

     Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

     Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on Plaintiffs' response to the Court's May 29, 2026, Order on the non-party movants' Motion for Relief from Judgment or Order, or, in the Alternative, for Leave to Appear as *Amici Curiae* (DE 89).[1]

On May 27, 2026, thirty-five non-party movants filed a Motion for Relief from Judgment or Order (DE 63), in which they requested this Court to set aside its dismissal pursuant to Rule 60 because the case, and its purported settlement, is "a fraud on the Court." (*Id.* at 6). The non-party movants highlighted the atypical way the litigation had unfolded and argued that the purported settlement reached in this matter "is a product of collusion." (*Id.* at 9). In light of those serious allegations and the Court's own view of the unusual circumstances of the case, the Court entered an Order on May 29, 2026, (the "***May 29 Order***") (DE 65), directing Plaintiffs to detail their position as to various issues, "including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and

---

[1] Throughout this Order, the Court uses the CM/ECF pagination rather than the document pagination.

(3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" (DE 65 at 3). On June 12, 2026, Plaintiffs responded to the May 29 Order. (DE 89). The non-party movants filed a reply on June 19, 2026. (DE 94).

In the very first paragraph of the Complaint, Plaintiffs introduce their claims stating, "President Trump served as the 45th President of the United States, and is the 47th President of the United States." (DE 1 ¶ 1). They then go on to state that "President Trump brings this suit in his personal capacity." (*Id.*) After a review of the record, and the Parties' statements, the Court declines to adopt or accept the credulous exercise of divorcing President Trump's current job title from an understanding of what happened here.

But perhaps the most startling misstatement[2] advanced by Plaintiffs is their characterization of this case as "ordinary." (DE 89 at 9). The Parties here are not private actors to a mine-run dispute, recounting their proficiency in the art of the deal they negotiated. Lead Plaintiff and Defendants are public servants—the pinnacle of the Executive Branch—sworn to uphold the law, faithfully perform the duties of their office, and protect the interests of the American public. The issue before the Court is whether, instead, they ignored ethical norms, court rules, and legal authority to manipulate the judicial process. The issue is whether they did so to gild their efforts to gain unprecedented access to the public fisc with the patina of legitimacy. There is nothing "ordinary" about this case; it is the very definition of *sui generis.*

---

[2] Plaintiffs also—with no apparent sense of irony—criticize the non-party movants' political motivations, their previous disinterest in the case, and their purported inappropriate promotion of "abstract grievance[s]." (DE 89 at 10).

## I.   BACKGROUND[3]

On September 29, 2023, the Department of Justice ("**DOJ**") charged Charles Edward Littlejohn ("**Mr. Littlejohn**") with illegal disclosure of "[tax] information associated with Public Official A and thousands of the nation's wealthiest people," in violation of 26 U.S.C. § 7213(a)(1). Information, *United States v. Littlejohn*, No. 23-cr-00343, DE 1 (D.D.C. 2023).[4] It was subsequently revealed that Mr. Littlejohn worked as a contractor for Booz Allen Hamilton Inc. ("**Booz Allen**") which, in turn, maintained a contract with the Internal Revenue Service ("**IRS**") to perform certain work for the agency.[5] During his plea hearing on October 12, 2023, Mr. Littlejohn identified President Donald Trump ("**President Trump**") as the "high-ranking government official" at issue, whose tax

---

[3] The Court *sua sponte* takes judicial notice of articles reporting on relevant events attendant to this case, dockets of other cases, and statements the Parties made. *See* FED. R. EVID. 201(c); *Griffin v. Verizon Commc'ns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018) ("Courts typically take judicial notice of record documents from other judicial proceedings."). The Court incorporates these sources to provide an overview of the architecture of this litigation. Moreover, the Department of Justice has directed courts to look to unsworn public statements as binding party admissions. *See Floyd v. Dep't of Just.*, No. 26-cv-01399, DE 62 at 4, n.1 (E.D. Va. filed June 5, 2026) ("Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.") (citing FED. R. EVID. 201(b)(2)); *see also Citizens for Resp. and Ethics in Wash. v. Dep't of Just.*, No. 26-cv-01789, DE 15 at 4, n.1 (D.D.C. filed June 5, 2026) (same). The Court will do so here.

[4] The illegal disclosures of tax information all transpired during President Trump's first term. During this period, Charles Rettig was Commissioner of the IRS and Steven Mnuchin was the Secretary of the Treasury Department. *See Nomination of Charles P. Rettig to be Comm'r of Internal Revenue, 115th Cong.* (2018), https://www.congress.gov/nomination/115th-congress/1620; *Nomination of Steven T. Mnuchin to be Sec'y of the Treasury*, 115th Cong., 1st Sess., Vote No. 63 (Feb. 13, 2017), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1151/vote_115_1_00063.htm. Mr. Littlejohn's prosecution, however, was undertaken in 2023 during the administration of President Joseph R. Biden.

[5] Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024, at 22:13 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

information was illegally disclosed to news organizations like the New York Times and ProPublica. *Transcript of Plea Agreement Hearing* at 10, *United States v. Littlejohn*, No. 23-cr-00343, DE 13 (D.D.C. Oct. 23, 2023). The following exchange took place during the October 12, 2023, plea colloquy:

> **THE COURT:** Before I go on to accept or not accept this plea, **are there any victims or their representatives here today** that would like to exercise their rights to be reasonably heard under the Crimes Victims' Right Act?
>
> **MS. ALINA HABBA:** Yes, Your Honor.
>
> **THE COURT:** Please come up.
>
> **MS. ALINA HABBA:** Thank you, Your Honor, for the opportunity to be heard. As an attorney, I find that I should probably state I am not licensed in this state, in the District of Columbia. **I'm here on behalf of President Trump who was a victim**, as we just heard, of this atrocity.

*Id.* at 14.

On January 29, 2024, Mr. Littlejohn was sentenced to sixty months of incarceration, followed by thirty-six months of supervised release. *See United States v. Littlejohn*, No. 23-cr-00343, DE 35.

Subsequent to Mr. Littlejohn's disclosures, various parties sued Mr. Littlejohn, Booz Allen, the IRS, and the United States Department of the Treasury ("***Treasury Department***") for damages pursuant to 26 U.S.C. § 7431.[6] This statute confers a private right of action on individuals whose tax returns were improperly inspected or disclosed. *See* 26 U.S.C. § 7431. However, any action arising under this statute must be brought "within 2 years after the date of discovery by the plaintiff of the unauthorized inspection

---

[6] These cases include: (1) *Griffin v. Internal Revenue Serv.*, No. 22-cv-24023 (S.D. Fla. filed Dec. 13, 2022); (2) *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); (3) *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139 (D. Md. filed Jan. 14, 2025); and (4) *Scott v. Booz Allen Hamilton, Inc.*, 26-cv-00845 (M.D. Fla. filed Mar. 23, 2026).

or disclosure." 26 U.S.C. § 7431(d). The statute provides for damages, including "$1,000 for each act of unauthorized inspection or disclosure[.]" 26 U.S.C. § 7431(c)(1). In these actions, where the IRS or Treasury Department was named as a party, the DOJ zealously defended the government by challenging the timeliness of the plaintiffs' claims; disputing whether damages had been correctly calculated; and denying that the government could be held liable under § 7431 because the unlawful disclosures at issue were made by "a [Booz Allen] employee working on IRS contracts," and not an officer or employee of the United States. United States' Mot. To Dismiss, *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139, DE 31 (D. Md. filed July 23, 2025). In every case naming the government as a defendant, the DOJ engaged in a vigorous defense.[7]

That is, every case until the instant litigation.

This Complaint was filed on January 29, 2026—two years and three months after Ms. Habba's appearance at Mr. Littlejohn's plea hearing—by Plaintiffs President Trump ("***Lead Plaintiff***"), Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC (collectively, "***Plaintiffs***") against the IRS and the Treasury Department (collectively, "***Defendants***" or "***Government***"). Because Defendants are government agencies, they are afforded sixty days from the date that the United States Attorney was served to file an answer or responsive pleading. *See* FED. R. CIV. P. 12(a)(2). However, on April 17, 2026, three days before the sixty-day period lapsed, Plaintiffs filed a Consent Motion for a 90-day Extension ("***Consent Motion***") to relieve Defendants of their obligation to file a responsive pleading to the Complaint "while the Parties engage[d] in discussions

---

[7] In two related cases, the IRS and Treasury Department were not named as parties. *See, e.g.*, *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); *MacNeil v. Booz Allen Hamilton, Inc.*, No. 25-cv-00963 (D. Md. filed Mar. 24, 2025).

designed to resolve this matter and avoid protracted litigation." (DE 40 at 2). The Consent Motion also represented that Daniel Epstein, co-counsel for Plaintiffs, conferred with counsel for Defendants, and Defendants consented to the requested extension. (DE 40 at 3). Counsel for Defendants was not identified. Other than the Complaint and Notice of Voluntary Dismissal, this was the only pleading filed by any party in this matter before dismissal.[8]

At this point, because the Court had serious concerns about whether it had subject matter jurisdiction in a case where the Lead Plaintiff ostensibly had direct, unassailable control over Defendants, it ordered the Parties to file memoranda of law on this issue by May 21, 2026. (DE 41). The Court then appointed *amici curiae* "to assist the Court in identifying the applicable law governing an analysis" of its subject matter jurisdiction. (DE 43). The *amici* were also directed to file a memorandum of law by May 21, 2026. (*Id.*) On May 14, 2026, the court-appointed *amici* filed their memorandum. (DE 45). Neither Party to this action, however, filed any pleading to address the Court's concerns.

Instead, on May 18, 2026, Plaintiffs filed a two-page Notice of Voluntary Dismissal with Prejudice ("**Notice of Dismissal**") (DE 52), where Plaintiffs stressed that the Notice of Dismissal automatically divested the Court of jurisdiction.[9] Subsequently, the DOJ

_____

[8] The Court notes that various non-parties have filed motions to appear as *amici curiae*. For example, on February 5, 2026, one week after the Complaint was filed, a Motion for Leave to File Brief as *Amici Curiae* was filed by Former Government Officials and Public Interest Organizations. (DE 7). On February 12, 2026, another Motion for Leave to file a Brief as *Amici Curiae* was filed by Citizens for Responsibility and Ethics in Washington and Public Citizen. (DE 15). Because the latter motion indicated that, based on conferral, Plaintiffs were opposed to the motion, the Court entered an order giving Plaintiffs two weeks, until February 25, 2026, to file a memorandum in opposition. (DE 27). No opposition was filed, however, and the motions were granted by default. (DE 28).

[9] Plaintiffs argued that "a Rule 41(a)(1)(A) dismissal is self-executing, terminates the action upon filing, and divests the district court of jurisdiction" and stated that "the [N]otice

issued a press release about a "settlement" that had been reached in this matter, and published what purported to be the "settlement agreement" (the "***settlement agreement***") signed by lawyers for both Plaintiffs and Defendants.[10] In this document, the Parties referenced the instant litigation and claimed that, "[i]n the interest of resolving the dispute between the parties," they stipulated and agreed to certain terms, which included "a formal apology from the United States" to Plaintiffs, along with the creation of an "Anti-Weaponization Fund."[11] The Anti-Weaponization Fund, ostensibly set up "to provide a systematic process to hear and redress claims of [individuals] who suffered weaponization and lawfare," was to be financed by the Treasury Department's Judgment Fund in the amount of $1.776 billion dollars.[12]

The day after the dismissal, Acting Attorney General Todd Blanche testified before Congress.[13] In response to a question as to why the "settlement agreement" had not been

---

does not require judicial action." (DE 52 at 1). They emphasized that "no judicial analysis is appropriate." (*Id.* at 2).

[10] *Settlement Agreement, Trump v. Internal Revenue Serv.*, U.S. DEP'T OF JUSTICE (May 18, 2026), https://www.justice.gov/opa/media/1441201/dl?inline. At the same time that the DOJ publicized the "settlement agreement," the Treasury Department's General Counsel, Brian Morrissey, announced his resignation. Andrew Duehren, *Top Treasury Lawyer Resigns After Creation of 'Anti-Weaponization Fund'*, N.Y. TIMES (May 18, 2026), https://www.nytimes.com/2026/05/18/business/anti-weaponization-fund-brian-morrissey-treasury.html.

[11] *Id.*

[12] Press Release, U.S. Dep't of Justice, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund. The Court notes that the DOJ previously established a "Weaponization Working Group" in February 2025. Memorandum from the Att'y Gen. to All Dep't Emps., *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline.

[13] *A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice: Hearing Before the Subcommittee. on Commerce, Justice, Sci., & Related Agen-*

provided to this Court for review, he replied that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the "settlement agreement."[14] On that same day, Acting Attorney General Blanche issued an "order" (the "**Release Order**") which referenced the "settlement agreement" and released the President, his relatives, companies, and affiliates from "any and all claims, counterclaims, [and] causes of actions" that "have been or could have been asserted" against Plaintiffs that arise out of "(1) any matters that were raised or could have been raised in the Case or the Pending Agency Claims; (2) Lawfare and/or Weaponization; (3) any matters currently pending or that could be pending (including tax returns filed before the Effective Date) before Defendants or other agencies or departments."[15] Unlike the "settlement agreement," which was signed by purported representatives of both Plaintiffs and Defendants, only Acting Attorney General Blanche's signature was on the Release Order.[16] Also on that day, it was reported that IRS officials had prepared a 25-page memorandum[17] that outlined major flaws with Plaintiffs' claims and listed the various

---

*cies of the S. Comm. on Appropriations*, 119th Cong. (2026) (statement of Todd Blanche, Acting Att'y Gen., U.S. Dep't of Justice), https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2027-budget-request-for-the-department-of-justice.

[14] *Id.*

[15] Order of the Att'y Gen., U.S. Dep't of Justice (May 19, 2026), https://www.justice.gov/opa/media/1441216/dl.

[16] *Id.*

[17] Andrew Duehren, *The IRS Thought It Could Fight Trump's Lawsuit, but It Reached a Deal Anyway*, N.Y. TIMES (May 19, 2026), https://www.nytimes.com/2026/05/19/admin/irs-trump-lawsuit-deal.html. The actual memorandum has yet to be published by the Government.

defenses that could be advanced on behalf of Defendants, defenses that had been raised in other litigation arising from the disclosures.[18]

On June 2, 2026, in testimony before the United States House of Representatives, Acting Attorney General Blanche advised that the Anti-Weaponization Fund would not be moving forward.[19] He did not, however, commit to a similar termination of the audit and immunity protections set forth in his Release Order. Six days later, President Trump nominated Mr. Blanche to permanently serve as Attorney General of the United States.

## II.    DISCUSSION

As it must, the Court begins with jurisdiction. *See Leedom Mgmt. Grp., Inc. v. Perlmutter*, 532 F. App'x 893, 895 (11th Cir. 2013) (explaining that courts must "always address threshold jurisdictional issues first, since [a court] cannot reach questions that [it] never had jurisdiction to entertain."). Typically, a voluntary dismissal filed under Rule 41(a) divests the court of its jurisdiction over the merits of a case. *See Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1278 (11th Cir. 2012); *see also Absolute Activist Value Master Fund v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021) (citations and quotation marks omitted). But a voluntary dismissal does not deprive the court of authority to resolve issues collateral to the merits. *Absolute Activist Value Master Fund*, 998 F.3d at 1266. Among these collateral issues are those relating to Rule 11 sanctions. *Id.* (noting that "it

---

[18] The Court notes that in a subsequent response to a Freedom of Information Act request by Citizens for Responsibility and Ethics in Washington, the DOJ stated that there were no "responsive records within the Civil Division pertaining to [this litigation]." Letter from Brian Flannigan, Div. Couns. for Recs. & Info., Civ. Div., U.S. Dep't of Just., to Kayvan Farchadi, Citizens for Resp. & Ethics in Wash. (June 3, 2026).

[19] Hailey Fuchs & Jordain Carney, *Anti-Weaponization Fund Is Dead, Acting AG Says*, POLITICO (June 2, 2026), https://www.politico.com/news/2026/06/02/todd-blanche-anti-weaponization-fund-00947083. As the article notes, Acting Attorney General Blanche refused to commit to the termination of the Anti-Weaponization Fund in writing.

is clear that even when a voluntary dismissal disposes of an entire action, district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards."); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("As the violation of Rule 11 is complete when the paper is filed, . . . a voluntary dismissal does not expunge the Rule 11 dismissal.") (citations and quotation marks omitted).

"Although [the Eleventh Circuit] call[s] these issues 'collateral,' that doesn't make them any less important." *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020). "Many involve the power to enforce compliance with the rules and standards that keep the judiciary running smoothly." *Id.* Indeed, "[w]ithout them, abuses of the judicial system would go unchecked, burdening courts and individuals alike with needless expense and delay." *Id.* (quotation marks omitted). "And that's not just a matter of procedure." *Id.* Consequently, the Court will examine the matters raised in the non-parties' motion under the rubric of Rule 11 because the issues are collateral and their resolution is essential to assuring the integrity of the Court's jurisdiction and process. *See id.* (explaining that a court retains jurisdiction over collateral matters to "ensure that justice is done."); *Baker v. Alderman*, 158 F.3d 516, 523 (11th Cir. 1998) ("Rule 11 motions are collateral to an action and are not barred if filed after a dismissal order, or after entry of judgment.").

In order to examine whether Plaintiffs brought this case for an improper purpose, the Court must consider and "inevitably decide" the question posed to the Parties in its April 24, 2026, Order: is there a case or controversy presented in this litigation. *See Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1328 (11th Cir. 2018) ("We recognize that merits and jurisdiction will sometimes come intertwined . . . If . . . the

district court's resolution of the jurisdictional questions . . . requires it to inevitably decide some, or all, of the merits issues, so be it.") (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017)) (quotation marks omitted). Although jurisdiction ordinarily precedes the merits, a court may consider both where, as here, jurisdiction overlaps with the merits. *See Brownback v. King*, 592 U.S. 209, 217 (2021) (explaining that "the merits and jurisdiction will sometimes come intertwined, and a [district] court can decide all . . . of the merits issues in resolving a jurisdictional question, or vice versa.") (citations and quotation marks omitted); *Gutrejman v. United States*, 596 F. Supp. 3d 1, 8 (D.D.C. 2022) ("[T]he Court must resolve a jurisdictional defense . . . before resolving the two merits defenses . . . , but the Court's resolution of that jurisdictional defense will require the Court to address the merits as well."); *Jakubowicz v. Islamic Rep. of Iran*, No. 18-1450, 2022 WL 3354719, at *7 (D.D.C. Aug. 9, 2022) (addressing both standing and the merits and noting that "it is not uncommon for courts to consider jurisdiction and the merits together"); *Force v. Islamic Rep. of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020) ("Although courts must, in general, resolve jurisdictional questions before reaching the merits, in the present context, the questions of jurisdiction and the merits merge. The jurisdictional test and the federal cause of action are, in relevant respects, the same[.]") (citation omitted).

## A. *Justiciability: Case or Controversy*

"Judicial Power . . . is the power of a court to decide and pronounce a judgment and carry it into effect between . . . parties who bring a case before it for decision." *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (citation and quotation marks omitted). Article III, Section 2 of the United States Constitution confines judicial power to matters that

present a case or controversy. U.S. CONST. art. III, § 2, cl. 1. This precept exists as the defining principle for the federal judiciary. *See Lord v. Veazie*, 49 U.S. 251, 255 (1850)*; see also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–41 (1937). Indeed, the Framers, relying on their knowledge of English law and practice, did not intend for Article III to empower federal judges to hear every possible dispute brought before them.[20] Thus, the terms "case" and "controversy" mark the threshold of federal judicial power.

The case or controversy requirement imposes two important limitations on the federal judiciary. First, the requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Second, the requirement ensures that "the federal courts will not intrude into areas committed to the other branches of government." *Id*. at 95. "Federal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Id*. at 97. "Whenever the claim or contention of a party takes such a form that the judicial power is capable of acting upon it, then it has become a case [or] controversy." *Smith v. Adams*, 130 U.S. 167, 173–74 (1889).

---

[20] *See* CONST. ANNOTATED, art III, § 1.2, *Historical Background on Judicial Review*, https://constitution.congress.gov/browse/essay/artIII-S2-C1-2/ALDE_00001243/   (last visited on July 13, 2026) (discussing three occurrences in 1787 where the Framers declined to expand federal judiciary power).

## 1.  Adverseness is a Prerequisite to Article III Jurisdiction.

The "judicial power conferred by the Constitution" grants the federal judiciary "the right to determine actual controversies arising between **adverse litigants**, duly instituted in courts of proper jurisdiction." *Muskrat*, 219 U.S. at 361 (emphasis added). A justiciable controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. of Hartford, Conn.*, 300 U.S. at 240–41. Adverseness is essential to a federal court's ability to adjudicate the merits of a case where federal courts are restricted to "questions presented in an adversary context[.]" *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 382 (1980) (noting that adverseness "sharpens the presentation of issues"). Indeed, "[e]ven when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *United States v. Windsor*, 570 U.S. 744, 760 (2013) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).[21]

---

[21] In *Windsor*, the United States refused to pay the plaintiff a real estate tax refund due to § 3 of the Defense of Marriage Act's definition of marriage, despite acquiescing to the plaintiff's position that § 3 of the Act was unconstitutional. 570 U.S. at 753, 756. As the Court reasoned, "Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction." *Id.* at 758. Plaintiffs fail to acknowledge that there was a controversy in *Windsor* precisely because the plaintiff did not control the actions of the defendant, as Lead Plaintiff does here, and therefore could not secure the refund to which she was entitled. *See infra* pp. 17–38. Here, Plaintiffs do have the ability to control the "stakes" of the litigation and determine whether Defendants can or will give Plaintiffs the relief they seek independent of a judicial determination or statutory amendment. The decision in *Windsor* addressed the argument of when adverseness ceases and not whether adverseness exists as a threshold matter due to the relationship of the parties.

For more than a century, the Supreme Court has recognized the adverseness requirement. *See Veazie*, 49 U.S. at 255. In *Veazie,* a defendant, and his brother-in-law entered into a contract to institute a lawsuit that would procure a favorable court opinion as to land rights. *Id*. at 254. After examining the record, the *Veazie* court determined that there was no real conflict of interest between the parties because their interests regarding the issue of law were "one and the same[.]" *Id.* In fact, the *Veazie* court declared that "any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehened [sic], and treated as a punishable contempt of court." *Id*. at 255. *Veazie* recognized that even where parties may work together to avoid the expense of litigation, there still must be a "real dispute between the parties concerning some matter of right." *Id.*

The Supreme Court repeated and reinforced the adverseness requirement in *Muskrat*. In *Muskrat*, several plaintiffs endeavored to halt the enforcement of legislation that affected their land rights. 219 U.S. 346, 349 (1911). The plaintiffs initiated the suit at the behest of Congress who authorized the plaintiffs to sue the United States on behalf of themselves and others with similar interests. *Id*. at 350. Aware of Congress's acquiescence to the suit, the *Muskrat* court nonetheless questioned its jurisdiction to entertain the proceeding. *Id*. at 351. The court there noted that "[t]he term ['case'] implies the existence of present or possible adverse parties, whose contentions are submitted to the court for adjudication." *Id*. at 357. After examining precedent establishing the limits of judicial power, the *Muskrat* court determined that the parties did not present a case or

controversy as contemplated under the Constitution. *Id*. The Supreme Court was not persuaded by the fact that the United States was named as a party defendant where the government did not have an interest adverse to the plaintiffs. *Id*. As a result, the Court held that, without sufficient adverseness between the parties, the action presented "no justiciable controversy" to be determined by the court. *Id*. at 363.

The decisions in *Veazie* and *Muskrat* establish beyond cavil that adverseness between litigants is a constitutional minimum that must be satisfied in every federal case seeking judicial determination. "[T]here is no Art. III case or controversy when the parties desire 'precisely the same result[.]'" *GTE Sylvania, Inc.*, 445 U.S. at 383 (quoting *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)); *see also NLRB v. Constellium Rolled Prod. Ravenswood, LLC*, 44 F. 4th 395, 398 (4th Cir. 2022) (finding that the parties lacked adverseness where any judicial determination by the court "would only rubberstamp an agreement that the parties memorialized in writing and consummated before ever arriving on a federal court's doorstep"). Moreover, the adverseness requirement "subsists through all stages" of a federal judicial proceeding. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citations omitted). Therefore, a federal court must revisit the case or controversy inquiry as often as it deems necessary. *Id*.; *see also Hartfield v. King*, 184 U.S. 162, 165 (1902) (noting that "it is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties") (citations omitted).

Adverseness is not determined merely by affixing the labels "plaintiff" and "defendant" to the parties. *See Muskrat*, 219 U.S. at 361 (declining to find adverseness although the United States was a named defendant where the record revealed that the

United States' interest was not adverse to that of the plaintiffs). Courts must look beyond names and titles to determine whether a justiciable case or controversy is presented. *See e.g.*, *Cleveland v. Chamberlin*, 66 U.S. 419, 425 (1861) (dismissing an appeal where one party was in fact both appellant and appellee); *United States v. Interstate Com. Comm'n*, 337 U.S. 426, 430 (1949) (acknowledging that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.").

With this principle in mind, a court must consider whether "one party is actually and formally in control of the other party," and if so, "adjudication may be refused." 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026). Put another way, a court must determine whether a single party acts as the "*dominus litis*"—the "master" or owner of the suit—on both sides of the litigation. *See South Spring Hill Gold-Min. Co. v. Amador Medean Gold-Gold-Min. Co.*, 145 U.S. 300, 301–02 (1892) (determining that the litigation "ceased to be between adverse parties" where control of the corporations on both sides "had come into the hands of the same persons," causing the plaintiff to become the "*dominus litis*" on both sides); *see also Veritas Vincit v. Brown*, No. 24-cv-00079, 2024 WL 3543414, at *6 (E.D. Tex. July 25, 2024) ("The Court finds that Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and [Defendant Reticulum], necessitating [Defendant] Reticulum's dismissal from the present case."). Courts "do not engage in the academic pastime of rendering judgments in favor of persons against themselves." *Interstate Com. Comm'n*, 337 U.S. at 430. Consonant with the general principle that "no person may sue himself[,]" adverseness is lacking where one party controls the other party. *Id*.; *see Dasma Inv., LLC v. Realty*

*Assoc. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 (2006) ("It is undisputed that Ms. Padron controls both Dasma and PWC[] . . . Insofar as an action between Dasma and PWC is concerned, therefore, the necessary adversity under Article III of the Constitution is lacking."); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023) (allowing an appeal to proceed where "both parties [had] a real interest in the legal positions" they advanced, and "nothing in the record establishe[d] that Monsanto control[led] [plaintiff] or his representation"); *id.* at 1269 (Jordan, J. concurring) ("In principle it is easy to see why an important constitutional issue should not be determined in a proceeding in which one nominal party has dominated the conduct of the other.") (citing Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 96 (7th ed. 2015)).

### 2. The Parties Were Not Sufficiently Adverse to Satisfy Article III's Case or Controversy Prerequisite.

The Complaint purports to present a controversy between Plaintiffs—President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and the Trump Organization, LLC— and Defendants—the Internal Revenue Service and United States Treasury Department—claiming Defendants caused Plaintiffs reputational and financial harm for which they now seek "at least $10,000.000,000.00." (DE 1 ¶ 11; *Id.* at 26). At first glance, the Complaint seemingly satisfies Article III by establishing causes of action "arising under . . . the laws of the United States[.]" U.S. CONST. ART. III, § 2. However, closer examination reveals that a justiciable case or controversy is absent; Plaintiffs and Defendants are not adverse because one party controls this litigation. *See Muskrat*, 219 U.S. at 361 (noting that judicial power only extends to "actual controversies arising between adverse litigants[.]"). In reaching this conclusion, the Court determines that Plaintiffs improperly

employed this lawsuit to justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations—which was accomplished by leveraging control over Defendants.

   a.   *There is No Case or Controversy Because One Party Controls This Litigation.*

President Trump is Chief of the Executive Branch, *see* U.S. CONST. Art. II, § 1 (the "***Vesting Clause***"), and the Vesting Clause is the bedrock of his authority over that branch of government. *Id*. Specifically, the Vesting Clause states that "The executive Power shall be vested in a President of the United States of America." *Id*.; *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 496–97 (2010) ("[T]he President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it,' because Article II 'makes a single President responsible for the actions of the Executive Branch.'") (citing *Clinton v. Jones,* 520 U.S. 681, 712–13, (1997)); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("The entire executive Power belongs to the President alone.") (citation and quotation marks omitted). Indeed, just recently, the Supreme Court cited *Myers v. United States*, 272 U.S. 52, 133 (1926) as a "landmark decision" and "perhaps our best word on the subject" of whether the President could remove subordinates in government service at will. *Trump v. Slaughter*, 609 U.S. __, slip op. at 16 (2026). Finding that he could, the majority ruled that "[s]ubordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people." *Id.* at 36. "[T]hese officers exercise the *President's* power, not their own, and thus must be *responsible* to him." *Id.* at 35 (emphasis in original).

Here, Defendants are the Treasury Department—an Executive agency—and the IRS, the largest bureau of the Treasury Department. Both Defendants are unquestionably part of the Executive Branch and ultimately answer to its Chief Executive, President Trump. President Trump's authority to appoint and remove federal officers as he sees fit is evidence of his ability to exercise control over Defendants. *See* U.S. CONST. ART. II, § 2. Article II explicitly states that "[t]he President shall . . . appoint . . . all Other Officers of the United States, whose Appointments are not herein otherwise provided for[.]" *Id.*; *see also Cunningham v. Neagle*, 135 U.S. 1, 63 (1890) (noting that the ministerial officers are marshals of the United States who are "appointed by the president," and are "removable from office at his pleasure[.]"). While the Constitution strategically allows "individual executive officials" to "wield significant authority," such "authority remains subject to the ongoing supervision and control of the elected President." *Seila Law LLC*, 591 U.S. at 200; *see also* Br. for Pet'r at 10, *Trump v. Slaughter*, 609 U.S. __ (2026) (No. 25-332) ("Article II requires that the President control all executive power—especially the authority wielded by agency heads, who are 'the most important' of the President's subordinates and who 'must be the President's alter ego[s]' in their agencies.") (citing *Myers*, 272 U.S. at 133); *id.* at 2 ("Removal is the President's indispensable tool of control."). President Trump's supervisory authority directly implicates two key individuals acting on behalf of Defendants: Scott Bessent,[22] the Secretary of the Treasury Department and Acting

---

[22] "On January 28, 2025, Secretary Bessent was sworn in as the 79th Secretary of the Treasury of the United States." *Scott Bessent*, U.S. Dept. of Treasury, https://home.treasury.gov/about/general-information/officials/scott-bessent (last visited July 9, 2026). Secretary Bessent also serves as the "Acting" Commissioner of the Internal Revenue Service. *See The Commissioner's Section*, Internal Revenue Serv., https://www.irs.gov/about-irs/the-commissioners-section (last updated Feb. 12, 2026).

Commissioner of the IRS, and Frank J. Bisignano,[23] the Chief Executive Officer of the IRS. Plaintiffs cannot argue before the Supreme Court that Executive Branch actors "unquestionably exercise[] executive power, and must therefore be controlled by the Chief Executive[,]" *Slaughter*, 609 U.S. at 27, and then here, argue that the Parties are sufficiently adverse to establish an actual case or controversy.

Secretary Bessent, in particular, is subject to President Trump's actual and direct control in *both* of his representative roles. First, as Secretary of the Treasury Department, Bessent is a member of President Trump's cabinet. In this role, Secretary Bessent is "the President's alter ego" in the matters of the Treasury Department "where the President is required by law to exercise authority." *Myers*, 272 U.S. at 133. Consequently, Bessent is under President Trump's direct control as an appointed member of his cabinet.[24]

Second, President Trump's actual control over Secretary Bessent is grounded in statute. The Internal Revenue Code establishes that in "the Department of the Treasury[,] a Commissioner of Internal Revenue . . . shall be appointed by the President[.]" 26 U.S.C. § 7803(a)(1)(A). The Internal Revenue Code also provides that, Bessent, in his role as Acting IRS Commissioner, "may be removed at the will of the President." 26 U.S.C. § 7803(a)(1)(D). President Trump employs his authority to remove the IRS commissioner, without cause, and has done so as recently as August 2025.[25] Through Secretary

---

[23] Frank Bisignano also serves as the "18th Senate-confirmed Commissioner of the U.S. Social Security Administration." *See Commissioner*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner/ (last visited July 11, 2026).

[24] *See The Executive Branch*, The White House, https://www.whitehouse.gov/government/executive-branch/ (last visited July 6, 2026) ("[T]he members of the Cabinet are often the President's closest confidants.").

[25] Nicole Markus & Brian Faler, *Billy Long Out as IRS Commissioner*, POLITICO (last updated Aug. 8, 2025), https://www.politico.com/news/2025/08/08/billy-long-irs-

Bessent, President Trump also wields significant control over CEO Bisignano, who Secretary Bessent selected to be the "first Chief Executive Officer of the Internal Revenue Service."[26] CEO Bisignano reports directly to Secretary Bessent who oversees CEO Bisignano's management of the IRS's daily operations.[27] "Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law LLC*, 591 U.S. at 224 (citing 1 Annals of Cong. 499 (J. Madison)). Therefore, not only is Secretary Bessent directed by President Trump **as his alter ego**, but the President's ability to remove him at-will, and control Bisignano through his oversight, unquestionably impedes Secretary Bessent and CEO Bisignano's ability to zealously represent the Treasury Department and IRS in a matter that is directly adverse to the President.

In addition to the Constitutional and statutory bases for President Trump's control over Defendants, President Trump's Executive Order confirms his intent to wield actual, comprehensive control over Defendants in this matter. Executive Order 14215: *Ensuring Accountability for All Agencies* ("**Executive Order**") sets out the scope and breadth of President Trump's control over federal agencies. The Executive Order was issued on February 18, 2025, shortly after President Trump took office for his second term, and

---

commissioner-trump-00500365 (noting that President Trump removed Billy Long as IRS commissioner just two months into Long's five-year tenure).

[26] *CEO Frank Bisignano*, Internal Revenue Serv., (last updated Mar. 4, 2026), https://www.irs.gov/about-irs/ceo-frank-bisignano.

[27] *See* Brian Scwartz, *Bessent Picks Social Security Chief Frank Bisignano as IRS CEO,* WALL ST. J. (Oct. 6, 2025, at 14:37 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

expands the President's oversight of federal agencies and employees.[28] Notably, the

Executive Order provides that "it shall be the policy of the executive branch to ensure

Presidential supervision and control of the entire executive branch." *Id*. § 1.

Most relevant to the issue of control in this matter is Section 7 of the Executive

Order which explicitly addresses President Trump's ability to direct Defendants' conduct

in litigation. Section 7 begins by declaring, "The President and the Attorney General,

**subject to the President's supervision and control**, shall provide authoritative

interpretations of law for the executive branch." *Id*. (emphasis added). The Section

continues by making clear that "The President and the Attorney General's opinions on

questions of law are **controlling** on all employees in the conduct of their official

duties."[29] *Id*. (emphasis added). The following language further animates the Court's

concern as to adverseness in this matter:

> No employee of the executive branch acting in their official capacity may
> advance an interpretation of the law as the position of the United States that
> contravenes the President or the Attorney General's opinion on a matter of
> law, including but not limited to the issuance of regulations, guidance, and
> **positions advanced in litigation**, unless authorized to do so by the
> President or in writing by the Attorney General.

*Id*. (emphasis added).

Therefore, in this case, unlike others that private parties have instituted,

Defendants and their representatives are unable to advance any legal position or

---

[28] *See* Exec. Order No. 14215, 90 FED. REG. 10447 (Feb. 24, 2025).

[29] Counsel for Plaintiffs points to the other Plaintiffs—Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC—as having separate, disinterested claims from those of President Trump, establishing a viable case or controversy. However, these Plaintiffs share the same attorney, the same parent company, and the same parent and have not espoused any different or distinct view of this matter or this "Settlement." Accordingly, the Court will treat their role as parenthetical to that of Lead Plaintiff President Trump.

interpretation—however legitimate or well-reasoned—contrary to that held by Lead Plaintiff in this matter, President Trump. *See, e.g., Griffin v. Internal Revenue Serv.*, No. 22-cv-24023, DE 23; DE 58 (S.D. Fla. 2024) (challenging similar allegations through motions to dismiss the complaint and amended complaint). Not surprisingly then, no attorney appeared[30] on Defendants' behalf, challenged Plaintiffs' actions, or justified the United States' position in any way.

Plaintiffs seem to suggest that the course of litigation in *Griffin*, supports their position on adverseness, claiming that the plaintiff in *Griffin* asserted "substantially identical allegations against the same defendants, arising from the same course of conduct by the same individual." (DE 89 at 18). But unlike this case, the plaintiff in *Griffin* is a private, non-governmental actor. And, unlike this case, the *Griffin* defendants challenged the plaintiff's allegations. *See* United States' Mot. to Dismiss Complaint at 2, *Griffin*, No. 22-cv-24023 (S.D. Fla. Apr. 23, 2023), DE 23. In *Griffin*, the defendants (the same IRS and Treasury Department sued here) contested the plaintiff's privacy act claims by arguing preemption and, alternatively, the plaintiff's failure to plead actual damages. *Id*. The *Griffin* defendants also challenged the section 7431 claim, arguing the complaint was a shotgun pleading based solely on conclusory allegations. *Id*. After the motion to

---

[30] The DOJ, Civil Division "represents the United States, its departments and agencies, Members of Congress, Cabinet Officers, and other federal employees in any civil or criminal matter within its scope of responsibility." *See* Dep't of Just., *About the Civil Division*, https://www.justice.gov/civil/about (last visited June 16, 2026). Notably, although the statute allows President Trump to receive the Attorney General's "advice and opinion on questions of law when required," President Trump is not obligated to obey the Attorney General's opinion on issues of law. *See* 28 U.S.C. § 511; *see also* Saikrishna Bangalore Prakash, *Too Unitary,* 135 Yale L.J. Forum 533, 552 (2026) ("The President, and not the Attorney General, is the chief law-enforcement officer of the United States."). Indeed, "a lawyer's counsel does not bind the advice seeker." *Id.*

dismiss was granted in part and denied in part, the government filed an answer asserting a sovereign immunity defense and denying several allegations in the amended complaint. That action was settled after two years of litigation.[31]

Likewise, in *Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, a class action lawsuit brought by non-government plaintiffs, the government appeared and moved to dismiss the plaintiff's class action complaint. No. 25-cv-00139, 2026 WL 900051, at *1 (D. Md. Apr. 2, 2026). After the court denied its motion to dismiss, the government filed an answer, asserting sovereign immunity and statute of limitations defenses. To date, that litigation remains pending. Here, unlike *Griffin* and *Safe Harbor Int'l, LLC*, the same defendants, faced with the same claims caused by the "same course of conduct" attributable to the "same individual," did not endeavor to defend their agencies, safeguard taxpayer monies, or even file an appearance. Instead, before the Parties' deadline for addressing the Court's critical jurisdictional questions passed, the Parties executed the "settlement agreement" that effectively mooted the issues the Court identified. This case was "resolved" before any litigation occurred and before the Government was required to explicate its position.

---

[31] Additionally, *Griffin* was filed in 2022, well within the applicable statute of limitations period. And while the question of whether the government was the appropriate party survived a motion to dismiss challenge, the court there noted it was a matter more suited to summary judgment. Significantly, the settlement reached after two years of litigation with the IRS amounted only to a nonmonetary apology, not an award of billions of taxpayer dollars and conferral of immunities to plaintiff, his family, and affiliates.

Considering the brief chronology,[32] the silent docket, and Defendants' deviation

from basic litigation strategies pursued in similar cases, the Court must conclude that

---

[32] By comparison, the limited universe of other civil cases involving publicly available settlements of similar or greater monetary magnitude had significantly more active dockets, required much more time to resolve, and involved serious allegations of catastrophic environmental destruction, life-threatening physical harm, or egregious market fraud:

- *O'Brien's Brien's Response Mgmt., LLC v. BP Expl. & Prod. Inc.*, MDL No. 2179 (E.D. La.) (multidistrict litigation that consisted of approximately 3000 cases relating to the catastrophic explosion of the Deepwater Horizon rig; claims were resolved for approximately $20 billion after several years).

- *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) (claims based on fraudulent accounting; case settled for approximately $6 billion after six years of litigation, with a docket spanning 3366 entries).

- *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495 (W.D. Wash. 2023) (nonconsensual enrollment of consumers into subscriptions; parties stipulated to a $2.5 billion judgment, after litigating across 695 docket entries).

- *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-MD-02672 (N.D. Ca. 2015). (Volkswagen AG, in a case involving Volkswagen's use of illegal software on its 2.0-liter diesel vehicles, agreed to pay up to $14.7 billion after vigorous motion practice in a case with 8281 docket entries).

- *United States ex rel. Thorpe v. GSK,* No. 11-cv-10398 (D. Mass. 2011) (false price reporting and off-label use practices; settlement resolved four pending qui tam lawsuits; approximately $3 billion settlement resolved four pending qui tam lawsuits).

- *In re: Enron Corp. Sec.*, No. 02-md-01446 (S.D. Tex. 2002) (Enron Corp. agreed to settle claims alleging investment fraud for a collective amount exceeding $7 billion—only after several years of vigorous litigation across multiple lawsuits, with the consolidated case spanning 473 entries).

- *Brown v. Am. Home Prod.,* No. 99-cv-20593 (E.D. Pa. 1999) (heart valve disease was caused by the combination of fenfluramine and phentermine; the manufacturer of the pharmaceuticals agreed to a $3.75 billion settlement after zealously defending their position with a docket spanning 5448 entries).

All of these billion-dollar civil settlements involved more time, effort, and advocacy than that expended in the instant case. Moreover, in these cases, the claims resolved were

Defendants chose not to "advance an interpretation of the law as the position of the United States that contravenes" President Trump's opinion regarding this lawsuit. *See* Executive Order § 7. It is clear that obeisance to the mandate of his Executive Order has been fulfilled by Defendants' actions (or more accurately, inaction) in this case. Therefore, not only does the Executive Order demonstrate President Trump's espoused control over Defendants' conduct generally in litigation, it also demonstrates President Trump's actual control in this litigation. *See* 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026).

Adverseness is further defeated by President Trump's influence over the DOJ here. During an interview with the New York Times, President Trump publicly expressed his belief in his unequivocal control over the DOJ. *See Excerpts From Trump's Interview With The Times,* NEW YORK TIMES (Dec. 28, 2017), https://www.ny-times.com/2017/12/28/us/politics/trump-interview-excerpts.html ("I have absolute right to do what I want to do with the Justice Department."). However, the DOJ is tasked with zealously representing the United States' interests, *see* 28 U.S.C. § 516,[33] and is trusted

---

legally cognizable: discrimination, property damage, or tort as defined by applicable state and federal statutes. Here, however, the terms "Anti-Weaponization" and "Lawfare" are inchoate and the "settlement agreement" provides no legal definition as to what constitutes either term, outside their meaning in political discourse.

[33] "The Judiciary Act of 1789 created the Office of the Attorney General which evolved over the years into the head of the Department of Justice and chief law enforcement officer of the Federal Government." *See* Office of the Attorney General, U.S. Dep't of Just., https://www.justice.gov/ag (last visited June 17, 2026). "Since the Judiciary Act of 1789, the United States Attorney General has had the authority 'to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.'" *See Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.,* 922 F.3d 480, 483 (D.C. Cir. 2019) (citing Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–513)).

to remain insulated from political influence. Fidelity to the rule of law can be achieved only when the DOJ is free to assess the facts and governing law of each case it reviews without the stain of political interference.[34] There is "an expectation that even the Attorney General must be able to draw the line between political allegiance and fidelity to the people, as well as the fair administration of the law." Tonna Onyendu, *Department of Justice's Role in Electoral Politics: Maintaining Neutrality in the Enforcement of Voting Rights,* 31 Geo. J. Legal Ethics 799, 803 (2018).[35]

> b. *The Conduct of Executive Branch Actors Demonstrates Lack of Adverseness and Improper Motive.*

Here, Defendants' actions (or inaction), as directed by the DOJ, and the subsequent "resolution" of this lawsuit leads the Court to conclude the Parties' interests

---

[34] Legislators on both sides of the political aisle have emphasized the need for an independent DOJ. *See, e.g.*, *Confirmation Hearing on the Nomination of Michael B. Mukasey to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 110th Cong. 478 (2007) (Patrick J. Leahy, (D.)) ("There is good reason why the rule of law requires that we have an Attorney General and not merely a Secretary of the Department of Justice. This is a different kind of Cabinet position. It is distinct from all others. It requires greater independence"); *Nomination of Eric H. Holder, Jr., Nominee to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 111th Cong. 403 (2009) (Arlen Specter, (R.)) ("Next to the President of the United States, there is no Federal officer more important than the Attorney General. The Attorney General is different from any other Cabinet officer because Cabinet officers ordinarily carry out the policies of the President. But the Attorney General has an independent duty to the people and to uphold the rule of law.").

[35] It has been reported that a Principal Deputy Associate Attorney General advised United States Attorneys around the country that the President is the Department's "chief client." Ben Penn, *In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump*, BLOOMBERG L. (Feb. 19, 2026), https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump; *see supra* p. 26. Former Attorney General Pam Bondi also characterized DOJ attorneys as the President's "lawyers." *See* Memorandum from the Att'y Gen. to All Dep't of Just. Emps., General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025), https://www.justice.gov/ag/media/1388521/dl.

were "one and the same." *Veazie*, 49 U.S. at 256. In justifying the "unusual"[36] settlement to resolve Plaintiffs' claims, the DOJ and Acting Attorney General Blanche in a press release, and Acting Attorney General Blanche's Congressional testimony respectively, cited *Keepseagle v. Vilsack*, 99-cv-03119, (D.D.C. 1999), as the "precedent" for the unprecedented establishment of the $1.776 billion dollar fund. However, Plaintiffs' briefing is conspicuously silent as to this justification, making no mention of the *Keepseagle* case. Understandably so.[37]

In *Keepseagle*, the parties—including the Department of Agriculture represented by the DOJ—engaged in a decade-long litigation regarding alleged discrimination perpetrated against thousands of Native American farmers and ranchers who had been illegally denied farm loans and access to benefit programs. *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 104 (D.D.C. 2015). As the presiding judge observed, "[i]t was a major class-action seeking to remedy what many felt was the latest chapter in the federal government's sordid history of mistreating Native Americans." *Id.* at 104. There, "[f]or

---

[36] *See A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice,* 119th Cong. (2026) (statement of Todd Blanche, Acting Attorney General) ("So what we've done with this fund. . . And by the way, it is true that this is unusual").

[37] During the first administration of President Trump, Associate Attorney General Rachel Brand delivered remarks to the Washington, D.C. Lawyer Chapter of the Federalist Society. Rachel L. Brand, Assoc. Att'y Gen., *Remarks to the Washington, D.C. Lawyers Chapter of the Federalist Society* (Feb. 15, 2018), https://www.justice.gov/archives/opa/speech/associate-attorney-general-brand-delivers-remarks-washington-dc-lawyers-chapter. In her remarks, Ms. Brand acknowledged that the "Department of Justice is not your typical litigant or litigator." *Id.* She explained that "protecting the public fisc is something the Attorney General takes seriously," and highlighted *Keepseagle* as "one of the worst examples" of settlements involving the DOJ. Ms. Brand critiqued the fact that, under the mechanism of the *Keepseagle* fund, "hundreds of millions of dollars of the taxpayer's money will be spent in ways never appropriated by Congress, with virtually no oversight." *Id.* In President Trump's second administration, the DOJ now contrives to rehabilitate *Keepseagle* as the rationale for this "unusual" settlement.

nearly ten years, the parties engaged in extensive and contentious discovery and motions practice," *id.* at 105; propounded notice to putative class members regarding a proposed class settlement; defined the mechanisms of class claims for recovery; and participated in an hours-long fairness proceeding, where every person who attended was heard. The *Keepseagle* case history stands in stark contrast to the 109-day sojourn of this matter where Defendants never appeared, never challenged Plaintiffs' claims, and never filed a single pleading.

Ultimately, the DOJ has endeavored to justify its position to create the appearance of a case or controversy "resolved" under the aegis of the Court. But the Parties, most of whom are government actors, did not engage in any public discussion or judicial review regarding their "unusual" arrangement and whether they were legally adverse; indeed, they actively avoided such an undertaking.[38] And the extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties[39] whose future remedies bear no relationship to the claims in this case, indicates that real adverse interests were never before the Court. *Cf. Monsanto Co.*, 72 F.4th at 1266 (finding a justiciable case or controversy where the parties zealously

---

[38] The Court is extremely troubled by the testimony given by Acting Attorney General Blanche on May 19, 2026. In response to why the "settlement agreement" had not been submitted to this Court for review, he stated that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the agreement. *See supra* note 13. While temporally accurate, this answer is, at best, misleading and, at worst, disingenuous. The Court was available to review any pleading by any Party at any time during this lawsuit. And if Acting Attorney General Blanche had thought the dismissal was improvidently granted or thought Plaintiffs misspoke when they said, "no judicial analysis is appropriate," (DE 52 at 2), he only had to file an appearance and ask for relief.

[39] Compounding these concerns, an official at the DOJ publicly stated that he intended to apply for compensation from the Fund. *See* Daniel Lippman, *DOJ Official Sought Weaponization Fund*, POLITICO (June 10, 2026), https://www.polit-ico.com/news/2026/06/10/doj-official-sought-weaponization-fund-patrick-davis-00955.

asserted their rights and there was "no suggestion" that the defendant "selected or control[ed]" the plaintiff's counsel). Indeed, the DOJ seems to have purposefully adopted the strategy of creating a "slush fund disguised as a settlement, and then doling the money out to whatever constituency the Executive wants bankrolled." *Keepseagle v. Perdue*, 856 F.3d 1039, 1058 (D.D.C. 2017) (Rogers, J., dissenting).[40]

The Court's conclusion regarding the Parties' shared interest is also underscored by the circumstances surrounding the execution of the "settlement agreement." First, the "settlement agreement" is signed on behalf of Plaintiffs by Daniel Epstein ("**Mr. Epstein**"), a former White House Senior Associate Counsel and Special Assistant to President Trump from 2017 until 2020. Notably, Mr. Epstein was never counsel of record in this case; the Complaint's signature block identified him as counsel[41] for Plaintiffs but represented that his *pro hac vice* application was "forthcoming." (DE 1 at 27). Since no such application was filed with the Court, and since, in other matters pending in Florida and elsewhere, Mr. Epstein sought *pro hac* admission within weeks of filing the

---

[40] While ignoring the facts and history of the *Keepseagle* case, the DOJ also seems to studiously ignore the lessons of *Keepseagle*. Here, the DOJ chose to bypass notice, adversarial advocacy, legal analysis, and court review altogether to go straight to creating its own billion-dollar Cy Pres fund for non-parties with no pending claims against the United States. In this way, the DOJ has both disregarded the precedential meaning of *Keepseagle* while engaging in the constitutional assault predicted by its most ardent critics.

[41] Mr. Brito signed the Complaint—he is admitted to the Florida Bar and is admitted to the United States District Court for the Southern District of Florida. Mr. Brito did not sign the "settlement agreement," but his name appears on it. Mr. Epstein's name appears on the Complaint, but he did not (and could not) sign it. Mr. Epstein did sign the "settlement agreement."

complaint,[42] the Court can only surmise that Mr. Epstein was aware that he would never need to appear and litigate the merits of Plaintiffs' claims.

Second, the "settlement agreement" is signed on behalf of Defendants by Stanley Woodward, Jr., the current Associate Attorney General at the DOJ, and Acting Attorney General Blanche. Before he went to the DOJ, Associate Attorney General Woodward represented several individuals charged in connection with the events of January 6, 2021, at the United States Capitol.[43] He also represented Walt Nauta, who was President Trump's personal aide and a co-defendant in the criminal matter involving the return of classified documents at Mar-a-Lago.[44] Before his appointment to the DOJ, Acting Attorney General Blanche served as President Trump's personal criminal defense attorney in several high-profile matters. *See, e.g.*, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023) ("**Mar-a-Lago Documents Case**"); *United States v. Trump*, No. 23-cr-00257 (D.D.C. 2023) (the criminal case charging President Trump with conspiring

---

[42] *See Trump v. Brit. Broad. Corp.*, No. 25-cv-25894, (S.D. Fla. filed Dec. 15, 2025); *see also Trump v. N.Y. Times Co.*, No. 25-cv-02487 (M.D. Fla. filed Sept. 15, 2025). Mr. Epstein also appeared as counsel for President Trump after appropriately filing *pro hac* papers in *Trump v. CBS Broad. Inc.*, No. 24-cv-00236 (N.D. Tex. filed October 31, 2024). In that case, Mr. Epstein sought *pro hac* admission despite being a member of the State Bar of Texas.

[43] Associate Attorney General Woodward appeared and represented Connie Meggs and Kelly Meggs (husband and wife), Ryan Samsel, and Federico Klein. *See United States v. Meggs*, No. 21-cr-00028 (D.D.C. 2021); *United States v. Meggs*, No. 22-cr-00015 (D.D.C. 2021); *United States v. Samsel*, 21-cr-00537 (D.D.C. 2021); *United States v. Klein,* No. 24-cv-02610 (D.D.C. 2021).

[44] *See United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023). In that same matter, Associate Attorney General Woodward also represented Yuscil Tavares, an information technology worker at Mar-a-Lago who was charged alongside President Trump and Walt Nauta for his role in allegedly deleting surveillance camera footage. That representation was the subject of a conflict of interest hearing pursuant to *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

to overturn the 2020 election and for attempting to obstruct with the election's results before, during, and after January 6, 2021); *People v. Donald J. Trump*, No. 71543-23 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 3, 2024) (the "hush money" case that raised allegations of President Trump falsifying business records).

While the Court appreciates that attorneys successfully transition between private practice and government service, such transitions do not absolve counsel of their ethical obligations. For example, Rule 11.1(c) of the Southern District of Florida Local Rules incorporates the Florida Bar's rules of professional conduct as ethical standards. *See* S.D. Fla. L.R. 11.1(c) ("The standards of professional conduct shall include the current Rules Regulating the Florida Bar."). As relevant here, Rule 4-1.11 of the Rules Regulating the Florida Bar provides a conflict-of-interest rule which specifically governs former and current government officers and employees. The commentary to this rule explains, in relevant part, the following:

> This rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, **the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government**.

R. Regul. the Fla. Bar 4-1.11 (emphasis added).[45] The spectre of that risk seems to be present here.

---

[45] These principles, however, are not confined to Florida practitioners or Florida Bar rules. The attorneys involved in the negotiation and execution of the "settlement agreement" are governed by similar ethical standards in the states in which they are admitted to practice law. The Court may take judicial notice of those admissions. *See Jackson v. United States*, Nos. 12-cv-388, 20-cr-198, 2014 WL 5474132, at *12 n.6 (M.D. Fla. Oct. 29, 2024) (taking judicial notice of attorney's Florida bar membership status because attorney's membership and status "can be readily and accurately determined from Florida Bar

The gravamen of the "settlement agreement" is to fund claims premised on events including those arising from, *inter alia*, the Mar-a-Lago Documents Case and the events of January 6, 2021.[46] Indeed, these two cases have been referenced as quintessential Anti-Weaponization and Lawfare claims.[47] Instead of either recusing[48] because of their previous representations or vigorously defending this lawsuit as required to do so by DOJ

---

records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned"). Attorney Epstein is admitted in Texas, the District of Columbia, and Maryland. Attorney Woodward is likewise admitted in the District of Columbia, and as noted above, Attorney Blanche is admitted in New York.

[46] "President Trump's views about the prosecution of those who attacked the U.S. Capitol on January 6 . . . are well known[.]" *United States v. Nordean*, No. 21-cr-00175, DE 1098 (D.D.C. July 10, 2026) (dismissing indictments with prejudice following appellate court's vacatur of judgments against four defendants convicted at trial of "serious offenses" arising from January 6, 2021).

[47] *See supra* note 11; *see also* Sabrina Lam*, Trump defends 'Anti-Weaponization Fund' amid GOP blowup*, POLITICO (May 22, 2026), https://www.polit-ico.com/news/2026/05/22/trump-defends-anti-weaponization-fund-00933727 (reporting on President Trump's May 22, 2026, statement that "I gave up a lot of money in allowing the just announced Anti-Weaponization Fund to go forward. I could have settled my case, including the illegal release of my Tax Returns and the equally illegal BREAK IN of Mar-a-Lago, for an absolute fortune. **Instead, I am helping others, who were so badly abused by an evil, corrupt, and weaponized Biden Administration, receive, at long last, JUSTICE**!") (emphasis added). Acting Attorney General Blanche expressly acknowl-edged that the Anti-Weaponization Fund "is not limited to in any way scope or form to January 6th" but declined to ensure that the funds would not be disbursed "to anyone convicted on the January 6th attack on Congress." *Supra* note 13 at 37:26 and 01:48-37.

[48] *See* Katelyn Polantz, *Exclusive: Acting AG Todd Blanche was told last year to recuse from Justice Department matters involving Trump*, CNN (May 14, 2026), https://www.cnn.com/2026/05/14/politics/todd-blanche-recusal-trump-investigations-brennan. As a Justice Department spokeswoman stated: "[Blanche] is recused from many cases before DOJ. In any cases that are still ongoing where he previously represented someone, he is recused." *Id.* In this case, however, notwithstanding his prior representation of President Trump, Blanche did not recuse.

policies and procedures,[49] these lawyers agreed to a "settlement" involving a staggering amount of money potentially benefitting former clients.

Moreover, the Release Order, signed only by Acting Attorney General Blanche, extends a blanket grant of immunity to all Plaintiffs and their families and "affiliates," and precludes all "current or possible" investigations or actions before any other agencies or departments.[50] The Release Order also purports to bar the IRS from conducting any future tax audits of President Trump, his sons, and their entities.[51] This provision directly contravenes 26 U.S.C. § 7217, titled "Prohibition on executive branch influence over taxpayer audits and other investigations," which states:

> It shall be unlawful for any applicable person to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer.

26 U.S.C. § 7217(a).

The explicit text of this statute prohibits President Trump and his lawyers—one of whom was former White House Counsel—from asking for or promoting termination of an audit directed toward him.[52] And acquiescing to any such demand is wholly incompatible

---

[49] *See* U.S. Dep't of Just., *Just. Manual* § 4-3.432 (2018) (requiring that request for compromise "demonstrate a thorough, thoughtful exploration of any issues relating to jurisdiction, liability, and damages, with the ultimate goal of ensuring that a proposed settlement is in the best interests of the United States and that the United States has brought peace with respect to any claims that the plaintiff could bring based on the subject matter of the case").

[50] *See supra* note 15.

[51] *Id*.

[52] This proviso of the "settlement" also raises the question of whether the agreement violates Article II, Section 3 of the United States Constitution, which directs that the President "shall take [c]are that the Laws be faithfully executed[.]" U.S. CONST. art. II, § 3.

with the duties of DOJ attorneys (as well as CEO Bisignano for the IRS) to enforce the law and protect the public interest. Moreover, the conferral of possibly millions of dollars in tax relief and corollary benefits potentially violates Article II, Section I of the United States Constitution, a limitation surely known by former White House Counsel and the current Acting Attorney General. *See* U.S. CONST. art. II, § 1, cl. 7: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."[53] No sitting President has ever sued federal agencies completely subject to his control for monetary benefits, or any benefits that inure to him, his family, and associates. The failure of any attorney in this case to address, on this docket, the relationship of this Article II proscription with the benefits conferred by the "settlement" is a glaring omission that speaks to the control of the Lead Plaintiff.[54]

Another signal that adverseness was absent was Acting Attorney General Blanche's unilateral repudiation and severance of the purported "Anti-Weaponization Fund" associated with this lawsuit.[55] Two weeks after the dismissal, in testimony before the House of Representatives, Acting Attorney General Blanche conceded that the DOJ

---

[53] "Neither the Union nor any of its members will be at liberty to give, nor will he (the President) be at liberty to receive any other emolument than that which may have been determined by the first act." THE FEDERALIST NO. 73 (A. Hamilton).

[54] As recently discussed in a decision affirming attorney sanctions, the Eleventh Circuit observed that "one of a lawyer's chief duties is to give his clients a clear-eyed view of whether the law says what the client wants it to say." *Est. of Lane Caviness v. Atlas Air, Inc.*, No. 24-11033 (11th Cir. July 10, 2026).

[55] *See* Defendant's Notice of Filing, *Floyd v. Dep't. of Just.*, No. 1:26-cv-01399, DE 93 (E.D. Va. filed on May 22, 2026).

was "not moving forward with the fund, period."[56] Acting Attorney General Blanche's decision, which has not been memorialized or adopted by Plaintiffs[57] or their lawyers, demonstrates his confidence that he could speak for, and bind, both sides of this matter. This certitude supports the conclusion that the Parties worked in tandem and were never actually adverse. Indeed, "a party may not unilaterally repudiate a settlement agreement once it is reached." *Reed by and through Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir. 1990). "It is 'hornbook law' requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; subsequent modifications require consent and 'a meeting of the minds' of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification." *Tropicana Pools, Inc. v. Boysen*, 296 So. 2d 104, 108 (Fla. Dist. Ct. App. 1974). Acting Attorney General Blanche's apparent capacity to speak for both Plaintiffs and Defendants, sign a "settlement" document on behalf of all Parties to this action, and then repudiate part of that agreement, demonstrates that there was only one party whose interests were being represented throughout this case.

In this case, the President[58] filed a lawsuit alleging reputational and financial harm from the unlawful disclosure of his tax returns. (DE 1). He sued the IRS and the Treasury Department—entities that are part of the Executive Branch headed by him and, more

---

[56] *Supra* note 19.

[57] In an interview with CNN, President Trump defended the "Anti-Weaponization Fund" to reporters, noting that he didn't know whether the fund was "fully dead or just on hold" and that he would "have to ask the lawyers." *See* Sarah Ferrls, *et al.*, *Trump tells CNN he doesn't know if $1.8 billion fund is dead, calling it 'a beautiful thing'*, CNN (June 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump.

[58] Again, while Plaintiffs also include Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC, these individuals and entity are parenthetical to this analysis.

recently, that have been directed to adhere to any interpretation of law advanced by him. And while it is true that President Trump had a legal right to bring a suit for the unlawful disclosure, any remedy would be circumscribed by the legal guardrails applicable to all litigants: the statute of limitations, naming the appropriate defendant, and pleading special recoverable damages. Notably, had President Trump (and his then-lawyers Alina Habba and Todd Blanche) brought this lawsuit in a timely fashion while he was a private citizen, this litigation understandably might have been resolved in a 109-day time span. But that is not what happened. Instead, President Trump did not pursue his claims until he once again occupied the White House and had appointed his former lawyer, and the former lawyer of persons who are putative beneficiaries of the "Anti-Weaponization Fund" to prominent positions in the DOJ. These officials then negotiated on behalf of the United States, with his current lawyers, including his former White House Counsel to reach a "settlement." It is risible to suggest that there was ever adverseness between the Parties.

In dismissing the non-parties' claims of collusion, Plaintiffs reveal the true position of the Parties and say the quiet part out loud: "Regardless of whether Plaintiffs had ever filed this action, the Government and Plaintiffs still had the power to resolve all disputes between the parties." (DE 89 at 15). The power to resolve was never a question before this Court. Whether Executive Branch actors can privately agree to give themselves and their former clients blanket immunities and billions of dollars in tax monies for legally undefined grievances was never an issue advanced to this Court. The question is whether the Parties could do so by claiming to be adverse and engaging the legitimacy of a court proceeding. The answer is a resounding "no": the Lead Plaintiff and the Government are one, a fully realized unitary interest. Because "Plaintiffs have no answer for the fact that

the [L]ead Plaintiff, President Trump, directs and controls the Defendants[,]" this "renders this lawsuit non-adversarial, collusive, and jurisdictionally improper." *See* DE 94 at 4.

And because this fact was so obvious and so insurmountable, the Court finds that this matter was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a "settlement" that had no viable basis in law or fact. As was observed in another matter brought in this District, "this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes." *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1219 (S.D. Fla. 2023).

Having concluded that this action was presented for an improper purpose, the Court now turns to the question of sanctions. This inquiry proceeds under two independent, but overlapping frameworks: Federal Rule of Civil Procedure 11 and the Court's inherent authority.

### B. *Federal Rule of Civil Procedure 11*[59]

Federal Rule of Civil Procedure 11 ("**Rule 11**") governs the filings of pleadings, motions, and other papers with the Court. "The purpose of Rule 11 is to deter baseless filings in [the] district court and thus streamline the administration and procedure of federal

---

[59] As acknowledged by the non-party movants, Rule 60(d)(3) allows the Court to "set aside a judgment for fraud on the Court." FED. R. CIV. P. 60(D)(3); *see also Bevan v. Lee Cnty. SO*, 224 F. App'x 880, 882 (11th Cir. 2007) ("A federal court can vacate its own judgment upon proof that a fraud has been perpetrated on the court.") (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). The Court notes that it possesses the authority to protect the integrity of these proceedings under Rule 11 and its inherent authority, and so it need not invoke Rule 60(d)(3). However, this decision should not be understood as a final determination regarding any fraud perpetrated on the court and does not foreclose the possibility of future relief under Rule 60(d)(3). *See SEC v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) ("Fraud that prevents the functioning of the judicial process does not have to be brought within any specific period of time."). Accordingly, the Court expresses no view as to whether the requirements of Rule 60(d)(3) have been satisfied.

courts." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (citations omitted). As relevant here, when an attorney files a pleading in federal court, he certifies that, among other things, the pleading is not being presented for an improper purpose. FED. R. CIV. P. 11(B); *Spolter v. SunTrust Bank*, 403 F. App'x 387, 391 (11th Cir. 2010). Because this question strikes at the heart of the integrity of the judicial process, the Court may raise the improper purpose inquiry *sua sponte* and at any time. FED. R. CIV. P. 11(c)(3); *see also id.* advisory committee's note to 1983 amendment ("The time when sanctions are to be imposed rests in the discretion of the trial judge.").

An improper purpose under Rule 11 includes filing suit to force a settlement. *See e.g.*, *Scott v. Vantage Corp.*, 64 F.4th 462, 472–73 (3d Cir. 2023) (discerning no abuse of discretion in district court's conclusion that plaintiffs violated Rule 11(b) where they filed a lawsuit with no "eye toward settlement" and to force a settlement); *Roe v Rivian Auto. LLC*, No. 20-998, 2020 WL 8812913, at *3 (C.D. Cal. Dec. 11, 2020) (determining that case was presented for an improper purpose where plaintiff filed lawsuit to garner publicity and force a settlement); *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1309 (11th Cir. 2021) (affirming sanctions against client whose "motivation [to file lawsuits] was to obtain payment of legal fees, as opposed to compliance with the ADA."). Even seemingly viable claims can support the finding of improper purpose when presented in such a way that subverts the rules or the Court's authority. *See In re Flynn*, 139 F.R.D. 698, 699 (S.D. Fla. 1991).

"Rule 11 authorizes a court to sanction a party who submits a pleading for an improper purpose." *Smith v. Psych. Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014). Such sanctions are discretionary and may be imposed on any party as the court deems

appropriate. FED. R. CIV. P. 11(c)(1). "[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell*, 496 U.S. at 396.

"The standard for testing conduct under Rule 11 is 'reasonableness under the circumstances,' an objective standard." *Laborers Local 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987). "[A]s is almost always the case, the district court is better situated than [the reviewing appellate court] to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 638 (11th Cir. 2010) (citing *Cooter & Gell*, 496 U.S. at 402) (quotation marks omitted). "Given the district court's familiarity with the case and the parties, the district court is in a better position 'to make these determinations in the first instance[.]'" *Id.*

The Eleventh Circuit has recognized three instances in which Rule 11 sanctions are appropriate: where a pleading (1) "has no reasonable factual basis"; (2) "is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law"; or (3) is "in bad faith for an improper purpose." *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (quoting *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). This Order discusses whether Rule 11 sanctions are warranted under the improper purpose prong.[60]

---

[60] The Court confines its analysis to Rule 11's improper purpose prong. That said, this election should not be construed as suggesting that the remaining Rule 11 grounds are inapplicable.

Page **40** of **56**

The Court divides its analysis in three parts. First, the Court considers whether Plaintiffs' Rule 41(a)(1)(A)(i) voluntary dismissal precludes consideration of Rule 11 sanctions. Second, the Court determines whether Plaintiffs' conduct discussed *supra* satisfies Rule 11's improper purpose standard. Finally, the Court addresses what sanctions, if any, are appropriate.

**1. Plaintiffs' Rule 41(a)(1)(A)(i) Voluntary Dismissal Does Not Preclude Consideration of Rule 11 Sanctions.**

As stated previously, and as the non-party movants correctly note, a voluntary dismissal does not deprive a district court of jurisdiction to determine whether Rule 11 has been violated and, if so, what sanctions are appropriate. *See, e.g.*, *Fox v. Acadia State Bank*, 937 F.2d 1566, 1569 n.2 (11th Cir. 1991) ("[W]e hold that the stipulated dismissal did not deprive the district court of jurisdiction to impose Rule 11 sanctions."); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 818 F. Supp. 1510, 1516 (M.D. Fla. 1993) (explaining "that voluntary dismissal of a claim under Rule 41(a)(1), if otherwise sanctionable under Rule 11, does not preclude the assessment of sanctions."). As the Supreme Court has explained,

> The filing of complaints, papers, or other motions without taking the necessary care in their preparation is a separate abuse of the judicial system, subject to separate sanction. As noted above, a voluntary dismissal does not eliminate the Rule 11 violation. Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would lose all incentive to stop, think and investigate more carefully before serving and filing papers.

*Cooter & Gell*, 496 U.S. at 398 (citations omitted).

That reasoning applies with equal force here. Adopting Plaintiffs' position would grant parties immunity from Rule 11 sanctions, incentivizing them to misuse the judicial process and then moot the violation by voluntarily dismissing the case before the court can act. *See Absolute Activist Value Master Fund Ltd.*, 998 F.3d at 1266 ("If we divested the district court of jurisdiction over [sanctions] motions, an enterprising plaintiff could abuse the judicial system but nevertheless get off scot free by voluntarily dismissing its case under Rule 41(a)(1)(A)(i)."). Rule 11 does not permit such a result, and the Court will not countenance such behavior. *See id.* Therefore, contrary to Plaintiffs' assertions, the Rule 41(a)(1)(A)(i) voluntary dismissal does not foreclose the Court's Rule 11 inquiry. *See Cooter & Gell*, 496 U.S. at 395 (noting that "the violation of Rule 11 is complete when the paper is filed") (citation and quotation marks omitted).

### 2. Plaintiffs' Conduct Satisfies Rule 11's Improper Purpose Standard.

This case concerns whether Plaintiffs' conduct, as described *supra*, satisfies Rule 11's improper purpose standard. The Court concludes that it does. "[Plaintiffs] pursued this lawsuit in bad faith for the improper purpose of dishonestly advancing a political narrative." *Trump v. Clinton*, No. 22-14102-CV, 2023 WL 1207842, at *9 (S.D. Fla. Sept. 15, 2023). These efforts cannot be allowed in this Court. *See Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."); *Santana v. Frank Sufka Fam. Tr. Fund*, No. 26-cv-1440, 2026 WL 1492775, at *3 (M.D. Fla. May 28, 2026) ("If judges allow the court system to be weaponized by any party for improper purposes, the public is not well-served. Judges have a responsibility to ensure the courts remain open to all to pursue claims in good faith. They have an equally important responsibility to ensure courts are not abused for

improper purposes."). Certainly, a court should not be a forum for a party that cynically views a lawsuit as a vehicle to achieve a predetermined outcome: "I'm suing myself."[61]

"Improper purpose [under Rule 11] is often inferred from circumstantial evidence." *Thompson*, 610 F.3d at 665 (Tjoflat, J., concurring in part and dissenting in part); *Cohen v. Burlington, Inc.*, No. 18-cv-81420, 2020 WL 1033349, at *8 (S.D. Fla. Mar. 3, 2020) (same); *Meide v. Pulse Evol. Corp.*, No. 18-cv-1037, 2021 WL 4459653, at *10 (M.D. Fla. Sept. 29, 2021) (relying on plaintiff's persistence in pursuing factually and legally frivolous claims as circumstantial evidence of an improper purpose under Rule 11). Here, the record before the Court supports such an inference. As aptly summarized by the non-party movants, Plaintiffs acted in bad faith and for an improper purpose by "collusively filing a lawsuit with claims subject to multiple dispositive defenses solely to provide cover for a collusive settlement." (DE 94 at 12). The Court agrees. *See Trocano v. Vivaldi*, No. 25-11813, 2026 WL 446510, at *6–7 (11th Cir. Feb. 17, 2026) (explaining that the "district court may in its discretion impose Rule 11 sanctions against a party or lawyer who pursues a claim that is obviously barred by a waivable affirmative defense like the statute of limitations."). Accordingly, the Court must now determine what sanctions, if any, are appropriate. *See id.* (noting that "Rule 11 sanctions are discretionary" and therefore "just because a district court can impose sanctions does not mean that the court is required to do so.") (citation omitted).

---

[61] Even in the context of the Mar-a-Lago lawsuit, which became part of the "settlement," President Trump recognized the unique dynamics of his position and commented: "I'm suing myself." Joseph Gedeon, *Trump Says He Has Final Say on Paying Himself $230m for Past Investigations*, THE GUARDIAN (Oct. 22, 2025, 10:30 AM), https://www.theguardian.com/us-news/2025/oct/22/donald-trump-damages-federal-investigations.

### 3.  Sanctions are Appropriate.

District courts have broad discretion to tailor appropriate and reasonable sanctions under Rule 11. *See Riccard v. Prudential Ins. Co Am.*, 307 F.3d 1277, 1295 (11th Cir. 2002) (citing *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987)). A court may impose both monetary and non-monetary sanctions. FED. R. CIV. P. 11(C)(4). When assessing *sua sponte* Rule 11 sanctions, "[t]he initiating court must employ[:] (1) a show cause order to provide notice and an opportunity to be heard; and (2) a higher standard (akin to contempt) than in the case of party-initiated sanctions." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (quotation marks omitted).[62]

The Eleventh Circuit considers several factors in determining an appropriate sanction under Rule 11, including: "whether the person has engaged in similar conduct in other litigation," "what effect it had on the litigation process in time or expense," and "whether the person responsible is trained in the law." *See Thomas v. Early Cnty, Ga.*, 518 F. App'x 645, 646 (11th Cir. 2013) (citing FED. R. CIV. P. 11 advisory committee's note to 1993 amendment).

Plaintiffs maintain that monetary sanctions are unavailable because their voluntary dismissal preceded any order to show cause. (DE 89 at 13–14). This argument relies on a faulty premise: that the Court's authority under Rule 11 is limited to monetary sanctions.

---

[62] In assessing the adequacy of a show cause order under Rule 11, the Eleventh Circuit applies a "flexible standard." *DaimlerChrysler, A.G.*, 331 F.3d at 1257. Therefore, "in many cases substantial compliance may suffice." *Id.* Here, Plaintiffs received notice of the conduct at issue and a full opportunity to respond. *See Johnson*, 9 F.4th at 1311 ("Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why.") (quoting *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)). And Plaintiffs briefed the applicability of Rule 11 sanctions, indicating that they understood its relevance.

The Court recognizes that Rule 11(c)(5)(B) limits a court's ability to impose monetary sanctions on its own initiative where the show cause order follows a voluntary dismissal or settlement. FED. R. CIV. P. 11(C)(5)(B); *see also Capital Corp. Merch. Banking, Inc. v. Norwich*, No. 6:07-cv-1626, 2009 WL 10671309, at \*2 (M.D. Fla. June 2, 2009) (recommending that sanctions not be awarded to defendant where they were sought following plaintiff's voluntary dismissal), *report and recommendation adopted*, No. 07-cv-1626, DE 97 (M.D. Fla. June 23, 2009). The non-party movants do not contest this settled proposition. (DE 94 at 13) (explaining that Rule 11(c)(5)(B)'s limitation is "narrow" and does not foreclose "*non-monetary* sanctions") (emphasis in original).

However, this case presents unusual circumstances that distinguish it from the ordinary Rule 11 dispute. Plaintiffs do not identify at what point during the abbreviated procedural history of this case the Court realistically could have raised the issue of Rule 11 monetary sanctions. Had the Court done so before ordering briefing on the Court's subject matter jurisdiction, or after briefing was ordered but before the Parties responded, Plaintiffs undoubtedly would have protested that the discussion was both unmerited and premature. Moreover, the Advisory Committee Notes to Rule 11 explain that the reason monetary sanctions should be raised before a settlement is that a monetary resolution could be impaired by the threat of sanctions. FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Parties settling a case should not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case."). That concern is not implicated here.

Nonetheless, the Court need not decide whether the circumstances of this case permit monetary sanctions notwithstanding the language of Rule 11(c)(5)(B). That limitation applies only to monetary sanctions and does not prevent the Court from determining whether Rule 11 has been violated or whether appropriate *non-monetary* sanctions are appropriate. *See generally Goldenberg v. Indel, Inc.*, No. 09-5202, 2011 WL 1134454, at *1 (D.N.J. Mar. 25, 2011) ("But [Rule 11(c)(5)(B)'s] restriction is explicitly limited to monetary sanctions. The [c]ourt is empowered to issue a number of other sanctions against malfeasant parties, including censure, educational requirements, or referral to disciplinary authorities.").

Thus, after considering the totality of the circumstances, including the record, the relevant law, the written submissions, and the factors identified by the Eleventh Circuit, the Court concludes that Rule 11 sanctions are appropriate here. *See Trump v. Clinton*, 640 F. Supp. 3d at 1332, 1334 (awarding sanctions under Rule 11's improper purpose and concluding that "courts are not intended for performative litigation" as this "is harmful to the rule of law, portrays judges as partisans, and diverts resources that should be directed to real harms and legitimate legal claims."). In fashioning an appropriate sanction, the Court is guided by Rule 11's deterrent purpose. *See Baker*, 158 F.3d at 528 (explaining that "deterrence remains the touchstone of the Rule 11 inquiry."). The Court therefore imposes non-monetary sanctions under Rule 11 as follows:

1. Plaintiffs' Attorney Alejandro Brito is **REFERRED** to The Florida Bar for its consideration, review, and determination as to whether any disciplinary action is appropriate in light of the findings and rulings made in this Order. The Clerk of Court is **DIRECTED** to mail a copy of this

Order to The Florida Bar, of which Attorney Alejandro Brito is a member (No. 98442).

2. All future applications by Daniel Z. Epstein for admission *pro hac vice* in the Southern District of Florida will be **DENIED** for one year or until further order of this Court.

3. The Parties are prohibited from referring to the purported "settlement agreement," or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a "settlement" reached in this matter, Case No. 26-cv-20609-KMW (S.D. Fla. 2026).[63] "Plaintiffs" means the named Plaintiffs in this lawsuit: President Donald J. Trump, Donald J. Trump, Jr., Eric Trump, the Trump Organization, LLC and includes any of their agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with the party or under the party's control, whether directly or indirectly. "Defendants" means the Internal Revenue Service and the United States Department of the Treasury.

## C. *Inherent Authority*

Having concluded that sanctions are warranted under Rule 11, the Court will now address whether sanctions are likewise appropriate under the Court's inherent authority.

---

[63] Again, as noted by Plaintiffs in their brief, whether a private agreement between the Parties—as if "there is no judge"—is valid and enforceable or is a depredation of the Judgment Fund and an illegal conferral of immunity is not before this Court. (DE 89 at 15) ("Regardless of whether Plaintiffs had ever filed this action, the Government and the Plaintiff still had the power to resolve all disputes between the parties.").

Although Rule 11 limits imposing monetary sanctions following a voluntary dismissal, the Court's inherent authority remains available to address conduct that abuses the judicial process. *Trump v. Clinton*, 161 F.4th 671, 688 (11th Cir. 2025) ("Federal courts have the inherent authority to fashion an appropriate sanction for conduct which abuses the judicial process."); *Peer*, 571 F. App'x at 844 ("And the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct . . . for these rules are not substitutes for the inherent power.") (citations and quotation marks omitted).

Independent of Rule 11, federal courts possess inherent authority to protect the integrity of judicial proceedings. *See Kleiner v. First Nat'l Bank of Atl.*, 751 F.2d 1193, 1209 (11th Cir. 1985) ("Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal.") (citing *Roadway Ex., Inc. v. Piper*, 447 U.S. 752, 764–65 (1980)). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Id.* (citations omitted). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (citations and quotation marks omitted). "A court's inherent power is both broader and narrower than other means of imposing sanctions . . . . [w]hereas each of the other mechanisms reach only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." *JTR Enter., LLC v. An Unknown Entity*, 93 F. Supp. 3d 1331, 1367 (S.D. Fla. 2015); *see also Peer*, 571 F. App'x at 844 ("Whereas rule-based sanctions can reach only 'certain individuals or conduct, the

inherent power extends to a full range of litigation abuses' and serves to fill [in] the gaps left by rule-based sanctions.") (quoting *Chambers*, 501 U.S. at 46).

As the Supreme Court discussed in *Chambers*, "[N]othing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct." 501 U.S. at 50. Furthermore, "[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* Thus, while "the court ordinarily should rely on the Rules rather than the inherent power . . . if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* The Court does so here. *See* FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Rule 11 is not the exclusive source for control of improper presentations of claims . . . [and therefore] does not inhibit the court . . . in exercising its inherent powers[.]").

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted). This is a subjective standard. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("As a starting point, the inherent-powers standard is a subjective bad-faith standard."). "Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct." *Sciarretta v. Lincoln Nat'l. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (citing *Chambers*, 501 U.S. at 45–46). Bad faith is present if a court determines "that fraud has been practiced upon it, or that the very temple of justice has been defiled," or where a party is responsible for "delaying or disrupting the

litigation[.]" *Chambers*, 501 U.S. at 46 (citations and quotation marks omitted); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. (citations omitted).

"When the court uses its inherent powers to punish a party with attorneys' fees, there must be a direct causal link between the condemned conduct and the resulting costs." *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1352 (S.D. Fla. 2025) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "Sanctions under the Court's inherent powers are compensatory, not punitive." *Id.*

The conduct of the Parties triggers the Court's inherent authority. As to Plaintiffs, they filed a multibillion-dollar lawsuit asserting claims that they knew, or should have known, were time-barred and for an amount of damages unsupported by facts or law.[64] Plaintiffs could make no connection between the billions of dollars they sought, and the recovery authorized under the governing statute. *See* 26 U.S.C. § 7431(c)(1) (providing for damages in the amount of "$1,000 for each act of unauthorized inspection or disclosure."). Generally, the "central purpose" of a lawsuit must be to "vindicate rights through the judicial process." *In re Kunstler*, 914 F.2d 505, 520 (4th Cir. 1990). This lawsuit was not brought to vindicate rights; it was brought to manipulate the judicial process to pursue benefits unavailable in litigation because the Parties were not adverse.

Defendants' conduct is equally untenable. It is telling that the DOJ, which is tasked with enforcement of United States law, has remained conspicuously absent and silent

---

[64] Even the Fund amount—$1.776 billion—speaks of a "branding" effort rather than a deliberate and thoughtful calculation of damages.

when serious questions about this matter have been raised. *See generally Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922) (explaining that the Attorney General is the head of the DOJ and that he, acting through United States Attorneys, "is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings . . . be faithfully executed.") (citations omitted). And when representatives did choose to expound on the Department's conduct, they offered misleading explanations of the facts and the law.[65] In abdicating its responsibility to zealously defend the interests of the United States, the Government entered into a "settlement" that deviated from its litigation posture in similar actions, disregarded DOJ policies, and accomplished objectives beyond those authorized, as well as those specifically prohibited, by law. Under these circumstances, the Court may reasonably infer that the Government failed to defend this lawsuit or to respond to the Court's jurisdictional inquiry because its position would not withstand judicial scrutiny and because resolution of the threshold issues identified by the Court would not have favored its preferred outcome to this case.[66]

---

[65] *See supra* pp 7–8.

[66] *See generally Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.") (citations and quotation marks omitted); *In re Bailey*, 451 B.R. 640, 645 (Bankr. N.D. Ga. 2011) ("This Court draws an adverse inference from [d]efendants' concealment and assumes that truthful answers to those questions and production of documents would have been unfavorable to [d]efendants" and ultimately concluding that "the concealment of that information was intentional . . . and possibly motivated by a desire to perpetrate fraud on the [c]ourt."); *see also In re Mart*, 75 B.R. 808, 810 (Bankr. S.D. Fla. 1987) ("Furthermore, the failure of a party to provide evidence peculiarly available to that party supports the inference that the truth revealed by that evidence would be damaging to the party.") (citations omitted).

The Parties used the existence of federal litigation as a means of conferring legitimacy upon a course of action that they were unwilling to subject to judicial review. The context of the "settlement," the relationships of the people involved in negotiating and approving it, the ethical implications of their conduct, and the Parties' swift efforts to dismiss this case after the Court raised fundamental jurisdictional questions all support this conclusion. Accordingly, the Court expressly finds that Plaintiffs acted in bad faith. *See Sofaly v. Portfolio Recovery Assocs., LLC*, 155 F.4th 289, 295 (3d Cir. 2025) (monetary sanctions were proper under the court's inherent power where the lawyers acted in bad faith and committed fraud on the court by using "their clients to bring contrived lawsuits"). That finding is enough to invoke the Court's inherent authority. *See JTR Enter., LLC v. Columbian Emeralds*, 697 F. App'x 976, 986 (11th Cir. 2017) ("The key to invoking a court's inherent power to sanction is a finding of bad faith.") (citation omitted).

The Court finds monetary sanctions appropriate under its inherent authority and prerogative to police the matters and litigants who avail themselves of its jurisdiction. *See Purchasing Power, LLC*, 851 F.3d at 1223 ("Courts have the inherent power to police those appearing before them.") (citing *Chambers*, 501 U.S. at 46).[67] These monetary sanctions would include the attorneys' fees incurred by Court-appointed *amici*[68] in

---

[67] Although the Court's inherent authority extends to sanctioning all parties and counsel who engaged in bad-faith conduct, *see Spolter*, 403. F. App'x at 390 (noting that district "courts have the inherent power to impose sanctions on parties and lawyers"), the Court assesses monetary sanctions only against Plaintiffs and Plaintiffs' counsel.

[68] Court-appointed *amici* include John Gleeson and David A. O'Neil of Debevoise & Plimpton LLP; Donald B. Verrilli, Jr. of Munger Tolles & Olson LLP; and Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton of Selendy Gay PLLC, who were all appointed by the Court on April 29, 2026. (DE 43).

appearing before the Court and briefing the jurisdictional questions identified by the Court. *See Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998) ("Where, as here, the district court fashions a sanction which is a direct response to the harm that the bad faith conduct of the attorney causes, it is clearly acting within its discretion.").

> As one leading treatise has explained:
>
> Ordinarily, an amicus curiae who participates in a proceeding by leave of court or by court appointment is not entitled to compensation when he or she serves the interests of litigants, witnesses or any other private party . . . However, **where the court appoints an amicus curiae who renders services which prove beneficial to a resolution of the questions presented, the court may properly award compensation and direct it to be paid by the party responsible for the situation which prompted the court to make the appointment**.

4 Am. Jur. 2d Amicus Curiae § 12 (emphasis added); *see also Morales v. Turman*, 820 F.2d 728, 731 (5th Cir. 1987) (attorneys' fees may be awarded to appointed amici if the amici's services were highly beneficial and defendants were properly considered the parties who made the services necessary). Nonetheless, the Court-appointed *amici* have declined any reimbursement for their important service to the Court. [69]

There remain the initial *amici*—whose appearance was not contested by any Party—and the thirty-five former Federal Judges, whose briefing precipitated this Order. Accordingly, these *amici*, if they wish, may file, within fourteen (14) days of this Order, a memorandum regarding any appropriate reimbursement. Plaintiffs may file any response seven (7) days thereafter. Finally, the Clerk of Court is **DIRECTED** to mail a copy of this

---

[69] The Court acknowledges and thanks Court-appointed *amici* and their firms for their willingness to review the unprecedented jurisdictional questions presented by this case. Their thorough and well-reasoned scholarship, and uncompromising commitment to the rule of law—along with those of the organizations and lawyers referenced *supra*—are hallmarks of a vigorous, independent legal profession critical to sustaining a vigorous, independent judiciary.

Order to the State Bar of New York, of which Acting Attorney General Blanche is a member (No. 4192456), **AND** to the District of Columbia Bar, of which Associate Attorney General Woodward is a member (No. 997320), where disciplinary proceedings are currently ongoing.[70]

### III.     CONCLUSION

John Adams warned, "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." Thus, whatever may be the Parties' wishes, inclinations, or the dictates of their passion, they cannot alter the state of the facts or evade the rule of law. Contrary to Plaintiffs' concern, the Court did not have to "sally forth" to look for a wrong to right. *See* DE 89 at 17 (citing *Margolin v. Nat'l Ass'n of Immig. Judges*, 608 U.S. __ (2026)). The Court need only look to the uncontroverted facts here:

1.  Donald Trump is President.

2.  President Trump controls the actions of the Secretary of the Treasury Department Scott Bessent, IRS CEO Frank Bisignano, and all Executive Branch actors.

---

[70] Ethics complaints have been filed in New York and the District of Colombia against Acting Attorney General Blanche and Associate Attorney General Woodward. *See* Letter to Attorney Grievance Committee Re: Ethics Complaint Against Todd Blanche, https://dea5edf3-e27d-4adc-a42a-b9c082bc3167.usrfiles.com/ugd/dea5ed_b024aad49d1049c1ab03f01e8f1aa7fc.pdf; *see also* Request for Investigation of Stanley E. Woodward, Jr. D.C. Bar No. 997320, https://www.documentcloud.org/documents/28264896-cfa-dc-bar-complaint-stanley-woodward/.

3. President Trump, through Executive Order § 7, also controls the litigation strategy and interpretation of the laws guiding the Department of Justice. *See supra* note 28.

4. For the 109 days that this case was pending, no attorney representing the United States filed a notice of appearance or any document indicating the government's position, interest, or awareness of this matter.

5.  Defendants' actions are consonant with the dictates of Executive Order § 7.

These facts lead to the inexorable conclusion that the "settlement" terms, the individuals who signed the "settlement" as well as the putative beneficiaries of the "settlement," demonstrate a shared, unitary interest. And the unilateral revision and renunciation of the "Fund" component of the "settlement" demonstrate the fact that all Parties were aligned, and ultimately, undifferentiated. This action was never about a party seeking judicial resolution of a legal issue or a factual dispute. The nature of the suit itself and the conduct of the Parties and counsel from its filing make plain that this was an attempt to use the Court to provide some legitimacy to an agreement to confer immunity to people and entities affiliated with the President and to earmark billions of dollars from American taxpayers to redress grievances not defined in the law. The President may be the functional "dominus litus" of the Executive Branch, but as a party to a civil suit, he, as well as all the parties and lawyers before a court, are bound by the rules. Ensuring that our courts are used only for the express purpose created by the Constitution is the obligation of every judge and an obligation that this Court must discharge in light of the matter before it.

In sum, the facts before this Court demonstrate there was never adverseness between the Parties; there was never a case or controversy; and there was never a question as to who would prevail.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 13th day of July, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

|  |  |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC. <br><br> *Plaintiffs,* <br><br> *v.* <br><br> INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY <br> *Defendants.* | No. _____ <br><br> JURY TRIAL DEMANDED |

**COMPLAINT**

1.      President Donald J. Trump is the Founder and former Chief Executive Officer of the Trump Organization. President Trump served as the 45th President of the United States, and is the 47th President of the United States. President Trump brings this suit in his personal capacity.

2.      Donald J. Trump Jr. is an Executive Vice President at The Trump Organization, where he works to expand the company's real estate, retail, commercial, hotel, and golf interests.

3.      Eric Trump is an Executive Vice President of the Trump Organization. He oversees all aspects of the management and operation of the global real estate business, including new project acquisition, development, and construction.

4.      The Trump Organization is the preeminent developer of some of the most valuable and prized luxury real estate assets in the world, including five-star luxury hotels, championship golf courses, global realty services, residential & commercial buildings, property management, entertainment, dining, retail, and more.

5.      The Trump Organization includes The Trump Organization, LLC, as well as 418

other entities that received notices from Defendant U.S. Department of the Treasury's Internal Revenue Service ("IRS") between December 2024 and May 2025 ("The Trump Organization").

6.        At all relevant times, President Donald J. Trump, Donald Trump Jr., Eric Trump, and The Trump Organization, LLC ("Plaintiffs") filed tax returns with the IRS, which contained confidential, personal financial information.

7.        From May 2019 through at least September 2020, former IRS employee Charles "Chaz" Littlejohn, who was jointly employed by the IRS and/or one of its contractors, illegally obtained access to, and disclosed Plaintiffs' tax returns and return information to the *New York Times*, *ProPublica*, and other leftist media outlets. *See Information*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343-ACR (D.D.C. Sept. 29, 2023), ECF No. 1 ("Criminal Information").

8.        Defendants had a duty to safeguard and protect Plaintiffs' confidential tax returns and related tax return information from such unauthorized inspection and public disclosure. *See* 26 U.S.C. § 6103, 5 U.S.C. § 552a. Accordingly, Defendants were obligated to have appropriate technical, employee screening, security, and monitoring systems to prevent Littlejohn's unlawful conduct.

9.        Defendants failed to take such mandatory precautions.

10.        Mr. Littlejohn has admitted that he disclosed to outlet *ProPublica* "Trump information [that] included all businesses that he had owned." *Plaintiff's Notice of Filing Redacted Version of ECF 111-2 in Compliance with Court Order (ECF 114)*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 25, 2024), ECF No. 119 Exhibit 1 (Deposition of Charles Littlejohn) ("Littlejohn Dep.") at 200. *ProPublica* then falsely reported that Plaintiffs' leaked confidential tax returns contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies*,

(Oct. 16, 2019), https://tinyurl.com/4x9nak4e, and falsely characterized Plaintiffs' accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://tinyurl.com/4pwea2hk.

11. Defendants have caused Plaintiffs reputational and financial harm, public embarrassment, unfairly tarnished their business reputations, portrayed them in a false light, and negatively affected President Trump, and the other Plaintiffs' public standing. Joshua D. Blank, *Presidential Tax Transparency,* 40 Yale L. & Pol'y Rev. 1, 55 (2021) (describing how public claims about the President's taxes inform voters' electoral choices). Defendants' failures have caused significant and irreparable harm to Plaintiffs, their reputations, and their substantial financial interests.

12. This Court has already held these alleged facts sufficient to support Defendants' liability for violations of section 6103 of the Internal Revenue Code. *Order Den. in Part and Granting in Part Mot. to Dismiss*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 1 ("April Order"). The IRS "acknowledges that it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure of Mr. Griffin's confidential data." IRS, News Releases, No. IR-2024-172, *IRS statement as part of the resolution of Kenneth C. Griffin v. IRS, Case No. 22-cv-24023* (S.D. Fla.), (June 25, 2024), https://perma.cc/4T62-6HWG. As to Plaintiffs, the facts are even more egregious and warrant swift and sweeping relief to remedy Defendants' breach of Plaintiffs' rights under federal law.

**JURISDICTION AND VENUE**

13.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1340, 1346, 26 U.S.C. § 7431(a), and 5 U.S.C. § 552a(g)(1)(D).

14.    Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

**PARTIES**

15.    Plaintiff President Donald Trump is a citizen of the United States and is a resident of Florida.

16.    Plaintiffs Donald Trump Jr. and Eric Trump each reside in Palm Beach County, Florida, and lead and operate Trump Organization LLC and its affiliated entities from Palm Beach County, Florida, specifically Jupiter, Florida.

17.    Plaintiff, The Trump Organization LLC is a limited liability company with its principal place of business at 115 Eagle Tree Terrace, Jupiter, Florida. Its officers include Eric Trump, a resident of Florida; and Donald J. Trump, Jr., a resident of Florida. Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp., The Miami Restaurant Hospitality Member Corp, and THC Miami Restaurant Hospitality LLC (together with the Trump Organization LLC, the "Trump Entities") are all located in Miami, Florida, within this Division.

18.    Defendant U.S. Department of the Treasury is an Executive Department of the United States of America that oversees the IRS and the Treasury Inspector General for Tax Administration ("TIGTA"). Defendants, as the United States, are proper party defendants in this action and have waived sovereign immunity under 26 U.S.C. § 7431 and 5 U.S.C. § 552a(g)(1)(D).

19.    Defendant Internal Revenue Service is a bureau of the U.S. Department of the

Treasury responsible for administering and enforcing the Internal Revenue Code.

**FACTS**

**I.        The IRS is Responsible for Charles Littlejohn's Actions**

20.        "In or about September 2017 . . . and—in February 2018—[Mr. Littlejohn was] granted [ ] access to unmasked taxpayer data." *Government's Sentencing Mem.*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Jan. 16, 2024), ECF No. 23 at 2 ("Government's Sentencing Memorandum"); Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024), https://archive.is/ItQSG.

21.        Mr. Littlejohn was authorized, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2. "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law." *Id.* at 1.

22.        At all relevant times, Mr. Littlejohn was an officer or employee, joint employee, and contractor of the United States by virtue of his work for the IRS.

23.        Mr. Littlejohn had staff-like access to tax returns and confidential tax return information, and Defendants exercised the power to control the detailed physical performance of his work. April Order at 2, 6; *see also* Internal Revenue Manual ("IRM") § 7.11.13.1.1(3) (Feb. 12, 2018) ("All IRS employees (including managers, executives *and contractors*) are responsible for protecting the confidentiality and privacy of taxpayer information to which they have access.") (emphasis added), https://tinyurl.com/muc75h6r. Mr. Littlejohn testified that he "work[ed] at the IRS." Littlejohn Dep. at 204 ¶ 17.

24.     The IRS (including IRS Contracting Officer Representatives) exercised extensive, detailed, day-to-day supervision of Mr. Littlejohn's work. April Order at 2, 6 (describing the IRS's "supervision and control" of Littlejohn). IRS Contracting Officer Representatives are "IRS employees who oversee day-to-day operations of contracts and contractors." U.S. GOVERNMENT ACCOUNTABILITY OFFICE, GAO-23-105395, SECURITY OF TAXPAYER INFORMATION, IRS NEEDS TO ADDRESS CRITICAL SAFEGUARD WEAKNESSES, at 35 (August 2023), https://tinyurl.com/yrbvzvrn.

25.     The IRS's supervision and control included "managing the scope and purpose of Mr. Littlejohn's daily tasks and projects; ensuring that Mr. Littlejohn completed required training, monitoring Mr. Littlejohn's technical performance; ensuring Mr. Littlejohn was aware of data safeguards and appropriately protecting taxpayer information; and exercising control over the parameters of Mr. Littlejohn's access to IRS data and confidential tax return information." April Order at 2 (replacing "his" with "Mr. Littlejohn").

26.     During Mr. Littlejohn's employment, joint employment, and contractor status, "the IRS also had authority to both reprimand and terminate Littlejohn." *Id*. According to the IRS, all IRS employees—*i.e.*, "all IRS personnel," which "[a]lso includes all contractors who have staff-like access"—"may be subject to administrative penalties for the willful and unauthorized attempted access of their own or another taxpayer's records." *See* IRM § 10.5.5.1.6(2) and (3); IRM § 10.5.5.2(2). IRS administrative penalties include, but are not limited to, the removal and suspension of employees.

27.     These facts more than support the "plausible inference that Littlejohn was an employee of the United States." *Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 6.

28.     Indeed, Mr. Littlejohn testified that his work for the IRS was his "full-time job"

6

from May 2019 through at least September 2020.  Littlejohn Dep. at 264 ¶ 7.

29.     At all relevant times, Mr. Littlejohn's work at the IRS was supervised by Paul Wight, Supervisory Management and Program Analyst at the Department of Treasury. *Id*. at 265 ¶¶ 11-15.

30.     Mr. Littlejohn testified that Mr. Wight directed his work. *Id*. at 301 ¶ 7-9.

31.     Due to Mr. Littlejohn's employment, joint employment, and contractor status, the IRS had a duty to oversee and control his access to and removal of records. 36 C.F.R. §§ 1222.32(a) & (b) establishes that the IRS must oversee and control contractor, employee, or joint employee records and that such records are federal records for which unlawful removal requires actions for recovery by the executive branch. *See, e.g.,* 44 U.S.C. § 3106.

II.     **Defendants Willfully Failed to Establish Appropriate Administrative, Technical, and Physical Safeguards to Ensure the Security and Confidentiality of Plaintiffs' Confidential Tax Return Information, Compounding the Risk of Unauthorized Inspection and Disclosure.**

32.     "Every year from 2010 through 2020, the Treasury Inspector General for Tax Administration ("TIGTA") has warned the IRS about security deficiencies related to the protection of taxpayers' confidential tax return information." *Id.* at 1; ¶¶ 8-9, 26, 28-31, 64.

33.     "Many of these deficiencies went uncorrected and . . . allowed Littlejohn to misappropriate the information, upload it to a private website, and then disclose it[.]" *Id.*

34.     "The IRS also disclosed [Plaintiffs'] confidential tax return information to Littlejohn regardless of whether Littlejohn completed or was up to date with all [of] his purportedly required privacy and data-security training." *Id.*

35.     "In October 2023, a few weeks after being criminally charged for the disclosures, Littlejohn pleaded guilty to a violation of 26 U.S.C. § 7213(a) for the unlawful disclosure of confidential tax return information," including Plaintiffs' confidential tax returns and related return

information.  *Id*. at 3.

36.     In Mr. Littlejohn's own words, to disclose Plaintiffs' tax returns, he "made use of a private website that I could log into and I could upload the return data and then – you know, on my IRS computer, I could do that. And then, on a separate computer, I could log in and download the data." Littlejohn Dep. at 142.

37.     Mr. Littlejohn has admitted that the IRS did "not block creating a private website" on IRS computers. *Id*. Before Mr. Littlejohn stole Plaintiffs' returns via a private website on an IRS computer or computers, he tested the viability of using such a website by having "uploaded an image file to a website that I had control over, and it worked." *Id*. at 143.

38.     As a result of Defendants' incomplete and failed compliance procedures set forth in 5 U.S.C. § 552a (the "Privacy Act"), among other failures and procedure violations, it only took "[a] few hours" for Mr. Littlejohn to take Plaintiffs' tax returns into his personal custody. *Id*. at 145.

39.     Defendants' Privacy Act compliance and other security procedures were so insufficient that it took three years for the IRS to detect that Littlejohn breached the confidentiality and security protections of Plaintiffs' confidential tax returns and related tax information. *Id.* at 146-47 ¶¶ 19-22, and 1-8.

40.     Once Mr. Littlejohn uploaded Plaintiffs' tax returns and return information onto his private website, he placed them "on a flash drive" in his house. *Id*. at 148.

41.     From October 2019 until at least January 2020, Mr. Littlejohn repeatedly accessed IRS data to illegally provide additional information to the *New York Times* and *ProPublica,* which was all undetected by Defendants despite his initial breach several months earlier. *Id*. at 160, 163-64.

42.    Because the IRS tax return data lacked proper encryption, Mr. Littlejohn was able to put Plaintiffs' confidential tax return information as a draft in an e-mail account, and then provide the *New York Times* and *ProPublica* with login information to the account, in order to unlawfully retrieve the return information. *Id*. at 165.

43.    The IRS continued its failure to implement appropriate safeguards through at least Fiscal Year 2020 (ending September 30, 2020). In its *Annual Assessment of the Internal Revenue Service's Information Technology Program for Fiscal Year 2020*, the Treasury Inspector General for Tax Administration reported that 54% of the employees audited had unnecessary access to the IRS Centralized Authorization File, which houses tax information authorizations. *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2021-20-001, ANNUAL ASSESSMENT OF THE INTERNAL REVENUE SERVICE'S INFORMATION TECHNOLOGY PROGRAM FOR FISCAL YEAR 2020 (Oct. 30, 2020), https://tinyurl.com/bdysc8b3.

44.    Similarly, the Treasury Inspector General for Tax Administration has found that the IRS failed to establish safeguards to *detect*, let alone prevent, unauthorized access to confidential tax return information.

45.    Indeed, on July 31, 2020, the Treasury Inspector General for Tax Administration revealed that "the IRS could not provide an accurate inventory of all applications that store or process taxpayer data and [Personally Identifiable Information]." *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2020-20-033, MOST INTERNAL REVENUE SERVICE APPLICATIONS DO NOT HAVE SUFFICIENT AUDIT TRAILS TO DETECT UNAUTHORIZED ACCESS TO SENSITIVE INFORMATION at 2 (July 31, 2020), https://tinyurl.com/3rythsr3.

46.    Notwithstanding all of these data security failures, the IRS put, and continued to put long after this breach, Plaintiffs' and other United States taxpayers' confidential tax return

information at risk. Defendants failed to implement effective training, including training mandated for Mr. Littlejohn, to protect Plaintiffs' confidential tax returns and return information.

47.     Defendants' failure to establish necessary administrative, technical, and physical safeguards over its systems of records allowed Mr. Littlejohn to exploit these failures in order to repeatedly inspect and misappropriate Plaintiffs' confidential tax return information, and to unlawfully disclose that information to the *New York Times, ProPublica*, and others for widespread, unlawful publication.

**III.     Defendants Failed to Appropriately Screen Mr. Littlejohn and Failed to Properly Safeguard Plaintiffs' 6103-protected Information**

48.     At all relevant times, Mr. Littlejohn was authorized, even though he should not have been, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2.

49.     Because Defendants did not properly screen Mr. Littlejohn, they failed to determine that Mr. Littlejohn posed a risk to protected taxpayer information, including Plaintiffs' confidential tax returns and related tax information.

50.     Because Defendants did not institute proper controls and safeguards over Mr. Littlejohn's activities, he was able to engage in the unauthorized disclosure of Plaintiffs' confidential tax returns and related information to, among others, the *New York Times* and *ProPublica* for widespread, unlawful publication.

51.     To illustrate, if Defendants had ensured that Mr. Littlejohn had all IRS-based information in his possession connected to IRS-approved cybersecurity programs, they would have detected that Mr. Littlejohn was removing Plaintiffs' taxpayer information from his devices, prevented Mr. Littlejohn from leaving his office of employment carrying taxpayer records with

him for the purpose of disclosing them at a location in Gallaudet University, and detected and prohibited his use of a burner phone to orally disclose 6103-protected information. *See* ¶¶ 53-64, *infra*.

**IV.      Defendants' Privacy Act Violations Emboldened Mr. Littlejohn to Repeatedly and Unlawfully Inspect and Disclose Plaintiffs' Confidential Tax Returns and Tax Return Information.**

52.      "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law."   Government's Sentencing Memorandum at 1.

53.      On or around April or May 2019, Mr. Littlejohn disclosed Plaintiffs' confidential tax returns and/or return information to the *New York Times*. Littlejohn Dep. at 123, 140 ¶ 1.

54.      In response to the *New York Times'* continuous negative reporting regarding the Plaintiffs, Mr. Littlejohn decided to disclose Plaintiffs' confidential tax returns to the media outlet through its Signal account. Littlejohn Dep., *supra* at 148 ¶ 13-18 and 149 ¶1-4. Mr. Littlejohn then intentionally and maliciously disclosed those materials to the *New York Times* for unlawful, widespread publication. Mr. Littlejohn took Plaintiffs' confidential tax returns and related tax information, and illegally disclosed them in-person to *New York Times* reporters Susanne Craig and Russ Buettner at the Kellogg Business Center on the Gallaudet University campus. *Id*. at 152. Subsequently, in July 2019, Mr. Littlejohn met with the *New York Times* reporters and their editor at a safehouse in New York City to discuss providing legally protected materials to the reporters. *Id*. at 155. In October 2019, Mr. Littlejohn unlawfully provided the *New York Times* with a flash drive of several years of Plaintiffs' tax returns, and allowed the *New York Times* to illegally download those returns onto its computer. *Id*. at 160.

55.      In or around September 2020, Mr. Littlejohn contacted a second media outlet,

11

*ProPublica*, to discuss the possibility of unlawfully providing them with the confidential tax information in his possession, including Plaintiffs' confidential tax returns and related information. *Factual Basis for Plea*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Oct. 12, 2023), ECF No. 9 ("Factual Basis for Plea") at 3.

56.     In or around that time, Mr. Littlejohn illegally provided Plaintiffs' confidential tax returns and related tax information to *ProPublica* by mailing it on a password-protected personal data storage device. *Id.*

57.     In or around November 2020, Mr. Littlejohn unlawfully provided the password-protected data storage device password to a *ProPublica* journalist, who proceeded to illegally access Plaintiffs' confidential tax returns and related tax information. *Id.*

58.     Mr. Littlejohn later admitted that he disclosed to *ProPublica* "Trump information [that] included all businesses that he had owned." Littlejohn Dep. at 200.

59.     From as early as April 2019 until at least September 2020, based on deposition testimony, Littlejohn Dep. at 166-69, Mr. Littlejohn exploited Defendants' data integrity failures to repeatedly and unlawfully disclose Plaintiffs' confidential tax returns and related tax information.

60.     Defendants' failure to "ensure that all Windows computers connected to its network were authorized and compliant with security policy" allowed Mr. Littlejohn to use virtual machines that simulated physical computers to avoid IRS protocols designed to detect and prevent large downloads or uploads from IRS devices or systems.

61.     Further, Defendants' failure to use adequate encryption allowed Mr. Littlejohn to illegally store and to transmit Plaintiffs' confidential tax returns and tax information to the *New York Times* and *ProPublica* on a personal data storage device.

62. According to court documents, "Littlejohn accessed tax returns associated with [Plaintiffs] – and related individuals and entities – on an IRS database after using broad search parameters designed to conceal the true purpose of his queries. He then evaded IRS protocols established to detect and prevent large downloads or uploads from IRS devices or systems." *See,* e.g., U.S. Department of Justice, Press Release, https://tinyurl.com/2vjru7z7 (paraphrasing filings).

63. "Littlejohn then saved the tax returns to multiple personal storage devices, including an iPod, before contacting [the *New York Times*]. Between August 2019 and October 2019, Littlejohn provided [the *New York Times*] with the tax return information associated with [Plaintiffs]. Littlejohn then stole additional tax return information related to [Plaintiffs] and provided it to [the *New York Times*]. In September 2020, [the *New York Times*] published a series of articles about [Plaintiffs'] tax returns." Criminal Division of the U.S. Department of Justice, Case Summary, *United States v. Charles E. Littlejohn,* https://tinyurl.com/5n7b4fpz.

64. The IRS, through Littlejohn, unlawfully disclosed Plaintiffs' confidential tax return information to the *New York Times* on a personal storage device. Eileen Sullivan, *Former Contractor Who Leaked Trump's Tax Returns Sentenced to 5 Years in Prison*, N.Y. TIMES (Jan. 29, 2024), https://tinyurl.com/vyumarcu.

65. Littlejohn committed these crimes because he considered President Trump to be "dangerous" and a "threat to democracy," and that disclosure was, in Littlejohn's view, necessary due to political "norms." Littlejohn Dep. at 85-87.

66. In fact, once the IRS granted Mr. Littlejohn access to Plaintiffs' confidential tax returns and related tax information, it was certain that the information would be illegally disclosed, including to the press.

13

67. Littlejohn sought employment, joint employment, and contractor status with the IRS with "the goal of getting access to taxpayer information from Donald Trump[.]" *Id.* at 88. When asked, "so you were looking to do something to cause some kind of harm to him?" Mr. Littlejohn responded, "Less about harm, more just about a statement. I mean, there's little harm that can actually be done to him, I think. . . He's shown a remarkable resilience." *Id.* at 90.

68. Mr. Littlejohn's deposition in *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, *supra*, quoted the government's statements at his January 29, 2024, sentencing hearing, where the prosecution stated, "All Americans are obligated to provide an enormous amount of financial information about their private lives to the IRS -- to the government. And in exchange, in turn, what we expect from the government and what we expect from the IRS is that they will secure the data. They will protect the data. The defendant's crime undermined that faith. It undermined that trust." *Id.* at 286 ¶ 7-15.

69. At that sentencing, Mr. Littlejohn admitted: "I felt that the American people should have the opportunity to see the tax returns of the sitting President before they decided on how they were going to vote." *Id*. at 287 ¶ 3-6. Mr. Littlejohn clearly committed his crimes, which the Defendants allowed to occur, in order to improperly influence the results of the 2020 presidential election.

70. In his Factual Basis for Plea, Mr. Littlejohn expressly admitted that his "disclosure of the [Plaintiffs] tax returns and return information . . . was knowing and willful." *U.S.A. v. Littlejohn*, Case No. 23-cr-00343, Dkt. No. 9, at ¶ 16.

71. U.S. District Court Judge Ana C. Reyes, at sentencing, expressly found: "Mr. Littlejohn's targeting of a sitting President of the United States is part of a three-year criminal scheme, including working with reporters to help him understand the tax returns, deciding again

and again and again to take the law into his own hands." *Id*. at 289 ¶ 7-12.

72.     Judge Reyes further found that Mr. Littlejohn sought to harm President Trump: "Despite what Mr. Littlejohn argues, I find it implausible that he did not intend to harm at least some taxpayers. Indeed, he provided the returns to the *New York Times* and *ProPublica* so that they could write articles about Mr. Trump and wealthy individuals." *Id*. at 291 ¶ 16-21.

73.     Because of Defendants' wrongful conduct, Plaintiffs were subject to, among many others, at least eight ("8") separate stories in the *New York Times* which wrongly and specifically alleged various improprieties related to Plaintiffs' financial records and taxpayer history, including:

- False allegations that President Trump engaged in "tax avoidance," Russ Buettner, Susanne Craig, and Mike McIntire, *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance,* N.Y. Times (Sept. 27, 2020), https://tinyurl.com/yhhvep2d;

- False allegations that President Trump "reduced his tax bill with questionable measures," David Leonhardt, *18 Revelations from a Trove of Trump Tax Records*, N.Y. Times (Sept. 27, 2020), https://tinyurl.com/w93vrbty;

- False allegations that President Trump "suffered heavy business losses," Charlie Smart, *Here Are the Key Numbers From Trump's Tax Returns*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/46pfw63b;

- False allegations regarding the specifics of existence of various IRS audits of Defendants; Jim Tankersley, Susanne Craig and

Russ Buettner, *Trump Tax Returns Undermine His Image as a Successful Entrepreneur*, N.Y. Times (Dec. 30, 2022), https://tinyurl.com/mvbv7m22;

- False allegations regarding President Trump's charitable contributions; Jim Tankersley, Susanne Craig and Russ Buettner, *Key Takeaways From Trump's Tax Returns*, N.Y. Times, (Dec. 30, 2022), https://tinyurl.com/bdf5nwfs;

- False allegations that President Trump's returns and information had "red flags," Jim Tankersley, Susanne Craig and Russ Buettner, *Trump's Taxes: Red Flags, Big Losses, and a Windfall From His Father*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/muz53b7x;

- False allegations that President Trump "paid no federal income taxes in 11 of 18 years", Trump's Taxes: I.R.S. Didn't Audit Trump for 2 Years in Office, House Committee Says, N.Y. Times (Dec. 20, 2022), https://tinyurl.com/yu4as6zf; and

- False allegations that President Trump paid "$750 in federal income taxes in 2017", Russ Buettner, Mike McIntire, Susanne Craig and Keith Collins, *Trump Paid $750 in Federal Income Taxes in 2017. Here's the Math.*, N.Y. Times (Sept. 29, 2020), https://tinyurl.com/2pcywfm6.

74.     Likewise, *ProPublica* published at least 50 articles as a result of Defendant's unlawful disclosures, many of which contained false and inflammatory claims about Defendants'

16

confidential tax documents.  *See* Government's Sentencing Memorandum at 4.

75.     For instance, *ProPublica* falsely reported that President Trump's unlawfully leaked tax information contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies* (Oct. 16, 2019), https://tinyurl.com/4x9nak4e; and mischaracterized his accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://perma.cc/2FYA-W7UA.

76.     President Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until January 29, 2024, when the IRS sent a letter addressed to "Donald J. Trump and Melania," that stated, "We're providing you this letter to notify you that an Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information between 2018 and 2020."

77.     When the first relevant *New York Times* story was released on September 27, 2020, Plaintiffs had no reason to believe that an unauthorized disclosure had occurred for at least two reasons. First, the *New York Times* reporting did not state that the information came from the IRS, and second, the IRS Commissioner supposedly investigated and found that the disclosure did not come from the IRS. Littlejohn Dep., *infra* at 172.

78.     Eric Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

79.     The § 7431 notice received by Eric Trump informed that "[a]n Internal Revenue

Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

80.     Donald Trump, Jr. did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he first received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

81.     The § 7431 notice received by Donald Trump, Jr. informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

82.     To date, the Trump Organization continues to receive notices from Defendants pursuant to Internal Revenue Code § 7431.

83.     The notices that were sent to Plaintiffs disclosed numerous violations of § 6103 that were committed in connection with The Trump Organization's corporate tax returns, as well as the corporate tax returns of subsidiaries of, and/or fully owned affiliates of, the Trump Organization.

84.     Between December 2024 and May 12, 2025, the Trump Organization received § 7431 notices with respect to 418 Trump Entities.

85.     All § 7431 notices received by the Trump Organization informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

86.     Plaintiffs were not able to bring an action against an unknowable, indeterminate defendant to vindicate their rights until such notification occurred—which, in this case, was

18

pursuant to the statutory requirement imposed upon the Secretary of the Treasury to notify a taxpayer "as soon as practicable" if "any person is criminally charged by indictment or information with inspection or disclosure of" that taxpayer's return or return information. 26 U.S.C. § 7431(e). 26 U.S.C. § 7431(e) provides the Defendants' notice requirement to Plaintiffs, while 26 U.S.C. § 7431(d) governs the two-year time period within which Plaintiffs must generally file their action pursuant to 26 U.S.C. § 7431(a)(1).

87.     All conditions precedent to this action have been performed, excused, or waived.

## CLAIMS FOR RELIEF

### Count I - Violations of 26 U.S.C. § 6103 and 26 U.S.C. § 7431(a)(1)

88.     Plaintiffs repeat each of Paragraphs 1 to 87 as if fully alleged herein.

89.     26 U.S.C. § 6103 provides that tax "[r]eturns and return information shall be confidential" and prohibits disclosure and inspection by United States employees and other defined persons, except as specifically authorized by law." *Id*. § 6103(a)(3).

90.     Under 26 U.S.C. § 6103(a), no such person who has received tax returns or return information "shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." The statute defines "officer or employee" as a former officer or employee. *Id.*

91.     Section 6103(a) provides that, with limited exceptions, federal tax "[r]eturns and return information shall be confidential," and it imposes this confidentiality obligation on, among other persons, federal contractors who receive access to returns or return information. 26 U.S.C. § 6103(a)(2).

92.     "Return" is defined as:

> [A]ny tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this

19

title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

26 U.S.C. § 6103(b)(1).

93.     "Return information" includes:

[A] taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

26 U.S.C. § 6103(b)(2)(A).

94.     "[D]isclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

95.     The IRS's Internal Revenue Manual § 10.5.5.1.6(2) defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." The Internal Revenue Manual § 10.5.5.1.6(3) defines "staff-like access" to mean "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS information."

96.     The Internal Revenue Manual defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." *See IRS Unauthorized Access, Attempted Access, Or Inspection of Taxpayer Records ("UNAX") Program Policy, Guidance, and Requirements ("UNAX Policy")*, IRM § 10.5.5.1.6(2).

97.     According to the IRS, "staff-like access" means "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS

information." *See id.* § 10.5.5.1.6(3).

98.     26 U.S.C. § 6103(n) permits the disclosure of returns and return information to any person "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration."

99.     26 C.F.R. § 301.6103(n)-1(b)(2) prohibits such disclosures under 26 U.S.C. § 6103(n) if the disclosure is not "necessary" or, in the alternative, if the services for which the disclosure is made under 26 U.S.C. § 6103(n) can be:

> [R]easonably, properly, or economically performed by disclosure of only parts or portions of a return or if deletion of taxpayer identity information […] reflected on a return would not seriously impair the ability of the employees to perform the service, then only the parts or portions of the return, or only the return with taxpayer identity information deleted, may be disclosed.

100.     26 U.S.C. § 7431 provides taxpayers a private right of action for damages against the United States for the knowing or negligent unauthorized inspection or disclosure of tax return information in violation of 26 U.S.C. § 6103.

101.     An affected taxpayer may bring a civil action for damages "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103."

102.     As alleged herein, Defendants, through Mr. Littlejohn, acting as an employee, contractor, and jointly-employed individual of Defendants, repeatedly violated 26 U.S.C. § 6103 from as early as March 2019 through at least September 2020 by unlawfully inspecting Plaintiffs' confidential tax return information and then unlawfully disclosing that information to the *New York*

*Times* and *ProPublica*, with the expectation that this information would be widely published and harm Plaintiffs.

103.    Defendants, through Mr. Littlejohn, knowingly and unlawfully disclosed Plaintiffs' "tax returns and return information dating back *more than 15 years*," from at least 2000 through 2020, to the *New York Times* and *ProPublica*, which the expectation that this information would be widely published and harm Plaintiffs. *See* Information at 1.

104.    Thus, Defendants violated § 6103 in connection with each of the Plaintiffs, including the unlawful inspection and disclosure of numerous confidential tax returns covering the time period of at least 2005 through 2020, to at least two media outlets, *The New York Times* and *ProPublica*. The unlawful disclosure of *each* confidential tax return and/or return information, for *each* year and to *each* outlet, and each time that confidential tax return and/or return information was viewed as a result of the unlawful disclosure constitutes a separate violation of 26 U.S.C. § 6103.    *See, e.g., Snider v. United States* 468 F.3d 500, 508 (8th Cir. 2006) ("Direct disclosures to multiple persons multiplies the harm to the taxpayer . . . one disclosure to two people counts as two separate disclosures.") (citing *Mallas v. United States*, 993 F.2d 1111, 1125 (4th Cir. 1993)); *Minda v. United States*, 851 F.3d 231, 236 (2d Cir. 2017) (noting that 26 U.S.C. § 7431(c) "clearly provides an aggrieved taxpayer $1,000 in statutory damages for 'each act' of unauthorized disclosure."). This information was likely seen by tens of millions of viewers. *See e.g.,* Sarah Diamond, *What Makes a Times Article Go Viral?*, The New York Times, (Mar. 16, 2022), https://tinyurl.com/4v9h3zhr (stating "articles evoking high-arousal emotions like awe, anger, surprise and anxiety were more likely to go viral" and thus "amass[ ] millions of page views") ("Diamond Article").

105.    Those unlawful inspections and disclosures encompassed, among other things, the

22

wage information, charitable contributions, financial and securities transactions, adjusted gross income, and information sufficient to calculate the purported effective federal income tax rates of President Trump, Eric Trump, and Donald Trump, Jr. The unlawful inspections and disclosures also encompassed sensitive corporate financial information of The Trump Organization and the Trump Entities.

106.   Defendants made these unlawful disclosures knowingly—or at the very least negligently or with gross negligence—because they willfully failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' confidential taxpayer information and protect from the exact unlawful disclosures that occurred.

107.   As shown above, Defendants, through Littlejohn, illegally disclosed the confidential return information to the *New York Times* and *ProPublica* with the intent that the *New York Times* and ProPublica would widely publicize the information through its print and online reporting.

108.   Defendants' illegal disclosures of Plaintiffs' tax return information did not result from a "good faith, but erroneous interpretation of section 6103," 26 U.S.C. § 7431(b)(1), but rather from knowing violations, gross negligence, and/or negligence.

109.   Defendants' unlawful disclosures of Plaintiffs' tax return information to the *New York Times* were not "requested by the taxpayer," i.e., Plaintiffs, under 26 U.S.C. § 7431(b)(2).

110.   Therefore, the IRS's disclosure of Plaintiffs' tax return information violated 26 U.S.C. § 6103.

111.   Under 26 U.S.C. § 7431, Plaintiffs are entitled to statutory damages of $1,000 "for *each* act of unauthorized disclosure of a return or return information[.]" 26 U.S.C. § 7431(c)(2).

112. Plaintiffs are also entitled to punitive damages under 26 U.S.C. § 7431(c)(1)(B)(ii), because the IRS's unlawful disclosure of their confidential tax return information was either willful or a result of gross negligence.

113. There are several further aggravating factors that support the award of punitive damages in this case, including, without limitation: (i) the overtly political nature of Defendants' conduct—which was targeted at a then-sitting (and now current) President, his family, and entities bearing his name; (ii) the fact that the unlawful disclosures were committed with the express purpose of influencing and/or interfering with the 2020 presidential election; (iii) the unprecedented size and scope of the breach of privacy and the sheer number of individuals and entities affected (which forced Plaintiffs to have to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information); and (iv) the reckless abandon displayed by Defendants with respect to the complete and utter failure to safeguard the confidential, sensitive, and highly sought-after tax return information of the President of the United States, his family members, and businesses bearing his name.

114. Plaintiffs are entitled to the costs of the action and reasonable attorney's fees under 26 U.S.C. § 7431(c)(3).

### Count II - Violation of 5 U.S.C. § 552a(e)(10)

115. Plaintiffs repeat the allegations contained in paragraphs 1 through 87 as if fully alleged herein.

116. The IRS is an agency within the meaning of the Privacy Act.

117. The IRS maintained Plaintiffs' records, including his confidential tax return information, in a system of records as defined in the Privacy Act.

24

118. The IRS has long been aware of serious deficiencies in its privacy safeguards, including due to repeated notices from the Treasury Inspector General for Tax Administration.

119. The Privacy Act requires that Defendants "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination[.]" 5 U.S.C. § 552a(e)(5).

120. Defendants failed to do so with respect to Plaintiffs' tax return information.

121. Mr. Littlejohn's unlawful disclosure of Plaintiffs' tax returns and related information to *The New York Times* and *ProPublica* caused reputational and financial harm to Plaintiffs and adversely impacted President Trump's support among voters in the 2020 presidential election.

122. At Mr. Littlejohn's January 29, 2024, criminal sentencing, the prosecutors charged that Mr. Littlejohn's "disclosures were intended to damage his victims' reputations, and through that criminal damage, he sought to influence an election and to reshape our nation's political discourse and political process." Littlejohn Dep. at 285 ¶ 3-7.

123. As a result of Defendants' repeated violations of the Privacy Act, Plaintiffs incurred substantial financial and other damages, including having to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information.

124. Plaintiffs will continue to sustain substantial financial, reputational, and other damages as a result of Defendants' repeated violations of the Privacy Act set forth above.

125. Plaintiffs are therefore entitled to substantial damages under 5 U.S.C. §§ 552a(g)(1)(D), (g)(2)(A), and (g)(4).

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs President Donald Trump, Donald Trump Jr., Eric Trump, and the Trump Organization respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully accessed and inspected Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

B. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully disclosed Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

C. Awarding Plaintiffs, pursuant to 26 U.S.C. § 7431(c)(1), the greater of either $1,000 in damages for each unauthorized disclosure of their tax return information, including each subsequent disclosure by third parties, including by the *New York Times*, *ProPublica,* and by many additional print, broadcast, cable, social media and other platforms, which amounts to at least $10,000,000,000.00, *see* Diamond Article, *supra*, or the actual damages sustained by Plaintiffs and all related entities, including each of the 418 Trump Organization-affiliated entities that received notices from the IRS, which also amounts to at least $10,000,000,000.00;

D. Awarding Plaintiffs reasonable costs and attorney's fees pursuant to 26 U.S.C. § 7431(c)(2)-(3), and as may otherwise be permitted by law;

E.  Awarding Plaintiffs punitive damages pursuant to 26 U.S.C. § 7431(c)(1)(B)(ii) because the unlawful disclosure of their confidential tax returns and return information was either willful or the result of gross negligence;

F.  Ordering Defendants to pay damages under the Privacy Act's damages provision, 5 U.S.C. § 552a(g)(4)(A), for actual damages resulting from the IRS's failure to maintain its records in a confidential manner;

G.  Awarding costs and pre-and post-judgment interest as allowed by law; and

H.  Any such other relief as the Court deems just and proper.

Dated: January 29, 2026                    Respectfully submitted,

                                           **BRITO, PLLC**
                                           2121 Ponce de Leon Boulevard
                                           Suite 650
                                           Coral Gables, FL 33134
                                           Office: 305-614-4071
                                           Fax: 305-440-4385

                                           By: /s/ *Alejandro Brito*
                                               **ALEJANDRO BRITO**
                                               Florida Bar No. 098442
                                               Primary: abrito@britopllc.com
                                               Secondary: apiriou@britopllc.com
                                               **IAN MICHAEL CORP**
                                               Florida Bar No. 1010943
                                               Primary: icorp@britopllc.com

                                               **Daniel Z. Epstein**
                                               D.C. Bar No. 1009132
                                               Epstein & Co. LLC
                                               E-mail: dan@epsteinco.co
                                               *\* Pro Hac Vice Forthcoming*

                                               *Counsel to Plaintiffs*
                                               *President Donald J. Trump et al.*

# EXHIBIT C

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

      Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

      Defendants.

_____/

**<u>ORDER</u>**

**THIS MATTER** is before the Court on the Motion to Reopen Case filed by thirty-five former federal judges ("***Motion***") (DE 63). In the Motion, the non-party movants ask this Court to reopen the instant case pursuant to Rule 60 of the Federal Rules of Civil Procedure, arguing that the Court should "exercise its authority under Rule 60 to set aside the judgment in this lawsuit . . . [and] resume its inquiry into whether there is an actual underlying case or controversy[.]" (DE 63 at 6). The non-party movants explain that although there is no settlement of record in this matter, public documents and announcements indicate that the dismissal of this case was premised on a purported settlement between the Parties.[1] In turn, movants submit that the settlement "is a product of collusion and is itself a fraud on the Court." (*Id.* at 9).

A court is empowered to investigate serious misconduct as a collateral issue within the purview of Rule 11 and determine "whether an attorney has abused the judicial process." *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993); *see also Willy v. Coastal*

---

[1] As the Court noted in its April 29, 2026 Order (DE 43), Defendants did not file any notices of appearances and acted through Plaintiffs to ask the Court for relief from their imminent answer deadline.

*Corp.*, 503 U.S. 131 (1992) (holding that a district court could impose Rule 11 sanctions even where it was subsequently determined to lack subject matter jurisdiction); *Ormsby Motors, Inc. v. General Motors Corp.,* 32 F.3d 240, 241 (7th Cir. 1994) (finding that a litigant cannot avoid sanctions by voluntarily dismissing the case). Rule 11 issues can be "raised *sua sponte* by the [C]ourt." *Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 813 F. App'x 368, 375 (11th Cir. 2020); *see also Taylor v. Stanciel,* 202 F. App'x 662, 663–64 (5th Cir. 2006) (explaining that "a court may, on its own initiative, enter an order describing Rule 11 violations and ordering a party to show why it has not violated Rule 11").

"The purpose of Rule 11 is to deter baseless filings." *Powrzanas v. Jones Util. & Contracting Co.*, 834 F. App'x 500, 507 (11th Cir. 2020). Specifically, Rule 11 "requires that an attorney or unrepresented party filing a pleading certify that the filing is not presented for any improper purpose." *Id.* (internal quotation marks omitted); *see also In re Ames*, 993 F.3d 27, 34 (1st Cir. 2021) ("Under Rule 11, a court may impose sanctions on a lawyer 'for advocating a frivolous position, pursuing an unfounded claim, or *filing a lawsuit* for some improper purpose.'") (emphasis added). A party's decision to file a frivolous lawsuit for the sole purpose of forcing a settlement may qualify as such an improper purpose. *See Scott v. Vantage Corp.*, 64 F.4th 462, 472 (3d Cir. 2023) (affirming the district court's finding that plaintiffs filed their complaint for an improper purpose when two out of the three claims lacked factual support and plaintiffs expressed that they filed the lawsuit to force a settlement). If a party files a lawsuit for an improper purpose, "the court may impose an appropriate sanction on the responsible party." *Powrzanas*, 834 F. App'x at 507.

Here, the non-party movants advance grievous allegations that Plaintiffs voluntarily dismissed this litigation solely to avoid judicial scrutiny of a lawsuit that "was collusive from the start" and was only filed to provide the imprimatur of legality for an unlawful settlement. (DE 63 at 16). They point to the fact that the settlement in question includes a "three-paragraph addendum[2] . . . [that] purports to 'forever bar[] and preclude[]' the United States from pursuing claims that could have been [otherwise] asserted [against] Plaintiffs," (*Id.* at 8), and highlight the fact that Defendants did not "even try[] to defend against Plaintiffs' claims" despite their active opposition to nearly identical claims in other litigation.[3] (*Id.* at 16). Finally, the non-party movants assert that Plaintiffs' claims were "clearly untimely" and therefore untenable. (*Id.*).

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs shall file a response to the Motion (DE 63) on or before June 12, 2026, detailing their position on the matters set forth in the Motion, including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the "victim of a fraud." (DE 63 at 13, citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2870 (3d ed.)). The non-party movants may, if they choose, file a reply on or before June 19, 2026.

---

[2] This addendum, as the non-party movants point out, may be in conflict with internal Department of Justice policies that require the Department to only enter into compromises that are "specifically limited to the immediate subject matter of the claim which was in fact compromised." (DE 63 at 8). The addendum was signed only by the Acting Attorney General.

[3] The Court is aware of reporting that the IRS prepared a memorandum outlining ways to challenge Plaintiffs' claims. Andrew Duehren, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026), https://www.nytimes.com/2026/05/19/admin/irs-trump-lawsuit-deal.html. These defenses are consistent with the positions taken by the IRS and the Department of Justice in other litigation.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this <u>29th</u> day of May,

2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 26-20609-CV-WILLIAMS

PRESIDENT DONALD J. TRUMP, *et al.*,

     Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

     Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on the Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114) ("***Motion***"). Upon review of the Motion, the record, and applicable law, the Court finds that Plaintiffs have not shown good cause for an expedited ruling under Southern District of Florida Local Rule 7.1. *See* S.D. Fla. L.R. 7.1(d)(2) (requiring an expedited motion to "set forth in detail" . . . "the reason the ruling is needed by the stated date"); *see also Levine v. Bradshaw*, No. 22-cv-80321, 2022 WL 22859168, at *3 (S.D. Fla. April 1, 2022) (declining a plaintiff's expedited request where the court found "no basis to justify [p]laintiff's request"). Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' request for an expedited ruling is **DENIED**.

2. Court-appointed *amici* shall file a response to the Motion (DE 114) on or before **August 14, 2026**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 5th day of August, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

I certify that on August 12, 2026, I caused the foregoing motion to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to all current counsel of record. I further certify that the foregoing document is being served on appellees by UPS overnight mail and emailed at the following addresses:

Andrés Rivero
Daniela Tenjido-Eljaiek
Rivero Mestre LLP
2525 Ponce de Leon Boulevard, Suite 1000
Miami, FL 33134
arivero@riveromestre.com
dtenjido@riveromestre.com

Norman L. Eisen
David W. Ogden
Stephen A. Jonas
Democracy Defenders Action
600 Pennsylvania Ave. SE #15180
Washington, D.C. 20003
norman@democracydefenders.org
david@democracydefenders.org
steve@democracydefenders.org

*Counsel for 35 Former Judges*

Neal S. Manne
Justin A. Nelson
Stephen Shackelford, Jr.
Davida Brook
Daniel J. Shih
Zach Savage
Glenn Bridgman

Jillian Hewitt
Nick Carullo
Russell Rennie
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002
nmanne@susmangodfrey.com
jnelson@susmangodfrey.com
sshackelford@susmangodfrey.com
dbrook@susmangodfrey.com
dshih@susmangodfrey.com
zsavage@susmangodfrey.com
gbridgman@susmangodfrey.com
jhewitt@susmangodfrey.com
ncarullo@susmangodfrey.com
rrennie@susmangodfrey.com

Matthew J. Platkin
Angela Cai
Ravi Ramanathan
Aaron E. Haier
Conor Bradley
Platkin LLP
413 Washington Ave.
Unit 174
Belleville, NJ 07109
mplatkin@platkinllp.com
acai@platkinllp.com
rramanathan@platkinllp.com
ahaier@platkinllp.com
cbradley@platkinllp.com

*Counsel for Former Judges Michael
Luttig and Nancy Gertner*

U.S. Department of the Treasury
Attention: Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

U.S. Attorney's Office Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Internal Revenue Service
Attention: Commissioner of Internal Revenue
1111 Constitution Avenue, NW
Washington, D.C. 20224

*/s/ Christopher G. Oprison*
Christopher G. Oprison

August 12, 2026