NO. 26-12692

IN THE

# United States Court of Appeals for the Eleventh Circuit

PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC,

*Plaintiffs-Appellants, Cross-Appellants*,

ALEJANDRO BRITO, DANIEL EPSTEIN,

*Interested Parties-Appellants, Cross-Appellees*,

v.

INTERNAL REVENUE SERVICE, U.S. DEPARTMENT OF THE TREASURY,

*Defendants-Appellees, Cross-Appellants*,

THIRTY-FIVE FORMER FEDERAL JUDGES,

*Interested Parties-Appellees.*

On Appeal from the United States District Court for the Southern District of Florida, Case No. 1:26-CV-20609, District Judge Kathleen M. Williams

**OPENING BRIEF OF APPELLANTS PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC, ALEJANDRO BRITO, AND DANIEL EPSTEIN**

*(Counsel's Information on Inside Cover)*

Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
(305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
(610) 405-5531
jhalpern@jhlegalpllc.com

Rachel A.H. Horton
DLA PIPER LLP (US)
1650 Market Street
Suite 5000
Philadelphia, PA 19103
(215) 656-3300
rachel.horton@dlapiper.com

*Counsel for Appellants President Donald J. Trump,*
*Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC,*
*Alejandro Brito, and Daniel Epstein*

*President Donald J. Trump v. Internal Revenue Service*
No. 26-12692

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rules 26.1 and 28(a)(1) of the Federal Rules of Appellate Procedure and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, counsel for Appellants hereby certify on behalf of Appellants that the Certificate of Interested Parties filed on August 31, 2026, remains correct.

*/s/ Christopher G. Oprison*
Christopher G. Oprison

September 28, 2026

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal presents substantial questions concerning Article III adversity and the limits of the district court's sanctions authority. In this case, the court erroneously imposed (i) an unprecedented and unconstitutional restriction on the speech of the sitting President of the United States, as well as other government officials, and private persons, in every official forum in the country, and (ii) career-altering sanctions on the President's attorneys for advocating a legitimate legal position with which the court simply disagreed. Even worse, the district court did so without a show-cause order, a hearing, or individualized findings. Oral argument will assist the Court in resolving these important constitutional and procedural questions.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........ 1

STATEMENT REGARDING ORAL ARGUMENT ........ i

TABLE OF CITATIONS ........ iv

INTRODUCTION ........ 1

STATEMENT OF JURISDICTION ........ 6

STATEMENT OF THE ISSUES ........ 8

STATEMENT OF THE CASE ........ 10

I. Factual Background ........ 10

II. Procedural History ........ 12

A. The Underlying Lawsuit ........ 12

B. The Sanctions Order ........ 13

C. The Stay Proceedings ........ 15

STANDARDS OF REVIEW ........ 16

SUMMARY OF ARGUMENT ........ 17

ARGUMENT ........ 21

I. The District Court Wrongly Sanctioned Appellants for Pursuing Substantial Claims Between Adverse Parties. ........ 21

A. Plaintiffs' Substantial Statutory Claims Presented a Genuine Controversy Between Adverse Parties. ........ 22

B. The District Court's Theory of Adversity Was Erroneous and, in Any Event, Did Not Support Sanctions. ........ 26

1. The district court wrongly treated presidential control as an inherent bar to adversity. ........ 26

2. The district court distorted the facts to fit its mistaken theory of adversity. ....................30

C. The District Court Independently Erred by Treating Appellants' Substantial Jurisdictional Arguments as Sanctionable Misconduct. .........37

II. The District Court Wrongly Imposed Sanctions Without Adequate Notice, Evidence, or Individualized Findings. ....................40

A. The District Court Failed to Provide Proper Notice of the Conduct or Sanctions Under Consideration. ....................40

B. The District Court Erroneously Used Judicial Notice and Extrarecord Materials for Its Unsupported "Factfinding." ....................42

C. The District Court Made No Individualized Findings of Culpability. ......44

III. The Speech Injunction Is Unlawful and Must Be Vacated. ....................46

A. The Speech Injunction Is an Unconstitutional Content- and Viewpoint-Based Prior Restraint. ....................47

B. The Speech Injunction Is Overbroad and Impermissibly Vague. .............52

C. The Speech Injunction Exceeds Any Sanctions Authority. ......................53

IV. Professional Sanctions Against the Attorneys Lack Any Basis and Must Be Vacated. ....................55

V. Inviting *Amici* to Submit Fees Was Improper and Must Be Vacated. ..............57

CONCLUSION ....................59

## TABLE OF CITATIONS

**Page(s)**

**Cases**

*Alabama-Tombigbee Rivers Coal. v. Norton*,
338 F.3d 1244 (11th Cir. 2003) ....................................................................25

* *Alabama v. U.S. Army Corps of Engineers*,
424 F.3d 1117 (11th Cir. 2005) ......................................................................6

*Alexander v. Mare*,
5 F.2d 964 (1st Cir. 1925)..............................................................................30

*Alexander v. Trump*,
413 So. 3d 795 (Fla. Dist. Ct. App. 2025) ....................................................30

*Alexander v. United States*,
509 U.S. 544 (1993).......................................................................................47

*Aloe Vera of Am., Inc. v. United States*,
699 F.3d 1153 (9th Cir. 2012) ........................................................................33

*Am. Empire Surplus Lines Ins. Co. v. Chabad House of N. Dade, Inc.*,
450 F. App'x 792 (11th Cir. 2011) .................................................................52

*Baker v. Alderman*,
158 F.3d 516 (11th Cir. 1998) ...........................................................37, 38, 45

*Bancroft Glob. Dev. v. United States*,
330 F. Supp. 3d 82 (D.D.C. 2018)..................................................................33

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963)..........................................................................................47

*BE&K Constr. Co. v. NLRB*,
536 U.S. 516 (2002).........................................................................................49

*Biden v. IRS*,
No. 1:23-CV-02711 (D.D.C. Sept. 18, 2023)...................................................35

*Birmingham Fire Fighters Ass'n 117 v. Jefferson Cnty.*,
280 F.3d 1289 (11th Cir. 2002) ....................................................................6

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026)....................................................................................34

*Bradley v. Sebelius*,
621 F.3d 1330 (11th Cir. 2010) ..................................................................31

*Buckler v. MacGregor*,
634 F. App'x 694 (11th Cir. 2015)...............................................................37

*Burk v. Augusta-Richmond Cnty.*,
365 F.3d 1247 (11th Cir. 2004) ..........................................................47, 49

*Calderon v. Baker Concrete Constr., Inc.*,
771 F.3d 807 (11th Cir. 2014) ....................................................................16

*Carson v. Monsanto Co.*,
72 F.4th 1261 (11th Cir. 2023) (en banc) ...................................16, 22, 38

*CEATS, Inc. v. TicketNetwork, Inc.*,
71 F.4th 314 (5th Cir. 2023) ........................................................................7

*Chambers v. NASCO, Inc.*,
501 U.S. 32 (1991)..........................................................................16, 53, 58

*Chairs v. Burgess*,
143 F.3d 1432 (11th Cir. 1998) ....................................................................7

*U.S. ex rel. Chapman v. Fed. Power Comm'n*,
345 U.S. 153 (1953)....................................................................................24

*Citizens & S. Nat'l Bank v. United States*,
451 F.2d 221 (5th Cir. 1971) ......................................................................31

*Clinton v. Jones*,
520 U.S. 681 (1997)....................................................................................22

*Cooper v. Dillon*,
403 F.3d 1208 (11th Cir. 2005) ..........................................................49, 50

*Coquina Invs. v. TD Bank, N.A.*,
760 F.3d 1300 (11th Cir. 2014) ........................................................................8

*Creel v. Town of Dover*,
486 S.E.2d 478 (N.C. Ct. App. 1997)................................................................29

*Delta Air Lines, Inc. v. August*,
450 U.S. 346 (1981)...........................................................................................31

*Donaldson v. Clark*,
819 F.2d 1551 (11th Cir. 1987) (en banc) ...................................................37, 42

*Dubinin v. Papazian*,
No. 25-CV-23877, 2025 WL 3248187 (S.D. Fla. Nov. 21, 2025).....................38

*In re Finkelstein*,
901 F.2d 1560 (11th Cir. 1990) ........................................................................56

*Franklin v. Massachusetts*,
505 U.S. 788 (1992)...........................................................................................50

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991).........................................................................................51

*Glassroth v. Moore*,
347 F.3d 916 (11th Cir. 2003) ..........................................................................58

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017)......................................................................................54, 59

*Griffin v. IRS*,
730 F. Supp. 3d 1312 (S.D. Fla. 2024)........................................................24, 31

*Hafer v. Melo*,
502 U.S. 21 (1991).............................................................................................22

*Jaffe v. Sundowner Properties, Inc.*,
808 F.2d 1425 (11th Cir. 1987) ..........................................................................8

*Jarrard v. Sheriff of Polk Cnty.*,
115 F.4th 1306 (11th Cir. 2024) ........................................................................48

*Jones v. Governor of Fla.*,
975 F.3d 1016 (11th Cir. 2020) (en banc) .......................................................17

*Kaplan v. DaimlerChrysler, A.G.*,
331 F.3d 1251 (11th Cir. 2003) ............................................................17, 41, 45

*Kirkland v. Nat'l Mortg. Network, Inc.*,
884 F.2d 1367 (11th Cir. 1989) ..................................................................16, 56

*Kleiner v. First Nat'l Bank of Atlanta*,
751 F.2d 1193 (11th Cir. 1985) ............................................................30, 55, 56

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994).........................................................................................54

*Lewis v. Clarke*,
581 U.S. 155 (2017).........................................................................................22

*Lord v. Veazie*,
49 U.S. (8 How.) 251, 254 (1850) ....................................................................36

* *Madsen v. Women's Health Center, Inc.*,
512 U.S. 753 (1994)...................................................................................48, 49

*Marek v. Chesny*,
473 U.S. 1 (1985).............................................................................................31

*Marshall v. Gibson's Prods., Inc. of Plano*,
584 F.2d 668 (5th Cir. 1978) ............................................................................35

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1867) ............................................................................50

*Mitchell v. Nobles*,
873 F.3d 869 (11th Cir. 2017) ...........................................................................42

*In re Mroz*,
65 F.3d 1567 (11th Cir. 1995) ...................................................................38, 40, 45

*Muransky v. Godiva Chocolatier, Inc.*,
979 F.3d 917 (11th Cir. 2020) (en banc) ...........................................................16

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)....................................................................................51

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
427 U.S. 539 (1976)......................................................................................7

*Nebraska Press Ass'n v. Stuart*,
427 U.S. 539 (1976)....................................................................................47

*NLRB v. Constellium Rolled Products Ravenswood, LLC*,
43 F.4th 395 (4th Cir. 2022) .........................................................................36

*Peer v. Lewis*,
606 F.3d 1306 (11th Cir. 2010) ....................................................................37

*Positano Place at Naples I Condominium Ass'n v. Empire Indemnity Insurance Co.*,
84 F.4th 1241 (11th Cir. 2023) .......................................................................7

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017) ...........................................................38, 45, 58

*Safe Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*,
No. 25-cv-00139, 2026 WL 900051 (D. Md. Apr. 2, 2026) ........................24, 31

*Schlumberger Techs., Inc. v. Wiley*,
113 F.3d 1553 (11th Cir. 1997) ....................................................................56

*Schmidt v. Lessard*,
414 U.S. 473 (1974) (per curiam)..................................................................53

*Sec'y of Agric. of U.S. v. United States*,
347 U.S. 645 (1954)....................................................................................24

*Shahar v. Bowers*,
120 F.3d 211 (11th Cir. 1997) (en banc) ........................................................42

*Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*,
158 F.4th 1227 (11th Cir. 2025) ...................................................................35

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026)........................................................................3, 11, 13

*Thornton v. General Motors Corp.*,
136 F.3d 450 (5th Cir. 1998) ....................................................................7

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................................35

*Trump v. United States*,
603 U.S. 593 (2024)....................................................................................50

*TVA v. EPA*,
278 F.3d 1184 (11th Cir. 2002) ..................................................................22

*United States v. Allegheny-Ludlum Industries, Inc.*,
517 F.2d 826 (5th Cir. 1975) ......................................................................31

*United States v. Baker*,
432 F.3d 1189 (11th Cir. 2005) ..................................................................43

*United States v. Biden*,
No. 23-CR-00061 (D. Del.) ........................................................................35

*United States v. Conn. Nat'l Bank*,
418 U.S. 656 (1974)....................................................................................24

* *United States v. ICC*,
337 U.S. 426 (1949)...................................................................23, 24, 27, 38

*United States v. Johnson*,
319 U.S. 302 (1943)....................................................................................36

*United States v. Marine Bancorp., Inc.*,
418 U.S. 602 (1974)....................................................................................24

* *United States v. Nixon*,
418 U.S. 683 (1974)...............................................................................*passim*

*United States v. Ron Pair Enters.*,
489 U.S. 235 (1989)....................................................................................52

*United States v. Shaygan*,
652 F.3d 1297 (11th Cir. 2011) ..........................................................16, 41, 45

*United States v. Trump*,
88 F.4th 990 (D.C. Cir. 2023) .......... 7

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 25

*Universal Oil Products Co. v. Root Refining Co.*,
328 U.S. 575 (1946) .......... 58

*Wainberg v. Mellichamp*,
93 F.4th 1221 (11th Cir. 2024) .......... 33

**<u>Statutes</u>**

5 U.S.C. § 552a .......... 6

26 U.S.C. § 7431 .......... *passim*

28 U.S.C. § 1292 .......... 6

28 U.S.C. § 1331 .......... 6

28 U.S.C. § 1340 .......... 6

28 U.S.C. § 1346 .......... 6

28 U.S.C. § 2414 .......... 35

31 U.S.C. § 1304 .......... 35

**<u>Constitutional Provisions and Rules</u>**

U.S. Const., First Amendment .......... 15, 47-51

Fed. R. Civ. P. 11(b) .......... 40

Fed. R. Civ. P. 11(c)(3) .......... 40, 41, 42, 57

Fed. R. Civ. P. 11(c)(4) .......... 53, 57

Fed. R. Civ. P. 11(c)(5)(B) .......... 58

Fed. R. Civ. P. 60 .......... 13

Fed. R. Civ. P. 65 .......... 53

Fed. R. Civ. P. 68 .......................................................................................58

Fed. R. Evid. 201(b).......................................................................................42, 43

## INTRODUCTION

This appeal arises from the U.S. District Court for the Southern District of Florida's (the "court") extraordinary abuse of its sanctions power. In this action, President Donald J. Trump (in his personal capacity), Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC sued the Internal Revenue Service and the Department of the Treasury (together, "Government") pursuant to a congressionally authorized remedy, over the undeniably illegal disclosure of their confidential tax-return information to the press. The perpetrator of this egregious leak pleaded guilty and received the maximum prison sentence. The IRS itself acknowledged it failed to prevent his criminal conduct. Plaintiffs voluntarily dismissed the action with prejudice, and the court closed the case.

Thirty-five former judges ("Former Judges") improperly moved under Rule 60 to reopen the case, falsely alleging fraud on the court. The court, ignoring on-point case law and instead improperly invoking Rule 11 and its inherent authority, entered an unprecedented order, wrongly holding that a sitting President cannot ever sue the Government in his personal capacity. The court held this prohibition even extended to his private-citizen sons and a business he is not currently operating. The court cited no authority supporting its extraordinary, unjust ruling. It also improperly treated the filing of the Complaint as proof of collusion and bad faith, neither of which existed.

Specifically, the court imposed a sweeping, unconstitutional speech injunction on Plaintiffs and the Government (together, "Parties"), as well as on their "affiliates," and harsh, improper professional penalties on Plaintiffs' counsel Alejandro Brito and Daniel Epstein ("Attorneys"), all without the legally required notice, evidence, or individualized findings. The order under review is unsupported, and rests on error built on error. Doc.106 ("Sanctions Order").[1] The court misquoted the Supreme Court, erroneously treated a D.C. Circuit dissent as a district court decision, and repeatedly misattributed legal and news sources. This Court should reverse the hurried and wrongful use of the coercive sanctions power.

The Sanctions Order's adversity theory is wrong. President Trump sued in his personal capacity, alongside his sons and The Trump Organization, to vindicate their own statutory rights after the theft and disclosure of their tax information. The Government represented the United States' separate interests. The court wrongly held that Article II collapsed those distinct interests into "one, a fully realized unitary interest," somehow eliminating adversity altogether. Doc.106 at 37-38. That was obvious error. The court then improperly doubled down by converting that wrongful constitutional conclusion into supposed proof that the litigation was collusive, which

[1] Appeal.Doc.# refers to this Court's docket entries, and the black footer page numbers are cited. Doc.# refers to district court docket entries, with page references to the blue header generated by the filing system.

it was not. The court called the issue "unprecedented," appointed six *amici* to brief it, and devoted nearly thirty pages to resolving it. After all that, the court still erroneously declared its conclusion "so obvious and so insurmountable" that advancing a different view warranted a sweeping, unconstitutional speech injunction and career-altering punishment of the Attorneys. *Id.* at 38. The Supreme Court decision on which the court principally tried to rely, *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), was decided on June 29, 2026—five months after the Complaint was filed and six weeks after the case was dismissed.

The court's deeply flawed process was no better than its wrongful theory. Notably, no party requested the sanctions imposed, and no sanctions proceeding was ever lawfully commenced. The Attorneys received no notice that their professional standing and ability to practice were at stake. The court directed Plaintiffs alone to answer false accusations of collusion, then improperly sanctioned Attorneys which it had never ordered to show cause. It failed to identify for Plaintiffs or their Attorneys much of the conduct it erroneously considered contemptuous. No individualized finding established that Plaintiffs or their Attorneys knowingly made a false statement or acted in bad faith, because neither actually occurred. As to Mr. Epstein, who signed and filed nothing, the court shockingly conceded it could "only surmise" his motive. Doc.106 at 31.

Having adopted its erroneous adversity theory, the court discarded ordinary adjudicative safeguards. It improperly took judicial notice of press reports and relied on extrarecord research, conjecture about professional relationships, and collective attribution. Based on that improper record, the court wrongly forbade the President, the Government, and broad categories of associated persons from referring to the Settlement Agreement in official proceedings, wrongly referred Mr. Brito to The Florida Bar, improperly barred Mr. Epstein from appearing *pro hac vice* in the Southern District of Florida ("District") for one year, and erroneously invited volunteer *amici* to seek fees.

The Sanctions Order is an utterly unprecedented restriction on speech, reaching far beyond the courtroom to dictate what the President, the Government, and other persons may say before other courts, Congress, and official bodies. Neither the court nor its army of *amici* has identified even remotely analogous precedent for that extraordinary, unconstitutional assertion of power. The court has thus wrongfully claimed the extraordinary power to silence dissent and quash disagreement with its conclusions, even before the appellate court charged with reviewing them. A court's authority over its own proceedings supplies no license to censor advocacy elsewhere, much less to enjoin the sitting President and his co-Plaintiffs from challenging its errors before this Court, Congress, and the American people.

This timing was no accident: two days before Attorney General Todd Blanche's confirmation hearing, the court issued its opinion littered with legal, factual, and citation errors condemning conduct under Senate review, directed that its accusations be sent to his disciplinary authorities, and purported to dictate what he could tell Senators about the case. An Article III judge thus interfered with the Article II confirmation process, supplying a judicial condemnation of the nominee's conduct, while purporting to restrict his ability to respond. That extraordinary intrusion, coupled with the Sanctions Order's timing and haste, creates the disturbing appearance that the court wielded its sanctions power to try and inflict political damage on the President, rather than adjudicate supposed, nonexistent in this case, misconduct in good faith.

The court's treatment of counsel compounds its errors. It wrongly threatened Plaintiffs' Attorneys' professional standing and ability to practice for advancing a substantial legal position, while inviting volunteer *amici* who advocated its preferred position to seek fees for their efforts. It then enlisted its appointed *amici* to defend the sanctions imposed. The message is unmistakable: lawyers who challenge a court's unprecedented theory risk their careers; lawyers who support it may be rewarded. That selective use of sanctions chills the independent advocacy on which courts rely, and turns legal disagreement into a professional hazard.

Plaintiffs entered court seeking redress for a crime committed against them, as was their right. They left with their speech unlawfully restricted and their Attorneys wrongfully sanctioned for pursuing the remedy Congress provided. This Court should reverse the Sanctions Order and vacate all sanctions imposed.

## STATEMENT OF JURISDICTION

The court had jurisdiction under 28 U.S.C. §§ 1331, 1340, 1346, 26 U.S.C. § 7431(a), and 5 U.S.C. § 552a(g)(1)(D). Appellants timely appealed the Sanctions Order on July 31, 2026. Doc.106; Doc.113. Appeal.Doc.42-1. As Appellants and the Government explained in response to this Court's jurisdictional question, the Sanctions Order is immediately appealable on multiple grounds. Appeal.Doc.56 at 3-7; Appeal.Doc.54 at 1-5.

First, this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The Sanctions Order unconstitutionally prohibits the Parties from invoking their Settlement Agreement in general, and in official proceedings, as evidence that this case settled. Doc.106 at 47. That is injunctive relief. Courts examine an order's "actual effect," not its form. *Birmingham Fire Fighters Ass'n 117 v. Jefferson Cnty.*, 280 F.3d 1289, 1293 (11th Cir. 2002). In *Alabama v. U.S. Army Corps of Engineers*, this Court reviewed an order restricting implementation of a settlement agreement, including its filing in another court, and explained that an order prohibiting litigation in another forum "unquestionably is an injunction." 424 F.3d 1117, 1125, 1129 n.18 (11th Cir.

2005). This Court likewise exercises immediate jurisdiction over injunctions restricting future filings to address abusive litigation. *Procup v. Strickland*, 792 F.2d 1069, 1070 & n.1 (11th Cir. 1986) (en banc). So too here.

The Sanctions Order is also appealable under *Positano Place at Naples I Condominium Ass'n v. Empire Indemnity Insurance Co.*, 84 F.4th 1241, 1251-52 (11th Cir. 2023): it operates as an injunction with serious, irreparable consequences requiring immediate review. It purported to restrict the Attorney General's discussion of the settlement, including at his confirmation hearing, and likewise reaches Appellants' advocacy in this appeal. Later review cannot restore those lost opportunities to speak. *See United States v. Trump*, 88 F.4th 990, 1001 (D.C. Cir. 2023). Nor can the court indefinitely insulate a speech injunction from appellate review by prolonging the ancillary fee proceeding. The injunction operates now, and unresolved fees provide no basis to postpone review. *See CEATS, Inc. v. TicketNetwork, Inc.*, 71 F.4th 314, 321-22 (5th Cir. 2023); *Chairs v. Burgess*, 143 F.3d 1432, 1435 & n.3 (11th Cir. 1998). Prior restraints require "strict procedural safeguards, including immediate appellate review." *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 44 (1977) (per curiam) (citation omitted).

Second, the post-dismissal prohibition on Mr. Epstein's *pro hac vice* admission is appealable under § 1291. The court conclusively imposed a one-year district-wide restriction; no further determination is necessary to establish its scope

or duration. *Thornton v. General Motors Corp.*, 136 F.3d 450, 453-54 (5th Cir. 1998), treated a completed professional suspension as final despite unquantified fee sanctions. Unlike the dismissal-and-fee sanctions held inseparable in *Jaffe v. Sundowner Properties, Inc.*, 808 F.2d 1425, 1426-27 (11th Cir. 1987), this professional restriction followed dismissal of the underlying action and operates independently of any fee calculation.

Third, this Court should exercise pendent appellate jurisdiction over all remaining sanctions determinations, including the findings underlying Mr. Brito's Bar referral and the fee proceedings. Each sanction rests on the same erroneous findings of collusion and bad faith, reached through the same defective procedures that underlie the injunction. The issues are inextricably intertwined, and reversal of those findings defeats the basis for every sanction. *See Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1308 n.6 (11th Cir. 2014) (exercising pendent jurisdiction over a sanctions ruling containing unquantified fees). The Court should therefore review, and reverse, the Sanctions Order as a whole.

## STATEMENT OF THE ISSUES

1. Whether the court erred in holding that Article III adversity was absent from a suit brought by President Trump, Donald Trump Jr., Eric Trump, and The Trump Organization, because the President and the Executive Branch are somehow

"one"—where Plaintiffs sued in their personal capacities to vindicate their own rights and recover personal damages under 26 U.S.C. § 7431.

2. Whether the court unlawfully exceeded its authority and violated the First Amendment by imposing an overbroad and impermissibly vague content- and viewpoint-based prior restraint dictating how the sitting President, other federal officials, and private persons may refer to, invoke, or characterize their Settlement Agreement, including before other courts, Congress, and other official bodies—including this Court.

3. Whether the court violated due process and exceeded its sanctions authority by imposing *sua sponte* sanctions on Attorneys for advancing a reasonable position on what the court acknowledged was an unprecedented legal question, without adequate notice or individualized findings of culpability, and by using judicial notice and extrarecord materials to resolve disputed questions of motive and intent.

4. Whether the court exceeded its authority by imposing professional sanctions on Plaintiffs' Attorneys without the required procedural protections and findings, and by authorizing fee recovery for volunteer *amici* without a lawful basis.

## STATEMENT OF THE CASE

### I. Factual Background

This case arises from the theft and publication of confidential tax-return information of President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization. Doc.1 ¶¶ 6-7. Between 2019 and 2020, Charles Littlejohn—an employee-contractor working for the IRS—exploited his government position to systematically access and steal Plaintiffs' tax records, which he then provided to the media opposed to President Trump. *Id.* ¶¶ 35-37, 53-58, 65, 67. Littlejohn secured his role at the IRS specifically to gain access to President Trump's tax information, and, over a multi-year scheme, he extracted vast amounts of confidential data while the agency failed to detect or prevent his conduct. *Id.* ¶¶ 22-30, 32-33, 37-39. Littlejohn admitted to committing these crimes because he thought President Trump was "'dangerous' and a 'threat to democracy,' and that disclosure was … necessary due to political 'norms.'" Doc.1 ¶ 65. Littlejohn's sentencing judge noted Littlejohn's intent to harm President Trump and others. *Id.* ¶ 72. The breach was extensive: The Trump Organization alone received IRS notifications confirming that confidential data pertaining to 418 affiliated entities was unlawfully disclosed. *Id.* ¶ 84.

The disclosures of approximately 15 years of tax returns had severe negative impacts for Plaintiffs. *Id.* ¶ 103. The media falsely reported that the confidential

tax information evidenced fraud. *Id.* ¶ 10. Plaintiffs have suffered reputational and financial harm and embarrassment, as well as damage to their business reputations and standing in the public's eye. *Id.* ¶ 11. For example, some of the damaging articles falsely alleged that President Trump engaged in "tax avoidance," "reduced his tax bill with questionable measures," "suffered heavy business losses," and "paid no federal income taxes in 11 of 18 years." *Id.* ¶ 73 (quoting articles).

Littlejohn was criminally prosecuted, entered a guilty plea, and was sentenced to the statutory maximum of sixty months' incarceration. *Id.* ¶ 35; Doc.106 at 4. At sentencing, the court determined that Littlejohn had deliberately targeted President Trump as part of a three-year criminal enterprise and harbored intent to cause harm to at least some of the taxpayers whose records he compromised. Doc.1 ¶¶ 71-72. The IRS acknowledged its own institutional failure, conceding "it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure," despite its legal obligation to do so. *Id.* ¶¶ 8, 12.

Each Plaintiff became aware of the specific unauthorized disclosures at different points in time. President Trump received notice on January 29, 2024; Donald Trump Jr. and Eric Trump received notices on December 16, 2024; and The Trump Organization received notices on a rolling basis between December 2024 and 2026. *Id.* ¶¶ 5, 76, 78, 80, 82, 84. Plaintiffs did not have reason to believe that the tax-return information leaked in the first relevant media story was a result of

unauthorized disclosure from the IRS because the article did not name the IRS as a source, and "the IRS Commissioner supposedly investigated and found that the disclosure did not come from the IRS." *Id.* ¶ 77.

## II. Procedural History

### A. The Underlying Lawsuit

Plaintiffs commenced this action on January 29, 2026, seeking damages under § 7431 for the unlawful disclosure of their tax-return information. Doc.1. President Trump sued in his personal capacity. *Id.* ¶ 1. Plaintiffs demanded at least $10 billion in damages. *Id.* at 26. The statute provides $1,000 in damages for each act of unauthorized disclosure, and the unauthorized disclosures were "likely seen by tens of millions of viewers." *Id.* ¶ 104. Plaintiffs were also entitled to punitive damages under 26 U.S.C. § 7431(c)(1)(B)(ii), because the disclosure "was either willful or a result of gross negligence." *Id.* ¶ 112.

One week later, Former Government Officials and Public Interest Organizations ("Former Officials") sought and obtained leave to participate as *amici curiae*. Doc.7; Doc.28. On April 17, Plaintiffs filed a consent motion for a 90-day extension for Defendants to respond, explaining that settlement negotiations were underway. Doc.40 at 2. The court instead stayed Defendants' response, ordered briefing on Article III adversity, and appointed six *amici* to address that question. Doc.41; Doc.43. On May 18, Plaintiffs voluntarily dismissed the case with

prejudice. Doc.52; Doc.106 at 6-7. That day, the court cancelled the remaining briefing deadlines and closed the case. Doc.62.

Nine days later, the Former Judges moved to improperly reopen the case under Rule 60, falsely accusing the Parties of fraudulently dismissing it to evade jurisdictional review. Doc.63. They requested no professional sanctions, monetary penalties, or speech restrictions. *Id.* at 14-18. The court directed Plaintiffs alone to respond to the accusations of collusion; it did not require either Attorney to show cause and did not identify the speech restrictions and professional penalties ultimately imposed. Doc.65 at 3. Plaintiffs responded, and the Former Judges replied. Doc.89; Doc.94.

**B. The Sanctions Order**

On July 13—two days before Attorney General Blanche's confirmation hearing—the court issued its 56-page Sanctions Order. Doc.106. It erroneously concluded that presidential supervision made President Trump and the Government "one, a fully realized unitary interest," rendering the lawsuit "non-adversarial, collusive, and jurisdictionally improper." *Id.* at 37-38. The court took no evidence, identified no pre-filing agreement or false representation, and never cited *United States v. Nixon*, 418 U.S. 683, 693 (1974). Its principal authority on adversity, *Slaughter*, 146 S. Ct. at 2291, which is inapposite, was decided after the Complaint was filed and the case was dismissed. As detailed in Appellants' Motion to Stay,

Appeal.Doc.8 at 9, the court also committed numerous errors misquoting and misciting Supreme Court and other decisions—errors that should, and likely would, have been identified and addressed but for the court's apparent rush to decision.

Instead, the court mistakenly inferred collusion from the fact that the Government did not appear or respond to the Complaint—even though the court itself stayed the Government's response. Doc.106 at 24; Doc.41. It likewise "surmise[d]" from Mr. Epstein's not seeking *pro hac vice* admission that he knew he would never need to litigate Plaintiffs' claims, while acknowledging that Mr. Epstein did not sign, file, or submit the Complaint. Doc.106 at 30-31 & n.41. These baseless inferences supplied the purported basis for punishing Plaintiffs and their Attorneys.

The court referred Mr. Brito to The Florida Bar, prohibited Mr. Epstein from seeking *pro hac vice* admission throughout the District for one year, and barred the Parties and their affiliates from invoking the Settlement Agreement in official proceedings as evidence that this case settled. *Id.* at 46-47. It also directed that the Sanctions Order be sent to disciplinary authorities for then-Acting Attorney General Blanche and Associate Attorney General Woodward, as well as invited volunteer

*amici* to seek fees. *Id.* at 53-54.[2]

### C. The Stay Proceedings

Appellants appealed and requested an expedited stay on July 31. Doc.113; Doc.114. The court declined expedited consideration and instead enlisted its appointed *amici*, allowing them forty pages of briefing, to defend its *sua sponte* Sanctions Order. Doc.120; Doc.123. Appellants sought a stay from this Court on August 12, which is pending. Appeal.Doc.8. For all that briefing, neither the court nor its *amici* identified any analogous precedent authorizing a court to dictate how the sitting President and other litigants may characterize their agreement before other official bodies—including the appellate court reviewing its order.

After rushing out its Sanctions Order, the court took more than six weeks to deny an expedited stay. Doc.130. The delay yielded no sounder justification, only a clearer acknowledgment that the court was forbidding the Parties from disagreeing with it elsewhere: it wrongly branded their position a "false narrative" and erroneously dismissed contrary advocacy as "inaccurate assertions under the cloak of the First Amendment." *Id.* at 13. The court thus claimed authority to suppress debate over its own disputed conclusions in other forums—including this Court—

---

[2] The Former Officials sought $39,000 in attorneys' fees; the Former Judges sought nominal fees and expenses totaling $4,610.83. Doc.111; Doc.112. Plaintiffs opposed those requests, and neither group replied. Doc.116.

while simultaneously, and in a clear contradiction, denying the existence of any "concrete and ongoing harm." *Id.* at 17. It then improperly invoked that supposedly minimal harm and the unresolved fee proceedings to argue that immediate appellate review was unavailable. *Id.* at 5-7. That is wrong. The court also faulted the Parties for having "eschewed the opportunity to create their own record" by exercising their Rule 41(a)(1)(A)(i) dismissal right, and concluded they "cannot now protest" the denial of process. *Id.* at 10. It further claimed that a stay would "diminish[] the public's confidence in the judiciary's ability to impose binding legal consequences"—attempting to assert that judicial legitimacy depended on insulating its rulings from challenge rather than subjecting them to proper review. *Id.* at 18. That is also wrong.

## STANDARDS OF REVIEW

This Court reviews *de novo* whether the parties presented an Article III case or controversy, including whether they were sufficiently adverse. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 923 (11th Cir. 2020) (en banc); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023) (en banc). Where jurisdiction "is intertwined with the merits," the underlying factfinding is also reviewed *de novo*. *Calderon v. Baker Concrete Constr., Inc.*, 771 F.3d 807, 810 (11th Cir. 2014) (internal marks and citation omitted).

Due process challenges, including whether sanctions were imposed without adequate notice or a hearing, are reviewed *de novo*. *United States v. Shaygan*, 652 F.3d 1297, 1310 (11th Cir. 2011); *Kirkland v. Nat'l Mortg. Network, Inc.*, 884 F.2d 1367, 1370 (11th Cir. 1989). Inherent-power sanctions are reviewed for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991). The same standard governs *sua sponte* Rule 11 sanctions, but applies with "particular stringency." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). The entry of a permanent injunction is reviewed for abuse of discretion, its underlying legal conclusions *de novo*, and its factual findings for clear error. *Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc).

## SUMMARY OF ARGUMENT

The Sanctions Order rests on a mistaken theory of adversity, unsupported findings of misconduct, and procedures that wrongly denied Plaintiffs and their Attorneys a fair opportunity to defend themselves. Each resulting sanction independently exceeds the court's authority.

**I.A.** The court wrongly sanctioned Plaintiffs and their Attorneys for pursuing substantial claims between adverse parties. Plaintiffs were victims of criminal disclosures of their tax information and invoked the remedy Congress expressly provided in § 7431. Plaintiffs' personal interests in compensation directly opposed the United States' financial interests. Presidential supervision did not merge

President Trump's private rights with the Government's interests, and his co-Plaintiffs exercised no governmental authority whatsoever.

**I.B.** The court displaced that straightforward analysis with the erroneous premise that presidential control made the Parties' interests identical. Its reliance on *Slaughter* and Executive Order 14215 concerned supervision of executive power, not ownership of private claims. It then forced ordinary litigation conduct into that mistaken framework: settlement became collusion, unpressed defenses became bad faith, and professional relationships became evidence of improper motives, although none of these dreamt up wrongs existed. The court also disregarded the other Plaintiffs' independent interests and overlooked that the Parties never sought judicial approval of their agreement. Finally, punishing Plaintiffs for advancing their substantial jurisdictional position was independently erroneous. Rule 11 protects reasonable advocacy; neither it nor inherent authority permits substituting disagreement with legal reasoning for proof of (nonexistent) misconduct.

**II.A.** The sanctions independently fail because the court bypassed essential procedural protections. It never identified the specific conduct and sanctions under consideration, never directed either Attorney to show cause, and imposed sanctions materially exceeding its purported notice to Plaintiffs. General references to sanctions authority supplied no fair warning that the Parties' future speech or counsel's professional standing was at stake.

**II.B.** The court improperly used judicial notice and extrarecord research to resolve disputed questions of knowledge, motive, and intent. Wrongly utilized articles, public statements, and unrelated filings did not establish the truth of the court's accusations or permit it to dispense with a meaningful opportunity to contest them.

**II.C.** The court mistakenly imposed collective blame without findings establishing individual culpability. That fails both the heightened standard for *sua sponte* Rule 11 sanctions and the subjective-bad-faith requirement for inherent-power sanctions. The court's issuance of its condemnation two days before Attorney General Blanche's confirmation hearing further undermines the appearance of impartiality.

**III.A.** The speech injunction is an unprecedented and unconstitutional content- and viewpoint-based prior restraint reaching beyond the court's courtroom. The stay denial's attempted narrowing confirms the discrimination: the Parties may somehow discuss their agreement but may not invoke it as evidence that this case settled. That prohibition purports to restrict advocacy in various forums, including this very appeal, and in presidential speech before Congress. The court cannot manufacture a compelling interest in censorship by mislabeling disagreement with its disputed jurisdictional ruling a falsehood.

**III.B.** The injunction is overbroad and impermissibly vague. It extends beyond official proceedings and reaches sweeping categories of associated persons without justification for any of that reach. The stay denial neither establishes clear boundaries for the persons bound nor adequately defines the prohibited speech.

**III.C.** The injunction exceeds any sanctions authority. The purported, nonexistent misconduct was filing the Complaint; the restraint prohibits future advocacy about a later agreement. Neither Rule 11's deterrent purpose nor the court's inherent authority permits it to compel acceptance of its account of the litigation.

**IV.** The professional sanctions lack the findings and protections required for disciplinary action. The court established no misconduct by Mr. Brito warranting referral and relied on speculation to exclude Mr. Epstein from appearances throughout the District. It identified no professional rule Mr. Epstein violated and afforded no notice or hearing. Mislabeling the exclusion a prospective admission restriction cannot evade the safeguards governing professional discipline.

**V.** The court wrongly invited volunteer *amici* to recover fees while punishing the Attorneys who opposed their position. Agreement with the court creates no entitlement to compensation. The required show-cause order did not precede dismissal, and the court established neither the bad faith and procedural protections necessary for inherent-power sanctions nor a compensable loss caused by proven

misconduct. Plaintiffs cannot be required to finance advocacy of a position the court preferred merely because it rejected theirs.

This Court should reverse and vacate all sanctions imposed.

## ARGUMENT

### I. The District Court Wrongly Sanctioned Appellants for Pursuing Substantial Claims Between Adverse Parties.

Plaintiffs were victims of a federal crime, and Congress expressly authorized them to seek redress from the United States. They brought substantial claims for the unlawful disclosure of their confidential tax information, seeking compensation for private injuries from a Government with an opposing financial stake. The court improperly turned that ordinary exercise of statutory rights into grounds for punishment. It wrongly declared that presidential supervision made Plaintiffs and Defendants "one, a fully realized unitary interest," then pronounced that anomalous conclusion "so obvious and so insurmountable" that taking the contrary position proved an improper purpose (which never existed). Doc.106 at 37-38. The court thus wrongly made disagreement with its own novel jurisdictional theory sanctionable.

Having erroneously presumed that no genuine controversy could exist, the court treated ordinary efforts to resolve it—settlement, dismissal, and decisions not to press contested defenses—as confirmation that the lawsuit was a sham, which it was not. That circular reasoning supplies no lawful basis for sanctions. Plaintiffs

were entitled to pursue the remedy Congress provided, and their Attorneys were entitled to advocate its availability without being punished for failing to anticipate and accept the court's unprecedented view.

### A. Plaintiffs' Substantial Statutory Claims Presented a Genuine Controversy Between Adverse Parties.

Plaintiffs' claims against the Government presented precisely the opposing legal and financial interests Article III requires. The inquiry turns on whether each side possesses "a real interest in the legal positions" it advances and whether the record establishes that one party actually controls the other or its representation (which does not exist here). *Carson*, 72 F.4th at 1266. In *Carson*, even a negotiated settlement did not eliminate adversity because the parties retained conflicting financial stakes and nothing established that the defendant controlled the plaintiff or his counsel. *Id.* Courts thus look "behind names that symbolize the parties" to identify the actual controversy. *Nixon*, 418 U.S. at 693 (quoting *United States v. ICC*, 337 U.S. 426, 430 (1949)). Governmental hierarchy alone does not foreclose adversity. *See TVA v. EPA*, 278 F.3d 1184, 1197 (11th Cir. 2002).

For suits involving government officials, adversity turns on the interests that they assert, not the offices they hold. In a personal-capacity action, "the real party in interest is the individual, not the sovereign." *Lewis v. Clarke*, 581 U.S. 155, 162-63 (2017); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Presidency likewise remains distinct from "the individual who happens to be the President." *Clinton v.*

*Jones*, 520 U.S. 681, 701 (1997). In *Nixon*, the Supreme Court rejected the President's contention that his dispute with the Special Prosecutor was nonjusticiable because it arose within the Executive Branch. 418 U.S. at 692-97. The Court acknowledged the Executive's "exclusive authority and absolute discretion to decide whether to prosecute a case," but examined the competing claims to evidence and the regulation authorizing the Special Prosecutor to contest presidential privilege. *Id.* at 693-96. Those claims supplied "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends." *Id.* at 697. Presidential supervision did not alter the inquiry into the parties' legal interests.

*ICC* is still more explicit. There, "[t]he Attorney General appeared for the Government as both plaintiff and defendant," and a three-judge district court dismissed "on the theory that the Government could not maintain a suit against itself." 337 U.S. at 429. The Supreme Court reversed, looking beyond the Government's appearance on both sides to the underlying dispute over "who is legally entitled to sums of money." *Id.* at 430-31. Here, the distinction is even clearer: Plaintiffs sought recovery in their private capacities, and the United States faced corresponding liability. If the Government's appearance as both plaintiff and defendant did not itself defeat adversity in *ICC*, President Trump's public office cannot by itself erase the adverse interests presented by his private statutory claims

and those presented by the claims of his family and of a business he does not currently operate or control.

*ICC* is not an outlier. The same principle governed *U.S. ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 154 (1953), and *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 614 (1974), where the Court adjudicated disputes between government agencies and officers in their official capacity answering to the President. *See also United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974); *Sec'y of Agric. of U.S. v. United States*, 347 U.S. 645, 650 (1954).

Plaintiffs sought redress for completed criminal violations of their own rights. Littlejohn stole and disclosed each Plaintiff's confidential tax information, pleaded guilty, and received the statutory maximum sentence. Doc.1 ¶ 35; Doc.106 at 4. The IRS acknowledged that "it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure." Doc.1 ¶ 12. Congress expressly authorized taxpayers to recover damages from the United States for such unauthorized disclosures by federal officers and employees. 26 U.S.C. § 7431(a)(1). Plaintiffs also pleaded substantial claims under that statute: the Complaint detailed the IRS's control over Littlejohn's access, work, supervision, and compliance obligations. Doc.1 ¶¶ 7, 22-30. Courts addressing the same disclosure scheme held that materially similar allegations plausibly established that Littlejohn qualified as an "employee of the United States" under § 7431. *Griffin v. IRS*, 730 F. Supp. 3d 1312, 1318 (S.D. Fla. 2024); *Safe*

*Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*, No. 25-cv-00139, 2026 WL 900051, at *11 (D. Md. Apr. 2, 2026). Plaintiffs invoked the same statutory remedy that other victims of Littlejohn's crimes had pursued.

Each Plaintiff had a personal stake in obtaining relief, directly opposed to the Government's financial interest. President Trump sued in his personal capacity for illegal disclosure of his own tax information; Donald Trump Jr., Eric Trump, and The Trump Organization asserted their own claims arising from separate illegal disclosures. Doc.1 ¶¶ 76-85. Each alleged an "injury in fact," fully traceable to the Government's conduct, and a "likelihood that the requested relief will redress the alleged injury"—the damages Congress expressly authorized. *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1252 (11th Cir. 2003). Any recovery would belong to the private claimant, not the Presidency or the Executive Branch. The corresponding liability would fall on the United States. That concrete dispute over entitlement to public funds supplied adversity even if the Parties agreed on particular legal questions, which they did not here. *See United States v. Windsor*, 570 U.S. 744, 756-58 (2013). President Trump's supervisory authority did not make those opposing interests "one," and his co-Plaintiffs exercised no governmental authority at all. The lawsuit was very much genuine, and created true adversity among the Parties.

### B. The District Court's Theory of Adversity Was Erroneous and, in Any Event, Did Not Support Sanctions.

The court displaced that straightforward adversity analysis with a fundamentally mistaken premise: that presidential supervision somehow made President Trump and the Government "one, a fully realized unitary interest." Doc.106 at 37. From that erroneous premise, it wrongly declared the lawsuit "non-adversarial, collusive, and jurisdictionally improper." *Id.* at 38. The court then recast ordinary litigation conduct as evidence of nonexistent collusion and routine disagreement with its unprecedented view as grounds for improper punishment. Its legal premise was wrong, its factual inferences were unfounded, and neither justified sanctions.

#### 1. The district court wrongly treated presidential control as an inherent bar to adversity.

The court's threshold error was to equate presidential authority over executive officials with a joinder of legal interests between the President personally and the Government. Its flawed reasoning rested on presidential control itself—asserting that one "need only look" to President Trump's office, his supervisory authority, Executive Order 14215, and the Government's litigation conduct to conclude that adversity was absent. Doc.106 at 54-55. But that erroneous premise—that presidential control over executive officials precludes adverse legal interests—

would bar any sitting President from suing the Government in their individual capacity, however concrete the injury or substantial the claim.

The court's incorrect invocation of *Slaughter*, 146 S. Ct. 2291, makes the faulty premise explicit. Quoting *Slaughter*'s explanation that executive officers "exercise the President's power, not their own," the court declared that Plaintiffs could not defend presidential control before the Supreme Court and "then here, argue that the Parties are sufficiently adverse to establish an actual case or controversy." Doc.106 at 18, 20. The court thus wrongly treated Article II authority as incompatible with Article III adversity. But those positions are not inconsistent. *Slaughter* addressed control over executive power, not ownership of the President's private rights. 146 S. Ct. at 2292-97, 2304-06. Indeed, *Slaughter*—decided months after the Complaint was filed—itself adjudicated opposing claims between the President and an officer claiming a right to remain in executive office. Presidential supervision did not eliminate that controversy, just as it did not in *Nixon*. 418 U.S. at 692-97.

The court's mistreatment of other Supreme Court precedents underscores its error. It relied extensively on *Slaughter*'s account of presidential control, yet never addressed *Nixon*'s rejection of executive hierarchy as an automatic bar to adversity. Additionally, although it quoted *ICC*, it ignored that decision's reversal of a dismissal premised on the Government's inability to sue itself. Doc.106 at 16. The

court thus wrongly treated removal authority as dispositive while failing to apply the precedents addressing the jurisdictional question actually before it.

The court's reliance on Executive Order 14215 confirms that presidential control drove its wrongful finding of non-adversity. It erroneously treated the President's supervisory authority under Section 7 as establishing identical interests between the President and the Government, without identifying any invocation of the Executive Order here. Doc.106 at 21-23. Its stay denial made the mistaken reasoning explicit: *Slaughter* and Executive Order 14215 "significantly expand Presidential oversight of the Executive branch," and that control had a "dooming effect" on adversity. Doc.130 at 8. Despite disclaiming a "categorical rule," the court improperly applied one: presidential authority over executive officials forecloses a genuine controversy between the President individually and the Government. *Id.* at 7-9. That is wrong.

Executive Order 14215 actually reflects a longstanding supervisory relationship that has coexisted with distinct private and governmental interests across administrations. The Obama Administration recognized the Attorney General's authority to provide "controlling legal advice to Executive Branch officials in furtherance of the President's constitutional duties" under the Take Care Clause. David J. Barron, Acting Assistant Att'y Gen., Memorandum for Attorneys of the Office, *Best Practices for OLC Legal Advice and Written Opinions* (July 16,

2010). The Bush Administration likewise invoked presidential oversight of agencies to ensure "that the President's policies are reflected in agency rules," tracing that practice through administrations dating to President Ford. Office of Information and Regulatory Affairs, *OIRA Q&A's* (June 22, 2005) (citing Executive Orders 11821, 11949, 12044, 12291, and 12866). Those principles concern supervision of the Executive Branch, not ownership of a private claim against the Government.

The court's incorrect theory also improperly creates a presidential exception Congress never enacted. Section 7431 authorizes recovery against the United States for unlawful disclosures of tax-return information without excluding a sitting President or his family. President Trump's election changed neither the private injuries Plaintiffs suffered nor the statutory remedy available. With concrete adversity established, his public office supplied no basis for withholding that remedy.[3]

The consequences of the court's view are absurd. Public officials assert personal claims against the governments they lead. *See, e.g.*, *Creel v. Town of*

---

[3] The court's reliance on President Trump's remark that he was "suing myself" is equally misplaced. Doc.106 at 43 n.61. An informal public remark cannot reasonably be expected to articulate the distinction between official authority and personal legal interests with a judicial opinion's precision. President Trump sued for injury to his own tax information, and any recovery would belong to him personally, not to the Office of the President and not to the United States Government.

*Dover*, 486 S.E.2d 478, 480 (N.C. Ct. App. 1997) (adjudicating mayor's claim against town for benefits arising from on-duty injury); *Alexander v. Mare*, 5 F.2d 964, 965 (1st Cir. 1925) (rejecting "purely technical" objection that naval officer could not seek mandamus for salary owed because he was also the disbursing officer). At bottom, Article III does not strip the President—or any public official—of ordinary private rights merely because he supervises, in his official capacity, those responsible for the injury. *Accord Alexander v. Trump*, 413 So. 3d 795, 800 (Fla. Dist. Ct. App. 2025). The court's erroneous reasoning would do precisely that, and the Sanctions Order must be reversed.

### 2. The district court distorted the facts to fit its mistaken theory of adversity.

Having wrongly deemed genuine adversity somehow impossible due to presidential control, the court wrongly treated ordinary efforts to resolve the case as evidence of a sham that never existed. Settlement became collusion, unpressed defenses became bad faith, and counsel's professional ties and admission status became grounds for speculation about motive—none of which were present in this case. Each false accusation depended on the same erroneous premise of non-adversity.

***First***, the court erroneously equated the avoidance of litigation with the absence of a genuine dispute, treating prompt settlement as evidence of collusion. Doc.106 at 24-26 & n.32. But federal law encourages parties to resolve disputes

before incurring litigation expense. *See Marek v. Chesny*, 473 U.S. 1, 5 (1985) ("plain purpose of Rule 68 is to encourage settlement and avoid litigation"); *Bradley v. Sebelius*, 621 F.3d 1330, 1339 (11th Cir. 2010) (recognizing "strong public interest in the expeditious resolution of lawsuits through settlement"). Parties often compromise adverse interests to avoid litigation; doing so does not render those interests identical. *See Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981).

The timing of settlement does not prove collusion. There was no collusion or pre-filing settlement agreement, and the court identified no evidence that either existed. Even a preexisting intent to settle (not present here) would not render the controversy fictitious. In *United States v. Allegheny-Ludlum Industries, Inc.*, the parties announced a tentative settlement "[s]imultaneously with the filing of the complaint." 517 F.2d 826, 834 (5th Cir. 1975); *see also Citizens & S. Nat'l Bank v. United States*, 451 F.2d 221, 226 (5th Cir. 1971). Plaintiffs did not have to prolong their dispute to prove that it was real.

The Government also had ample reason to settle. Littlejohn pleaded guilty, the IRS acknowledged failing to prevent his criminal disclosures, and other courts allowed materially similar claims arising from the same conduct to proceed. Doc.1 ¶ 12; *Griffin*, 730 F. Supp. 3d at 1318; *Safe Harbor*, 2026 WL 900051, at *11. Choosing settlement over contested motion practice did not establish collusion. The court's reliance on the Government's absence or lack of response was particularly

misplaced because it had itself stayed the Government's response to the Complaint. Doc.41; Doc.106 at 24. It could not stay the Government's response and then treat the absence of one as evidence that the lawsuit was somehow a sham.

Nor does the creation or size of the Anti-Weaponization Fund evidence collusion. The Complaint demanded at least $10 billion in damages; Plaintiffs received none. Doc.1 at 26. The Settlement Agreement expressly provides that Plaintiffs "will not receive any monetary payment or damages of any kind." The $1.776 billion Fund instead establishes a mechanism for third-party claims. Plaintiffs' acceptance of an apology rather than the billions in damages that they sought reflects negotiated compromise between adverse parties, not collusive acquiescence. The court's speculation that the Fund's amount merely "speaks of a 'branding' effort" does not negate that clear adversity. Doc.106 at 50 n.64.

***Second***, the court's limitations theory compounded speculation with legal error. It wrongly treated the attendance of President Trump's former counsel (not any attorney in this case) at Littlejohn's October 2023 plea hearing as proof that all Plaintiffs' claims were untimely, then improperly inferred collusion from the Government's decision not to assert that defense. Doc.106 at 5, 24 n.31, 37, 43, 50. Neither inference was justified. The Complaint alleged separate discovery dates for each Plaintiff, from President Trump's January 29, 2024 IRS notice through 2026 for The Trump Organization. Doc.1 ¶¶ 76-86. Attendance at a hearing in 2023 by

a lawyer not involved in this case did not establish each Plaintiff's knowledge of each disclosure.

Section 7431 requires "knowledge of each particular disclosure," not a limitations period triggered "by a single generalized event." *Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1160 (9th Cir. 2012). Courts cannot disregard plausible allegations of later discovery to resolve a contested limitations defense on the pleadings. *See Bancroft Glob. Dev. v. United States*, 330 F. Supp. 3d 82, 95-97 (D.D.C. 2018); *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024). Yet the court wrongly assumed that the defense would succeed and condemned the Parties for settling. Parties need not litigate a defense to avoid claims of collusion, and a court cannot manufacture one from its disagreement with their decision to settle.

***Third***, the court improperly substituted guilt by association for evidence of collusion, citing Mr. Woodward's prior representation of Trump associates, including Mr. Walt Nauta. Doc.106 at 31-34. A former client list is not evidence of collusion. The court's inference about Mr. Epstein was even more extraordinary: because he had not actually sought *pro hac vice* admission (despite indicating his application was forthcoming), the court declared that it could "only surmise" that he knew he would never litigate the merits. *Id.* at 30-31. An unfiled admission application establishes no such advance knowledge. The court's observation that

Mr. Brito's name appeared on an agreement he did not sign supplied no such evidence. *Id.* at 30 n.41. Having wrongly assumed that presidential control made the outcome predetermined, the court worked backward from the settlement to incorrectly impute advance knowledge to counsel. That inference merely repackaged its mistaken legal premise as evidence of nonexistent collusion, and cannot support sanctions.

***Fourth***, the court's mistreatment of the other Plaintiffs exposes the same determination to fit the facts to its faulty theory of presidential control. Donald Trump Jr., Eric Trump, and The Trump Organization exercised no authority over the IRS or Treasury, and each sought compensation for disclosure of his or its own tax information. Yet the court wrongly dismissed their claims as "parenthetical" because of shared counsel, familial or corporate relationships, and a common litigation position. Doc.106 at 22 n.29. The stay denial made the error explicit: because those Plaintiffs lacked "a divergent interest" from President Trump, their claims required no "independent treatment." Doc.130 at 7 n.12. That asks the wrong question. Co-plaintiffs must be adverse to the defendant—not to each other. These Plaintiffs' interests in recovering damages were plainly adverse to the Government's, and their agreement with President Trump did not erase that conflict.

Those Plaintiffs' claims independently presented genuine controversies. *Cf. Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026). The court could not

dismiss them by association: "standing is not dispensed in gross," and Article III requires attention to each plaintiff's claims. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *see Shen v. Comm'r, Fla. Dep't of Agric. & Consumer Servs.*, 158 F.4th 1227, 1241-49 (11th Cir. 2025). Familiar examples expose the flaw. Hunter Biden sued the IRS for unauthorized disclosure of his tax information during President Biden's term, and President Biden's DOJ prosecuted him. *See Biden v. IRS*, No. 1:23-CV-02711 (D.D.C. Sept. 18, 2023); *United States v. Biden*, No. 23-CR-00061 (D. Del.). Presidential supervision and family relationships did not foreclose adversity there, and they provide no basis for disregarding Plaintiffs' rights here.

***Finally***, the court's baseless accusation that Plaintiffs manufactured this lawsuit to obtain judicial "imprimatur" ignores a basic fact: the Parties could have settled without filing suit. Doc.106 at 29 & n.38, 38. The Government may compromise claims without a pending lawsuit, and that authority expressly extends to "imminent litigation." 28 U.S.C. § 2414; *see also id.* §§ 2672, 2677; 31 U.S.C. § 1304; *Marshall v. Gibson's Prods., Inc. of Plano*, 584 F.2d 668, 676 n.11 (5th Cir. 1978); *Power of the Attorney General in Matters of Compromise*, 38 Att'y Gen. Op. 124, 126 (1934). Filing suit supplied no additional settlement authority. Nor did the Parties seek a consent judgment, retained jurisdiction, or judicial approval of their agreement; § 7431 required none. Had they already agreed on the outcome, they

could have achieved it without invoking federal jurisdiction, and that would have been proper also. Instead, Plaintiffs asserted substantial claims and later resolved them through an agreement the court was never asked to, and was not obligated to, approve. That sequence supplied no judicial endorsement and no evidence of a scheme to procure one.

The actual collusion cases underscore what is missing here. In *Lord v. Veazie*, the parties' interests were "one and the same," and they contracted to manufacture litigation and obtain an advisory opinion. 49 U.S. (8 How.) 251, 254 (1850). In *United States v. Johnson*, one party selected opposing counsel, paid the other side's legal expenses, and left the nominal plaintiff with "no active participation." 319 U.S. 302, 303-05 (1943). In *NLRB v. Constellium Rolled Products Ravenswood, LLC*, the parties sought judicial approval of a predetermined result. 43 F.4th 395, 398 (4th Cir. 2022). Here, the court identified no pre-filing agreement (there was none), no procurement or financing of nominal opposing counsel, and no request for an advisory judgment. Presidential supervisory authority that does not damage adversity could not fill that evidentiary gap.

The court found collusion only by wrongly assuming presidential control made an adverse lawsuit impossible, which is not the case, and then treating settlement as proof the suit was a sham, which it was not. That reasoning established

no misconduct; it merely recast the court's legal error as a factual accusation. This Court should reverse and vacate.

### C. The District Court Independently Erred by Treating Appellants' Substantial Jurisdictional Arguments as Sanctionable Misconduct.

With no evidence of collusion independent of its mistaken adversity theory, the court improperly punished Plaintiffs for taking the other side of a substantial legal question. That was a separate and independent error. The court pronounced its own unprecedented theory "so obvious and so insurmountable" that filing the lawsuit itself demonstrated an improper purpose. Doc.106 at 38. But its erroneous conviction in its own reasoning could not establish bad faith by those who disputed it. Plaintiffs' arguments were supported by substantial authority, and punishing their advocacy independently warrants reversal.

Rule 11 expressly protects reasonable arguments on unsettled questions. A legal contention warrants sanctions when it has "no reasonable chance of success" and "cannot be advanced as a reasonable argument to change existing law." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998); *see also Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010); *Buckler v. MacGregor*, 634 F. App'x 694, 697 (11th Cir. 2015). The Rule preserves room for "doctrinal development, novel legal arguments, [and] cases of first impression." *Donaldson v. Clark*, 819 F.2d 1551, 1561 (11th Cir. 1987) (en banc). Plaintiffs' position rested on Congress's express statutory remedy, substantial claims arising from criminal disclosures, and

decisions—including *Carson*, *Nixon*, and *ICC*—requiring examination of actual interests rather than governmental titles. That position was amply supported.

Mislabeling the lawsuit improperly motivated did not cure the error. Although Rule 11 reaches filings "filed in bad faith for an improper purpose," *Baker*, 158 F.3d at 524, the court improperly inferred that purpose from its disputed jurisdictional conclusion, and from ordinary litigation conduct that established no collusion. Inherent authority likewise requires subjective bad faith: "the key to unlocking a court's inherent power is a finding of bad faith." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017); *see In re Mroz*, 65 F.3d 1567, 1576 (11th Cir. 1995). The court supplied no such basis. It simply mistreated rejection of its legal analysis as evidence of an improper motive that did not exist.

Neither the court nor its *amici* identified any precedent for sanctions like these: punishing litigants and their attorneys for pursuing substantial statutory claims on a theory of adversity supported by Supreme Court precedent, then settling those claims without judicial approval. Ordinary Rule 11 cases involve concrete abuses of the judicial process—fabricated authorities, baseless filings, judge-shopping, or deception of the court. Courts identify the misconduct, provide an opportunity to respond, and impose sanctions based on demonstrated misconduct. *See, e.g.*, *Dubinin v. Papazian*, No. 25-CV-23877, 2025 WL 3248187, at *1-2 (S.D. Fla. Nov.

21, 2025). Here, by contrast, the court imposed career-altering professional sanctions and an unprecedented speech restriction by improperly and unlawfully elevating its novel jurisdictional theory as indisputable and contrary advocacy as bad faith. Rule 11 does not permit a court to substitute disagreement over the law for evidence of misconduct.

The court's own treatment of the issue underscores its error. It appointed six *amici* "'to assist the Court in identifying the applicable law governing an analysis' of its jurisdiction," Doc.130 at 2 (quoting Doc.43), devoted nearly thirty pages to adversity, and acknowledged the question's novelty, yet punished Appellants nonetheless. Doc.106 at 9-38, 53 n.69. A court does not need appointed counsel to identify the governing law of a position it later calls "risible." Doc.106 at 37. And the Supreme Court decision on which the court chiefly relied—*Slaughter*—does not support the sanctions and did not even exist when the Complaint was signed. Those circumstances belie the court's erroneous insistence that the jurisdictional defect was so self-evident that bringing the case demonstrated bad faith. The substantial authorities supporting Appellants' position did not disappear merely because the court adopted a competing theory.

Plaintiffs pursued a remedy Congress provided. Their Attorneys advanced a position supported by binding precedent. The court rejected that position on an erroneous theory of presidential control, then compounded the error by punishing its

proponents. Neither Rule 11 nor inherent authority permits a court to convert legal disagreement into professional misconduct. The sanctions must be reversed.

## II. The District Court Wrongly Imposed Sanctions Without Adequate Notice, Evidence, or Individualized Findings.

In its rush to impose sanctions, the court did not follow basic procedural protections. It failed to provide adequate notice of the charges and sanctions, improperly relied on extrarecord materials to resolve disputed questions of motive and intent, and wrongly imposed collective punishment without individualized culpability findings. These failures deprived Plaintiffs and their Attorneys of any meaningful opportunity to defend themselves before the court unlawfully restricted their speech and threatened counsel's professional standing. Standing alone, each defect requires reversal.

### A. The District Court Failed to Provide Proper Notice of the Conduct or Sanctions Under Consideration.

Due process requires "fair notice that [the] conduct may warrant sanctions and the reasons why," together with a meaningful opportunity to respond. *Mroz*, 65 F.3d at 1575-76. Rule 11 is equally explicit. Before imposing *sua sponte* sanctions, a court must order the particular attorney, firm, or party to show cause as to why "conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). The court did neither, and that independently requires reversal.

The May 29 Order directed Plaintiffs to respond to *amici*'s allegations of collusion, adversity, deception, and fraud on the court. But Rule 11(c)(3) requires more than a general reference to Rule 11 or a broad invitation to respond to allegations. It requires notice of the specific conduct believed to violate the Rule. Yet, the court never ordered Mr. Brito or Mr. Epstein to show cause, identified no sanctionable conduct by either Attorney, and never advised that professional standing, bar status, or a district-wide practice ban were at risk. The deficiency is underscored by the fact that no one asked for the sanctions the court ultimately imposed. No reasonable attorney reviewing the motion, briefing, and court orders would have anticipated such sanctions. *See Shaygan*, 652 F.3d at 1319 (attorneys are entitled to know "the precise rule, standard, or law" allegedly violated, and how they allegedly violated it).

The purported notice to Plaintiffs was likewise deficient. The May 29 Order omitted several theories on which the Sanctions Order ultimately relied, including the statute-of-limitations defense, the damages demand, counsel's prior professional relationships, purported conflicts, the Settlement Agreement's legality and scope, or the President's Compensation Clause. Nor did it disclose the monetary sanctions or the sweeping injunction it ultimately entered. This Court prohibits sanctions by ambush. *See Kaplan*, 331 F.3d at 1256-57 (finding "material variance" between

conduct identified in show-cause notice and conduct sanctioned); *Mitchell v. Nobles*, 873 F.3d 869, 875 (11th Cir. 2017).

Questions of "improper purpose," such as those that the court analyzed here, require especially careful notice, and "[t]he more serious the possible sanction … the more process that will be due." *Donaldson*, 819 F.2d at 1560-61. The court provided no notice commensurate with the sanctions it imposed, and could not excuse that failure by wrongly faulting the Parties for having "eschewed the opportunity to create their own record" through voluntary dismissal. Doc.130 at 10. Dismissal before an answer is a matter of right. Fed. R. Civ. P. 41(a)(1)(A)(i). Exercising that unconditional procedural right cannot constitute bad faith nor forfeiture of the notice Rule 11(c)(3) requires.

### B. The District Court Erroneously Used Judicial Notice and Extrarecord Materials for Its Unsupported "Factfinding."

The Sanctions Order also requires reversal because the court erroneously relied on judicial notice and extrarecord materials to resolve disputed factual questions underlying its mistaken findings of collusion, bad faith, and improper purpose, none of which existed. Judicial notice is confined to facts "not subject to reasonable dispute." Fed. R. Evid. 201(b). A court may notice that an article, public statement, or court filing exists. It may not accept disputed assertions within those materials as true. *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en

banc) (judicial notice is "a highly limited process"); *United States v. Baker*, 432 F.3d 1189, 1211 (11th Cir. 2005).

The court improperly crossed that line. It filled an evidentiary void by *sua sponte* invoking Rule 201 and taking "judicial notice of articles," public statements, and materials from its own research. Doc.106 at 3 n.3. Those materials included reporting by The New York Times, The Wall Street Journal, Politico, CNN, The Guardian, and Bloomberg Law. *Id.* at 3, 7-9, 20-21, 26-27, 29, 33, 36, 43. The court did not use those materials to establish publication or statements made. It relied on them to incorrectly determine the Parties' and Attorneys' knowledge, motives, and whether the lawsuit was filed to facilitate a predetermined settlement. Those are disputed factual conclusions, not facts capable of judicial notice. The court's own list of five purportedly "uncontroverted facts" fares no better: "Donald Trump is President;" he "controls … all Executive branch actors;" Executive Order 14215 governs DOJ litigation strategy; no Government lawyer appeared for 109 days; and Defendants' conduct was consonant with the Executive Order. *Id.* at 54-55. None bears on any Attorney's conduct, knowledge, or purpose.

The court's reliance on an unpublished IRS memorandum further illustrates its error. Although acknowledging that the memorandum "has yet to be published by the Government," the court relied on media reports to conclude that Defendants knowingly suppressed defenses. *Id.* at 8-9 & n.17. Judicial notice of an article's

publication did not permit the court to treat a journalist's description of an unseen document as proof of internal Executive Branch deliberations or strategy. The court similarly "surmise[d]" from Mr. Epstein's *pro hac vice* applications in unrelated cases that he knew he would never litigate the merits here. *Id.* at 30-31. Those filings established only that they were made, not Mr. Epstein's knowledge or expectations when the Complaint was filed. The court's own use of "surmise" confirms that its conclusion wrongly rested on conjecture, not evidence.

The same defect permeates the court's central erroneous finding of collusion. None of the judicially noticed or extrarecord materials established a pre-filing agreement, who entered it, what it required, or how any Plaintiff or Attorney participated. Instead, the court improperly inferred collusion from press accounts, professional relationships, public statements, litigation decisions, and the later settlement. Judicial notice cannot bridge the gap between circumstances a court considers unusual and proof of sanctionable misconduct.

### C. The District Court Made No Individualized Findings of Culpability.

The Sanctions Order independently requires reversal because the court never tied sanctionable conduct or culpability to the Plaintiffs and Attorneys it sanctioned. That omission is fatal under either sanctions authority. Because court-initiated Rule 11 sanctions provide no safe-harbor opportunity to withdraw or correct a challenged submission, they require a heightened showing "akin to contempt" and must be

reviewed with "particular stringency." *Kaplan*, 331 F.3d at 1255-56. Although *Kaplan* left open whether that heightened standard requires subjective bad faith, it cannot be satisfied without findings of contempt-like conduct. *Id.* at 1256. Inherent-power sanctions independently require a specific finding of subjective bad faith. *Purchasing Power*, 851 F.3d at 1223-25. Neither standard permits collective attribution or conjecture, as is permeated here.

This Court has repeatedly required sanctions to be tied to the sanctioned actor. A court abuses its discretion by sanctioning a plaintiff and counsel without finding that each violated Rule 11. *Baker*, 158 F.3d at 526. Likewise, attorneys "cannot be held responsible for the acts or omissions of others." *Shaygan*, 652 F.3d at 1319. And when sanctions are sought for bad-faith conduct, the court must determine which attorneys engaged in it before deciding "which attorneys … if any should be sanctioned." *Mroz*, 65 F.3d at 1576.

The Sanctions Order did none of those things. It repeatedly referred to "Plaintiffs and their counsel" collectively, wrongly attributing shared motives and knowledge without individualized findings. As to counsel, the court improperly referred Mr. Brito to The Florida Bar and wrongly barred Mr. Epstein from seeking *pro hac vice* admission for one year, yet identified no false statement by either Attorney, knowledge of any pre-filing arrangement, or agreement to suppress defenses, none of which existed. Doc.106 at 46-47. As to Plaintiffs, the court never

found who supposedly entered the purported (and nonexistent) pre-filing arrangement, when it was formed, what it required, or who authorized it. Nor did it identify which Plaintiff knowingly advanced a false allegation or acted in subjective bad faith (because none did).

These failures are especially troubling given the timing. The court bypassed necessary safeguards and issued its sweeping condemnation just two days before Attorney General Blanche's confirmation hearing. It directed that the Sanctions Order be sent to his disciplinary authorities and apparently sought to restrict him from describing the case as settled in the very proceeding where Senators would likely question him about it. Doc.106 at 47, 53-54; Doc.130 at 13-14. The court thus supplied accusations for a pending confirmation hearing while purporting to constrain the nominee's response. That sequence compounds the denial of a fair proceeding, creating a troubling appearance of judicial interference in the political process and reinforcing the need to reverse.

## III. The Speech Injunction Is Unlawful and Must Be Vacated.

The court imposed an unprecedented content-based prior restraint to silence disagreement with its own ruling. Reaching far beyond its courtroom, it improperly prohibited the Parties from referencing the "settlement agreement" or invoking it as evidence that this case settled before other courts, Congress, and other official bodies—including this Court. Neither the court nor its army of *amici* has identified

analogous precedent for that extraordinary and unconstitutional assertion of power. Its belated attempt to narrow the injunction only sharpened the constitutional offense: the Parties may apparently discuss their agreement, but may not contradict the court's disputed conclusion about what it accomplished. Doc.130 at 13-14. The injunction unlawfully suppresses protected speech, is overbroad and impermissibly vague, and exceeds any available sanctions authority. A court cannot compel acceptance of its errors by forbidding advocacy needed to expose them.

### A. The Speech Injunction Is an Unconstitutional Content- and Viewpoint-Based Prior Restraint.

The Sanctions Order prohibits the Parties from "referring to" the Settlement Agreement, or "using, offering, admitting, or citing any of its provisions" in official proceedings "as evidence of a 'settlement' reached in this matter." Doc.106 at 47. Orders forbidding future speech are "classic examples of prior restraints." *Alexander v. United States*, 509 U.S. 544, 550 (1993); *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1250-51 (11th Cir. 2004). They are "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and come "bearing a heavy presumption against [their] constitutional validity," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The court imposed that wrongful restraint without any constitutional justification.

The injunction unlawfully discriminates on both content and viewpoint. It singles out the Settlement Agreement and improperly prohibits the Parties from invoking it as evidence that this case settled. The stay denial's attempted narrowing makes that discrimination unmistakable: the Parties may somehow reference a "private agreement and the terms of that agreement," but may not characterize it as resolving the controversy before the court. Doc.130 at 14. The court thus permits discussion of the agreement while improperly suppressing the position that contradicts its own legal and factual findings. Such viewpoint-based restrictions are virtually never constitutional, and require, at the very least, a compelling governmental interest and narrow tailoring, neither of which exist here. *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1318-20 (11th Cir. 2024), *cert. denied sub nom. Moats v. Jarrard*, 145 S. Ct. 2702 (2025).

The court identified no compelling interest justifying its decision to silence the Parties outside its courtroom. The Sanctions Order did not even mention the First Amendment. The stay denial instead defended the injunction as necessary to prevent the "false narrative that the agreement resolved a controversy between adversarial litigants," wrongly dismissing contrary statements as "inaccurate assertions under the cloak of the First Amendment." Doc.130 at 13. That justification assumes the very incorrect conclusion Plaintiffs challenge. The court held no evidentiary hearing to establish that the Parties fabricated their dispute

(which they did not do). It instead inferred the absence of a genuine controversy from its erroneous premise that presidential control defeated adversity. Plaintiffs' disagreement with that premise is a legal argument, not a false factual assertion that the court may suppress. The court cannot manufacture a compelling interest in censorship by declaring its own disputed ruling the truth—especially when the prohibited advocacy seeks reversal of that ruling.

The injunction independently fails narrow tailoring. The court identified no concrete harm requiring suppression of Plaintiffs' position and never explained why responsive advocacy or adjudication in the receiving forum would be inadequate. Other courts can evaluate the Parties' arguments, and Congress can assess their explanations. The court supplied no justification for preempting those processes with a blanket and unconstitutional prohibition on a legal position it rejected. *See Cooper v. Dillon*, 403 F.3d 1208, 1215-16 (11th Cir. 2005); *Burk*, 365 F.3d at 1251-55.

This appeal exposes the injunction's absurdity. Even under the stay denial's narrower construction, Plaintiffs are forbidden from invoking their agreement before this Court as evidence that their genuine controversy settled. The First Amendment protects the right to seek judicial relief. *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25, 532-33 (2002). The court cannot require Plaintiffs to accept its faulty premise while Plaintiffs ask this Court to reject it.

The injunction likewise purports to prevent the President from explaining in a State of the Union address that this case settled and that the Anti-Weaponization Fund arose from that settlement. Its sweeping coverage also seemingly threatens to restrict what Attorney General Blanche could tell Senators at his confirmation hearing—testimony the stay denial attributed to "Defendants." Doc.106 at 47; Doc.130 at 14 n.16. Speech concerning governmental affairs "lies near the core of the First Amendment." *Cooper*, 403 F.3d at 1219. The court's disagreement with Plaintiffs supplies no authority to wrongly silence them before Congress or this Court.

The injunction's intrusion into presidential speech also raises grave separation-of-powers concerns. Courts have long recognized the constitutional difficulties of injunctions directed at a President's official conduct. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 500-01 (1867); *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992). The President possesses an "extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. United States*, 603 U.S. 593, 629 (2024) (quotation omitted). The court's authority over the President's private tax-disclosure suit supplies no license to dictate how he addresses Congress or other official fora in the discharge of his constitutional duties.

None of the court's authorities permit suppressing advocacy in this way. Doc.130 at 12-14. *Seattle Times Co. v. Rhinehart* upheld restrictions on information

obtained through compelled discovery—a process controlled by the issuing court. 467 U.S. 20, 32-34, 37 (1984). *Gentile v. State Bar of Nevada* addressed lawyers' extrajudicial statements threatening prejudice to pending proceedings. 501 U.S. 1030, 1071-75 (1991). Neither supports restricting advocacy in other proceedings. The remaining authorities do not supply the governing standard: *NAACP v. Claiborne Hardware Co.* discussed incidental burdens on protected activity, 458 U.S. 886, 912-13 (1982), and *Madsen v. Women's Health Center, Inc.* addressed content-neutral injunctions, 512 U.S. 753, 765 (1994), which is inapposite here. This injunction expressly prohibits a particular position on a particular subject. The court cannot justify that censorship with cases addressing materially different restrictions under less demanding standards.

The court likewise misused *Bill Johnson's Restaurants, Inc. v. NLRB*'s quote that "false statements are not immunized by the First Amendment" as authority to wrongly suppress Plaintiffs' position. Doc.130 at 13 (quoting 461 U.S. 731, 743 (1983)). That principle does not make disagreement with a court's legal ruling a punishable falsehood. Plaintiffs' claims presented a genuine controversy that their agreement settled. Whether adversity existed is a question for this Court to decide—not one to be foreclosed by prohibiting Plaintiffs from arguing it. The injunction must be vacated.

### B. The Speech Injunction Is Overbroad and Impermissibly Vague.

The injunction independently fails because its sweeping reach exceeds any permissible restriction on speech. Content-neutral injunctions must "burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765. This content- and viewpoint-based injunction cannot satisfy that less demanding standard, much less strict scrutiny. It improperly reaches Plaintiffs' "agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates," and anyone acting in concert with them or under their direct or indirect control. Doc.106 at 47. It bars "referring to" the Settlement Agreement, and restricts speech in every "judicial, administrative, regulatory, arbitration," or "other official proceeding," without justification tied to the speaker's conduct or the proceeding's subject. *Id.*

Nor does the "proceedings" language save the injunction. The Sanctions Order independently prohibits "referring to" the Agreement and, disjunctively, prohibits "using, offering, admitting, or citing" it in future proceedings. Doc.106 at 47. Under ordinary rules of construction, the proceedings limitation does not modify the separate prohibition on "referring to" the Agreement. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989); *Am. Empire Surplus Lines Ins. Co. v. Chabad House of N. Dade, Inc.*, 450 F. App'x 792, 794 (11th Cir. 2011). The injunction therefore reaches protected speech outside any official proceeding.

The injunction also fails Rule 65(d)'s specificity requirement. Those enjoined must "receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). The stay denial purports to permit discussion of a "private agreement" and its terms while forbidding its use as settlement evidence. Doc.130 at 14. That attempted clarification leaves unclear whether quoting the Agreement, explaining its role in the dismissal, or stating that the parties settled violates the injunction. The Sanctions Order likewise fails to explain whether presidential supervision alone brings Executive Branch officials within its sweeping personal coverage.

The court thus wrongly subjected an uncertain range of speakers to an uncertain restriction on protected speech. Rule 65(d)'s protections "are no mere technical requirements"; they prevent confusion and punishment under an inadequately defined decree. *Schmidt*, 414 U.S. at 476. The court's belated, and irrelevant, explanation neither narrows the injunction nor clarifies its commands. The injunction must be vacated.

### C. The Speech Injunction Exceeds Any Sanctions Authority.

The injunction independently exceeds the court's sanctions authority. Rule 11 permits only sanctions "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Inherent powers "must be exercised with restraint and discretion," *Chambers*, 501

U.S. at 44, and do not authorize punitive measures without the protections required for criminal sanctions. *See Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108-10 (2017). Neither source authorizes the court to punish the filing of a complaint by suppressing future advocacy concerning its resolution.

The court identified the Complaint's filing as the purported (nonexistent) misconduct. Doc.106 at 38. It then wrongly prohibited future speech about a later-executed agreement in other official proceedings, including by persons never found to have engaged in wrongdoing. *Id.* at 47. The stay denial merely asserted that this restriction would deter repetition by "frustrating the legitimacy imputed to the document" and "demonstrating the consequence … before any other court." Doc.130 at 15. It did not explain how describing the agreement as a settlement repeats the allegedly improper filing. Doc.130 at 14. The injunction instead enforces the court's erroneous view of that filing by prohibiting contrary advocacy. Rule 11 authorizes deterrence of misconduct, not compelled agreement with a judicial ruling.

Nor did the underlying litigation give the court continuing authority over the Settlement Agreement. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994). The court acknowledged the agreement's validity and enforceability were "not before" it. Doc.106 at 47 n.63. Yet, it purported to control how the Parties invoke that agreement before any other official body. Neither Rule

11 nor inherent authority permits that extraordinary extension of judicial power. The injunction must be vacated.

## IV. Professional Sanctions Against the Attorneys Lack Any Basis and Must Be Vacated.

The court wrongly threatened the Attorneys' professional standing and ability to practice for pursuing Plaintiffs' statutory claims. It improperly referred Mr. Brito to The Florida Bar and wrongly barred Mr. Epstein from obtaining *pro hac vice* admission throughout the District for one year. Doc.106 at 46-47. Those sanctions extend far beyond this litigation and independently fail the standards governing professional discipline. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1200 n.14 (11th Cir. 1985).

The court identified no misconduct by Mr. Brito warranting a disciplinary referral. Its observation that he "did not sign the 'settlement agreement,' but his name appears on it" establishes no false statement, improper agreement, or knowing participation in collusion, none of which existed. Doc.106 at 30 n.41. Nor could the court's collective accusations against Plaintiffs and their Attorneys supply the missing finding. As explained in Section II, the court never identified what Mr. Brito personally did or knew that made his advocacy sanctionable, which it was not, or gave notice that his professional standing was at risk.

The sanction against Mr. Epstein is also impermissibly severe. The court improperly inferred from his *pro hac vice* applications in unrelated cases that he

knew he would never need to litigate this case—only "surmise[ing]" his motives. Doc.106 at 30-31. That speculation supplied no basis for barring him from appearances before every judge in the District. The prohibition bears consequences that "could well hang over his name and career for years to come." *Kirkland*, 884 F.2d at 1370; *see also Kleiner*, 751 F.2d at 1200 n.14. That concern is especially significant given Mr. Epstein's role as a new law school dean in the very District he was sanctioned. Findings of this nature do not merely restrict his ability to practice; they wrongly impugn his integrity, professional judgment, and fitness to lead a law school.

Binding precedent requires far more before imposing such professional injury. *In re Evans* requires a showing of "unethical conduct of such a nature as to justify disbarment," adequate notice of "[s]pecific allegations" and an "adequate opportunity to defend himself and his professional reputation." 524 F.2d 1004, 1007-08 (5th Cir. 1975). The court must also "clearly identify a specific Rule of Professional Conduct" violated; it cannot impose discipline under some "transcendental code of conduct" that "existed only in the subjective opinion of the court." *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990); *see also Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561-62 (11th Cir. 1997).

The court did not identify a professional rule Mr. Epstein violated (he violated none), establish misconduct warranting district-wide exclusion (there was no such

misconduct), or provide notice or a hearing. The stay denial's reliance on the Attorneys' concerted action and joint representation supplies none of the missing findings or protections. Doc.130 at 11-12 & n.15. Practicing together does not establish an ethical violation by either Attorney.

The court cannot evade the protections governing professional discipline by labeling a district-wide exclusion a prospective restriction on admission. A one-year bar on admission throughout the District is, in substance, a suspension from practice in the District. Nor can the court convert disagreement with its unprecedented jurisdictional theory into grounds for damaging counsel's careers. The punitive professional sanctions against both Attorneys must be vacated.

## V. Inviting *Amici* to Submit Fees Was Improper and Must Be Vacated.

The court wrongly punished the Attorneys who opposed its jurisdictional theory while inviting volunteer *amici* who supported it to seek compensation. Doc.106 at 46-47, 52-53. Rule 11 does not permit the award. Fed. R. Civ. P. 11(c)(4). The Sanctions Order was *sua sponte* under Rule 11(c)(3), and *amici* are not movants. Agreement with the court supplies no entitlement to fees, just as disagreement supplies no basis for sanctions. The fee determination rests on the same erroneous findings of collusion and bad faith challenged above, and independently fails the standards governing *amici* compensation and inherent-power sanctions.

Volunteer participation does not create a right to shift legal expenses to the litigants. In *Universal Oil Products Co. v. Root Refining Co.*, the Supreme Court explained that "compensation is not the normal reward" of those offering services as *amici*. 328 U.S. 575, 581 (1946). This Court likewise recognizes that a "group that files an amicus brief on the winning side is not entitled to attorney's fees and expenses as a prevailing party, because it is not a party." *Glassroth v. Moore*, 347 F.3d 916, 919 (11th Cir. 2003). Here, neither group acquired any right to reimbursement because the court adopted its position.

The court's invocation of inherent authority does not cure that defect. Rule 11 prohibits court-initiated monetary sanctions unless the required show-cause order preceded voluntary dismissal or settlement. Fed. R. Civ. P. 11(c)(5)(B). No such order preceded dismissal here. The court could not simply substitute inherent authority for Rule 11 without establishing the distinct requirements for its use, including subjective bad faith and adequate procedural protections. *Purchasing Power*, 851 F.3d at 1223-25; *Chambers*, 501 U.S. at 50. As explained in Sections I and II, the court established neither. *Universal Oil* itself requires the "usual safeguards of adversary proceedings" before adjudicating rights through a judicial investigation of alleged fraud. 328 U.S. at 580. The court's agreement with *amici*'s false accusations could not substitute for proving them through a fair proceeding.

The fee determination also lacks the required compensatory basis. An inherent-power fee award must be limited to expenses caused by the established misconduct. *Goodyear*, 581 U.S. at 108-10. The court identified no such loss here. These *amici* chose to participate; they were not defending against claims. That distinction matters. In *A. Hirsh, Inc. v. United States*, the court rejected an *amicus*'s request under § 1927 because its expenses resulted from its voluntary participation rather than the opposing party's misconduct. 948 F.2d 1240, 1250-51 (Fed. Cir. 1991). The same causal problem undermines this award: the existence of litigation supplied an occasion for *amici*'s advocacy, but did not establish that their voluntary expenses were compensable injuries caused by sanctionable conduct.

The court thus invited Plaintiffs to finance the advocacy it preferred after sanctioning their Attorneys for advancing the position it rejected. That use of sanctions deepens the appearance of partiality and lacks the legal and factual predicates necessary for fee shifting. The determination authorizing fee recovery by *amici* must be vacated.

## **CONCLUSION**

For the foregoing reasons, Appellants respectfully request that this Court reverse the Sanctions Order and vacate all sanctions imposed.

September 28, 2026

Respectfully submitted,

*/s/ Christopher G. Oprison*

Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Rachel A.H. Horton
DLA Piper LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
rachel.horton@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com

*Counsel for Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify, on this 28th day of September 2026, that this brief complies with the Type-Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Eleventh Circuit Rule 32-4, this brief contains 12,998 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft 365 in 14-point Times New Roman.

*/s/ Christopher G. Oprison*
Christopher G. Oprison

September 28, 2026

**CERTIFICATE OF SERVICE**

I certify that on September 28, 2026, I caused the foregoing document to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to all current counsel of record.

*/s/ Christopher G. Oprison*
Christopher G. Oprison

September 28, 2026