NO. 26-12692

IN THE

# United States Court of Appeals for the Eleventh Circuit

PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC,

*Plaintiffs-Appellants, Cross-Appellants,*

ALEJANDRO BRITO, DANIEL EPSTEIN,

*Interested Parties-Appellants, Cross-Appellees,*

v.

INTERNAL REVENUE SERVICE, U.S. DEPARTMENT OF THE TREASURY,

*Defendants-Appellees, Cross-Appellants,*

THIRTY-FIVE FORMER FEDERAL JUDGES,

*Interested Parties-Appellees.*

---

On Appeal from the United States District Court for the Southern District of Florida, Case No. 1:26-CV-20609, District Judge Kathleen M. Williams

---

**APPELLANTS PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC, ALEJANDRO BRITO, AND DANIEL EPSTEIN'S APPENDIX TO OPENING BRIEF VOLUME I OF I**

---

*(Counsel's Information on Inside Cover)*

Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Boulevard
Suite 2500
Miami, FL 33131
(305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Rachel A.H. Horton
DLA PIPER LLP (US)
1650 Market Street
Suite 5000
Philadelphia, PA 19103
(215) 656-3300
rachel.horton@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
(610) 405-5531
jhalpern@jhlegalpllc.com

*Counsel for Appellants President Donald J. Trump,*
*Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC,*
*Alejandro Brito, and Daniel Epstein*

| DESCRIPTION | TAB | VOLUME(S) |
|---|---|---|
| District Court Docket Sheet | A | I |
| Plaintiffs' Complaint (January 29, 2026) | 1 | I |
| Order Staying Defendants' Response and Ordering Briefing on Subject Matter Jurisdiction (April 24, 2026) | 41 | I |
| Order Appointing *Amici Curiae* to Brief Subject Matter Jurisdiction (April 29, 2026) | 43 | I |
| Plaintiffs' Notice of Voluntary Dismissal with Prejudice (May 18, 2026) | 52 | I |
| Order Dismissing Case with Prejudice and Closing Case (May 18, 2026) | 62 | I |
| Order on Motion for Relief from Judgment or Order or to Appear as *Amici Curiae* (May 29, 2026) | 65 | I |
| Order on Plaintiffs' Response to the Court's May 29, 2026 Order on the Non-Party Movants' Motion for Relief from Judgment or Order, or in the Alternative, for Leave to Appear as *Amici Curiae* (July 13, 2026) | 106 | I |
| Joint Notice of Appeal (July 31, 2026) | 113 | I |
| Order Denying Plaintiffs' Request for Expedited Ruling on the Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (August 5, 2026) | 120 | I |
| Order Granting Court-Appointed *Amici Curiae* Leave to File Response in Excess of Page Limit (August 13, 2026) | 123 | I |
| Order Denying Plaintiffs' and Their Attorneys' Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (September 14, 2026) | 130 | I |

October 5, 2026

Respectfully submitted,


*<u>/s/ Christopher G. Oprison</u>*
Christopher G. Oprison
Tal Aburos
DLA PIPER LLP (US)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

Rachel A.H. Horton
DLA Piper LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
rachel.horton@dlapiper.com

Josh Halpern
JH Legal PLLC
1100 H Street NW, Suite 840
Washington, DC 20005
Telephone: (610) 405-5531
jhalpern@jhlegalpllc.com


*Counsel for Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein*

# TAB A

APPEAL,CLOSED,EAL,REF_DISCOV,REF_PTN

# U.S. District Court
# Southern District of Florida (Miami)
# CIVIL DOCKET FOR CASE #: 1:26-cv-20609-KMW

Trump et al v. Internal Revenue Service et al
Assigned to: Judge Kathleen M. Williams
Referred to: Magistrate Judge Enjolique A. Lett
Related - not spread Case: 0
Case in other court: USCA, 26-12692-C
USCA, 26-12692-CC
Cause: 26:7401 IRS: Tax Liability

Date Filed: 01/29/2026
Date Terminated: 05/18/2026
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**President Donald J. Trump**

represented by **Ian Michael Corp**
Brito PLLC
2121 Ponce De Leon Blvd
Suite 650
Coral Gables, FL 33134
305-614-4071
Email: Icorp@britopllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher George Oprison**
DLA Piper LLP (US)
Suite 2500
200 South Biscayne Boulevard
Miami, FL 33131-5341
305-423-8522
Fax: 305-657-6366
Email: chris.oprison@dlapiper.com
*ATTORNEY TO BE NOTICED*

**Richard Carroll Klugh , Jr.**
25 SE 2nd Avenue
Suite 1100
Miami, FL 33131
305-536-1191
Fax: 305-536-2170
Email: rickklu@aol.com
*ATTORNEY TO BE NOTICED*

**Tal Aburos**
DLA Piper LLP
200 S. Biscayne Blvd.
Ste 2500
Miami, FL 33131

305-423-8516
Fax: 305-503-7506
Email: tal.aburos@dlapiper.com
*ATTORNEY TO BE NOTICED*

**Alejandro Brito**
Brito, PLLC
2121 Ponce de Leon Boulevard
Ste 650
Coral Gables, FL 33134
305-614-4071
Fax: 305-440-4385
Email: abrito@britopllc.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Donald J Trump, Jr.** represented by **Ian Michael Corp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher George Oprison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Carroll Klugh , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tal Aburos**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alejandro Brito**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eric Trump** represented by **Ian Michael Corp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher George Oprison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Carroll Klugh , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tal Aburos**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alejandro Brito**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Trump Organization, LLC.** represented by **Alejandro Brito**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian Michael Corp**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher George Oprison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard Carroll Klugh , Jr.**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tal Aburos**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Internal Revenue Service**

**Defendant**

**U.S. Department of the Treasury**

**Amicus**

**Citizens for Responsibility and Ethics in Washington** represented by **Lauren Crowell Bingham**
Citizens for Responsibility and Ethics in Washington
PO Box 14596
Washington, DC 20044
202-408-5565
Email: lbingham@citizensforethics.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kayvan Farchadi**
Citizens for Responsibility and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565

Email: kfarchadi@citizensforethics.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nandan M. Joshi**
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
Email: njoshi@citizen.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nikhel S. Sus**
Citizens for Responsibility and Ethics in Washington
P.O. Box 14596
Washington, DC 20044
(202) 408-5565
Email: nsus@citizensforethics.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Public Citizen** represented by **Lauren Crowell Bingham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Common Cause**

**Amicus**

**Project On Government Oversight (POGO)** represented by **Ayesha N. Khan**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
Email: akhan@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jyoti Jasrasaria**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
Email: jjasrasaria@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pooja A. Boisture**
Democracy Forward Foundation
P.O. Box 34553

Washington, DC 20043
(202) 448-9090
Email: pboisture@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
Email: rthurston@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Skye L. Perryman**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
Email: sperryman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tsuki Hoshijima**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
Email: thoshijima@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**John Gleeson**

**Amicus**

**David A. O'Neil**

**Amicus**

**Donald B. Verrilli, Jr.**

**Amicus**

**Faith E. Gay**

**Amicus**

**Philippe Z. Selendy**

**Amicus**

**Corey Stoughton**

**Amicus**

**Court-Appointed Amici Curiae** represented by **Corey Stoughton**
Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
(212) 390-9036
Email: cstoughton@selendygay.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David A. O'Neil**
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW
Washington, DC 20004
202-383-8000
Email: daoneil@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Donald B. Verrilli , Jr.**
Munger Tolles & Olson LLP
601 Thirteenth Street, N.W.
Washington, DC 20005
202-220-1100
Email: donald.verrilli@mto.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Faith Elizabeth Gay**
Selendy & Gay PLLC
1290 Avenue of the Americas
17th Floor
New York, NY 10104
212 390 9000
Fax: 212 390 9399
Email: fgay@selendygay.com
*ATTORNEY TO BE NOTICED*

**John Gleeson**
Debevoise & Plimpton LLP
66 Hudson Boulevard E.
New York, NY 10001
(212) 909-6000
Email: jgleeson@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philippe Z. Selendy**
Selendy Gay, PLLC
1290 Avenue of the Americas
New York, NY 10104
212-390-9000
Email: pselendy@selendygay.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**93 Members of the United States House of Representatives** represented by

**Aaron Haier**
Platkin LLP
413 Washington Ave, Unit 174
Belleville, NJ 07109
(973) 561-1954
Email: ahaier@platkinllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andres Rivero**
Rivero Mestre LLP
2525 Ponce de Leon Boulevard
Suite 1000
Coral Gables, FL 33134
305-445-2500
Fax: (305) 445-2505
Email: arivero@riveromestre.com
*ATTORNEY TO BE NOTICED*

**Angela Cai**
Platkin LLP
413 Washington Ave, Unit 174
Belleville, NJ 07109
(973) 561-1952
Email: acai@platkinllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Conor Bradley**
Platkin LLP
413 Washington Ave, Unit 174
Belleville, NJ 07109
(973) 561-1958
Email: cbradley@platkinllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David W. Ogden**
Democracy Defenders Action
600 Pennsylvania Avenue SE, #15180
Washington, DC 20003
(202) 594-9958
Email: david@democracydefenders.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew J. Platkin**
Platkin LLP
413 Washington Ave, Unit 174
Belleville, NJ 07109
(973) 561-1951
Email: mplatkin@platkinllp.com
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Norman L. Eisen**
Democracy Defenders Action
600 Pennsylvania Avenue SE, #15180
Washington, DC 20003
(202) 594-9958
Email: norman@democracydefenders.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ravi Ramanathan**
Platkin LLP
413 Washington Ave, Unit 174
Belleville, NJ 07109
(973) 561-1953
Email: rramanathan@platkinllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen A. Jonas**
Democracy Defenders Action
600 Pennsylvania Avenue SE, #15180
Washington, DC 20003
(202) 594-9958
Email: steve@democracydefenders.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Corey Biazzo**
Biazzo Law, PLLC
9801 Lakeview Lane
Parkland, FL 33076

represented by **Corey John Biazzo**
Biazzo Law, PLLC
9801 Lakeview Lane
Parkland, FL 33076
(561)939-6300
Email: corey@biazzolaw.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Twenty-Three State Attorneys General**

represented by **Randy Richard Dow**
Boyd & Jenerette
4443 Lyons Road
Suite D-209
Coconut Creek, FL 33073
954 334 5597
Fax: 954 334 5625
Email: randy.r.dow@maine.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| | | |
|---|---|---|
| 01/29/2026 | 1 | COMPLAINT against Internal Revenue Service, U.S. Department of the Treasury. Filing fees $ 405.00 receipt number AFLSDC-19169654, filed by DONALD J TRUMP, THE TRUMP ORGANIZATION, LLC., Eric Trump, Donald J Trump, Jr.. (Attachments: # 1 Civil Cover Sheet)(Brito, Alejandro) (Entered: 01/29/2026) |
| 01/29/2026 | 2 | Clerks Notice of Judge Assignment to Judge Kathleen M. Williams.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Enjolique A. Lett is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (scn) (Entered: 01/30/2026) |
| 01/30/2026 | 3 | ORDER REFERRING CASE to Magistrate Judge Enjolique A. Lett for Discovery and Pretrial Non-Dispositive Matters, and Notice of Court Practices and Procedures. Signed by Judge Kathleen M. Williams on 1/30/2026. *See attached document for full details.* (ls) (Entered: 01/30/2026) |
| 01/30/2026 | 4 | ORDER SETTING DISCOVERY PROCEDURES Signed by Magistrate Judge Enjolique A. Lett on 1/30/2026. *See attached document for full details.* (cqs) (Entered: 02/02/2026) |
| 02/05/2026 | 5 | NOTICE of Attorney Appearance by Gerald Edward Greenberg on behalf of John Koskinen, Kathryn Keneally, Nina Olson, Gilbert Rothenberg. Attorney Gerald Edward Greenberg added to party John Koskinen(pty:ip), Attorney Gerald Edward Greenberg added to party Kathryn Keneally(pty:ip), Attorney Gerald Edward Greenberg added to party Nina Olson(pty:ip), Attorney Gerald Edward Greenberg added to party Gilbert Rothenberg(pty:ip). (Greenberg, Gerald) (Entered: 02/05/2026) |
| 02/05/2026 | 6 | NOTICE of Attorney Appearance by Daniel Robert Walsh on behalf of Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Attorney Daniel Robert Walsh added to party Kathryn Keneally(pty:ip), Attorney Daniel Robert Walsh added to party John Koskinen(pty:ip), Attorney Daniel Robert Walsh added to party Nina Olson(pty:ip), Attorney Daniel Robert Walsh added to party Gilbert Rothenberg(pty:ip). (Walsh, Daniel) (Entered: 02/05/2026) |
| 02/05/2026 | 7 | MOTION for Leave to File *Brief as Amici Curiae by Former Government Officials and Public Interest Organizations* by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/19/2026. (Attachments: # 1 Exhibit A - Brief of Amici Curiae)(Greenberg, Gerald) (Entered: 02/05/2026) |
| 02/06/2026 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Ayesha N. Khan. Filing Fee $ 250.00 Receipt # AFLSDC-19195577 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |
| 02/06/2026 | 9 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jyoti Jasrasaria. Filing Fee $ 250.00 Receipt # AFLSDC-19195606 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Motion for Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |
| 02/06/2026 | 10 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Pooja A. Boisture. Filing Fee $ 250.00 Receipt # AFLSDC-19195628 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Motion for Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |

| | | |
|---|---|---|
| 02/06/2026 | 11 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Robin F. Thurston. Filing Fee $ 250.00 Receipt # AFLSDC-19195663 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Motion for Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |
| 02/06/2026 | 12 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Skye L. Perryman. Filing Fee $ 250.00 Receipt # AFLSDC-19195728 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Motion for Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |
| 02/06/2026 | 13 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Tsuki Hoshijima. Filing Fee $ 250.00 Receipt # AFLSDC-19195752 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 2/20/2026. (Attachments: # 1 Text of Proposed Order on Motion for Pro Hac Vice)(Greenberg, Gerald) (Entered: 02/06/2026) |
| 02/12/2026 | 14 | NOTICE of Attorney Appearance by Lauren Crowell Bingham on behalf of Citizens for Responsibility and Ethics in Washington, Public Citizen. Attorney Lauren Crowell Bingham added to party Citizens for Responsibility and Ethics in Washington(pty:am), Attorney Lauren Crowell Bingham added to party Public Citizen(pty:am). (Bingham, Lauren) (Entered: 02/12/2026) |
| 02/12/2026 | 15 | MOTION for Leave to File *a Brief as Amici Curiae* by Citizens for Responsibility and Ethics in Washington, Public Citizen. Responses due by 2/26/2026. (Attachments: # 1 Exhibit Brief of Amici Curiae)(Bingham, Lauren) (Entered: 02/12/2026) |
| 02/12/2026 | 16 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Nikhel S. Sus. Filing Fee $ 250.00 Receipt # AFLSDC-19216073 by Citizens for Responsibility and Ethics in Washington, Public Citizen. Responses due by 2/26/2026. (Bingham, Lauren) (Entered: 02/12/2026) |
| 02/12/2026 | 17 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kayvan Farchadi. Filing Fee $ 250.00 Receipt # AFLSDC-19216118 by Citizens for Responsibility and Ethics in Washington, Public Citizen. Responses due by 2/26/2026. (Bingham, Lauren) (Entered: 02/12/2026) |
| 02/12/2026 | 18 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Nandan M. Joshi. Filing Fee $ 250.00 Receipt # AFLSDC-19216156 by Citizens for Responsibility and Ethics in Washington, Public Citizen. Responses due by 2/26/2026. (Bingham, Lauren) (Entered: 02/12/2026) |
| 02/13/2026 | 19 | NOTICE of Filing Proposed Summons(es) by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. re 1 Complaint, filed by Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump, Eric Trump (Brito, Alejandro) (Entered: 02/13/2026) |
| 02/13/2026 | 20 | NOTICE of Filing Proposed Summons(es) by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. re 1 Complaint, filed by Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump, Eric Trump (Brito, Alejandro) (Entered: 02/13/2026) |
| 02/13/2026 | 21 | NOTICE of Filing Proposed Summons(es) by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. re 1 Complaint, filed by Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump, Eric Trump (Brito, Alejandro) (Entered: 02/13/2026) |

| | | |
|---|---|---|
| 02/13/2026 | 22 | NOTICE of Filing Proposed Summons(es) by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. re 1 Complaint, filed by Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump, Eric Trump (Brito, Alejandro) (Entered: 02/13/2026) |
| 02/17/2026 | 23 | Summons Issued as to Internal Revenue Service(ls) (Entered: 02/17/2026) |
| 02/17/2026 | 24 | Summons Issued as to U.S. Department of the Treasury(ls) (Entered: 02/17/2026) |
| 02/17/2026 | 25 | Summons Issued as to U.S. Attorney General (ls) (Entered: 02/17/2026) |
| 02/17/2026 | 26 | Summons Issued as to U.S. Attorney (ls) (Entered: 02/17/2026) |
| 02/18/2026 | 27 | **THIS MATTER** is before the Court *sua sponte*. On February 5, 2026, former government officials and public interest organizations filed a Motion for Leave to File Brief as Amici Curiae ("First Motion") (DE 7 ). In the First Motion, movants represented that they "made reasonable efforts to confer with all parties for their position" but did not receive an answer from Plaintiffs' counsel. (DE 7 at 3). Then, on February 12, 2026, Citizens for Responsibility and Ethics in Washington and Public Citizen filed a Motion for Leave to File a Brief as Amici Curiae ("Second Motion") (DE 15 ). In the Second Motion, movants represented that Plaintiffs' counsel objects to the motion and "may file a memorandum in opposition to the motion." (DE 15 at 3). To date, Plaintiffs have not filed a memorandum in opposition to either motion.<br><br>Accordingly, it is **ORDERED AND ADJUDGED** that if Plaintiffs wish to file a memorandum in opposition, they shall do so on or before 5:00 P.M. on February 25, 2026. Signed by Judge Kathleen M. Williams on 2/18/2026. (ymd) (Entered: 02/18/2026) |
| 02/27/2026 | 28 | PAPERLESS ORDER. **THIS MATTER** is before the Court *sua sponte*. On February 18, 2026, the Court entered a paperless order (DE 27) that instructed Plaintiffs to file any memorandum in opposition to the motions for leave to file briefs as amici curiae (DE 7 ; DE 15 ) on or before February 25, 2026. Plaintiffs did not file any memorandum in opposition. Accordingly, it is **ORDERED AND ADJUDGED** that the motions for leave to file briefs as amici curiae (DE 7 ; DE 15 ) are **GRANTED**. Signed by Judge Kathleen M. Williams on 2/27/2026. (ymd) (Entered: 02/27/2026) |
| 03/02/2026 | 29 | PAPERLESS OMNIBUS ORDER granting ECF Nos. 8 - 13 , Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Ayesha N. Khan, Jyoti Jasrasaria, Pooja A. Boisture, Robin F. Thurston, Skye L. Perryman, and Tsuki Hoshijima. Signed by Magistrate Judge Enjolique A. Lett on 3/2/2026. (ncn) (Entered: 03/02/2026) |
| 03/02/2026 | 30 | PAPERLESS OMNIBUS ORDER granting ECF Nos. 16 - 18 , Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Nikhel S. Sus, Kayvan Farchadi, and Nandan M. Joshi. Signed by Magistrate Judge Enjolique A. Lett on 3/2/2026. (ncn) (Entered: 03/02/2026) |
| 03/03/2026 | 31 | NOTICE of Attorney Appearance by Ian Michael Corp on behalf of The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. (Corp, Ian) (Entered: 03/03/2026) |
| 03/03/2026 | 32 | MEMORANDUM of Law *BRIEF OF AMICI CURIAE* by Citizens for Responsibility and Ethics in Washington, Public Citizen. (Bingham, Lauren) (Entered: 03/03/2026) |
| 03/04/2026 | 33 | MEMORANDUM of Law *Brief* by Amici Curiae Former Government Officials and Public Interest Organizations. (Greenberg, Gerald) (Entered: 03/04/2026) |

| | | |
|---|---|---|
| 03/05/2026 | 34 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Eric Trump, Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump. Internal Revenue Service served on 2/18/2026, response/answer due 3/11/2026. (Corp, Ian) (Entered: 03/05/2026) |
| 03/05/2026 | 35 | SUMMONS (Affidavit) Returned Executed on 1 Complaint, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Eric Trump, Donald J Trump, Jr., The Trump Organization, LLC., Donald J. Trump. U.S. Attorney's Office served on 2/18/2026, response/answer due 3/11/2026. (Corp, Ian) Modified Text on 3/5/2026 (ls). (Entered: 03/05/2026) |
| 03/05/2026 | 36 | ACKNOWLEDGMENT OF SERVICE as to 1 Complaint, *Internal Revenue Service* filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Attachments: # 1 Exhibit A)(Corp, Ian) (Entered: 03/05/2026) |
| 03/05/2026 | 37 | ACKNOWLEDGMENT OF SERVICE as to 1 Complaint, *U.S. Attorneys Office Southern District of Florida* filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Attachments: # 1 Exhibit A)(Corp, Ian) (Entered: 03/05/2026) |
| 03/05/2026 | 38 | ACKNOWLEDGMENT OF SERVICE as to 1 Complaint, *U.S. Department of Justice* filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Attachments: # 1 Exhibit A)(Corp, Ian) (Entered: 03/05/2026) |
| 03/05/2026 | 39 | ACKNOWLEDGMENT OF SERVICE as to 1 Complaint, *U.S. Department of the Treasury* filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Attachments: # 1 Exhibit A)(Corp, Ian) (Entered: 03/05/2026) |
| 04/17/2026 | 40 | Consent MOTION for Extension of Time For a Period of Ninety (90) Days in All Proceedings in this Matter by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Responses due by 5/1/2026. (Attachments: # 1 Text of Proposed Order Granting Parties' Consent Motion for a 90 Day Extension and Incorporated Memorandum of Law)(Brito, Alejandro) (Entered: 04/17/2026) |
| 04/24/2026 | 41 | ORDER. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 4/24/2026. (ymd) (Entered: 04/24/2026) |
| 04/29/2026 | 42 | Error in Docketing per Chambers, See ECF No. 43 Order. (sk) Modified on 4/29/2026 (sk). (Entered: 04/29/2026) |
| 04/29/2026 | 43 | ORDER. Signed by Judge Kathleen M. Williams on 4/29/2026. *See attached document for full details.* (jas) (Entered: 04/29/2026) |
| 04/29/2026 | 44 | Clerk's Notice of Docket Correction re 42 Error in Docketing/Order (Per Chambers) (sk) (Entered: 04/29/2026) |
| 05/14/2026 | 45 | MEMORANDUM of Law by Court-Appointed Amici Curiae. (Gay, Faith) (Entered: 05/14/2026) |
| 05/15/2026 | 46 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Philippe Z. Selendy. Pay.gov Agency Tracking ID FLSDC-19546722. Filing Fee $ 250.00 by Court-Appointed Amici Curiae. Responses due by 5/29/2026. (Attachments: # 1 Text of Proposed Order)(Gay, Faith) (Entered: 05/15/2026) |

| | | |
|---|---|---|
| 05/15/2026 | 47 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Corey Stoughton. Filing Fee $ 250.00 Receipt # AFLSDC-19547258 by Court-Appointed Amici Curiae. Responses due by 5/29/2026. (Attachments: # 1 Text of Proposed Order)(Gay, Faith) (Entered: 05/15/2026) |
| 05/15/2026 | 48 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Donald B. Verrilli, Jr.. Filing Fee $ 250.00 Receipt # AFLSDC-19547293 by Court-Appointed Amici Curiae. Responses due by 5/29/2026. (Attachments: # 1 Text of Proposed Order)(Gay, Faith) (Entered: 05/15/2026) |
| 05/15/2026 | 49 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for John Gleeson. Filing Fee $ 250.00 Receipt # AFLSDC-19547411 by Court-Appointed Amici Curiae. Responses due by 5/29/2026. (Attachments: # 1 Text of Proposed Order)(Gay, Faith) (Entered: 05/15/2026) |
| 05/15/2026 | 50 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David A. O'Neil. Filing Fee $ 250.00 Receipt # AFLSDC-19547440 by Court-Appointed Amici Curiae. Responses due by 5/29/2026. (Attachments: # 1 Text of Proposed Order)(Gay, Faith) (Entered: 05/15/2026) |
| 05/15/2026 | 51 | PAPERLESS OMNIBUS ORDER granting DE Nos. 46 - 50 , Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Philippe Z. Selendy, Corey Stoughton, Donald B. Verrilli, Jr., John Gleeson, and David A. O'Neil. Signed by Judge Kathleen M. Williams on 5/15/2026. (ymd) (Entered: 05/15/2026) |
| 05/18/2026 | 52 | NOTICE of Voluntary Dismissal *With Prejudice* by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. (Brito, Alejandro) (Entered: 05/18/2026) |
| 05/18/2026 | 53 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Matthew J. Platkin. Filing Fee $ 250.00 Receipt # AFLSDC-19551856 by 93 Members of the United States House of Representatives. Attorney Andres Rivero added to party 93 Members of the United States House of Representatives(pty:am). Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 54 | MOTION for Leave to File *Brief as Amici Curiae* by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Exhibit) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 55 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Norman L. Eisen. Filing Fee $ 250.00 Receipt # AFLSDC-19551938 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 56 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Aaron Haier. Filing Fee $ 250.00 Receipt # AFLSDC-19551984 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |

| | | |
|---|---|---|
| 05/18/2026 | 57 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Angela Cai. Filing Fee $ 250.00 Receipt # AFLSDC-19552028 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 58 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Conor Bradley. Filing Fee $ 250.00 Receipt # AFLSDC-19552063 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 59 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Stephen A. Jonas. Filing Fee $ 250.00 Receipt # AFLSDC-19552088 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 60 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Ravi Ramanathan. Filing Fee $ 250.00 Receipt # AFLSDC-19552116 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 61 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David W. Ogden. Filing Fee $ 250.00 Receipt # AFLSDC-19552148 by 93 Members of the United States House of Representatives. Responses due by 6/1/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order) (Rivero, Andres) (Entered: 05/18/2026) |
| 05/18/2026 | 62 | ORDER CLOSING CASE. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 5/18/2026. (ymd) (Entered: 05/18/2026) |
| 05/27/2026 | 63 | MOTION for Reconsideration/Relief from Judgment or Order re 62 Order by Thirty-Five Former Federal Judges. Attorney Andres Rivero added to party Thirty-Five Former Federal Judges(pty:mov). Responses due by 6/10/2026. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Rivero, Andres). Added MOTION for Leave to Appear as Amici Curiae on 6/2/2026 (ls). Modified Relief and document link on 6/2/2026 (ls). (Entered: 05/27/2026) |
| 05/28/2026 | 64 | APPENDIX to 63 MOTION to Reopen Case *Corrected Appendix: List of Movants / Amici Curiae* by Thirty-Five Former Federal Judges (Rivero, Andres) (Entered: 05/28/2026) |
| 05/29/2026 | 65 | ORDER. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 5/29/2026. (ymd) (Entered: 05/29/2026) |
| 06/01/2026 | | Reset Deadlines as to 63 MOTION to Reopen Case . Responses due by 6/12/2026. Replies due by 6/19/2026. Per DE 65 . (ksr) (Entered: 06/01/2026) |
| 06/02/2026 | 66 | First MOTION for Leave to File *Brief Amicus Curiae* by Corey Biazzo. Attorney Corey John Biazzo added to party Corey Biazzo(pty:am). Responses due by 6/16/2026. (Attachments: # 1 Exhibit Proposed Order Granting Motion)(Biazzo, Corey) (Entered: 06/02/2026) |
| 06/02/2026 | 67 | PAPERLESS ORDER. **THIS MATTER** is before the Court on the Motion for Leave to File Amicus Curiae Brief filed by Corey J. Biazzo ("Motion") (DE 66 ). In the Motion, Mr. Biazzo seeks leave to appear as *amicus curiae* and file a memorandum regarding a |

| | | |
|---|---|---|
| | | certain "statutory and appropriations-law issue." However, the Court is awaiting the briefing of the Plaintiffs and believes that, at this juncture, there is no need for additional *amicus* participation. *See Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991).<br><br>Accordingly, it is **ORDERED AND ADJUDGED** that the Motion (DE 66 ) is **DENIED**. Signed by Judge Kathleen M. Williams on 6/2/2026. (ymd) (Entered: 06/02/2026) |
| 06/02/2026 | 68 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Aaron Haier. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 56 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 69 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for David W. Ogden. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 61 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 70 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Angela Cai. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 57 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 71 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Norman L. Eisen. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 55 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 72 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Conor Bradley. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 58 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 73 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Matthew J. Platkin. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 53 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 74 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Stephen A. Jonas. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 59 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |

| | | |
|---|---|---|
| 06/02/2026 | 75 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Ravi Ramanathan. Filing Fee $ 250.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed - Filing Fees Previously Paid. See 60 Motion to Appear Pro Hac Vice, by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 76 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Daniel J. Shih. Filing Fee $ 250.00 Receipt # AFLSDC-19608004 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 77 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Zachary B. Savage. Filing Fee $ 250.00 Receipt # AFLSDC-19608020 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 78 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Davida P. Brook. Filing Fee $ 250.00 Receipt # AFLSDC-19608072 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 79 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Stephen L. Shackelford, Jr.. Filing Fee $ 250.00 Receipt # AFLSDC-19608075 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 80 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Russell F. Rennie. Filing Fee $ 250.00 Receipt # AFLSDC-19608142 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 81 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Glenn C. Bridgman. Filing Fee $ 250.00 Receipt # AFLSDC-19608146 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 82 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Nicholas C. Carullo. Filing Fee $ 250.00 Receipt # AFLSDC-19608175 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 83 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jillian S. Hewitt. Filing Fee $ 250.00 Receipt # AFLSDC-19608205 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 84 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Neal Manne. Filing Fee $ 250.00 Receipt # |

| | | |
|---|---|---|
| | | AFLSDC-19608226 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/02/2026 | 85 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Justin Adatto Nelson. Filing Fee $ 250.00 Receipt # AFLSDC-19608244 by Thirty-Five Former Federal Judges. Responses due by 6/16/2026. (Attachments: # 1 Certification, # 2 Text of Proposed Order)(Rivero, Andres) (Entered: 06/02/2026) |
| 06/09/2026 | 86 | Intervenor's Motions to Amend the Caption, to Join, Opposing Reopening, to Strike and, as a Third Party Beneficiary, for Timely Specific Performance re 62 Order MOTION for Leave to Appear as Amici Curiae, re 63 Motion for Reconsideration/Relief from Judgment or Order re 62 Order MOTION for Leave to Appear as Amici Curiae by Glenn Stephens. Responses due by 6/23/2026. (pc) Modified on 6/26/2026 (mf). (Entered: 06/09/2026) |
| 06/09/2026 | 87 | Intervenor's Brief in Support of his Motions to Amend the Caption, to Join, Opposing Reopening, to Strike, and Ordering Specific Performance by Glenn Stephens re 86 MOTION to Amend/Correct MOTION to Adopt/Join 63 Motion for Reconsideration/Relief from Judgment or Order re 62 Order MOTION for Leave to Appear as Amici Curiae, 62 Order, Order Dismissing/Closing Case MOTION to Strike MOTION to amend the caption, to join opposing reopening, to Strike and, as a Third Party Beneficiary, for Timely Specific Performance (pc) (Entered: 06/09/2026) |
| 06/09/2026 | 88 | Clerk's Notice of Filing Deficiency Re: 87 Notice (Other), filed by Glenn Stephens, 86 MOTION to Amend/Correct MOTION to Adopt/Join 63 Motion for Reconsideration/Relief from Judgment or Order re 62 Order MOTION for Leave to Appear as Amici Curiae, 62 Order, Order Dismissing/Closing Case MOTION to Strike MOTION to amend the caption, to join opposing reopening, to Strike and, as a Third Party Beneficiary, for Timely Specific Performance filed by Glenn Stephens. Document(s) missing required signature(s) (Fed.R.Civ.P. 11(a)). (pc) (Entered: 06/09/2026) |
| 06/12/2026 | 89 | RESPONSE to Motion re 63 Motion for Reconsideration/Relief from Judgment or Order re 62 Order MOTION for Leave to Appear as Amici Curiae filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Replies due by 6/22/2026. (Brito, Alejandro) (Entered: 06/12/2026) |
| 06/12/2026 | 90 | NOTICE of Attorney Appearance by Richard Carroll Klugh, Jr on behalf of The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Attorney Richard Carroll Klugh, Jr added to party The Trump Organization, LLC.(pty:pla), Attorney Richard Carroll Klugh, Jr added to party Donald J. Trump(pty:pla), Attorney Richard Carroll Klugh, Jr added to party Eric Trump(pty:pla), Attorney Richard Carroll Klugh, Jr added to party Donald J Trump, Jr.(pty:pla). (Klugh, Richard) (Entered: 06/12/2026) |
| 06/15/2026 | 91 | Renewed MOTION for Leave to File *Short Supplemental Amicus Curiae Brief* by Corey Biazzo. Responses due by 6/29/2026. (Attachments: # 1 Exhibit Proposed Order Granting Motion)(Biazzo, Corey) (Entered: 06/15/2026) |
| 06/15/2026 | 92 | PAPERLESS OMNIBUS ORDER granting ECF Nos. 68 - 85 , Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorneys Aaron Haier, David W. Ogden, Angela Cai, Norman L. Eisen, Conor Bradley, Matthew J. Platkin, Stephen A. Jonas, Ravi Ramanathan, Daniel J. Shih, Zachary B. Savage, Davida P. Brook, Stephen L. Shackelford, Jr., Russell F. Rennie, Glenn C. Bridgman, Nicholas C. Carullo, Jillian S. Hewitt, Neal Manne, and Justin |

| | | |
|---|---|---|
| | | Adatto Nelson. Signed by Magistrate Judge Enjolique A. Lett on 6/15/2026. (ncn) (Entered: 06/15/2026) |
| 06/16/2026 | | SYSTEM ENTRY - Docket Entry 93 [motion] restricted/sealed until further notice. (cds) (Entered: 06/16/2026) |
| 06/18/2026 | 98 | MOTION to Amend the Caption, MOTION to Join, Opposing Reopening, MOTION to Strike and, as a Third-Party Beneficiary, for Timely Specific Performance by Glenn Stephens. Responses due by 7/2/2026. (ls) (Entered: 06/23/2026) |
| 06/18/2026 | 99 | BRIEF in Support re 98 MOTION to Amend the Caption, MOTION to Join, Opposing Reopening, MOTION to Strike and, as a Third-Party Beneficiary, for Timely Specific Performance by Glenn Stephens. (ls) (Entered: 06/23/2026) |
| 06/19/2026 | 94 | REPLY in Support of Motion re 63 Motion for Reconsideration/Relief from Judgment or Order re 62 Order MOTION for Leave to Appear as Amici Curiae. filed by Thirty-Five Former Federal Judges. (Rivero, Andres) (Entered: 06/19/2026) |
| 06/22/2026 | 95 | MOTION for Leave to File *Brief as Amici Curiae by Former Government Officials and Public Interest Organizations* by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 7/6/2026. (Attachments: # 1 Exhibit A - Brief of Amici Curiae, # 2 Exhibit B - Proposed Order)(Greenberg, Gerald) (Entered: 06/22/2026) |
| 06/22/2026 | 96 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Cynthia Liao. Filing Fee $ 250.00 Receipt # AFLSDC-19675124 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 7/6/2026. (Attachments: # 1 Text of Proposed Order) (Greenberg, Gerald) (Entered: 06/22/2026) |
| 06/22/2026 | 97 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Lisa Newman. Filing Fee $ 250.00 Receipt # AFLSDC-19675206 by Kathryn Keneally, John Koskinen, Nina Olson, Gilbert Rothenberg. Responses due by 7/6/2026. (Attachments: # 1 Text of Proposed Order) (Greenberg, Gerald) (Entered: 06/22/2026) |
| 06/23/2026 | 100 | Amicus Curiae APPEARANCE entered by Randy Richard Dow on behalf of Twenty-Three State Attorneys General. Attorney Randy Richard Dow added to party Twenty-Three State Attorneys General(pty:am). (Dow, Randy) (Entered: 06/23/2026) |
| 06/23/2026 | 101 | MOTION for Leave to File *Brief of Amici Curiae* by Twenty-Three State Attorneys General. Responses due by 7/7/2026. (Attachments: # 1 Exhibit A - Brief of Amicus Curiae Twenty-Three State Attorneys General Concerning Amici-Movants' Motion for Relief from the Order of Dismissal, # 2 Exhibit B - [Proposed] Order Granting Leave to File Amicus Brief)(Dow, Randy) (Entered: 06/23/2026) |
| 06/23/2026 | 102 | NOTICE *of Filing Corrected Appendix to Brief of Amicus Curiae* by Twenty-Three State Attorneys General re 101 MOTION for Leave to File *Brief of Amici Curiae* (Attachments: # 1 Exhibit A - Appendix List to Brief of Amicus Curiae Twenty-Three State Attorneys General) (Dow, Randy) (Entered: 06/23/2026) |
| 06/25/2026 | 103 | PAPERLESS ORDER. **THIS MATTER** is before the Court on the various motions ("Motions") for leave to file briefings as *amici curiae* (DE 91 ); DE 95 ; DE 101 ). The Court greatly appreciates the assistance that these attorneys have offered through their proposed filings. However, the Court has determined that this case has been sufficiently briefed and there is no need for additional *amici* briefing. Accordingly, the Motions (DE 91 ; DE 95 ; DE 101 ) are **DENIED**. Signed by Judge Kathleen M. Williams on 6/25/2026. (ymd) (Entered: 06/25/2026) |

| | | |
|---|---|---|
| 06/25/2026 | 104 | PAPERLESS ORDER. **THIS MATTER** is before the Court on Glenn Stephens' Motion to Amend the Caption, to Join, Oppose Reopening, to Strike and, as a Third-Party Beneficiary, for Timely Specific Performance ("Motion") (DE 86 ). Upon review of the Motion, it is **ORDERED AND ADJUDGED** that the Motion is **DENIED**. Signed by Judge Kathleen M. Williams on 6/25/2026. (ymd) (Entered: 06/25/2026) |
| 07/06/2026 | 105 | PAPERLESS ORDER denying without prejudice ECF Nos. 96 - 97 Motions to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Cynthia Liao and Lisa Newman (the "Motions"). The Motions are denied in light of District Judge Williams' June 25, 2026, Order. *See* ECF No. 103. Signed by Magistrate Judge Enjolique A. Lett on 7/6/2026. (ncn) (Entered: 07/06/2026) |
| 07/13/2026 | 106 | ORDER. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 7/13/2026. (ah06) (Entered: 07/13/2026) |
| 07/13/2026 | 107 | Clerk's NOTICE of Compliance re: 106 Order. (ane) (Entered: 07/13/2026) |
| 07/20/2026 | | SYSTEM ENTRY - Docket Entry 108 [misc] restricted/sealed until further notice. (mno) (Entered: 07/20/2026) |
| 07/21/2026 | 109 | NOTICE of Attorney Appearance by Christopher George Oprison on behalf of The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr., Alejandro Brito, Daniel Epstein. Attorney Christopher George Oprison added to party The Trump Organization, LLC.(pty:pla), Attorney Christopher George Oprison added to party Donald J. Trump(pty:pla), Attorney Christopher George Oprison added to party Eric Trump(pty:pla), Attorney Christopher George Oprison added to party Donald J Trump, Jr.(pty:pla), Attorney Christopher George Oprison added to party Alejandro Brito(pty:ip), Attorney Christopher George Oprison added to party Daniel Epstein(pty:ip). (Oprison, Christopher) (Entered: 07/21/2026) |
| 07/21/2026 | 110 | NOTICE of Attorney Appearance by Tal Aburos on behalf of Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Attorney Tal Aburos added to party Alejandro Brito(pty:ip), Attorney Tal Aburos added to party Daniel Epstein(pty:ip), Attorney Tal Aburos added to party The Trump Organization, LLC.(pty:pla), Attorney Tal Aburos added to party Donald J. Trump(pty:pla), Attorney Tal Aburos added to party Eric Trump(pty:pla), Attorney Tal Aburos added to party Donald J Trump, Jr.(pty:pla). (Aburos, Tal) (Entered: 07/21/2026) |
| 07/27/2026 | 111 | MEMORANDUM in Support re 106 Order by Amici Curiae Former Government Officials and Public Interest Organizations. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Greenberg, Gerald) (Entered: 07/27/2026) |
| 07/27/2026 | 112 | MOTION for Attorney Fees by Thirty-Five Former Federal Judges. Responses due by 8/10/2026. (Rivero, Andres) (Entered: 07/27/2026) |
| 07/31/2026 | 113 | Notice of Appeal as to 106 Order by Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Filing fee $ 605.00 receipt number AFLSDC-19817065. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (Oprison, Christopher) (Entered: 07/31/2026) |
| 07/31/2026 | 114 | EXPEDITED MOTION To Stay The Sanctions Order And Related Proceedings Pending Appeal re 106 Order by Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. Responses due by 8/14/2026. (Oprison, Christopher) (Entered: 07/31/2026) |

| | | |
|---|---|---|
| 08/01/2026 | 115 | PAPERLESS ORDER. **THIS MATTER** is before the Court on the Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114 ) ("Motion"), filed by Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, together with their attorneys Alejandro Brito and Daniel Epstein. In the twenty-four-page Motion, Plaintiffs and their attorneys seek a stay of the Court's July 13, 2026 Order (DE 106 ) pending appeal and request an expedited ruling from this Court by August 5, 2026.<br><br>Accordingly, and in light of the fact that Defendants do not intend to appear or file a response to the Motion, the Court requests that the *amici curiae* previously appointed by the Court on April 29, 2026 (DE 43 )--John Gleeson, David A. O'Neil, Donald B. Verrilli, Jr., Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton--submit a response identifying relevant legal authority and addressing the multiple issues raised in Plaintiffs' and their attorneys' Motion to assist the Court in resolving this matter.<br><br>Signed by Judge Kathleen M. Williams on 8/1/2026. (ah06) (Entered: 08/01/2026) |
| 08/03/2026 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 113 Notice of Appeal. Notice has been electronically mailed. (apz) (Entered: 08/03/2026) |
| 08/03/2026 | 116 | MEMORANDUM in Opposition re 112 MOTION for Attorney Fees , 111 Memorandum by Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Oprison, Christopher) (Entered: 08/03/2026) |
| 08/03/2026 | 118 | Acknowledgment of Receipt of NOA from USCA re 113 Notice of Appeal, filed by Donald J Trump, Jr., The Trump Organization, LLC., Daniel Epstein, Alejandro Brito, Donald J. Trump, Eric Trump. Date received by USCA: 8/3/2026. USCA Case Number: 26-12692-C. (apz) (Entered: 08/04/2026) |
| 08/04/2026 | 117 | RESPONSE *TO EXPEDITED MOTION TO STAY* by Thirty-Five Former Federal Judges. (Rivero, Andres) (Entered: 08/04/2026) |
| 08/04/2026 | 119 | RESPONSE to 115 Order,,,, by Court-Appointed Amici Curiae. (Attachments: # 1 Proposed Order Denying Plaintiffs' Request for Expedited Consideration)(Gay, Faith) (Entered: 08/04/2026) |
| 08/05/2026 | 120 | ORDER. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 8/5/2026. (aw00) (Entered: 08/05/2026) |
| 08/11/2026 | 121 | REPLY in Support of Motion re 114 EXPEDITED MOTION To Stay The Sanctions Order And Related Proceedings Pending Appeal re 106 Order. filed by The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Oprison, Christopher) (Entered: 08/11/2026) |
| 08/13/2026 | 122 | MOTION for Leave to File Excess Pages by Court-Appointed Amici Curiae. Responses due by 8/27/2026. (Attachments: # 1 Proposed Order)(Gay, Faith) (Entered: 08/13/2026) |
| 08/13/2026 | 123 | ORDER. *See attached document for full details.* Signed by Judge Kathleen M. Williams on 8/13/2026. (aw00) (Entered: 08/13/2026) |
| 08/14/2026 | 124 | TRANSCRIPT ORDER FORM filed by Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr. re 113 Notice of Appeal,, filed by Donald J Trump, Jr., The Trump Organization, LLC., Daniel Epstein, Alejandro Brito, Donald J. Trump, Eric Trump. No Transcript Requested. (Oprison, Christopher) (Entered: 08/14/2026) |

| | | |
|---|---|---|
| 08/14/2026 | 125 | **STRICKEN PER DE# 126** - MEMORANDUM of Law re 115 Order,,,, by Court-Appointed Amici Curiae. (Gay, Faith) Modified text/status per Chambers on 8/17/2026 (sk). (Entered: 08/14/2026) |
| 08/17/2026 | 126 | NOTICE of Striking 125 Memorandum filed by Court-Appointed Amici Curiae by Court-Appointed Amici Curiae (Gay, Faith) (Entered: 08/17/2026) |
| 08/17/2026 | 127 | MEMORANDUM of Law re 115 Order,,,, *(Corrected)* by Court-Appointed Amici Curiae. (Gay, Faith) (Entered: 08/17/2026) |
| 08/21/2026 | 128 | REPLY in Support of Motion re 114 EXPEDITED MOTION To Stay The Sanctions Order And Related Proceedings Pending Appeal re 106 Order. filed by Alejandro Brito, Daniel Epstein, The Trump Organization, LLC., Donald J. Trump, Eric Trump, Donald J Trump, Jr.. (Oprison, Christopher) (Entered: 08/21/2026) |
| 09/11/2026 | 129 | Notice of Appeal as to 106 Order by Internal Revenue Service, U.S. Department of the Treasury. Filing fee $ 605.00. USA/FPD Filer - No Filing Fee Required. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all-forms. (McCotter, R.) (Entered: 09/11/2026) |
| 09/14/2026 | | Transmission of Notice of Appeal, Order under appeal, and Docket Sheet to US Court of Appeals re 129 Notice of Appeal. Notice has been electronically mailed. (jgo) (Entered: 09/14/2026) |
| 09/14/2026 | 130 | ORDER. *See attached document for full details.*<br><br>Signed by Judge Kathleen M. Williams on 9/14/2026. (aw00) (Entered: 09/14/2026) |
| 09/15/2026 | 131 | Acknowledgment of Receipt of NOA from USCA re 129 Notice of Appeal, filed by Internal Revenue Service, U.S. Department of the Treasury. Date received by USCA: 09/14/2026. USCA Case Number: 26-12692-CC. (jgo) (Entered: 09/15/2026) |

# TAB 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC.<br><br>*Plaintiffs,*<br><br>*v.*<br><br>INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY<br><br>*Defendants.* | No. ________________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

1. President Donald J. Trump is the Founder and former Chief Executive Officer of the Trump Organization. President Trump served as the 45th President of the United States, and is the 47th President of the United States. President Trump brings this suit in his personal capacity.

2. Donald J. Trump Jr. is an Executive Vice President at The Trump Organization, where he works to expand the company's real estate, retail, commercial, hotel, and golf interests.

3. Eric Trump is an Executive Vice President of the Trump Organization. He oversees all aspects of the management and operation of the global real estate business, including new project acquisition, development, and construction.

4. The Trump Organization is the preeminent developer of some of the most valuable and prized luxury real estate assets in the world, including five-star luxury hotels, championship golf courses, global realty services, residential & commercial buildings, property management, entertainment, dining, retail, and more.

5. The Trump Organization includes The Trump Organization, LLC, as well as 418

other entities that received notices from Defendant U.S. Department of the Treasury's Internal Revenue Service ("IRS") between December 2024 and May 2025 ("The Trump Organization").

6. At all relevant times, President Donald J. Trump, Donald Trump Jr., Eric Trump, and The Trump Organization, LLC ("Plaintiffs") filed tax returns with the IRS, which contained confidential, personal financial information.

7. From May 2019 through at least September 2020, former IRS employee Charles "Chaz" Littlejohn, who was jointly employed by the IRS and/or one of its contractors, illegally obtained access to, and disclosed Plaintiffs' tax returns and return information to the *New York Times*, *ProPublica*, and other leftist media outlets. *See Information*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343-ACR (D.D.C. Sept. 29, 2023), ECF No. 1 ("Criminal Information").

8. Defendants had a duty to safeguard and protect Plaintiffs' confidential tax returns and related tax return information from such unauthorized inspection and public disclosure. *See* 26 U.S.C. § 6103, 5 U.S.C. § 552a. Accordingly, Defendants were obligated to have appropriate technical, employee screening, security, and monitoring systems to prevent Littlejohn's unlawful conduct.

9. Defendants failed to take such mandatory precautions.

10. Mr. Littlejohn has admitted that he disclosed to outlet *ProPublica* "Trump information [that] included all businesses that he had owned." *Plaintiff's Notice of Filing Redacted Version of ECF 111-2 in Compliance with Court Order (ECF 114)*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 25, 2024), ECF No. 119 Exhibit 1 (Deposition of Charles Littlejohn) ("Littlejohn Dep.") at 200. *ProPublica* then falsely reported that Plaintiffs' leaked confidential tax returns contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies*,

(Oct. 16, 2019), https://tinyurl.com/4x9nak4e, and falsely characterized Plaintiffs' accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://tinyurl.com/4pwea2hk.

11. Defendants have caused Plaintiffs reputational and financial harm, public embarrassment, unfairly tarnished their business reputations, portrayed them in a false light, and negatively affected President Trump, and the other Plaintiffs' public standing. Joshua D. Blank, *Presidential Tax Transparency,* 40 Yale L. & Pol'y Rev. 1, 55 (2021) (describing how public claims about the President's taxes inform voters' electoral choices). Defendants' failures have caused significant and irreparable harm to Plaintiffs, their reputations, and their substantial financial interests.

12. This Court has already held these alleged facts sufficient to support Defendants' liability for violations of section 6103 of the Internal Revenue Code. *Order Den. in Part and Granting in Part Mot. to Dismiss*, *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 1 ("April Order"). The IRS "acknowledges that it failed to prevent Mr. Littlejohn's criminal conduct and unlawful disclosure of Mr. Griffin's confidential data." IRS, News Releases, No. IR-2024-172, *IRS statement as part of the resolution of Kenneth C. Griffin v. IRS, Case No. 22-cv-24023* (S.D. Fla.), (June 25, 2024), https://perma.cc/4T62-6HWG. As to Plaintiffs, the facts are even more egregious and warrant swift and sweeping relief to remedy Defendants' breach of Plaintiffs' rights under federal law.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1340, 1346, 26 U.S.C. § 7431(a), and 5 U.S.C. § 552a(g)(1)(D).

14. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, in this judicial district.

## PARTIES

15. Plaintiff President Donald Trump is a citizen of the United States and is a resident of Florida.

16. Plaintiffs Donald Trump Jr. and Eric Trump each reside in Palm Beach County, Florida, and lead and operate Trump Organization LLC and its affiliated entities from Palm Beach County, Florida, specifically Jupiter, Florida.

17. Plaintiff, The Trump Organization LLC is a limited liability company with its principal place of business at 115 Eagle Tree Terrace, Jupiter, Florida. Its officers include Eric Trump, a resident of Florida; and Donald J. Trump, Jr., a resident of Florida. Trump Miami Resort Management LLC, Trump Miami Resort Management Member Corp., The Miami Restaurant Hospitality Member Corp, and THC Miami Restaurant Hospitality LLC (together with the Trump Organization LLC, the "Trump Entities") are all located in Miami, Florida, within this Division.

18. Defendant U.S. Department of the Treasury is an Executive Department of the United States of America that oversees the IRS and the Treasury Inspector General for Tax Administration ("TIGTA"). Defendants, as the United States, are proper party defendants in this action and have waived sovereign immunity under 26 U.S.C. § 7431 and 5 U.S.C. § 552a(g)(1)(D).

19. Defendant Internal Revenue Service is a bureau of the U.S. Department of the

Treasury responsible for administering and enforcing the Internal Revenue Code.

## FACTS

### I. <u>The IRS is Responsible for Charles Littlejohn's Actions</u>

20. "In or about September 2017 . . . and—in February 2018—[Mr. Littlejohn was] granted [ ] access to unmasked taxpayer data." *Government's Sentencing Mem.*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Jan. 16, 2024), ECF No. 23 at 2 ("Government's Sentencing Memorandum"); Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024), https://archive.is/ItQSG.

21. Mr. Littlejohn was authorized, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2. "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law." *Id.* at 1.

22. At all relevant times, Mr. Littlejohn was an officer or employee, joint employee, and contractor of the United States by virtue of his work for the IRS.

23. Mr. Littlejohn had staff-like access to tax returns and confidential tax return information, and Defendants exercised the power to control the detailed physical performance of his work. April Order at 2, 6; *see also* Internal Revenue Manual ("IRM") § 7.11.13.1.1(3) (Feb. 12, 2018) ("All IRS employees (including managers, executives *and contractors*) are responsible for protecting the confidentiality and privacy of taxpayer information to which they have access.") (emphasis added), https://tinyurl.com/muc75h6r. Mr. Littlejohn testified that he "work[ed] at the IRS." Littlejohn Dep. at 204 ¶ 17.

24. The IRS (including IRS Contracting Officer Representatives) exercised extensive, detailed, day-to-day supervision of Mr. Littlejohn's work. April Order at 2, 6 (describing the IRS's "supervision and control" of Littlejohn). IRS Contracting Officer Representatives are "IRS employees who oversee day-to-day operations of contracts and contractors." U.S. GOVERNMENT ACCOUNTABILITY OFFICE, GAO- 23-105395, SECURITY OF TAXPAYER INFORMATION, IRS NEEDS TO ADDRESS CRITICAL SAFEGUARD WEAKNESSES, at 35 (August 2023), https://tinyurl.com/yrbvzvrn.

25. The IRS's supervision and control included "managing the scope and purpose of Mr. Littlejohn's daily tasks and projects; ensuring that Mr. Littlejohn completed required training, monitoring Mr. Littlejohn's technical performance; ensuring Mr. Littlejohn was aware of data safeguards and appropriately protecting taxpayer information; and exercising control over the parameters of Mr. Littlejohn's access to IRS data and confidential tax return information." April Order at 2 (replacing "his" with "Mr. Littlejohn").

26. During Mr. Littlejohn's employment, joint employment, and contractor status, "the IRS also had authority to both reprimand and terminate Littlejohn." *Id*. According to the IRS, all IRS employees—*i.e.*, "all IRS personnel," which "[a]lso includes all contractors who have staff-like access"—"may be subject to administrative penalties for the willful and unauthorized attempted access of their own or another taxpayer's records." *See* IRM § 10.5.5.1.6(2) and (3); IRM § 10.5.5.2(2). IRS administrative penalties include, but are not limited to, the removal and suspension of employees.

27. These facts more than support the "plausible inference that Littlejohn was an employee of the United States." *Revenue Service and U.S. Department of the Treasury*, Case No. 22-cv-24023 (S.D. Fla. Apr. 22, 2024), ECF No. 108 at 6.

28. Indeed, Mr. Littlejohn testified that his work for the IRS was his "full-time job"

from May 2019 through at least September 2020. Littlejohn Dep. at 264 ¶ 7.

29. At all relevant times, Mr. Littlejohn's work at the IRS was supervised by Paul Wight, Supervisory Management and Program Analyst at the Department of Treasury. *Id*. at 265 ¶¶ 11-15.

30. Mr. Littlejohn testified that Mr. Wight directed his work. *Id*. at 301 ¶ 7-9.

31. Due to Mr. Littlejohn's employment, joint employment, and contractor status, the IRS had a duty to oversee and control his access to and removal of records. 36 C.F.R. §§ 1222.32(a) & (b) establishes that the IRS must oversee and control contractor, employee, or joint employee records and that such records are federal records for which unlawful removal requires actions for recovery by the executive branch. *See, e.g.,* 44 U.S.C. § 3106.

## II. <u>Defendants Willfully Failed to Establish Appropriate Administrative, Technical, and Physical Safeguards to Ensure the Security and Confidentiality of Plaintiffs' Confidential Tax Return Information, Compounding the Risk of Unauthorized Inspection and Disclosure.</u>

32. "Every year from 2010 through 2020, the Treasury Inspector General for Tax Administration ("TIGTA") has warned the IRS about security deficiencies related to the protection of taxpayers' confidential tax return information." *Id.* at 1; ¶¶ 8-9, 26, 28-31, 64.

33. "Many of these deficiencies went uncorrected and . . . allowed Littlejohn to misappropriate the information, upload it to a private website, and then disclose it[.]" *Id.*

34. "The IRS also disclosed [Plaintiffs'] confidential tax return information to Littlejohn regardless of whether Littlejohn completed or was up to date with all [of] his purportedly required privacy and data-security training." *Id.*

35. "In October 2023, a few weeks after being criminally charged for the disclosures, Littlejohn pleaded guilty to a violation of 26 U.S.C. § 7213(a) for the unlawful disclosure of confidential tax return information," including Plaintiffs' confidential tax returns and related return

information. *Id*. at 3.

36. In Mr. Littlejohn's own words, to disclose Plaintiffs' tax returns, he "made use of a private website that I could log into and I could upload the return data and then – you know, on my IRS computer, I could do that. And then, on a separate computer, I could log in and download the data." Littlejohn Dep. at 142.

37. Mr. Littlejohn has admitted that the IRS did "not block creating a private website" on IRS computers. *Id*. Before Mr. Littlejohn stole Plaintiffs' returns via a private website on an IRS computer or computers, he tested the viability of using such a website by having "uploaded an image file to a website that I had control over, and it worked." *Id*. at 143.

38. As a result of Defendants' incomplete and failed compliance procedures set forth in 5 U.S.C. § 552a (the "Privacy Act"), among other failures and procedure violations, it only took "[a] few hours" for Mr. Littlejohn to take Plaintiffs' tax returns into his personal custody. *Id*. at 145.

39. Defendants' Privacy Act compliance and other security procedures were so insufficient that it took three years for the IRS to detect that Littlejohn breached the confidentiality and security protections of Plaintiffs' confidential tax returns and related tax information. *Id.* at 146-47 ¶¶ 19-22, and 1-8.

40. Once Mr. Littlejohn uploaded Plaintiffs' tax returns and return information onto his private website, he placed them "on a flash drive" in his house. *Id*. at 148.

41. From October 2019 until at least January 2020, Mr. Littlejohn repeatedly accessed IRS data to illegally provide additional information to the *New York Times* and *ProPublica,* which was all undetected by Defendants despite his initial breach several months earlier. *Id*. at 160, 163-64.

42. Because the IRS tax return data lacked proper encryption, Mr. Littlejohn was able to put Plaintiffs' confidential tax return information as a draft in an e-mail account, and then provide the *New York Times* and *ProPublica* with login information to the account, in order to unlawfully retrieve the return information. *Id*. at 165.

43. The IRS continued its failure to implement appropriate safeguards through at least Fiscal Year 2020 (ending September 30, 2020). In its *Annual Assessment of the Internal Revenue Service's Information Technology Program for Fiscal Year 2020*, the Treasury Inspector General for Tax Administration reported that 54% of the employees audited had unnecessary access to the IRS Centralized Authorization File, which houses tax information authorizations. *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2021-20-001, ANNUAL ASSESSMENT OF THE INTERNAL REVENUE SERVICE'S INFORMATION TECHNOLOGY PROGRAM FOR FISCAL YEAR 2020 (Oct. 30, 2020), https://tinyurl.com/bdysc8b3.

44. Similarly, the Treasury Inspector General for Tax Administration has found that the IRS failed to establish safeguards to *detect*, let alone prevent, unauthorized access to confidential tax return information.

45. Indeed, on July 31, 2020, the Treasury Inspector General for Tax Administration revealed that "the IRS could not provide an accurate inventory of all applications that store or process taxpayer data and [Personally Identifiable Information]." *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, REFERENCE NO. 2020-20-033, MOST INTERNAL REVENUE SERVICE APPLICATIONS DO NOT HAVE SUFFICIENT AUDIT TRAILS TO DETECT UNAUTHORIZED ACCESS TO SENSITIVE INFORMATION at 2 (July 31, 2020), https://tinyurl.com/3rythsr3.

46. Notwithstanding all of these data security failures, the IRS put, and continued to put long after this breach, Plaintiffs' and other United States taxpayers' confidential tax return

information at risk. Defendants failed to implement effective training, including training mandated for Mr. Littlejohn, to protect Plaintiffs' confidential tax returns and return information.

47. Defendants' failure to establish necessary administrative, technical, and physical safeguards over its systems of records allowed Mr. Littlejohn to exploit these failures in order to repeatedly inspect and misappropriate Plaintiffs' confidential tax return information, and to unlawfully disclose that information to the *New York Times, ProPublica*, and others for widespread, unlawful publication.

## III. **<u>Defendants Failed to Appropriately Screen Mr. Littlejohn and Failed to Properly Safeguard Plaintiffs' 6103-protected Information</u>**

48. At all relevant times, Mr. Littlejohn was authorized, even though he should not have been, under 26 U.S.C. § 6103(n), "to access vast amounts of unmasked taxpayer data, including tax returns and return information, on IRS databases." Government's Sentencing Memorandum at 2.

49. Because Defendants did not properly screen Mr. Littlejohn, they failed to determine that Mr. Littlejohn posed a risk to protected taxpayer information, including Plaintiffs' confidential tax returns and related tax information.

50. Because Defendants did not institute proper controls and safeguards over Mr. Littlejohn's activities, he was able to engage in the unauthorized disclosure of Plaintiffs' confidential tax returns and related information to, among others, the *New York Times* and *ProPublica* for widespread, unlawful publication.

51. To illustrate, if Defendants had ensured that Mr. Littlejohn had all IRS-based information in his possession connected to IRS-approved cybersecurity programs, they would have detected that Mr. Littlejohn was removing Plaintiffs' taxpayer information from his devices, prevented Mr. Littlejohn from leaving his office of employment carrying taxpayer records with

him for the purpose of disclosing them at a location in Gallaudet University, and detected and prohibited his use of a burner phone to orally disclose 6103-protected information. *See* ¶¶ 53-64, *infra*.

## IV. Defendants' Privacy Act Violations Emboldened Mr. Littlejohn to Repeatedly and Unlawfully Inspect and Disclose Plaintiffs' Confidential Tax Returns and Tax Return Information.

52. "After applying to work as an IRS consultant with the intention of accessing and disclosing tax returns, [Mr. Littlejohn] weaponized his access to unmasked taxpayer data to further his own personal, political agenda, believing that he was above the law." Government's Sentencing Memorandum at 1.

53. On or around April or May 2019, Mr. Littlejohn disclosed Plaintiffs' confidential tax returns and/or return information to the *New York Times*. Littlejohn Dep. at 123, 140 ¶ 1.

54. In response to the *New York Times'* continuous negative reporting regarding the Plaintiffs, Mr. Littlejohn decided to disclose Plaintiffs' confidential tax returns to the media outlet through its Signal account. Littlejohn Dep., *supra* at 148 ¶ 13-18 and 149 ¶1-4. Mr. Littlejohn then intentionally and maliciously disclosed those materials to the *New York Times* for unlawful, widespread publication. Mr. Littlejohn took Plaintiffs' confidential tax returns and related tax information, and illegally disclosed them in-person to *New York Times* reporters Susanne Craig and Russ Buettner at the Kellogg Business Center on the Gallaudet University campus. *Id*. at 152. Subsequently, in July 2019, Mr. Littlejohn met with the *New York Times* reporters and their editor at a safehouse in New York City to discuss providing legally protected materials to the reporters. *Id*. at 155. In October 2019, Mr. Littlejohn unlawfully provided the *New York Times* with a flash drive of several years of Plaintiffs' tax returns, and allowed the *New York Times* to illegally download those returns onto its computer. *Id*. at 160.

55. In or around September 2020, Mr. Littlejohn contacted a second media outlet,

*ProPublica*, to discuss the possibility of unlawfully providing them with the confidential tax information in his possession, including Plaintiffs' confidential tax returns and related information. *Factual Basis for Plea*, *U.S.A. v. Littlejohn*, Case No. 1:23-cr-00343 (D.D.C. Oct. 12, 2023), ECF No. 9 ("Factual Basis for Plea") at 3.

56. In or around that time, Mr. Littlejohn illegally provided Plaintiffs' confidential tax returns and related tax information to *ProPublica* by mailing it on a password-protected personal data storage device. *Id.*

57. In or around November 2020, Mr. Littlejohn unlawfully provided the password-protected data storage device password to a *ProPublica* journalist, who proceeded to illegally access Plaintiffs' confidential tax returns and related tax information. *Id.*

58. Mr. Littlejohn later admitted that he disclosed to *ProPublica* "Trump information [that] included all businesses that he had owned." Littlejohn Dep. at 200.

59. From as early as April 2019 until at least September 2020, based on deposition testimony, Littlejohn Dep. at 166-69, Mr. Littlejohn exploited Defendants' data integrity failures to repeatedly and unlawfully disclose Plaintiffs' confidential tax returns and related tax information.

60. Defendants' failure to "ensure that all Windows computers connected to its network were authorized and compliant with security policy" allowed Mr. Littlejohn to use virtual machines that simulated physical computers to avoid IRS protocols designed to detect and prevent large downloads or uploads from IRS devices or systems.

61. Further, Defendants' failure to use adequate encryption allowed Mr. Littlejohn to illegally store and to transmit Plaintiffs' confidential tax returns and tax information to the *New York Times* and *ProPublica* on a personal data storage device.

62. According to court documents, "Littlejohn accessed tax returns associated with [Plaintiffs] – and related individuals and entities – on an IRS database after using broad search parameters designed to conceal the true purpose of his queries. He then evaded IRS protocols established to detect and prevent large downloads or uploads from IRS devices or systems." *See, e.g.*, U.S. Department of Justice, Press Release, https://tinyurl.com/2vjru7z7 (paraphrasing filings).

63. "Littlejohn then saved the tax returns to multiple personal storage devices, including an iPod, before contacting [the *New York Times*]. Between August 2019 and October 2019, Littlejohn provided [the *New York Times*] with the tax return information associated with [Plaintiffs]. Littlejohn then stole additional tax return information related to [Plaintiffs] and provided it to [the *New York Times*]. In September 2020, [the *New York Times*] published a series of articles about [Plaintiffs'] tax returns." Criminal Division of the U.S. Department of Justice, Case Summary, *United States v. Charles E. Littlejohn,* https://tinyurl.com/5n7b4fpz.

64. The IRS, through Littlejohn, unlawfully disclosed Plaintiffs' confidential tax return information to the *New York Times* on a personal storage device. Eileen Sullivan, *Former Contractor Who Leaked Trump's Tax Returns Sentenced to 5 Years in Prison*, N.Y. TIMES (Jan. 29, 2024), https://tinyurl.com/vyumarcu.

65. Littlejohn committed these crimes because he considered President Trump to be "dangerous" and a "threat to democracy," and that disclosure was, in Littlejohn's view, necessary due to political "norms." Littlejohn Dep. at 85-87.

66. In fact, once the IRS granted Mr. Littlejohn access to Plaintiffs' confidential tax returns and related tax information, it was certain that the information would be illegally disclosed, including to the press.

67. Littlejohn sought employment, joint employment, and contractor status with the IRS with "the goal of getting access to taxpayer information from Donald Trump[.]" *Id.* at 88. When asked, "so you were looking to do something to cause some kind of harm to him?" Mr. Littlejohn responded, "Less about harm, more just about a statement. I mean, there's little harm that can actually be done to him, I think. . . He's shown a remarkable resilience." *Id.* at 90.

68. Mr. Littlejohn's deposition in *Kenneth C. Griffin v. Internal Revenue Service and U.S. Department of the Treasury*, *supra*, quoted the government's statements at his January 29, 2024, sentencing hearing, where the prosecution stated, "All Americans are obligated to provide an enormous amount of financial information about their private lives to the IRS -- to the government. And in exchange, in turn, what we expect from the government and what we expect from the IRS is that they will secure the data. They will protect the data. The defendant's crime undermined that faith. It undermined that trust." *Id.* at 286 ¶ 7-15.

69. At that sentencing, Mr. Littlejohn admitted: "I felt that the American people should have the opportunity to see the tax returns of the sitting President before they decided on how they were going to vote." *Id*. at 287 ¶ 3-6. Mr. Littlejohn clearly committed his crimes, which the Defendants allowed to occur, in order to improperly influence the results of the 2020 presidential election.

70. In his Factual Basis for Plea, Mr. Littlejohn expressly admitted that his "disclosure of the [Plaintiffs] tax returns and return information . . . was knowing and willful." *U.S.A. v. Littlejohn*, Case No. 23-cr-00343, Dkt. No. 9, at ¶ 16.

71. U.S. District Court Judge Ana C. Reyes, at sentencing, expressly found: "Mr. Littlejohn's targeting of a sitting President of the United States is part of a three-year criminal scheme, including working with reporters to help him understand the tax returns, deciding again

and again and again to take the law into his own hands." *Id*. at 289 ¶ 7-12.

72. Judge Reyes further found that Mr. Littlejohn sought to harm President Trump: "Despite what Mr. Littlejohn argues, I find it implausible that he did not intend to harm at least some taxpayers. Indeed, he provided the returns to the *New York Times* and *ProPublica* so that they could write articles about Mr. Trump and wealthy individuals." *Id*. at 291 ¶ 16-21.

73. Because of Defendants' wrongful conduct, Plaintiffs were subject to, among many others, at least eight ("8") separate stories in the *New York Times* which wrongly and specifically alleged various improprieties related to Plaintiffs' financial records and taxpayer history, including:

- False allegations that President Trump engaged in "tax avoidance," Russ Buettner, Susanne Craig, and Mike McIntire, *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance,* N.Y. Times (Sept. 27, 2020), https://tinyurl.com/yhhvep2d;
- False allegations that President Trump "reduced his tax bill with questionable measures," David Leonhardt, *18 Revelations from a Trove of Trump Tax Records*, N.Y. Times (Sept. 27, 2020), https://tinyurl.com/w93vrbty;
- False allegations that President Trump "suffered heavy business losses," Charlie Smart, *Here Are the Key Numbers From Trump's Tax Returns*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/46pfw63b;
- False allegations regarding the specifics of existence of various IRS audits of Defendants; Jim Tankersley, Susanne Craig and

Russ Buettner, *Trump Tax Returns Undermine His Image as a Successful Entrepreneur*, N.Y. Times (Dec. 30, 2022), https://tinyurl.com/mvbv7m22;

- False allegations regarding President Trump's charitable contributions; Jim Tankersley, Susanne Craig and Russ Buettner, *Key Takeaways From Trump's Tax Returns*, N.Y. Times, (Dec. 30, 2022), https://tinyurl.com/bdf5nwfs;
- False allegations that President Trump's returns and information had "red flags," Jim Tankersley, Susanne Craig and Russ Buettner, *Trump's Taxes: Red Flags, Big Losses, and a Windfall From His Father*, N.Y. Times, (Dec. 21, 2022), https://tinyurl.com/muz53b7x;
- False allegations that President Trump "paid no federal income taxes in 11 of 18 years", Trump's Taxes: I.R.S. Didn't Audit Trump for 2 Years in Office, House Committee Says, N.Y. Times (Dec. 20, 2022), https://tinyurl.com/yu4as6zf; and
- False allegations that President Trump paid "$750 in federal income taxes in 2017", Russ Buettner, Mike McIntire, Susanne Craig and Keith Collins, *Trump Paid $750 in Federal Income Taxes in 2017. Here's the Math.*, N.Y. Times (Sept. 29, 2020), https://tinyurl.com/2pcywfm6.

74. Likewise, *ProPublica* published at least 50 articles as a result of Defendant's unlawful disclosures, many of which contained false and inflammatory claims about Defendants'

confidential tax documents. *See* Government's Sentencing Memorandum at 4.

75. For instance, *ProPublica* falsely reported that President Trump's unlawfully leaked tax information contained "versions of fraud," Heather Vogell, *Never Before Seen Trump Tax Documents Show Major Inconsistencies* (Oct. 16, 2019), https://tinyurl.com/4x9nak4e; and mischaracterized his accounting firm as having engaged in "fraud, misconduct or malpractice," Peter Elkind, Meg Cramer, and Doris Burke, *Meet the Shadowy Accountants Who Do Trump's Taxes and Help Him Seem Richer Than He Is*, *ProPublica* (May 6, 2020), https://perma.cc/2FYA-W7UA.

76. President Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until January 29, 2024, when the IRS sent a letter addressed to "Donald J. Trump and Melania," that stated, "We're providing you this letter to notify you that an Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information between 2018 and 2020."

77. When the first relevant *New York Times* story was released on September 27, 2020, Plaintiffs had no reason to believe that an unauthorized disclosure had occurred for at least two reasons. First, the *New York Times* reporting did not state that the information came from the IRS, and second, the IRS Commissioner supposedly investigated and found that the disclosure did not come from the IRS. Littlejohn Dep., *infra* at 172.

78. Eric Trump did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

79. The § 7431 notice received by Eric Trump informed that "[a]n Internal Revenue

Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

80. Donald Trump, Jr. did not discover the numerous violations of § 6103 that were committed in connection with his personal tax returns until December 16, 2024, when he first received from Defendants relevant notices pursuant to Internal Revenue Code § 7431.

81. The § 7431 notice received by Donald Trump, Jr. informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

82. To date, the Trump Organization continues to receive notices from Defendants pursuant to Internal Revenue Code § 7431.

83. The notices that were sent to Plaintiffs disclosed numerous violations of § 6103 that were committed in connection with The Trump Organization's corporate tax returns, as well as the corporate tax returns of subsidiaries of, and/or fully owned affiliates of, the Trump Organization.

84. Between December 2024 and May 12, 2025, the Trump Organization received § 7431 notices with respect to 418 Trump Entities.

85. All § 7431 notices received by the Trump Organization informed that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020," and included an annexed copy of the Criminal Information against Mr. Littlejohn.

86. Plaintiffs were not able to bring an action against an unknowable, indeterminate defendant to vindicate their rights until such notification occurred—which, in this case, was

pursuant to the statutory requirement imposed upon the Secretary of the Treasury to notify a taxpayer "as soon as practicable" if "any person is criminally charged by indictment or information with inspection or disclosure of" that taxpayer's return or return information. 26 U.S.C. § 7431(e). 26 U.S.C. § 7431(e) provides the Defendants' notice requirement to Plaintiffs, while 26 U.S.C. § 7431(d) governs the two-year time period within which Plaintiffs must generally file their action pursuant to 26 U.S.C. § 7431(a)(1).

87. All conditions precedent to this action have been performed, excused, or waived.

## CLAIMS FOR RELIEF

### Count I - Violations of 26 U.S.C. § 6103 and 26 U.S.C. § 7431(a)(1)

88. Plaintiffs repeat each of Paragraphs 1 to 87 as if fully alleged herein.

89. 26 U.S.C. § 6103 provides that tax "[r]eturns and return information shall be confidential" and prohibits disclosure and inspection by United States employees and other defined persons, except as specifically authorized by law." *Id*. § 6103(a)(3).

90. Under 26 U.S.C. § 6103(a), no such person who has received tax returns or return information "shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." The statute defines "officer or employee" as a former officer or employee. *Id.*

91. Section 6103(a) provides that, with limited exceptions, federal tax "[r]eturns and return information shall be confidential," and it imposes this confidentiality obligation on, among other persons, federal contractors who receive access to returns or return information. 26 U.S.C. § 6103(a)(2).

92. "Return" is defined as:

> [A]ny tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this

> title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

26 U.S.C. § 6103(b)(1).

93. "Return information" includes:

> [A] taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

26 U.S.C. § 6103(b)(2)(A).

94. "[D]isclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

95. The IRS's Internal Revenue Manual § 10.5.5.1.6(2) defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." The Internal Revenue Manual § 10.5.5.1.6(3) defines "staff-like access" to mean "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS information."

96. The Internal Revenue Manual defines "[e]mployee" as "all IRS personnel," including "all contractors who have staff-like access." *See IRS Unauthorized Access, Attempted Access, Or Inspection of Taxpayer Records ("UNAX") Program Policy, Guidance, and Requirements ("UNAX Policy")*, IRM § 10.5.5.1.6(2).

97. According to the IRS, "staff-like access" means "when a contracted individual is granted access to IRS facilities or IRS systems, or has opportunity to be exposed to IRS

information." *See id.* § 10.5.5.1.6(3).

98. 26 U.S.C. § 6103(n) permits the disclosure of returns and return information to any person "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration."

99. 26 C.F.R. § 301.6103(n)-1(b)(2) prohibits such disclosures under 26 U.S.C. § 6103(n) if the disclosure is not "necessary" or, in the alternative, if the services for which the disclosure is made under 26 U.S.C. § 6103(n) can be:

> [R]easonably, properly, or economically performed by disclosure of only parts or portions of a return or if deletion of taxpayer identity information […] reflected on a return would not seriously impair the ability of the employees to perform the service, then only the parts or portions of the return, or only the return with taxpayer identity information deleted, may be disclosed.

100. 26 U.S.C. § 7431 provides taxpayers a private right of action for damages against the United States for the knowing or negligent unauthorized inspection or disclosure of tax return information in violation of 26 U.S.C. § 6103.

101. An affected taxpayer may bring a civil action for damages "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103."

102. As alleged herein, Defendants, through Mr. Littlejohn, acting as an employee, contractor, and jointly-employed individual of Defendants, repeatedly violated 26 U.S.C. § 6103 from as early as March 2019 through at least September 2020 by unlawfully inspecting Plaintiffs' confidential tax return information and then unlawfully disclosing that information to the *New York*

*Times* and *ProPublica*, with the expectation that this information would be widely published and harm Plaintiffs.

103. Defendants, through Mr. Littlejohn, knowingly and unlawfully disclosed Plaintiffs' "tax returns and return information dating back *more than 15 years*," from at least 2000 through 2020, to the *New York Times* and *ProPublica*, which the expectation that this information would be widely published and harm Plaintiffs. *See* Information at 1.

104. Thus, Defendants violated § 6103 in connection with each of the Plaintiffs, including the unlawful inspection and disclosure of numerous confidential tax returns covering the time period of at least 2005 through 2020, to at least two media outlets, *The New York Times* and *ProPublica*. The unlawful disclosure of *each* confidential tax return and/or return information, for *each* year and to *each* outlet, and each time that confidential tax return and/or return information was viewed as a result of the unlawful disclosure constitutes a separate violation of 26 U.S.C. § 6103. *See, e.g., Snider v. United States* 468 F.3d 500, 508 (8th Cir. 2006) ("Direct disclosures to multiple persons multiplies the harm to the taxpayer . . . one disclosure to two people counts as two separate disclosures.") (citing *Mallas v. United States*, 993 F.2d 1111, 1125 (4th Cir. 1993)); *Minda v. United States*, 851 F.3d 231, 236 (2d Cir. 2017) (noting that 26 U.S.C. § 7431(c) "clearly provides an aggrieved taxpayer $1,000 in statutory damages for 'each act' of unauthorized disclosure."). This information was likely seen by tens of millions of viewers. *See e.g.,* Sarah Diamond, *What Makes a Times Article Go Viral?*, The New York Times, (Mar. 16, 2022), https://tinyurl.com/4v9h3zhr (stating "articles evoking high-arousal emotions like awe, anger, surprise and anxiety were more likely to go viral" and thus "amass[ ] millions of page views") ("Diamond Article").

105. Those unlawful inspections and disclosures encompassed, among other things, the

wage information, charitable contributions, financial and securities transactions, adjusted gross income, and information sufficient to calculate the purported effective federal income tax rates of President Trump, Eric Trump, and Donald Trump, Jr. The unlawful inspections and disclosures also encompassed sensitive corporate financial information of The Trump Organization and the Trump Entities.

106. Defendants made these unlawful disclosures knowingly—or at the very least negligently or with gross negligence—because they willfully failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' confidential taxpayer information and protect from the exact unlawful disclosures that occurred.

107. As shown above, Defendants, through Littlejohn, illegally disclosed the confidential return information to the *New York Times* and *ProPublica* with the intent that the *New York Times* and ProPublica would widely publicize the information through its print and online reporting.

108. Defendants' illegal disclosures of Plaintiffs' tax return information did not result from a "good faith, but erroneous interpretation of section 6103," 26 U.S.C. § 7431(b)(1), but rather from knowing violations, gross negligence, and/or negligence.

109. Defendants' unlawful disclosures of Plaintiffs' tax return information to the *New York Times* were not "requested by the taxpayer," i.e., Plaintiffs, under 26 U.S.C. § 7431(b)(2).

110. Therefore, the IRS's disclosure of Plaintiffs' tax return information violated 26 U.S.C. § 6103.

111. Under 26 U.S.C. § 7431, Plaintiffs are entitled to statutory damages of $1,000 "for *each* act of unauthorized disclosure of a return or return information[.]" 26 U.S.C. § 7431(c)(2).

112. Plaintiffs are also entitled to punitive damages under 26 U.S.C. § 7431(c)(1)(B)(ii), because the IRS's unlawful disclosure of their confidential tax return information was either willful or a result of gross negligence.

113. There are several further aggravating factors that support the award of punitive damages in this case, including, without limitation: (i) the overtly political nature of Defendants' conduct—which was targeted at a then-sitting (and now current) President, his family, and entities bearing his name; (ii) the fact that the unlawful disclosures were committed with the express purpose of influencing and/or interfering with the 2020 presidential election; (iii) the unprecedented size and scope of the breach of privacy and the sheer number of individuals and entities affected (which forced Plaintiffs to have to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information); and (iv) the reckless abandon displayed by Defendants with respect to the complete and utter failure to safeguard the confidential, sensitive, and highly sought-after tax return information of the President of the United States, his family members, and businesses bearing his name.

114. Plaintiffs are entitled to the costs of the action and reasonable attorney's fees under 26 U.S.C. § 7431(c)(3).

**Count II - Violation of 5 U.S.C. § 552a(e)(10)**

115. Plaintiffs repeat the allegations contained in paragraphs 1 through 87 as if fully alleged herein.

116. The IRS is an agency within the meaning of the Privacy Act.

117. The IRS maintained Plaintiffs' records, including his confidential tax return information, in a system of records as defined in the Privacy Act.

118. The IRS has long been aware of serious deficiencies in its privacy safeguards, including due to repeated notices from the Treasury Inspector General for Tax Administration.

119. The Privacy Act requires that Defendants "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination[.]" 5 U.S.C. § 552a(e)(5).

120. Defendants failed to do so with respect to Plaintiffs' tax return information.

121. Mr. Littlejohn's unlawful disclosure of Plaintiffs' tax returns and related information to *The New York Times* and *ProPublica* caused reputational and financial harm to Plaintiffs and adversely impacted President Trump's support among voters in the 2020 presidential election.

122. At Mr. Littlejohn's January 29, 2024, criminal sentencing, the prosecutors charged that Mr. Littlejohn's "disclosures were intended to damage his victims' reputations, and through that criminal damage, he sought to influence an election and to reshape our nation's political discourse and political process." Littlejohn Dep. at 285 ¶ 3-7.

123. As a result of Defendants' repeated violations of the Privacy Act, Plaintiffs incurred substantial financial and other damages, including having to defend against a meritless civil suit brought by the New York Attorney General based on wrongful interpretation of unauthorized disclosures of their confidential tax returns and related tax information.

124. Plaintiffs will continue to sustain substantial financial, reputational, and other damages as a result of Defendants' repeated violations of the Privacy Act set forth above.

125. Plaintiffs are therefore entitled to substantial damages under 5 U.S.C. §§ 552a(g)(1)(D), (g)(2)(A), and (g)(4).

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs President Donald Trump, Donald Trump Jr., Eric Trump, and the Trump Organization respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully accessed and inspected Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

B. Declaring that Defendants willfully, knowingly, and/or by gross negligence unlawfully disclosed Plaintiffs' confidential tax return information in violation of 26 U.S.C. § 6103;

C. Awarding Plaintiffs, pursuant to 26 U.S.C. § 7431(c)(1), the greater of either $1,000 in damages for each unauthorized disclosure of their tax return information, including each subsequent disclosure by third parties, including by the *New York Times*, *ProPublica,* and by many additional print, broadcast, cable, social media and other platforms, which amounts to at least $10,000,000,000.00, *see* Diamond Article, *supra*, or the actual damages sustained by Plaintiffs and all related entities, including each of the 418 Trump Organization-affiliated entities that received notices from the IRS, which also amounts to at least $10,000,000,000.00;

D. Awarding Plaintiffs reasonable costs and attorney's fees pursuant to 26 U.S.C. § 7431(c)(2)-(3), and as may otherwise be permitted by law;

E. Awarding Plaintiffs punitive damages pursuant to 26 U.S.C. § 7431(c)(1)(B)(ii) because the unlawful disclosure of their confidential tax returns and return information was either willful or the result of gross negligence;

F. Ordering Defendants to pay damages under the Privacy Act's damages provision, 5 U.S.C. § 552a(g)(4)(A), for actual damages resulting from the IRS's failure to maintain its records in a confidential manner;

G. Awarding costs and pre-and post-judgment interest as allowed by law; and

H. Any such other relief as the Court deems just and proper.

Dated: January 29, 2026

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: */s/ Alejandro Brito*
**ALEJANDRO BRITO**
Florida Bar No. 098442
Primary: abrito@britopllc.com
Secondary: apiriou@britopllc.com
**IAN MICHAEL CORP**
Florida Bar No. 1010943
Primary: icorp@britopllc.com

**Daniel Z. Epstein**
D.C. Bar No. 1009132
Epstein & Co. LLC
E-mail: dan@epsteinco.co
* *Pro Hac Vice Forthcoming*

*Counsel to Plaintiffs*
*President Donald J. Trump et al.*

# TAB 41

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
______________________________________/

**ORDER**

**THIS MATTER** is before the Court on Plaintiffs' Consent Motion for a 90 Day Extension ("***Motion***") (DE 40). In the Motion, Plaintiffs ask the Court "to grant an extension for a period of ninety (90) days in all proceedings in this matter." (DE 40 at 1). The only scheduled event at issue is Defendants' response to the Complaint. For the reasons stated below, the Court will, *sua sponte*, stay Defendants' obligation to respond and set a briefing schedule to address the question of the Court's subject matter jurisdiction.

## I. BACKGROUND

On January 29, 2026, Plaintiffs President[1] Donald J. Trump ("***President Trump***"), Donald J. Trump Jr., Eric Trump, and The Trump Organization LLC (collectively, "***Plaintiffs***") filed a complaint against Defendants the Internal Revenue Service ("***IRS***") and the United States Department of the Treasury ( "***Treasury,***" and, together with the IRS, "***Defendants***") (DE 1; "***Complaint***"). In the Complaint, Plaintiffs assert two counts:

[1] In their Complaint, Plaintiffs state that "President Trump is bring[ing] this suit in his personal capacity." (DE 1 at 1). The Court notes, however, that President Trump's political title is used in the caption and throughout the Complaint.

violations of 26 U.S.C. § 6103 and 26 U.S.C. § 7431(a)(1) ("***Count I***") and violation of 5 U.S.C. § 552a(e)(10) ("***Count II***"). Before Defendants could respond to the Complaint, Plaintiffs filed the instant Motion, requesting a global extension of time so the Parties can "engage in discussions designed to resolve the matter[.]" (DE 40 at 2).

## II. DISCUSSION

"Federal courts are courts of limited jurisdiction." *Isom v. Bulso*, No. 20-14074, 2022 WL 682215, at *4 (11th Cir. 2022) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "We possess only that power authorized by Constitution and statute." *Id.* (internal quotations omitted). Thus, this Court has "an independent obligation to police the constitutional and statutory limits on [its] jurisdiction." *Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997). One such constitutional mandate is set forth in Article III, which limits federal courts to adjudicating "Cases" or "Controversies." U.S. CONST. art. III, § 2; *Kennedy v. Floridian Hotel, Inc.*, 998 F.3d 1221, 1229 (11th Cir. 2021). "The existence of a case or controversy is a "bedrock requirement" of our jurisdiction; we cannot exercise judicial power without it." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). Accordingly, before the Court can rule on Plaintiffs' Motion, it must first confirm its jurisdiction.

A key characteristic of the case or controversy requirement is the existence of adverseness, or "a dispute between parties who face each other in an adversary proceeding." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 242 (1937). "There must be an honest and actual antagonistic assertion of rights by one individual against another, which is neither feigned nor collusive." *Muransky*, 979 F.3d at 981 (internal quotation marks and citations omitted). Typically, adverseness is found in a

situation where one party is asserting its right and the other party is resisting. *Nat'l Lab. Rels. Bd. v. Constellium Rolled Prods. Ravenswood, LLC*, 43 F.4th 395, 400 (4th Cir. 2022) (internal quotations and citations omitted). Consequently, if there is no adverseness, there is no case or controversy. *See Druhan v. Am. Mut. Life,* 166 F.3d 1324, 1326 (11th Cir. 1999).

In the instant case, Defendants have not yet filed any notices of appearance. Nonetheless, the Parties have advised the Court that they are engaging in discussions to resolve this matter. Moreover, although President Trump avers that he is bringing this lawsuit in his personal capacity, he is the sitting president and his named adversaries are entities whose decisions are subject to his direction.[2] Indeed, President Trump's own remarks about this matter acknowledge the unique dynamic of this litigation.[3] Accordingly, it is unclear to this Court whether the Parties are sufficiently adverse to each other so as to satisfy Article III's case or controversy requirement.

---

[2] President Trump has issued multiple executive orders which shape the relationship of the agencies of the executive branch to his presidency. For example, "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law . . . that contravenes the President['s] . . . opinion on a matter of law, including but not limited to . . . positions advanced in litigation[.]" Exec. Order No. 14215, § 7. One such employee of the executive branch, the Attorney General, has a statutory obligation to defend the IRS when it is hailed into court, but then is ostensibly required by executive mandate to adhere to the President's opinion on a matter of law in such a case. This raises questions over whether the Parties here are truly antagonistic to each other.

[3] *See, e.g,* White House, *President Trump Gaggles with Press on Air Force One En Route Palm Beach, FL*, at 02:40 (Jan. 31, 2026), https://www.youtube.com/live/IvgGnWcxRhE; NBC News, *Full Interview: Tom Llamas exclusive with President Trump* (Feb. 8, 2026), at 40:10, https://www.youtube.com/watch?v=EJfyAcfE5HM.

## III. CONCLUSION

The Court hoped to evaluate this issue after Defendants responded to the Complaint. However, in light of Plaintiffs' Motion, the Court will ask the Parties to address the question of subject matter jurisdiction before addressing the relief requested in the Motion.

Accordingly, it is **ORDERED AND ADJUDGED** that, by May 20, 2026, the Parties shall each file a memorandum of law that addresses the issue of whether a case and controversy exists in this matter so as to establish the Court's jurisdiction. The Court **SETS** a hearing for 10:00 A.M. on May 27, 2026. The Parties should come prepared to discuss the issues identified above.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 24th day of April, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 43

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
_____________________________________/

**ORDER**

**THIS MATTER** is before the Court *sua sponte*. As set forth in its Order (DE 41), the Court has concerns about whether it has subject matter jurisdiction in this case. Accordingly, the Court appoints attorneys from the following law firms as *amici curiae* to assist the Court in identifying the applicable law governing an analysis of this issue:

John Gleeson and David A. O'Neil,
Debevoise & Plimpton LLP

Donald B. Verrilli, Jr.,
Munger Tolles & Olson LLP

Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton,
Selendy Gay PLLC

*See, e.g*, *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1249 n.34 (11th Cir. 2006) ("[D]istrict courts possess the inherent authority to appoint "friends of the court" to assist in their proceedings."); *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991) (internal quotations and citations omitted) ("[I]t is solely within the discretion of the court to determine the fact, extent, and manner of participation by the *amicus.*").

The *amici* shall file a memorandum addressing this Court's subject matter jurisdiction by May 21, 2026.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 29th day of April, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 52

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY<br><br>*Defendants.* | No. 1:26-cv-20609-KMW |

**PLAINTIFFS' NOTICE OF VOLUNTARY DISMISSAL WITH PREJUDICE**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(a)(1)(A)(i)**

Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC (collectively, "Plaintiffs"), by and through undersigned counsel, hereby give notice of the voluntary dismissal of this action **with prejudice** pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).[1]

Defendants Internal Revenue Service and the United States Department of the Treasury have neither served an answer nor a motion for summary judgment in this action. Accordingly, voluntary dismissal under Rule 41(a)(1)(A)(i) is available as of right, and requires neither leave of Court nor the consent of any party. *See* Fed. R. Civ. P. 41(a)(1)(A)(i); *Matthews v. Gaither*, 902

---

[1] Although Rule 41(a)(1)(A)(i) filings are sometimes colloquially styled as "motions," the Eleventh Circuit has made clear that a Rule 41(a)(1)(A) dismissal is self-executing, terminates the action upon filing, and divests the district court of jurisdiction. See *Est. of W. v. Smith*, 9 F.4th 1361, 1367–68 (11th Cir. 2021); *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1277–78 (11th Cir. 2012). Plaintiffs accordingly file this document as a Notice rather than a motion, as the notice does not require judicial action. *Est. of W.*, 9 F.4th at 1368.

F.2d 877, 880 (11th Cir. 1990) (a notice of voluntary dismissal under Rule 41(a)(1) is effective immediately upon filing); *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1277–78 (11th Cir. 2012) (Rule 41(a)(1) dismissals are "self-executing," and divest the district court of jurisdiction upon filing); *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1358 (11th Cir. 1999) ("When a plaintiff takes a voluntary dismissal, the effect is to remove completely from the court's consideration the power to enter an order, equivalent in all respects to a deprivation of 'jurisdiction.'") (cleaned up). The same principle applies to all dismissals under Rule 41(a)(1)(A), including those under Rule 41(a)(1)(A)(i). *See Matthews*, 902 F.2d at 880; *Anago Franchising*, 677 F.3d at 1278; *see also Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 409 (11th Cir. 1999) (Rule 41(a)(1) terminates the action upon filing, and "[n]o order of the district court is required to put the dismissal into effect" (cleaned up)). Upon the filing of this Notice, no judicial analysis is appropriate, and any "subsequent order purporting to dismiss 'all claims' . . . [would be] a nullity." *Est. of W.*, 9 F.4th at 1368.

Each party shall bear its own attorneys' fees and costs.

Dated: May 18, 2026

Respectfully submitted,

**BRITO, PLLC**
2121 Ponce de Leon Boulevard
Suite 650
Coral Gables, FL 33134
Office: 305-614-4071
Fax: 305-440-4385

By: /s/ Alejandro Brito
ALEJANDRO BRITO
Florida Bar No. 098442
Primary: abrito@britopllc.com

/s/ Daniel Z. Epstein
DANIEL Z. EPSTEIN
D.C. Bar No. 1009132
EPSTEIN & CO. LLC
E-mail: dan@epsteinco.co

*Counsel to Plaintiffs President Donald J. Trump et al.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Alejandro Brito

# TAB 62

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
_________________________________/

## ORDER CLOSING CASE

**THIS MATTER** is before the Court on Plaintiffs' Notice of Voluntary Dismissal with Prejudice ("***Notice***") (DE 52). In the Notice, Plaintiffs state that they are voluntarily dismissing the instant litigation with prejudice pursuant to Rule 41(a)(1)(A)(i).[1] Because the dismissal with prejudice extinguishes the claims regarding the unlawful disclosure of Plaintiffs' tax returns, the Court cancels all deadlines, including the date that the Parties were required to submit briefing as to whether an actual case or controversy existed in this matter.[2] *See, e.g.*, *Scott v. Roberts*, No. 4:10-CV-283-RH/WCS, 2010 WL 11598131, at *2 (N.D. Fla. 2010) ("[A] case or controversy . . . requires *actual adversaries*.")

[1] Under the Rule, a plaintiff may dismiss an action—without court approval—before a defendant files "either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A). Once a notice of dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A) is filed, the Court "is stripped of jurisdiction." *City of Jacksonville, Neighborhood Code Enf't Div. v. Jacksonville Hosp. Holdings L.P.*, No. 24-10145, 2024 WL 2186089, at *4 (11th Cir. 2024). The dismissal is self-executing and effective immediately upon the filing of the notice of dismissal. *See Absolute Activist*, 998 F.3d at 1265.

[2] The Court ordered the Parties to brief this issue because it needed to determine whether it had subject matter jurisdiction. If a court does not have subject matter jurisdiction, it cannot exercise any judicial power in the matter at hand. *See, e.g.*, *Evans v. United States*, No. 24-40300, 2025 WL 655799, at *2 (5th Cir. 2025) ("A court cannot stay a matter if it lacks subject-matter jurisdiction. If no jurisdiction exists, a district court is required to dismiss the claims."); *Kostin-Rosenberg v. Liberty Mut. Fire Ins. Co.*, No. 20-81603, 2020 WL 8413431, at *1 (S.D. Fla. 2020) ("If a court lacks subject matter jurisdiction over a matter, that court lacks authority to stay, or abate, the matter.").

(emphasis added); *United States v. Johnson*, 319 U.S. 302, 305 (1943) (finding no adverseness where appellee controlled plaintiff's litigation strategy); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008) ("When both litigants desire precisely the same result, there is no case or controversy within the meaning of Art. III of the Constitution.") (internal quotation marks and citation omitted); *Lord v. Veazie*, 49 U.S. 251, 255 (1850) ("[A]ny attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehened[.]"); *Fin. Guar. Ins. Co. v. City of Fayetteville, Ark.*, 943 F.2d 925, 929 (8th Cir. 1991) (explaining that actual adverseness exists when "a federal court . . . [is] presented with opposing parties representing adverse interests"); *Veritas Vincit, LLC v. Brown*, No. 4:24-CV-00079-JRG, 2024 WL 3543414, at *6 (E.D. Tex. 2024) ("The Court finds that Plaintiffs do in fact control Defendant . . . and that no case or controversy exists between Plaintiffs and [Defendant], necessitating Defendant's dismissal from the present case."); *Allen v. Gray*, 17 Ky. 98, 98 (1824) (holding that "[t]he same person can not be plaintiff and defendant in a common law action").

Because the Notice does not reference any settlement or include a stipulation of settlement, there is no settlement of record. Additionally, Defendants—federal agencies represented by the Department of Justice, which has an independent obligation to uphold the "public's strong interest in knowing about the conduct of its Government and expenditure of its resources" and the "fair administration of justice," 28 C.F.R. §§ 50.9, 50.23—neither submitted any settlement documents nor filed any documents ensuring

that settlement was appropriate where there was an outstanding question as to whether an actual case or controversy existed.

Accordingly, upon review of the Notice and the record, it is **ORDERED AND ADJUDGED** that this action is **DISMISSED WITH PREJUDICE**. Each Party is to bear its own attorneys' fees and costs. All deadlines and hearings are **CANCELLED**. All pending motions are **DENIED AS MOOT**. This case is **CLOSED**.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 65

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
______________________________________/

**ORDER**

**THIS MATTER** is before the Court on the Motion to Reopen Case filed by thirty-five former federal judges ("***Motion***") (DE 63). In the Motion, the non-party movants ask this Court to reopen the instant case pursuant to Rule 60 of the Federal Rules of Civil Procedure, arguing that the Court should "exercise its authority under Rule 60 to set aside the judgment in this lawsuit . . . [and] resume its inquiry into whether there is an actual underlying case or controversy[.]" (DE 63 at 6). The non-party movants explain that although there is no settlement of record in this matter, public documents and announcements indicate that the dismissal of this case was premised on a purported settlement between the Parties.[1] In turn, movants submit that the settlement "is a product of collusion and is itself a fraud on the Court." (*Id.* at 9).

A court is empowered to investigate serious misconduct as a collateral issue within the purview of Rule 11 and determine "whether an attorney has abused the judicial process." *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993); *see also Willy v. Coastal*

[1] As the Court noted in its April 29, 2026 Order (DE 43), Defendants did not file any notices of appearances and acted through Plaintiffs to ask the Court for relief from their imminent answer deadline.

*Corp.*, 503 U.S. 131 (1992) (holding that a district court could impose Rule 11 sanctions even where it was subsequently determined to lack subject matter jurisdiction); *Ormsby Motors, Inc. v. General Motors Corp.,* 32 F.3d 240, 241 (7th Cir. 1994) (finding that a litigant cannot avoid sanctions by voluntarily dismissing the case). Rule 11 issues can be "raised *sua sponte* by the [C]ourt." *Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, 813 F. App'x 368, 375 (11th Cir. 2020); *see also Taylor v. Stanciel,* 202 F. App'x 662, 663–64 (5th Cir. 2006) (explaining that "a court may, on its own initiative, enter an order describing Rule 11 violations and ordering a party to show why it has not violated Rule 11").

"The purpose of Rule 11 is to deter baseless filings." *Powrzanas v. Jones Util. & Contracting Co.*, 834 F. App'x 500, 507 (11th Cir. 2020). Specifically, Rule 11 "requires that an attorney or unrepresented party filing a pleading certify that the filing is not presented for any improper purpose." *Id.* (internal quotation marks omitted); *see also In re Ames*, 993 F.3d 27, 34 (1st Cir. 2021) ("Under Rule 11, a court may impose sanctions on a lawyer 'for advocating a frivolous position, pursuing an unfounded claim, or *filing a lawsuit* for some improper purpose.'") (emphasis added). A party's decision to file a frivolous lawsuit for the sole purpose of forcing a settlement may qualify as such an improper purpose. *See Scott v. Vantage Corp.*, 64 F.4th 462, 472 (3d Cir. 2023) (affirming the district court's finding that plaintiffs filed their complaint for an improper purpose when two out of the three claims lacked factual support and plaintiffs expressed that they filed the lawsuit to force a settlement). If a party files a lawsuit for an improper purpose, "the court may impose an appropriate sanction on the responsible party." *Powrzanas*, 834 F. App'x at 507.

Here, the non-party movants advance grievous allegations that Plaintiffs voluntarily dismissed this litigation solely to avoid judicial scrutiny of a lawsuit that "was collusive from the start" and was only filed to provide the imprimatur of legality for an unlawful settlement. (DE 63 at 16). They point to the fact that the settlement in question includes a "three-paragraph addendum[2] . . . [that] purports to 'forever bar[] and preclude[]' the United States from pursuing claims that could have been [otherwise] asserted [against] Plaintiffs," (*Id.* at 8), and highlight the fact that Defendants did not "even try[] to defend against Plaintiffs' claims" despite their active opposition to nearly identical claims in other litigation.[3] (*Id.* at 16). Finally, the non-party movants assert that Plaintiffs' claims were "clearly untimely" and therefore untenable. (*Id.*).

Accordingly, it is **ORDERED AND ADJUDGED** that Plaintiffs shall file a response to the Motion (DE 63) on or before June 12, 2026, detailing their position on the matters set forth in the Motion, including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the "victim of a fraud." (DE 63 at 13, citing 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2870 (3d ed.)). The non-party movants may, if they choose, file a reply on or before June 19, 2026.

---

[2] This addendum, as the non-party movants point out, may be in conflict with internal Department of Justice policies that require the Department to only enter into compromises that are "specifically limited to the immediate subject matter of the claim which was in fact compromised." (DE 63 at 8). The addendum was signed only by the Acting Attorney General.

[3] The Court is aware of reporting that the IRS prepared a memorandum outlining ways to challenge Plaintiffs' claims. Andrew Duehren, *The I.R.S. Thought It Could Fight Trump's Lawsuit, but It Struck a Deal Anyway*, N.Y. Times (May 19, 2026), https://www.nytimes.com/2026/05/19/admin/irs-trump-lawsuit-deal.html. These defenses are consistent with the positions taken by the IRS and the Department of Justice in other litigation.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 29th day of May, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 106

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
_______________________________________/

## ORDER

**THIS MATTER** is before the Court on Plaintiffs' response to the Court's May 29, 2026, Order on the non-party movants' Motion for Relief from Judgment or Order, or, in the Alternative, for Leave to Appear as *Amici Curiae* (DE 89).[1]

On May 27, 2026, thirty-five non-party movants filed a Motion for Relief from Judgment or Order (DE 63), in which they requested this Court to set aside its dismissal pursuant to Rule 60 because the case, and its purported settlement, is "a fraud on the Court." (*Id.* at 6). The non-party movants highlighted the atypical way the litigation had unfolded and argued that the purported settlement reached in this matter "is a product of collusion." (*Id.* at 9). In light of those serious allegations and the Court's own view of the unusual circumstances of the case, the Court entered an Order on May 29, 2026, (the "***May 29 Order***") (DE 65), directing Plaintiffs to detail their position as to various issues, "including (1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and

---

[1] Throughout this Order, the Court uses the CM/ECF pagination rather than the document pagination.

(3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" (DE 65 at 3). On June 12, 2026, Plaintiffs responded to the May 29 Order. (DE 89). The non-party movants filed a reply on June 19, 2026. (DE 94).

In the very first paragraph of the Complaint, Plaintiffs introduce their claims stating, "President Trump served as the 45th President of the United States, and is the 47th President of the United States." (DE 1 ¶ 1). They then go on to state that "President Trump brings this suit in his personal capacity." (*Id.*) After a review of the record, and the Parties' statements, the Court declines to adopt or accept the credulous exercise of divorcing President Trump's current job title from an understanding of what happened here.

But perhaps the most startling misstatement[2] advanced by Plaintiffs is their characterization of this case as "ordinary." (DE 89 at 9). The Parties here are not private actors to a mine-run dispute, recounting their proficiency in the art of the deal they negotiated. Lead Plaintiff and Defendants are public servants—the pinnacle of the Executive Branch—sworn to uphold the law, faithfully perform the duties of their office, and protect the interests of the American public. The issue before the Court is whether, instead, they ignored ethical norms, court rules, and legal authority to manipulate the judicial process. The issue is whether they did so to gild their efforts to gain unprecedented access to the public fisc with the patina of legitimacy. There is nothing "ordinary" about this case; it is the very definition of *sui generis.*

[2] Plaintiffs also—with no apparent sense of irony—criticize the non-party movants' political motivations, their previous disinterest in the case, and their purported inappropriate promotion of "abstract grievance[s]." (DE 89 at 10).

## I. BACKGROUND[3]

On September 29, 2023, the Department of Justice ("***DOJ***") charged Charles Edward Littlejohn ("***Mr. Littlejohn***") with illegal disclosure of "[tax] information associated with Public Official A and thousands of the nation's wealthiest people," in violation of 26 U.S.C. § 7213(a)(1). Information, *United States v. Littlejohn*, No. 23-cr-00343, DE 1 (D.D.C. 2023).[4] It was subsequently revealed that Mr. Littlejohn worked as a contractor for Booz Allen Hamilton Inc. ("***Booz Allen***") which, in turn, maintained a contract with the Internal Revenue Service ("***IRS***") to perform certain work for the agency.[5] During his plea hearing on October 12, 2023, Mr. Littlejohn identified President Donald Trump ("***President Trump***") as the "high-ranking government official" at issue, whose tax

---

[3] The Court *sua sponte* takes judicial notice of articles reporting on relevant events attendant to this case, dockets of other cases, and statements the Parties made. *See* FED. R. EVID. 201(c); *Griffin v. Verizon Commc'ns Inc.*, 746 F. App'x 873, 876 (11th Cir. 2018) ("Courts typically take judicial notice of record documents from other judicial proceedings."). The Court incorporates these sources to provide an overview of the architecture of this litigation. Moreover, the Department of Justice has directed courts to look to unsworn public statements as binding party admissions. *See Floyd v. Dep't of Just.*, No. 26-cv-01399, DE 62 at 4, n.1 (E.D. Va. filed June 5, 2026) ("Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.") (citing FED. R. EVID. 201(b)(2)); *see also Citizens for Resp. and Ethics in Wash. v. Dep't of Just.*, No. 26-cv-01789, DE 15 at 4, n.1 (D.D.C. filed June 5, 2026) (same). The Court will do so here.

[4] The illegal disclosures of tax information all transpired during President Trump's first term. During this period, Charles Rettig was Commissioner of the IRS and Steven Mnuchin was the Secretary of the Treasury Department. *See Nomination of Charles P. Rettig to be Comm'r of Internal Revenue, 115th Cong.* (2018), https://www.congress.gov/nomination/115th-congress/1620; *Nomination of Steven T. Mnuchin to be Sec'y of the Treasury*, 115th Cong., 1st Sess., Vote No. 63 (Feb. 13, 2017), https://www.senate.gov/legislative/LIS/roll_call_votes/vote1151/vote_115_1_00063.htm. Mr. Littlejohn's prosecution, however, was undertaken in 2023 during the administration of President Joseph R. Biden.

[5] Richard Rubin, *IRS Leaker Sought Job With Aim of Releasing Trump Tax Returns, DOJ Says*, WALL ST. J. (Jan. 16, 2024, at 22:13 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

information was illegally disclosed to news organizations like the New York Times and ProPublica. *Transcript of Plea Agreement Hearing* at 10, *United States v. Littlejohn*, No. 23-cr-00343, DE 13 (D.D.C. Oct. 23, 2023). The following exchange took place during the October 12, 2023, plea colloquy:

> **THE COURT:** Before I go on to accept or not accept this plea, **are there any victims or their representatives here today** that would like to exercise their rights to be reasonably heard under the Crimes Victims' Right Act?
>
> **MS. ALINA HABBA:** Yes, Your Honor.
>
> **THE COURT:** Please come up.
>
> **MS. ALINA HABBA:** Thank you, Your Honor, for the opportunity to be heard. As an attorney, I find that I should probably state I am not licensed in this state, in the District of Columbia. **I'm here on behalf of President Trump who was a victim**, as we just heard**,** of this atrocity.

*Id.* at 14.

On January 29, 2024, Mr. Littlejohn was sentenced to sixty months of incarceration, followed by thirty-six months of supervised release. *See United States v. Littlejohn*, No. 23-cr-00343, DE 35.

Subsequent to Mr. Littlejohn's disclosures, various parties sued Mr. Littlejohn, Booz Allen, the IRS, and the United States Department of the Treasury ("***Treasury Department***") for damages pursuant to 26 U.S.C. § 7431.[6] This statute confers a private right of action on individuals whose tax returns were improperly inspected or disclosed. *See* 26 U.S.C. § 7431. However, any action arising under this statute must be brought "within 2 years after the date of discovery by the plaintiff of the unauthorized inspection

[6] These cases include: (1) *Griffin v. Internal Revenue Serv.*, No. 22-cv-24023 (S.D. Fla. filed Dec. 13, 2022); (2) *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); (3) *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139 (D. Md. filed Jan. 14, 2025); and (4) *Scott v. Booz Allen Hamilton, Inc.*, 26-cv-00845 (M.D. Fla. filed Mar. 23, 2026).

or disclosure." 26 U.S.C. § 7431(d). The statute provides for damages, including "$1,000 for each act of unauthorized inspection or disclosure[.]" 26 U.S.C. § 7431(c)(1). In these actions, where the IRS or Treasury Department was named as a party, the DOJ zealously defended the government by challenging the timeliness of the plaintiffs' claims; disputing whether damages had been correctly calculated; and denying that the government could be held liable under § 7431 because the unlawful disclosures at issue were made by "a [Booz Allen] employee working on IRS contracts," and not an officer or employee of the United States. United States' Mot. To Dismiss, *Safe Harbor Int'l, LLC v. Internal Revenue Serv.*, No. 25-cv-00139, DE 31 (D. Md. filed July 23, 2025). In every case naming the government as a defendant, the DOJ engaged in a vigorous defense.[7]

That is, every case until the instant litigation.

This Complaint was filed on January 29, 2026—two years and three months after Ms. Habba's appearance at Mr. Littlejohn's plea hearing—by Plaintiffs President Trump ("***Lead Plaintiff***"), Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC (collectively, "***Plaintiffs***") against the IRS and the Treasury Department (collectively, "***Defendants***" or "***Government***"). Because Defendants are government agencies, they are afforded sixty days from the date that the United States Attorney was served to file an answer or responsive pleading. *See* FED. R. CIV. P. 12(a)(2). However, on April 17, 2026, three days before the sixty-day period lapsed, Plaintiffs filed a Consent Motion for a 90-day Extension ("***Consent Motion***") to relieve Defendants of their obligation to file a responsive pleading to the Complaint "while the Parties engage[d] in discussions

---

[7] In two related cases, the IRS and Treasury Department were not named as parties. *See, e.g.*, *Warren v. Booz Allen Hamilton, Inc.*, No. 24-cv-01252 (D. Md. filed Apr. 29, 2024); *MacNeil v. Booz Allen Hamilton, Inc.*, No. 25-cv-00963 (D. Md. filed Mar. 24, 2025).

designed to resolve this matter and avoid protracted litigation." (DE 40 at 2). The Consent Motion also represented that Daniel Epstein, co-counsel for Plaintiffs, conferred with counsel for Defendants, and Defendants consented to the requested extension. (DE 40 at 3). Counsel for Defendants was not identified. Other than the Complaint and Notice of Voluntary Dismissal, this was the only pleading filed by any party in this matter before dismissal.[8]

At this point, because the Court had serious concerns about whether it had subject matter jurisdiction in a case where the Lead Plaintiff ostensibly had direct, unassailable control over Defendants, it ordered the Parties to file memoranda of law on this issue by May 21, 2026. (DE 41). The Court then appointed *amici curiae* "to assist the Court in identifying the applicable law governing an analysis" of its subject matter jurisdiction. (DE 43). The *amici* were also directed to file a memorandum of law by May 21, 2026. (*Id.*) On May 14, 2026, the court-appointed *amici* filed their memorandum. (DE 45). Neither Party to this action, however, filed any pleading to address the Court's concerns.

Instead, on May 18, 2026, Plaintiffs filed a two-page Notice of Voluntary Dismissal with Prejudice ("***Notice of Dismissal***") (DE 52), where Plaintiffs stressed that the Notice of Dismissal automatically divested the Court of jurisdiction.[9] Subsequently, the DOJ

---

[8] The Court notes that various non-parties have filed motions to appear as *amici curiae*. For example, on February 5, 2026, one week after the Complaint was filed, a Motion for Leave to File Brief as *Amici Curiae* was filed by Former Government Officials and Public Interest Organizations. (DE 7). On February 12, 2026, another Motion for Leave to file a Brief as *Amici Curiae* was filed by Citizens for Responsibility and Ethics in Washington and Public Citizen. (DE 15). Because the latter motion indicated that, based on conferral, Plaintiffs were opposed to the motion, the Court entered an order giving Plaintiffs two weeks, until February 25, 2026, to file a memorandum in opposition. (DE 27). No opposition was filed, however, and the motions were granted by default. (DE 28).

[9] Plaintiffs argued that "a Rule 41(a)(1)(A) dismissal is self-executing, terminates the action upon filing, and divests the district court of jurisdiction" and stated that "the [N]otice

issued a press release about a "settlement" that had been reached in this matter, and published what purported to be the "settlement agreement" (the "***settlement agreement***") signed by lawyers for both Plaintiffs and Defendants.[10] In this document, the Parties referenced the instant litigation and claimed that, "[i]n the interest of resolving the dispute between the parties," they stipulated and agreed to certain terms, which included "a formal apology from the United States" to Plaintiffs, along with the creation of an "Anti-Weaponization Fund."[11] The Anti-Weaponization Fund, ostensibly set up "to provide a systematic process to hear and redress claims of [individuals] who suffered weaponization and lawfare," was to be financed by the Treasury Department's Judgment Fund in the amount of $1.776 billion dollars.[12]

The day after the dismissal, Acting Attorney General Todd Blanche testified before Congress.[13] In response to a question as to why the "settlement agreement" had not been

---

does not require judicial action." (DE 52 at 1). They emphasized that "no judicial analysis is appropriate." (*Id.* at 2).

[10] *Settlement Agreement, Trump v. Internal Revenue Serv.*, U.S. DEP'T OF JUSTICE (May 18, 2026), https://www.justice.gov/opa/media/1441201/dl?inline. At the same time that the DOJ publicized the "settlement agreement," the Treasury Department's General Counsel, Brian Morrissey, announced his resignation. Andrew Duehren, *Top Treasury Lawyer Resigns After Creation of 'Anti-Weaponization Fund'*, N.Y. TIMES (May 18, 2026), https://www.nytimes.com/2026/05/18/business/anti-weaponization-fund-brian-morrissey-treasury.html.

[11] *Id.*

[12] Press Release, U.S. Dep't of Justice, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund. The Court notes that the DOJ previously established a "Weaponization Working Group" in February 2025. Memorandum from the Att'y Gen. to All Dep't Emps., *Restoring the Integrity and Credibility of the Department of Justice* (Feb. 5, 2025), https://www.justice.gov/ag/media/1388506/dl?inline.

[13] *A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice: Hearing Before the Subcommittee. on Commerce, Justice, Sci., & Related Agen-*

provided to this Court for review, he replied that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the "settlement agreement."[14] On that same day, Acting Attorney General Blanche issued an "order" (the "***Release Order***") which referenced the "settlement agreement" and released the President, his relatives, companies, and affiliates from "any and all claims, counterclaims, [and] causes of actions" that "have been or could have been asserted" against Plaintiffs that arise out of "(1) any matters that were raised or could have been raised in the Case or the Pending Agency Claims; (2) Lawfare and/or Weaponization; (3) any matters currently pending or that could be pending (including tax returns filed before the Effective Date) before Defendants or other agencies or departments."[15] Unlike the "settlement agreement," which was signed by purported representatives of both Plaintiffs and Defendants, only Acting Attorney General Blanche's signature was on the Release Order.[16] Also on that day, it was reported that IRS officials had prepared a 25-page memorandum[17] that outlined major flaws with Plaintiffs' claims and listed the various

---

*cies of the S. Comm. on Appropriations*, 119th Cong. (2026) (statement of Todd Blanche, Acting Att'y Gen., U.S. Dep't of Justice), https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2027-budget-request-for-the-department-of-justice.

[14] *Id.*

[15] Order of the Att'y Gen., U.S. Dep't of Justice (May 19, 2026), https://www.justice.gov/opa/media/1441216/dl.

[16] *Id.*

[17] Andrew Duehren, *The IRS Thought It Could Fight Trump's Lawsuit, but It Reached a Deal Anyway*, N.Y. TIMES (May 19, 2026), https://www.nytimes.com/2026/05/19/admin/irs-trump-lawsuit-deal.html. The actual memorandum has yet to be published by the Government.

defenses that could be advanced on behalf of Defendants, defenses that had been raised in other litigation arising from the disclosures.[18]

On June 2, 2026, in testimony before the United States House of Representatives, Acting Attorney General Blanche advised that the Anti-Weaponization Fund would not be moving forward.[19] He did not, however, commit to a similar termination of the audit and immunity protections set forth in his Release Order. Six days later, President Trump nominated Mr. Blanche to permanently serve as Attorney General of the United States.

## II. DISCUSSION

As it must, the Court begins with jurisdiction. *See Leedom Mgmt. Grp., Inc. v. Perlmutter*, 532 F. App'x 893, 895 (11th Cir. 2013) (explaining that courts must "always address threshold jurisdictional issues first, since [a court] cannot reach questions that [it] never had jurisdiction to entertain."). Typically, a voluntary dismissal filed under Rule 41(a) divests the court of its jurisdiction over the merits of a case. *See Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1278 (11th Cir. 2012); *see also Absolute Activist Value Master Fund v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021) (citations and quotation marks omitted). But a voluntary dismissal does not deprive the court of authority to resolve issues collateral to the merits. *Absolute Activist Value Master Fund*, 998 F.3d at 1266. Among these collateral issues are those relating to Rule 11 sanctions. *Id.* (noting that "it

---

[18] The Court notes that in a subsequent response to a Freedom of Information Act request by Citizens for Responsibility and Ethics in Washington, the DOJ stated that there were no "responsive records within the Civil Division pertaining to [this litigation]." Letter from Brian Flannigan, Div. Couns. for Recs. & Info., Civ. Div., U.S. Dep't of Just., to Kayvan Farchadi, Citizens for Resp. & Ethics in Wash. (June 3, 2026).

[19] Hailey Fuchs & Jordain Carney, *Anti-Weaponization Fund Is Dead, Acting AG Says*, POLITICO (June 2, 2026), https://www.politico.com/news/2026/06/02/todd-blanche-anti-weaponization-fund-00947083. As the article notes, Acting Attorney General Blanche refused to commit to the termination of the Anti-Weaponization Fund in writing.

is clear that even when a voluntary dismissal disposes of an entire action, district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards."); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("As the violation of Rule 11 is complete when the paper is filed, . . . a voluntary dismissal does not expunge the Rule 11 dismissal.") (citations and quotation marks omitted).

"Although [the Eleventh Circuit] call[s] these issues 'collateral,' that doesn't make them any less important." *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020). "Many involve the power to enforce compliance with the rules and standards that keep the judiciary running smoothly." *Id.* Indeed, "[w]ithout them, abuses of the judicial system would go unchecked, burdening courts and individuals alike with needless expense and delay." *Id.* (quotation marks omitted). "And that's not just a matter of procedure." *Id.* Consequently, the Court will examine the matters raised in the non-parties' motion under the rubric of Rule 11 because the issues are collateral and their resolution is essential to assuring the integrity of the Court's jurisdiction and process. *See id.* (explaining that a court retains jurisdiction over collateral matters to "ensure that justice is done."); *Baker v. Alderman*, 158 F.3d 516, 523 (11th Cir. 1998) ("Rule 11 motions are collateral to an action and are not barred if filed after a dismissal order, or after entry of judgment.").

In order to examine whether Plaintiffs brought this case for an improper purpose, the Court must consider and "inevitably decide" the question posed to the Parties in its April 24, 2026, Order: is there a case or controversy presented in this litigation. *See Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311, 1328 (11th Cir. 2018) ("We recognize that merits and jurisdiction will sometimes come intertwined . . . If . . . the

district court's resolution of the jurisdictional questions . . . requires it to inevitably decide some, or all, of the merits issues, so be it.") (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 178 (2017)) (quotation marks omitted). Although jurisdiction ordinarily precedes the merits, a court may consider both where, as here, jurisdiction overlaps with the merits. *See Brownback v. King*, 592 U.S. 209, 217 (2021) (explaining that "the merits and jurisdiction will sometimes come intertwined, and a [district] court can decide all . . . of the merits issues in resolving a jurisdictional question, or vice versa.") (citations and quotation marks omitted); *Gutrejman v. United States*, 596 F. Supp. 3d 1, 8 (D.D.C. 2022) ("[T]he Court must resolve a jurisdictional defense . . . before resolving the two merits defenses . . . , but the Court's resolution of that jurisdictional defense will require the Court to address the merits as well."); *Jakubowicz v. Islamic Rep. of Iran*, No. 18-1450, 2022 WL 3354719, at *7 (D.D.C. Aug. 9, 2022) (addressing both standing and the merits and noting that "it is not uncommon for courts to consider jurisdiction and the merits together"); *Force v. Islamic Rep. of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020) ("Although courts must, in general, resolve jurisdictional questions before reaching the merits, in the present context, the questions of jurisdiction and the merits merge. The jurisdictional test and the federal cause of action are, in relevant respects, the same[.]") (citation omitted).

### A. *Justiciability: Case or Controversy*

"Judicial Power . . . is the power of a court to decide and pronounce a judgment and carry it into effect between . . . parties who bring a case before it for decision." *Muskrat v. United States*, 219 U.S. 346, 356 (1911) (citation and quotation marks omitted). Article III, Section 2 of the United States Constitution confines judicial power to matters that

present a case or controversy. U.S. CONST. art. III, § 2, cl. 1. This precept exists as the defining principle for the federal judiciary. *See Lord v. Veazie*, 49 U.S. 251, 255 (1850); *see also Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–41 (1937). Indeed, the Framers, relying on their knowledge of English law and practice, did not intend for Article III to empower federal judges to hear every possible dispute brought before them.[20] Thus, the terms "case" and "controversy" mark the threshold of federal judicial power.

The case or controversy requirement imposes two important limitations on the federal judiciary. First, the requirement limits "the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 95 (1968). Second, the requirement ensures that "the federal courts will not intrude into areas committed to the other branches of government." *Id*. at 95. "Federal judicial power is limited to those disputes which confine federal courts to a rule consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Id*. at 97. "Whenever the claim or contention of a party takes such a form that the judicial power is capable of acting upon it, then it has become a case [or] controversy." *Smith v. Adams*, 130 U.S. 167, 173–74 (1889).

---

[20] *See* CONST. ANNOTATED, art III, § 1.2, *Historical Background on Judicial Review*, https://constitution.congress.gov/browse/essay/artIII-S2-C1-2/ALDE_00001243/ (last visited on July 13, 2026) (discussing three occurrences in 1787 where the Framers declined to expand federal judiciary power).

**1. Adverseness is a Prerequisite to Article III Jurisdiction.**

The "judicial power conferred by the Constitution" grants the federal judiciary "the right to determine actual controversies arising between **adverse litigants**, duly instituted in courts of proper jurisdiction." *Muskrat*, 219 U.S. at 361 (emphasis added). A justiciable controversy "must be definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. of Hartford, Conn.*, 300 U.S. at 240–41. Adverseness is essential to a federal court's ability to adjudicate the merits of a case where federal courts are restricted to "questions presented in an adversary context[.]" *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 382 (1980) (noting that adverseness "sharpens the presentation of issues"). Indeed, "[e]ven when Article III permits the exercise of federal jurisdiction, prudential considerations demand that the Court insist upon 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *United States v. Windsor*, 570 U.S. 744, 760 (2013) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).[21]

[21] In *Windsor*, the United States refused to pay the plaintiff a real estate tax refund due to § 3 of the Defense of Marriage Act's definition of marriage, despite acquiescing to the plaintiff's position that § 3 of the Act was unconstitutional. 570 U.S. at 753, 756. As the Court reasoned, "Windsor's ongoing claim for funds that the United States refuses to pay thus establishes a controversy sufficient for Article III jurisdiction." *Id.* at 758. Plaintiffs fail to acknowledge that there was a controversy in *Windsor* precisely because the plaintiff did not control the actions of the defendant, as Lead Plaintiff does here, and therefore could not secure the refund to which she was entitled. *See infra* pp. 17–38. Here, Plaintiffs do have the ability to control the "stakes" of the litigation and determine whether Defendants can or will give Plaintiffs the relief they seek independent of a judicial determination or statutory amendment. The decision in *Windsor* addressed the argument of when adverseness ceases and not whether adverseness exists as a threshold matter due to the relationship of the parties.

For more than a century, the Supreme Court has recognized the adverseness requirement. *See Veazie*, 49 U.S. at 255. In *Veazie,* a defendant, and his brother-in-law entered into a contract to institute a lawsuit that would procure a favorable court opinion as to land rights. *Id*. at 254. After examining the record, the *Veazie* court determined that there was no real conflict of interest between the parties because their interests regarding the issue of law were "one and the same[.]" *Id.* In fact, the *Veazie* court declared that "any attempt, by a mere colorable dispute, to obtain the opinion of the court upon a question of law which a party desires to know for his own interest or his own purposes, when there is no real and substantial controversy between those who appear as adverse parties to the suit, is an abuse which courts of justice have always reprehened [sic], and treated as a punishable contempt of court." *Id*. at 255. *Veazie* recognized that even where parties may work together to avoid the expense of litigation, there still must be a "real dispute between the parties concerning some matter of right." *Id.*

The Supreme Court repeated and reinforced the adverseness requirement in *Muskrat*. In *Muskrat*, several plaintiffs endeavored to halt the enforcement of legislation that affected their land rights. 219 U.S. 346, 349 (1911). The plaintiffs initiated the suit at the behest of Congress who authorized the plaintiffs to sue the United States on behalf of themselves and others with similar interests. *Id*. at 350. Aware of Congress's acquiescence to the suit, the *Muskrat* court nonetheless questioned its jurisdiction to entertain the proceeding. *Id*. at 351. The court there noted that "[t]he term ['case'] implies the existence of present or possible adverse parties, whose contentions are submitted to the court for adjudication." *Id*. at 357. After examining precedent establishing the limits of judicial power, the *Muskrat* court determined that the parties did not present a case or

controversy as contemplated under the Constitution. *Id*. The Supreme Court was not persuaded by the fact that the United States was named as a party defendant where the government did not have an interest adverse to the plaintiffs. *Id*. As a result, the Court held that, without sufficient adverseness between the parties, the action presented "no justiciable controversy" to be determined by the court. *Id*. at 363.

The decisions in *Veazie* and *Muskrat* establish beyond cavil that adverseness between litigants is a constitutional minimum that must be satisfied in every federal case seeking judicial determination. "[T]here is no Art. III case or controversy when the parties desire 'precisely the same result[.]'" *GTE Sylvania, Inc.*, 445 U.S. at 383 (quoting *Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48 (1971)); *see also NLRB v. Constellium Rolled Prod. Ravenswood, LLC*, 44 F. 4th 395, 398 (4th Cir. 2022) (finding that the parties lacked adverseness where any judicial determination by the court "would only rubberstamp an agreement that the parties memorialized in writing and consummated before ever arriving on a federal court's doorstep"). Moreover, the adverseness requirement "subsists through all stages" of a federal judicial proceeding. *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (citations omitted). Therefore, a federal court must revisit the case or controversy inquiry as often as it deems necessary. *Id*.; *see also Hartfield v. King*, 184 U.S. 162, 165 (1902) (noting that "it is the duty of a court to make such inquiry, in order that it may not be imposed on by an apparent controversy to which there are really no adverse parties") (citations omitted).

Adverseness is not determined merely by affixing the labels "plaintiff" and "defendant" to the parties. *See Muskrat*, 219 U.S. at 361 (declining to find adverseness although the United States was a named defendant where the record revealed that the

United States' interest was not adverse to that of the plaintiffs). Courts must look beyond names and titles to determine whether a justiciable case or controversy is presented. *See e.g.*, *Cleveland v. Chamberlin*, 66 U.S. 419, 425 (1861) (dismissing an appeal where one party was in fact both appellant and appellee); *United States v. Interstate Com. Comm'n*, 337 U.S. 426, 430 (1949) (acknowledging that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.").

With this principle in mind, a court must consider whether "one party is actually and formally in control of the other party," and if so, "adjudication may be refused." 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026). Put another way, a court must determine whether a single party acts as the "*dominus litis*"—the "master" or owner of the suit—on both sides of the litigation. *See South Spring Hill Gold-Min. Co. v. Amador Medean Gold-Gold-Min. Co.*, 145 U.S. 300, 301–02 (1892) (determining that the litigation "ceased to be between adverse parties" where control of the corporations on both sides "had come into the hands of the same persons," causing the plaintiff to become the "*dominus litis*" on both sides); *see also Veritas Vincit v. Brown*, No. 24-cv-00079, 2024 WL 3543414, at *6 (E.D. Tex. July 25, 2024) ("The Court finds that Plaintiffs do in fact control Defendant Reticulum and that no case or controversy exists between Plaintiffs and [Defendant Reticulum], necessitating [Defendant] Reticulum's dismissal from the present case."). Courts "do not engage in the academic pastime of rendering judgments in favor of persons against themselves." *Interstate Com. Comm'n*, 337 U.S. at 430. Consonant with the general principle that "no person may sue himself[,]" adverseness is lacking where one party controls the other party. *Id.*; *see Dasma Inv., LLC v. Realty*

*Assoc. Fund III, L.P.*, 459 F. Supp. 2d 1294, 1304 (2006) ("It is undisputed that Ms. Padron controls both Dasma and PWC[] . . . Insofar as an action between Dasma and PWC is concerned, therefore, the necessary adversity under Article III of the Constitution is lacking."); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266 (11th Cir. 2023) (allowing an appeal to proceed where "both parties [had] a real interest in the legal positions" they advanced, and "nothing in the record establishe[d] that Monsanto control[led] [plaintiff] or his representation"); *id.* at 1269 (Jordan, J. concurring) ("In principle it is easy to see why an important constitutional issue should not be determined in a proceeding in which one nominal party has dominated the conduct of the other.") (citing Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 96 (7th ed. 2015)).

**2. The Parties Were Not Sufficiently Adverse to Satisfy Article III's Case or Controversy Prerequisite.**

The Complaint purports to present a controversy between Plaintiffs—President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and the Trump Organization, LLC—and Defendants—the Internal Revenue Service and United States Treasury Department—claiming Defendants caused Plaintiffs reputational and financial harm for which they now seek "at least $10,000.000,000.00." (DE 1 ¶ 11; *Id.* at 26). At first glance, the Complaint seemingly satisfies Article III by establishing causes of action "arising under . . . the laws of the United States[.]" U.S. CONST. ART. III, § 2. However, closer examination reveals that a justiciable case or controversy is absent; Plaintiffs and Defendants are not adverse because one party controls this litigation. *See Muskrat*, 219 U.S. at 361 (noting that judicial power only extends to "actual controversies arising between adverse litigants[.]"). In reaching this conclusion, the Court determines that Plaintiffs improperly

employed this lawsuit to justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations—which was accomplished by leveraging control over Defendants.

a. *There is No Case or Controversy Because One Party Controls This Litigation.*

President Trump is Chief of the Executive Branch, *see* U.S. CONST. Art. II, § 1 (the "***Vesting Clause***"), and the Vesting Clause is the bedrock of his authority over that branch of government. *Id*. Specifically, the Vesting Clause states that "The executive Power shall be vested in a President of the United States of America." *Id*.; *see also Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 496–97 (2010) ("[T]he President 'cannot delegate ultimate responsibility or the active obligation to supervise that goes with it,' because Article II 'makes a single President responsible for the actions of the Executive Branch.'") (citing *Clinton v. Jones,* 520 U.S. 681, 712–13, (1997)); *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020) ("The entire executive Power belongs to the President alone.") (citation and quotation marks omitted). Indeed, just recently, the Supreme Court cited *Myers v. United States*, 272 U.S. 52, 133 (1926) as a "landmark decision" and "perhaps our best word on the subject" of whether the President could remove subordinates in government service at will. *Trump v. Slaughter*, 609 U.S. __, slip op. at 16 (2026). Finding that he could, the majority ruled that "[s]ubordinates who exercise the President's power are subject to removal by him. Then, and only then, can they remain accountable to the President, and the President to the people." *Id.* at 36. "[T]hese officers exercise the *President's* power, not their own, and thus must be *responsible* to him." *Id*. at 35 (emphasis in original).

Here, Defendants are the Treasury Department—an Executive agency—and the IRS, the largest bureau of the Treasury Department. Both Defendants are unquestionably part of the Executive Branch and ultimately answer to its Chief Executive, President Trump. President Trump's authority to appoint and remove federal officers as he sees fit is evidence of his ability to exercise control over Defendants. *See* U.S. CONST. ART. II, § 2. Article II explicitly states that "[t]he President shall . . . appoint . . . all Other Officers of the United States, whose Appointments are not herein otherwise provided for[.]" *Id*.; *see also Cunningham v. Neagle*, 135 U.S. 1, 63 (1890) (noting that the ministerial officers are marshals of the United States who are "appointed by the president," and are "removable from office at his pleasure[.]"). While the Constitution strategically allows "individual executive officials" to "wield significant authority," such "authority remains subject to the ongoing supervision and control of the elected President." *Seila Law LLC*, 591 U.S. at 200; *see also* Br. for Pet'r at 10, *Trump v. Slaughter*, 609 U.S. __ (2026) (No. 25-332) ("Article II requires that the President control all executive power—especially the authority wielded by agency heads, who are 'the most important' of the President's subordinates and who 'must be the President's alter ego[s]' in their agencies.") (citing *Myers*, 272 U.S. at 133); *id*. at 2 ("Removal is the President's indispensable tool of control."). President Trump's supervisory authority directly implicates two key individuals acting on behalf of Defendants: Scott Bessent,[22] the Secretary of the Treasury Department and Acting

[22] "On January 28, 2025, Secretary Bessent was sworn in as the 79th Secretary of the Treasury of the United States." *Scott Bessent*, U.S. Dept. of Treasury, https://home.treasury.gov/about/general-information/officials/scott-bessent (last visited July 9, 2026). Secretary Bessent also serves as the "Acting" Commissioner of the Internal Revenue Service. *See The Commissioner's Section*, Internal Revenue Serv., https://www.irs.gov/about-irs/the-commissioners-section (last updated Feb. 12, 2026).

Commissioner of the IRS, and Frank J. Bisignano,[23] the Chief Executive Officer of the IRS. Plaintiffs cannot argue before the Supreme Court that Executive Branch actors "unquestionably exercise[] executive power, and must therefore be controlled by the Chief Executive[,]" *Slaughter*, 609 U.S. at 27, and then here, argue that the Parties are sufficiently adverse to establish an actual case or controversy.

Secretary Bessent, in particular, is subject to President Trump's actual and direct control in *both* of his representative roles. First, as Secretary of the Treasury Department, Bessent is a member of President Trump's cabinet. In this role, Secretary Bessent is "the President's alter ego" in the matters of the Treasury Department "where the President is required by law to exercise authority." *Myers*, 272 U.S. at 133. Consequently, Bessent is under President Trump's direct control as an appointed member of his cabinet.[24]

Second, President Trump's actual control over Secretary Bessent is grounded in statute. The Internal Revenue Code establishes that in "the Department of the Treasury[,] a Commissioner of Internal Revenue . . . shall be appointed by the President[.]" 26 U.S.C. § 7803(a)(1)(A). The Internal Revenue Code also provides that, Bessent, in his role as Acting IRS Commissioner, "may be removed at the will of the President." 26 U.S.C. § 7803(a)(1)(D). President Trump employs his authority to remove the IRS commissioner, without cause, and has done so as recently as August 2025.[25] Through Secretary

---

[23] Frank Bisignano also serves as the "18th Senate-confirmed Commissioner of the U.S. Social Security Administration." *See Commissioner*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner/ (last visited July 11, 2026).

[24] *See The Executive Branch*, The White House, https://www.whitehouse.gov/government/executive-branch/ (last visited July 6, 2026) ("[T]he members of the Cabinet are often the President's closest confidants.").

[25] Nicole Markus & Brian Faler, *Billy Long Out as IRS Commissioner*, POLITICO (last updated Aug. 8, 2025), https://www.politico.com/news/2025/08/08/billy-long-irs-

Bessent, President Trump also wields significant control over CEO Bisignano, who Secretary Bessent selected to be the "first Chief Executive Officer of the Internal Revenue Service."[26] CEO Bisignano reports directly to Secretary Bessent who oversees CEO Bisignano's management of the IRS's daily operations.[27] "Through the President's oversight, 'the chain of dependence [is] preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community.'" *Seila Law LLC*, 591 U.S. at 224 (citing 1 Annals of Cong. 499 (J. Madison)). Therefore, not only is Secretary Bessent directed by President Trump **as his alter ego**, but the President's ability to remove him at-will, and control Bisignano through his oversight, unquestionably impedes Secretary Bessent and CEO Bisignano's ability to zealously represent the Treasury Department and IRS in a matter that is directly adverse to the President.

In addition to the Constitutional and statutory bases for President Trump's control over Defendants, President Trump's Executive Order confirms his intent to wield actual, comprehensive control over Defendants in this matter. Executive Order 14215: *Ensuring Accountability for All Agencies* ("***Executive Order***") sets out the scope and breadth of President Trump's control over federal agencies. The Executive Order was issued on February 18, 2025, shortly after President Trump took office for his second term, and

---

commissioner-trump-00500365 (noting that President Trump removed Billy Long as IRS commissioner just two months into Long's five-year tenure).

[26] *CEO Frank Bisignano*, Internal Revenue Serv., (last updated Mar. 4, 2026), https://www.irs.gov/about-irs/ceo-frank-bisignano.

[27] *See* Brian Scwartz*, Bessent Picks Social Security Chief Frank Bisignano as IRS CEO,* WALL ST. J. (Oct. 6, 2025, at 14:37 ET), https://www.wsj.com/us-news/law/irs-leaker-sought-job-with-aim-of-releasing-trump-tax-returns-doj-says-93944811.

expands the President's oversight of federal agencies and employees.[28] Notably, the Executive Order provides that "it shall be the policy of the executive branch to ensure Presidential supervision and control of the entire executive branch." *Id*. § 1.

Most relevant to the issue of control in this matter is Section 7 of the Executive Order which explicitly addresses President Trump's ability to direct Defendants' conduct in litigation. Section 7 begins by declaring, "The President and the Attorney General, **subject to the President's supervision and control**, shall provide authoritative interpretations of law for the executive branch." *Id*. (emphasis added). The Section continues by making clear that "The President and the Attorney General's opinions on questions of law are **controlling** on all employees in the conduct of their official duties."[29] *Id*. (emphasis added). The following language further animates the Court's concern as to adverseness in this matter:

> No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and **positions advanced in litigation**, unless authorized to do so by the President or in writing by the Attorney General.

*Id*. (emphasis added).

Therefore, in this case, unlike others that private parties have instituted, Defendants and their representatives are unable to advance any legal position or

---

[28] *See* Exec. Order No. 14215, 90 FED. REG. 10447 (Feb. 24, 2025).

[29] Counsel for Plaintiffs points to the other Plaintiffs—Donald J. Trump, Jr., Eric Trump, and the Trump Organization, LLC—as having separate, disinterested claims from those of President Trump, establishing a viable case or controversy. However, these Plaintiffs share the same attorney, the same parent company, and the same parent and have not espoused any different or distinct view of this matter or this "Settlement." Accordingly, the Court will treat their role as parenthetical to that of Lead Plaintiff President Trump.

interpretation—however legitimate or well-reasoned—contrary to that held by Lead Plaintiff in this matter, President Trump. *See, e.g., Griffin v. Internal Revenue Serv.*, No. 22-cv-24023, DE 23; DE 58 (S.D. Fla. 2024) (challenging similar allegations through motions to dismiss the complaint and amended complaint). Not surprisingly then, no attorney appeared[30] on Defendants' behalf, challenged Plaintiffs' actions, or justified the United States' position in any way.

Plaintiffs seem to suggest that the course of litigation in *Griffin*, supports their position on adverseness, claiming that the plaintiff in *Griffin* asserted "substantially identical allegations against the same defendants, arising from the same course of conduct by the same individual." (DE 89 at 18). But unlike this case, the plaintiff in *Griffin* is a private, non-governmental actor. And, unlike this case, the *Griffin* defendants challenged the plaintiff's allegations. *See* United States' Mot. to Dismiss Complaint at 2, *Griffin*, No. 22-cv-24023 (S.D. Fla. Apr. 23, 2023), DE 23. In *Griffin*, the defendants (the same IRS and Treasury Department sued here) contested the plaintiff's privacy act claims by arguing preemption and, alternatively, the plaintiff's failure to plead actual damages. *Id*. The *Griffin* defendants also challenged the section 7431 claim, arguing the complaint was a shotgun pleading based solely on conclusory allegations. *Id*. After the motion to

[30] The DOJ, Civil Division "represents the United States, its departments and agencies, Members of Congress, Cabinet Officers, and other federal employees in any civil or criminal matter within its scope of responsibility." *See* Dep't of Just., *About the Civil Division*, https://www.justice.gov/civil/about (last visited June 16, 2026). Notably, although the statute allows President Trump to receive the Attorney General's "advice and opinion on questions of law when required," President Trump is not obligated to obey the Attorney General's opinion on issues of law. *See* 28 U.S.C. § 511; *see also* Saikrishna Bangalore Prakash, *Too Unitary,* 135 Yale L.J. Forum 533, 552 (2026) ("The President, and not the Attorney General, is the chief law-enforcement officer of the United States."). Indeed, "a lawyer's counsel does not bind the advice seeker." *Id.*

dismiss was granted in part and denied in part, the government filed an answer asserting a sovereign immunity defense and denying several allegations in the amended complaint. That action was settled after two years of litigation.[31]

Likewise, in *Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, a class action lawsuit brought by non-government plaintiffs, the government appeared and moved to dismiss the plaintiff's class action complaint. No. 25-cv-00139, 2026 WL 900051, at *1 (D. Md. Apr. 2, 2026). After the court denied its motion to dismiss, the government filed an answer, asserting sovereign immunity and statute of limitations defenses. To date, that litigation remains pending. Here, unlike *Griffin* and *Safe Harbor Int'l, LLC*, the same defendants, faced with the same claims caused by the "same course of conduct" attributable to the "same individual," did not endeavor to defend their agencies, safeguard taxpayer monies, or even file an appearance. Instead, before the Parties' deadline for addressing the Court's critical jurisdictional questions passed, the Parties executed the "settlement agreement" that effectively mooted the issues the Court identified. This case was "resolved" before any litigation occurred and before the Government was required to explicate its position.

[31] Additionally, *Griffin* was filed in 2022, well within the applicable statute of limitations period. And while the question of whether the government was the appropriate party survived a motion to dismiss challenge, the court there noted it was a matter more suited to summary judgment. Significantly, the settlement reached after two years of litigation with the IRS amounted only to a nonmonetary apology, not an award of billions of taxpayer dollars and conferral of immunities to plaintiff, his family, and affiliates.

Considering the brief chronology,[32] the silent docket, and Defendants' deviation from basic litigation strategies pursued in similar cases, the Court must conclude that

---

[32] By comparison, the limited universe of other civil cases involving publicly available settlements of similar or greater monetary magnitude had significantly more active dockets, required much more time to resolve, and involved serious allegations of catastrophic environmental destruction, life-threatening physical harm, or egregious market fraud:

- *O'Brien's Brien's Response Mgmt., LLC v. BP Expl. & Prod. Inc.*, MDL No. 2179 (E.D. La.) (multidistrict litigation that consisted of approximately 3000 cases relating to the catastrophic explosion of the Deepwater Horizon rig; claims were resolved for approximately $20 billion after several years).

- *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392 (S.D.N.Y. 2003) (claims based on fraudulent accounting; case settled for approximately $6 billion after six years of litigation, with a docket spanning 3366 entries).

- *Fed. Trade Comm'n v. Amazon.com, Inc.*, No. 23-cv-01495 (W.D. Wash. 2023) (nonconsensual enrollment of consumers into subscriptions; parties stipulated to a $2.5 billion judgment, after litigating across 695 docket entries).

- *In re: Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 15-MD-02672 (N.D. Ca. 2015). (Volkswagen AG, in a case involving Volkswagen's use of illegal software on its 2.0-liter diesel vehicles, agreed to pay up to $14.7 billion after vigorous motion practice in a case with 8281 docket entries).

- *United States ex rel. Thorpe v. GSK,* No. 11-cv-10398 (D. Mass. 2011) (false price reporting and off-label use practices; settlement resolved four pending qui tam lawsuits; approximately $3 billion settlement resolved four pending qui tam lawsuits).

- *In re: Enron Corp. Sec.*, No. 02-md-01446 (S.D. Tex. 2002) (Enron Corp. agreed to settle claims alleging investment fraud for a collective amount exceeding $7 billion—only after several years of vigorous litigation across multiple lawsuits, with the consolidated case spanning 473 entries).

- *Brown v. Am. Home Prod.,* No. 99-cv-20593 (E.D. Pa. 1999) (heart valve disease was caused by the combination of fenfluramine and phentermine; the manufacturer of the pharmaceuticals agreed to a $3.75 billion settlement after zealously defending their position with a docket spanning 5448 entries).

All of these billion-dollar civil settlements involved more time, effort, and advocacy than that expended in the instant case. Moreover, in these cases, the claims resolved were

Defendants chose not to "advance an interpretation of the law as the position of the United States that contravenes" President Trump's opinion regarding this lawsuit. *See* Executive Order § 7. It is clear that obeisance to the mandate of his Executive Order has been fulfilled by Defendants' actions (or more accurately, inaction) in this case. Therefore, not only does the Executive Order demonstrate President Trump's espoused control over Defendants' conduct generally in litigation, it also demonstrates President Trump's actual control in this litigation. *See* 13 Wright & Miller's Federal Practice & Procedure § 3530 (3d ed. 2026).

Adverseness is further defeated by President Trump's influence over the DOJ here. During an interview with the New York Times, President Trump publicly expressed his belief in his unequivocal control over the DOJ. *See Excerpts From Trump's Interview With The Times,* NEW YORK TIMES (Dec. 28, 2017), https://www.ny-times.com/2017/12/28/us/politics/trump-interview-excerpts.html ("I have absolute right to do what I want to do with the Justice Department."). However, the DOJ is tasked with zealously representing the United States' interests, *see* 28 U.S.C. § 516,[33] and is trusted

legally cognizable: discrimination, property damage, or tort as defined by applicable state and federal statutes. Here, however, the terms "Anti-Weaponization" and "Lawfare" are inchoate and the "settlement agreement" provides no legal definition as to what constitutes either term, outside their meaning in political discourse.

[33] "The Judiciary Act of 1789 created the Office of the Attorney General which evolved over the years into the head of the Department of Justice and chief law enforcement officer of the Federal Government." *See* Office of the Attorney General, U.S. Dep't of Just., https://www.justice.gov/ag (last visited June 17, 2026). "Since the Judiciary Act of 1789, the United States Attorney General has had the authority 'to give his advice and opinion upon questions of law when required by the President of the United States, or when requested by the heads of any of the departments, touching any matters that may concern their departments.'" *See Citizens for Resp. & Ethics in Washington v. United States Dep't of Just.*, 922 F.3d 480, 483 (D.C. Cir. 2019) (citing Judiciary Act of 1789, § 35, 1 Stat. 73, 93 (codified as amended at 28 U.S.C. §§ 511–513)).

to remain insulated from political influence. Fidelity to the rule of law can be achieved only when the DOJ is free to assess the facts and governing law of each case it reviews without the stain of political interference.[34] There is "an expectation that even the Attorney General must be able to draw the line between political allegiance and fidelity to the people, as well as the fair administration of the law." Tonna Onyendu, *Department of Justice's Role in Electoral Politics: Maintaining Neutrality in the Enforcement of Voting Rights,* 31 Geo. J. Legal Ethics 799, 803 (2018).[35]

b. *The Conduct of Executive Branch Actors Demonstrates Lack of Adverseness and Improper Motive.*

Here, Defendants' actions (or inaction), as directed by the DOJ, and the subsequent "resolution" of this lawsuit leads the Court to conclude the Parties' interests

[34] Legislators on both sides of the political aisle have emphasized the need for an independent DOJ. *See, e.g.*, *Confirmation Hearing on the Nomination of Michael B. Mukasey to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 110th Cong. 478 (2007) (Patrick J. Leahy, (D.)) ("There is good reason why the rule of law requires that we have an Attorney General and not merely a Secretary of the Department of Justice. This is a different kind of Cabinet position. It is distinct from all others. It requires greater independence"); *Nomination of Eric H. Holder, Jr., Nominee to be Attorney General of the United States Before the S. Comm. on the Judiciary*, 111th Cong. 403 (2009) (Arlen Specter, (R.)) ("Next to the President of the United States, there is no Federal officer more important than the Attorney General. The Attorney General is different from any other Cabinet officer because Cabinet officers ordinarily carry out the policies of the President. But the Attorney General has an independent duty to the people and to uphold the rule of law.").

[35] It has been reported that a Principal Deputy Associate Attorney General advised United States Attorneys around the country that the President is the Department's "chief client." Ben Penn, *In-Your-Face DOJ Aide Rides Prosecutors for 'Chief Client' Trump*, BLOOMBERG L. (Feb. 19, 2026), https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump; *see supra* p. 26. Former Attorney General Pam Bondi also characterized DOJ attorneys as the President's "lawyers." *See* Memorandum from the Att'y Gen. to All Dep't of Just. Emps., General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025), https://www.justice.gov/ag/media/1388521/dl.

were "one and the same." *Veazie*, 49 U.S. at 256. In justifying the "unusual"[36] settlement to resolve Plaintiffs' claims, the DOJ and Acting Attorney General Blanche in a press release, and Acting Attorney General Blanche's Congressional testimony respectively, cited *Keepseagle v. Vilsack*, 99-cv-03119, (D.D.C. 1999), as the "precedent" for the unprecedented establishment of the $1.776 billion dollar fund. However, Plaintiffs' briefing is conspicuously silent as to this justification, making no mention of the *Keepseagle* case. Understandably so.[37]

In *Keepseagle*, the parties—including the Department of Agriculture represented by the DOJ—engaged in a decade-long litigation regarding alleged discrimination perpetrated against thousands of Native American farmers and ranchers who had been illegally denied farm loans and access to benefit programs. *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 104 (D.D.C. 2015). As the presiding judge observed, "[i]t was a major class-action seeking to remedy what many felt was the latest chapter in the federal government's sordid history of mistreating Native Americans." *Id.* at 104. There, "[f]or

---

[36] *See A Review of the President's Fiscal Year 2027 Budget Request for the Department of Justice,* 119th Cong. (2026) (statement of Todd Blanche, Acting Attorney General) ("So what we've done with this fund. . . And by the way, it is true that this is unusual").

[37] During the first administration of President Trump, Associate Attorney General Rachel Brand delivered remarks to the Washington, D.C. Lawyer Chapter of the Federalist Society. Rachel L. Brand, Assoc. Att'y Gen., *Remarks to the Washington, D.C. Lawyers Chapter of the Federalist Society* (Feb. 15, 2018), https://www.justice.gov/archives/opa/speech/associate-attorney-general-brand-delivers-remarks-washington-dc-lawyers-chapter. In her remarks, Ms. Brand acknowledged that the "Department of Justice is not your typical litigant or litigator." *Id.* She explained that "protecting the public fisc is something the Attorney General takes seriously," and highlighted *Keepseagle* as "one of the worst examples" of settlements involving the DOJ. Ms. Brand critiqued the fact that, under the mechanism of the *Keepseagle* fund, "hundreds of millions of dollars of the taxpayer's money will be spent in ways never appropriated by Congress, with virtually no oversight." *Id.* In President Trump's second administration, the DOJ now contrives to rehabilitate *Keepseagle* as the rationale for this "unusual" settlement.

nearly ten years, the parties engaged in extensive and contentious discovery and motions practice," *id.* at 105; propounded notice to putative class members regarding a proposed class settlement; defined the mechanisms of class claims for recovery; and participated in an hours-long fairness proceeding, where every person who attended was heard. The *Keepseagle* case history stands in stark contrast to the 109-day sojourn of this matter where Defendants never appeared, never challenged Plaintiffs' claims, and never filed a single pleading.

Ultimately, the DOJ has endeavored to justify its position to create the appearance of a case or controversy "resolved" under the aegis of the Court. But the Parties, most of whom are government actors, did not engage in any public discussion or judicial review regarding their "unusual" arrangement and whether they were legally adverse; indeed, they actively avoided such an undertaking.[38] And the extraordinary award fashioned by the Parties for claims that were never litigated, and have yet to be defined, on behalf of unidentified third parties[39] whose future remedies bear no relationship to the claims in this case, indicates that real adverse interests were never before the Court. *Cf. Monsanto Co.*, 72 F.4th at 1266 (finding a justiciable case or controversy where the parties zealously

[38] The Court is extremely troubled by the testimony given by Acting Attorney General Blanche on May 19, 2026. In response to why the "settlement agreement" had not been submitted to this Court for review, he stated that "there is no judge" because the case had been dismissed and, therefore, there was "no mechanism" for reviewing the agreement. *See supra* note 13. While temporally accurate, this answer is, at best, misleading and, at worst, disingenuous. The Court was available to review any pleading by any Party at any time during this lawsuit. And if Acting Attorney General Blanche had thought the dismissal was improvidently granted or thought Plaintiffs misspoke when they said, "no judicial analysis is appropriate," (DE 52 at 2), he only had to file an appearance and ask for relief.

[39] Compounding these concerns, an official at the DOJ publicly stated that he intended to apply for compensation from the Fund. *See* Daniel Lippman, *DOJ Official Sought Weaponization Fund*, POLITICO (June 10, 2026), https://www.politico.com/news/2026/06/10/doj-official-sought-weaponization-fund-patrick-davis-00955.

asserted their rights and there was "no suggestion" that the defendant "selected or control[ed]" the plaintiff's counsel). Indeed, the DOJ seems to have purposefully adopted the strategy of creating a "slush fund disguised as a settlement, and then doling the money out to whatever constituency the Executive wants bankrolled." *Keepseagle v. Perdue*, 856 F.3d 1039, 1058 (D.D.C. 2017) (Rogers, J., dissenting).[40]

The Court's conclusion regarding the Parties' shared interest is also underscored by the circumstances surrounding the execution of the "settlement agreement." First, the "settlement agreement" is signed on behalf of Plaintiffs by Daniel Epstein ("***Mr. Epstein***"), a former White House Senior Associate Counsel and Special Assistant to President Trump from 2017 until 2020. Notably, Mr. Epstein was never counsel of record in this case; the Complaint's signature block identified him as counsel[41] for Plaintiffs but represented that his *pro hac vice* application was "forthcoming." (DE 1 at 27). Since no such application was filed with the Court, and since, in other matters pending in Florida and elsewhere, Mr. Epstein sought *pro hac* admission within weeks of filing the

[40] While ignoring the facts and history of the *Keepseagle* case, the DOJ also seems to studiously ignore the lessons of *Keepseagle*. Here, the DOJ chose to bypass notice, adversarial advocacy, legal analysis, and court review altogether to go straight to creating its own billion-dollar Cy Pres fund for non-parties with no pending claims against the United States. In this way, the DOJ has both disregarded the precedential meaning of *Keepseagle* while engaging in the constitutional assault predicted by its most ardent critics.

[41] Mr. Brito signed the Complaint—he is admitted to the Florida Bar and is admitted to the United States District Court for the Southern District of Florida. Mr. Brito did not sign the "settlement agreement," but his name appears on it. Mr. Epstein's name appears on the Complaint, but he did not (and could not) sign it. Mr. Epstein did sign the "settlement agreement."

complaint,[42] the Court can only surmise that Mr. Epstein was aware that he would never need to appear and litigate the merits of Plaintiffs' claims.

Second, the "settlement agreement" is signed on behalf of Defendants by Stanley Woodward, Jr., the current Associate Attorney General at the DOJ, and Acting Attorney General Blanche. Before he went to the DOJ, Associate Attorney General Woodward represented several individuals charged in connection with the events of January 6, 2021, at the United States Capitol.[43] He also represented Walt Nauta, who was President Trump's personal aide and a co-defendant in the criminal matter involving the return of classified documents at Mar-a-Lago.[44] Before his appointment to the DOJ, Acting Attorney General Blanche served as President Trump's personal criminal defense attorney in several high-profile matters. *See, e.g.*, *United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023) ("***Mar-a-Lago Documents Case***"); *United States v. Trump*, No. 23-cr-00257 (D.D.C. 2023) (the criminal case charging President Trump with conspiring

---

[42] *See Trump v. Brit. Broad. Corp.*, No. 25-cv-25894, (S.D. Fla. filed Dec. 15, 2025); *see also Trump v. N.Y. Times Co.*, No. 25-cv-02487 (M.D. Fla. filed Sept. 15, 2025). Mr. Epstein also appeared as counsel for President Trump after appropriately filing *pro hac* papers in *Trump v. CBS Broad. Inc.*, No. 24-cv-00236 (N.D. Tex. filed October 31, 2024). In that case, Mr. Epstein sought *pro hac* admission despite being a member of the State Bar of Texas.

[43] Associate Attorney General Woodward appeared and represented Connie Meggs and Kelly Meggs (husband and wife), Ryan Samsel, and Federico Klein. *See United States v. Meggs*, No. 21-cr-00028 (D.D.C. 2021); *United States v. Meggs*, No. 22-cr-00015 (D.D.C. 2021); *United States v. Samsel*, 21-cr-00537 (D.D.C. 2021); *United States v. Klein,* No. 24-cv-02610 (D.D.C. 2021).

[44] *See United States v. Trump*, No. 23-cr-80101 (S.D. Fla. 2023). In that same matter, Associate Attorney General Woodward also represented Yuscil Tavares, an information technology worker at Mar-a-Lago who was charged alongside President Trump and Walt Nauta for his role in allegedly deleting surveillance camera footage. That representation was the subject of a conflict of interest hearing pursuant to *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975).

to overturn the 2020 election and for attempting to obstruct with the election's results before, during, and after January 6, 2021); *People v. Donald J. Trump*, No. 71543-23 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 3, 2024) (the "hush money" case that raised allegations of President Trump falsifying business records).

While the Court appreciates that attorneys successfully transition between private practice and government service, such transitions do not absolve counsel of their ethical obligations. For example, Rule 11.1(c) of the Southern District of Florida Local Rules incorporates the Florida Bar's rules of professional conduct as ethical standards. *See* S.D. Fla. L.R. 11.1(c) ("The standards of professional conduct shall include the current Rules Regulating the Florida Bar."). As relevant here, Rule 4-1.11 of the Rules Regulating the Florida Bar provides a conflict-of-interest rule which specifically governs former and current government officers and employees. The commentary to this rule explains, in relevant part, the following:

> This rule represents a balancing of interests. On the one hand, where the successive clients are a government agency and another client, public or private, **the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government**.

R. Regul. the Fla. Bar 4-1.11 (emphasis added).[45] The spectre of that risk seems to be present here.

---

[45] These principles, however, are not confined to Florida practitioners or Florida Bar rules. The attorneys involved in the negotiation and execution of the "settlement agreement" are governed by similar ethical standards in the states in which they are admitted to practice law. The Court may take judicial notice of those admissions. *See Jackson v. United States*, Nos. 12-cv-388, 20-cr-198, 2014 WL 5474132, at *12 n.6 (M.D. Fla. Oct. 29, 2024) (taking judicial notice of attorney's Florida bar membership status because attorney's membership and status "can be readily and accurately determined from Florida Bar

The gravamen of the "settlement agreement" is to fund claims premised on events including those arising from, *inter alia*, the Mar-a-Lago Documents Case and the events of January 6, 2021.[46] Indeed, these two cases have been referenced as quintessential Anti-Weaponization and Lawfare claims.[47] Instead of either recusing[48] because of their previous representations or vigorously defending this lawsuit as required to do so by DOJ

---

records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned"). Attorney Epstein is admitted in Texas, the District of Columbia, and Maryland. Attorney Woodward is likewise admitted in the District of Columbia, and as noted above, Attorney Blanche is admitted in New York.

[46] "President Trump's views about the prosecution of those who attacked the U.S. Capitol on January 6 . . . are well known[.]" *United States v. Nordean*, No. 21-cr-00175, DE 1098 (D.D.C. July 10, 2026) (dismissing indictments with prejudice following appellate court's vacatur of judgments against four defendants convicted at trial of "serious offenses" arising from January 6, 2021).

[47] *See supra* note 11; *see also* Sabrina Lam, *Trump defends 'Anti-Weaponization Fund' amid GOP blowup*, POLITICO (May 22, 2026), https://www.politico.com/news/2026/05/22/trump-defends-anti-weaponization-fund-00933727 (reporting on President Trump's May 22, 2026, statement that "I gave up a lot of money in allowing the just announced Anti-Weaponization Fund to go forward. I could have settled my case, including the illegal release of my Tax Returns and the equally illegal BREAK IN of Mar-a-Lago, for an absolute fortune. **Instead, I am helping others, who were so badly abused by an evil, corrupt, and weaponized Biden Administration, receive, at long last, JUSTICE**!") (emphasis added). Acting Attorney General Blanche expressly acknowledged that the Anti-Weaponization Fund "is not limited to in any way scope or form to January 6th" but declined to ensure that the funds would not be disbursed "to anyone convicted on the January 6th attack on Congress." *Supra* note 13 at 37:26 and 01:48-37.

[48] *See* Katelyn Polantz, *Exclusive: Acting AG Todd Blanche was told last year to recuse from Justice Department matters involving Trump*, CNN (May 14, 2026), https://www.cnn.com/2026/05/14/politics/todd-blanche-recusal-trump-investigations-brennan. As a Justice Department spokeswoman stated: "[Blanche] is recused from many cases before DOJ. In any cases that are still ongoing where he previously represented someone, he is recused." *Id.* In this case, however, notwithstanding his prior representation of President Trump, Blanche did not recuse.

policies and procedures,[49] these lawyers agreed to a "settlement" involving a staggering amount of money potentially benefitting former clients.

Moreover, the Release Order, signed only by Acting Attorney General Blanche, extends a blanket grant of immunity to all Plaintiffs and their families and "affiliates," and precludes all "current or possible" investigations or actions before any other agencies or departments.[50] The Release Order also purports to bar the IRS from conducting any future tax audits of President Trump, his sons, and their entities.[51] This provision directly contravenes 26 U.S.C. § 7217, titled "Prohibition on executive branch influence over taxpayer audits and other investigations," which states:

> It shall be unlawful for any applicable person to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer.

26 U.S.C. § 7217(a).

The explicit text of this statute prohibits President Trump and his lawyers—one of whom was former White House Counsel—from asking for or promoting termination of an audit directed toward him.[52] And acquiescing to any such demand is wholly incompatible

---

[49] *See* U.S. Dep't of Just., *Just. Manual* § 4-3.432 (2018) (requiring that request for compromise "demonstrate a thorough, thoughtful exploration of any issues relating to jurisdiction, liability, and damages, with the ultimate goal of ensuring that a proposed settlement is in the best interests of the United States and that the United States has brought peace with respect to any claims that the plaintiff could bring based on the subject matter of the case").

[50] *See supra* note 15.

[51] *Id*.

[52] This proviso of the "settlement" also raises the question of whether the agreement violates Article II, Section 3 of the United States Constitution, which directs that the President "shall take [c]are that the Laws be faithfully executed[.]" U.S. CONST. art. II, § 3.

with the duties of DOJ attorneys (as well as CEO Bisignano for the IRS) to enforce the law and protect the public interest. Moreover, the conferral of possibly millions of dollars in tax relief and corollary benefits potentially violates Article II, Section I of the United States Constitution, a limitation surely known by former White House Counsel and the current Acting Attorney General. *See* U.S. CONST. art. II, § 1, cl. 7: "The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them."[53] No sitting President has ever sued federal agencies completely subject to his control for monetary benefits, or any benefits that inure to him, his family, and associates. The failure of any attorney in this case to address, on this docket, the relationship of this Article II proscription with the benefits conferred by the "settlement" is a glaring omission that speaks to the control of the Lead Plaintiff.[54]

Another signal that adverseness was absent was Acting Attorney General Blanche's unilateral repudiation and severance of the purported "Anti-Weaponization Fund" associated with this lawsuit.[55] Two weeks after the dismissal, in testimony before the House of Representatives, Acting Attorney General Blanche conceded that the DOJ

---

[53] "Neither the Union nor any of its members will be at liberty to give, nor will he (the President) be at liberty to receive any other emolument than that which may have been determined by the first act." THE FEDERALIST NO. 73 (A. Hamilton).

[54] As recently discussed in a decision affirming attorney sanctions, the Eleventh Circuit observed that "one of a lawyer's chief duties is to give his clients a clear-eyed view of whether the law says what the client wants it to say." *Est. of Lane Caviness v. Atlas Air, Inc.*, No. 24-11033 (11th Cir. July 10, 2026).

[55] *See* Defendant's Notice of Filing, *Floyd v. Dep't. of Just.*, No. 1:26-cv-01399, DE 93 (E.D. Va. filed on May 22, 2026).

was "not moving forward with the fund, period."[56] Acting Attorney General Blanche's decision, which has not been memorialized or adopted by Plaintiffs[57] or their lawyers, demonstrates his confidence that he could speak for, and bind, both sides of this matter. This certitude supports the conclusion that the Parties worked in tandem and were never actually adverse. Indeed, "a party may not unilaterally repudiate a settlement agreement once it is reached." *Reed by and through Reed v. United States*, 891 F.2d 878, 881 n.3 (11th Cir. 1990). "It is 'hornbook law' requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; subsequent modifications require consent and 'a meeting of the minds' of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification." *Tropicana Pools, Inc. v. Boysen*, 296 So. 2d 104, 108 (Fla. Dist. Ct. App. 1974). Acting Attorney General Blanche's apparent capacity to speak for both Plaintiffs and Defendants, sign a "settlement" document on behalf of all Parties to this action, and then repudiate part of that agreement, demonstrates that there was only one party whose interests were being represented throughout this case.

In this case, the President[58] filed a lawsuit alleging reputational and financial harm from the unlawful disclosure of his tax returns. (DE 1). He sued the IRS and the Treasury Department—entities that are part of the Executive Branch headed by him and, more

[56] *Supra* note 19.

[57] In an interview with CNN, President Trump defended the "Anti-Weaponization Fund" to reporters, noting that he didn't know whether the fund was "fully dead or just on hold" and that he would "have to ask the lawyers." *See* Sarah Ferrls, *et al.*, *Trump tells CNN he doesn't know if $1.8 billion fund is dead, calling it 'a beautiful thing'*, CNN (June 3, 2026), https://www.cnn.com/2026/06/03/politics/anti-weaponization-fund-trump.

[58] Again, while Plaintiffs also include Donald J. Trump, Jr., Eric Trump, and The Trump Organization, LLC, these individuals and entity are parenthetical to this analysis.

recently, that have been directed to adhere to any interpretation of law advanced by him. And while it is true that President Trump had a legal right to bring a suit for the unlawful disclosure, any remedy would be circumscribed by the legal guardrails applicable to all litigants: the statute of limitations, naming the appropriate defendant, and pleading special recoverable damages. Notably, had President Trump (and his then-lawyers Alina Habba and Todd Blanche) brought this lawsuit in a timely fashion while he was a private citizen, this litigation understandably might have been resolved in a 109-day time span. But that is not what happened. Instead, President Trump did not pursue his claims until he once again occupied the White House and had appointed his former lawyer, and the former lawyer of persons who are putative beneficiaries of the "Anti-Weaponization Fund" to prominent positions in the DOJ. These officials then negotiated on behalf of the United States, with his current lawyers, including his former White House Counsel to reach a "settlement." It is risible to suggest that there was ever adverseness between the Parties.

In dismissing the non-parties' claims of collusion, Plaintiffs reveal the true position of the Parties and say the quiet part out loud: "Regardless of whether Plaintiffs had ever filed this action, the Government and Plaintiffs still had the power to resolve all disputes between the parties." (DE 89 at 15). The power to resolve was never a question before this Court. Whether Executive Branch actors can privately agree to give themselves and their former clients blanket immunities and billions of dollars in tax monies for legally undefined grievances was never an issue advanced to this Court. The question is whether the Parties could do so by claiming to be adverse and engaging the legitimacy of a court proceeding. The answer is a resounding "no": the Lead Plaintiff and the Government are one, a fully realized unitary interest. Because "Plaintiffs have no answer for the fact that

the [L]ead Plaintiff, President Trump, directs and controls the Defendants[,]" this "renders this lawsuit non-adversarial, collusive, and jurisdictionally improper." *See* DE 94 at 4.

And because this fact was so obvious and so insurmountable, the Court finds that this matter was brought for an improper purpose—to gain the imprimatur of judicial legitimacy for a "settlement" that had no viable basis in law or fact. As was observed in another matter brought in this District, "this case is part of Mr. Trump's pattern of misusing the courts to serve political purposes." *Trump v. Clinton*, 653 F. Supp. 3d 1198, 1219 (S.D. Fla. 2023).

Having concluded that this action was presented for an improper purpose, the Court now turns to the question of sanctions. This inquiry proceeds under two independent, but overlapping frameworks: Federal Rule of Civil Procedure 11 and the Court's inherent authority.

**B. *Federal Rule of Civil Procedure 11*** [59]

Federal Rule of Civil Procedure 11 ("***Rule 11***") governs the filings of pleadings, motions, and other papers with the Court. "The purpose of Rule 11 is to deter baseless filings in [the] district court and thus streamline the administration and procedure of federal

[59] As acknowledged by the non-party movants, Rule 60(d)(3) allows the Court to "set aside a judgment for fraud on the Court." FED. R. CIV. P. 60(D)(3); *see also Bevan v. Lee Cnty. SO*, 224 F. App'x 880, 882 (11th Cir. 2007) ("A federal court can vacate its own judgment upon proof that a fraud has been perpetrated on the court.") (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). The Court notes that it possesses the authority to protect the integrity of these proceedings under Rule 11 and its inherent authority, and so it need not invoke Rule 60(d)(3). However, this decision should not be understood as a final determination regarding any fraud perpetrated on the court and does not foreclose the possibility of future relief under Rule 60(d)(3). *See SEC v. ESM Grp., Inc.*, 835 F.2d 270, 273 (11th Cir. 1988) ("Fraud that prevents the functioning of the judicial process does not have to be brought within any specific period of time."). Accordingly, the Court expresses no view as to whether the requirements of Rule 60(d)(3) have been satisfied.

courts." *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (citations omitted). As relevant here, when an attorney files a pleading in federal court, he certifies that, among other things, the pleading is not being presented for an improper purpose. FED. R. CIV. P. 11(B); *Spolter v. SunTrust Bank*, 403 F. App'x 387, 391 (11th Cir. 2010). Because this question strikes at the heart of the integrity of the judicial process, the Court may raise the improper purpose inquiry *sua sponte* and at any time. FED. R. CIV. P. 11(c)(3); *see also id.* advisory committee's note to 1983 amendment ("The time when sanctions are to be imposed rests in the discretion of the trial judge.").

An improper purpose under Rule 11 includes filing suit to force a settlement. *See e.g.*, *Scott v. Vantage Corp.*, 64 F.4th 462, 472–73 (3d Cir. 2023) (discerning no abuse of discretion in district court's conclusion that plaintiffs violated Rule 11(b) where they filed a lawsuit with no "eye toward settlement" and to force a settlement); *Roe v Rivian Auto. LLC*, No. 20-998, 2020 WL 8812913, at *3 (C.D. Cal. Dec. 11, 2020) (determining that case was presented for an improper purpose where plaintiff filed lawsuit to garner publicity and force a settlement); *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1309 (11th Cir. 2021) (affirming sanctions against client whose "motivation [to file lawsuits] was to obtain payment of legal fees, as opposed to compliance with the ADA."). Even seemingly viable claims can support the finding of improper purpose when presented in such a way that subverts the rules or the Court's authority. *See In re Flynn*, 139 F.R.D. 698, 699 (S.D. Fla. 1991).

"Rule 11 authorizes a court to sanction a party who submits a pleading for an improper purpose." *Smith v. Psych. Sols., Inc.*, 750 F.3d 1253, 1260 (11th Cir. 2014). Such sanctions are discretionary and may be imposed on any party as the court deems

appropriate. FED. R. CIV. P. 11(c)(1). "[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell*, 496 U.S. at 396.

"The standard for testing conduct under Rule 11 is 'reasonableness under the circumstances,' an objective standard." *Laborers Local 938 Joint Health & Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987). "[A]s is almost always the case, the district court is better situated than [the reviewing appellate court] to marshal the pertinent facts and apply the fact-dependent legal standard mandated by Rule 11." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 638 (11th Cir. 2010) (citing *Cooter & Gell*, 496 U.S. at 402) (quotation marks omitted). "Given the district court's familiarity with the case and the parties, the district court is in a better position 'to make these determinations in the first instance[.]'" *Id.*

The Eleventh Circuit has recognized three instances in which Rule 11 sanctions are appropriate: where a pleading (1) "has no reasonable factual basis"; (2) "is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law"; or (3) is "in bad faith for an improper purpose." *Massengale v. Ray*, 267 F.3d 1298, 1301 (11th Cir. 2001) (quoting *Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996)). This Order discusses whether Rule 11 sanctions are warranted under the improper purpose prong.[60]

---

[60] The Court confines its analysis to Rule 11's improper purpose prong. That said, this election should not be construed as suggesting that the remaining Rule 11 grounds are inapplicable.

The Court divides its analysis in three parts. First, the Court considers whether Plaintiffs' Rule 41(a)(1)(A)(i) voluntary dismissal precludes consideration of Rule 11 sanctions. Second, the Court determines whether Plaintiffs' conduct discussed *supra* satisfies Rule 11's improper purpose standard. Finally, the Court addresses what sanctions, if any, are appropriate.

**1. Plaintiffs' Rule 41(a)(1)(A)(i) Voluntary Dismissal Does Not Preclude Consideration of Rule 11 Sanctions.**

As stated previously, and as the non-party movants correctly note, a voluntary dismissal does not deprive a district court of jurisdiction to determine whether Rule 11 has been violated and, if so, what sanctions are appropriate. *See, e.g.*, *Fox v. Acadia State Bank*, 937 F.2d 1566, 1569 n.2 (11th Cir. 1991) ("[W]e hold that the stipulated dismissal did not deprive the district court of jurisdiction to impose Rule 11 sanctions."); *Sussman v. Salem, Saxon & Nielsen, P.A.*, 818 F. Supp. 1510, 1516 (M.D. Fla. 1993) (explaining "that voluntary dismissal of a claim under Rule 41(a)(1), if otherwise sanctionable under Rule 11, does not preclude the assessment of sanctions."). As the Supreme Court has explained,

> The filing of complaints, papers, or other motions without taking the necessary care in their preparation is a separate abuse of the judicial system, subject to separate sanction. As noted above, a voluntary dismissal does not eliminate the Rule 11 violation. Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would lose all incentive to stop, think and investigate more carefully before serving and filing papers.

*Cooter & Gell*, 496 U.S. at 398 (citations omitted).

That reasoning applies with equal force here. Adopting Plaintiffs' position would grant parties immunity from Rule 11 sanctions, incentivizing them to misuse the judicial process and then moot the violation by voluntarily dismissing the case before the court can act. *See Absolute Activist Value Master Fund Ltd.*, 998 F.3d at 1266 ("If we divested the district court of jurisdiction over [sanctions] motions, an enterprising plaintiff could abuse the judicial system but nevertheless get off scot free by voluntarily dismissing its case under Rule 41(a)(1)(A)(i)."). Rule 11 does not permit such a result, and the Court will not countenance such behavior. *See id.* Therefore, contrary to Plaintiffs' assertions, the Rule 41(a)(1)(A)(i) voluntary dismissal does not foreclose the Court's Rule 11 inquiry. *See Cooter & Gell*, 496 U.S. at 395 (noting that "the violation of Rule 11 is complete when the paper is filed") (citation and quotation marks omitted).

**2. Plaintiffs' Conduct Satisfies Rule 11's Improper Purpose Standard.**

This case concerns whether Plaintiffs' conduct, as described *supra*, satisfies Rule 11's improper purpose standard. The Court concludes that it does. "[Plaintiffs] pursued this lawsuit in bad faith for the improper purpose of dishonestly advancing a political narrative." *Trump v. Clinton*, No. 22-14102-CV, 2023 WL 1207842, at *9 (S.D. Fla. Sept. 15, 2023). These efforts cannot be allowed in this Court. *See Procup v. Strickland*, 792 F.2d 1069, 1073 (11th Cir. 1986) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."); *Santana v. Frank Sufka Fam. Tr. Fund*, No. 26-cv-1440, 2026 WL 1492775, at *3 (M.D. Fla. May 28, 2026) ("If judges allow the court system to be weaponized by any party for improper purposes, the public is not well-served. Judges have a responsibility to ensure the courts remain open to all to pursue claims in good faith. They have an equally important responsibility to ensure courts are not abused for

improper purposes."). Certainly, a court should not be a forum for a party that cynically views a lawsuit as a vehicle to achieve a predetermined outcome: "I'm suing myself."[61]

"Improper purpose [under Rule 11] is often inferred from circumstantial evidence." *Thompson*, 610 F.3d at 665 (Tjoflat, J., concurring in part and dissenting in part); *Cohen v. Burlington, Inc.*, No. 18-cv-81420, 2020 WL 1033349, at *8 (S.D. Fla. Mar. 3, 2020) (same); *Meide v. Pulse Evol. Corp.*, No. 18-cv-1037, 2021 WL 4459653, at *10 (M.D. Fla. Sept. 29, 2021) (relying on plaintiff's persistence in pursuing factually and legally frivolous claims as circumstantial evidence of an improper purpose under Rule 11). Here, the record before the Court supports such an inference. As aptly summarized by the non-party movants, Plaintiffs acted in bad faith and for an improper purpose by "collusively filing a lawsuit with claims subject to multiple dispositive defenses solely to provide cover for a collusive settlement." (DE 94 at 12). The Court agrees. *See Trocano v. Vivaldi*, No. 25-11813, 2026 WL 446510, at *6–7 (11th Cir. Feb. 17, 2026) (explaining that the "district court may in its discretion impose Rule 11 sanctions against a party or lawyer who pursues a claim that is obviously barred by a waivable affirmative defense like the statute of limitations."). Accordingly, the Court must now determine what sanctions, if any, are appropriate. *See id.* (noting that "Rule 11 sanctions are discretionary" and therefore "just because a district court can impose sanctions does not mean that the court is required to do so.") (citation omitted).

---

[61] Even in the context of the Mar-a-Lago lawsuit, which became part of the "settlement," President Trump recognized the unique dynamics of his position and commented: "I'm suing myself." Joseph Gedeon, *Trump Says He Has Final Say on Paying Himself $230m for Past Investigations*, THE GUARDIAN (Oct. 22, 2025, 10:30 AM), https://www.theguardian.com/us-news/2025/oct/22/donald-trump-damages-federal-investigations.

**3. Sanctions are Appropriate.**

District courts have broad discretion to tailor appropriate and reasonable sanctions under Rule 11. *See Riccard v. Prudential Ins. Co Am.*, 307 F.3d 1277, 1295 (11th Cir. 2002) (citing *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987)). A court may impose both monetary and non-monetary sanctions. FED. R. CIV. P. 11(C)(4). When assessing *sua sponte* Rule 11 sanctions, "[t]he initiating court must employ[:] (1) a show cause order to provide notice and an opportunity to be heard; and (2) a higher standard (akin to contempt) than in the case of party-initiated sanctions." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (quotation marks omitted).[62]

The Eleventh Circuit considers several factors in determining an appropriate sanction under Rule 11, including: "whether the person has engaged in similar conduct in other litigation," "what effect it had on the litigation process in time or expense," and "whether the person responsible is trained in the law." *See Thomas v. Early Cnty, Ga.*, 518 F. App'x 645, 646 (11th Cir. 2013) (citing FED. R. CIV. P. 11 advisory committee's note to 1993 amendment).

Plaintiffs maintain that monetary sanctions are unavailable because their voluntary dismissal preceded any order to show cause. (DE 89 at 13–14). This argument relies on a faulty premise: that the Court's authority under Rule 11 is limited to monetary sanctions.

---

[62] In assessing the adequacy of a show cause order under Rule 11, the Eleventh Circuit applies a "flexible standard." *DaimlerChrysler, A.G.*, 331 F.3d at 1257. Therefore, "in many cases substantial compliance may suffice." *Id.* Here, Plaintiffs received notice of the conduct at issue and a full opportunity to respond. *See Johnson*, 9 F.4th at 1311 ("Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why.") (quoting *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)). And Plaintiffs briefed the applicability of Rule 11 sanctions, indicating that they understood its relevance.

The Court recognizes that Rule 11(c)(5)(B) limits a court's ability to impose monetary sanctions on its own initiative where the show cause order follows a voluntary dismissal or settlement. FED. R. CIV. P. 11(C)(5)(B); *see also Capital Corp. Merch. Banking, Inc. v. Norwich*, No. 6:07-cv-1626, 2009 WL 10671309, at *2 (M.D. Fla. June 2, 2009) (recommending that sanctions not be awarded to defendant where they were sought following plaintiff's voluntary dismissal), *report and recommendation adopted*, No. 07-cv-1626, DE 97 (M.D. Fla. June 23, 2009). The non-party movants do not contest this settled proposition. (DE 94 at 13) (explaining that Rule 11(c)(5)(B)'s limitation is "narrow" and does not foreclose "*non-monetary* sanctions") (emphasis in original).

However, this case presents unusual circumstances that distinguish it from the ordinary Rule 11 dispute. Plaintiffs do not identify at what point during the abbreviated procedural history of this case the Court realistically could have raised the issue of Rule 11 monetary sanctions. Had the Court done so before ordering briefing on the Court's subject matter jurisdiction, or after briefing was ordered but before the Parties responded, Plaintiffs undoubtedly would have protested that the discussion was both unmerited and premature. Moreover, the Advisory Committee Notes to Rule 11 explain that the reason monetary sanctions should be raised before a settlement is that a monetary resolution could be impaired by the threat of sanctions. FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Parties settling a case should not be subsequently faced with an unexpected order from the court leading to monetary sanctions that might have affected their willingness to settle or voluntarily dismiss a case."). That concern is not implicated here.

Nonetheless, the Court need not decide whether the circumstances of this case permit monetary sanctions notwithstanding the language of Rule 11(c)(5)(B). That limitation applies only to monetary sanctions and does not prevent the Court from determining whether Rule 11 has been violated or whether appropriate *non-monetary* sanctions are appropriate. *See generally Goldenberg v. Indel, Inc.*, No. 09-5202, 2011 WL 1134454, at *1 (D.N.J. Mar. 25, 2011) ("But [Rule 11(c)(5)(B)'s] restriction is explicitly limited to monetary sanctions. The [c]ourt is empowered to issue a number of other sanctions against malfeasant parties, including censure, educational requirements, or referral to disciplinary authorities.").

Thus, after considering the totality of the circumstances, including the record, the relevant law, the written submissions, and the factors identified by the Eleventh Circuit, the Court concludes that Rule 11 sanctions are appropriate here. *See Trump v. Clinton*, 640 F. Supp. 3d at 1332, 1334 (awarding sanctions under Rule 11's improper purpose and concluding that "courts are not intended for performative litigation" as this "is harmful to the rule of law, portrays judges as partisans, and diverts resources that should be directed to real harms and legitimate legal claims."). In fashioning an appropriate sanction, the Court is guided by Rule 11's deterrent purpose. *See Baker*, 158 F.3d at 528 (explaining that "deterrence remains the touchstone of the Rule 11 inquiry."). The Court therefore imposes non-monetary sanctions under Rule 11 as follows:

1. Plaintiffs' Attorney Alejandro Brito is **REFERRED** to The Florida Bar for its consideration, review, and determination as to whether any disciplinary action is appropriate in light of the findings and rulings made in this Order. The Clerk of Court is **DIRECTED** to mail a copy of this

Order to The Florida Bar, of which Attorney Alejandro Brito is a member (No. 98442).

2. All future applications by Daniel Z. Epstein for admission *pro hac vice* in the Southern District of Florida will be **DENIED** for one year or until further order of this Court.

3. The Parties are prohibited from referring to the purported "settlement agreement," or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a "settlement" reached in this matter, Case No. 26-cv-20609-KMW (S.D. Fla. 2026).[63] "Plaintiffs" means the named Plaintiffs in this lawsuit: President Donald J. Trump, Donald J. Trump, Jr., Eric Trump, the Trump Organization, LLC and includes any of their agents, representatives, officers, directors, employees, partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with the party or under the party's control, whether directly or indirectly. "Defendants" means the Internal Revenue Service and the United States Department of the Treasury.

**C. *Inherent Authority***

Having concluded that sanctions are warranted under Rule 11, the Court will now address whether sanctions are likewise appropriate under the Court's inherent authority.

---

[63] Again, as noted by Plaintiffs in their brief, whether a private agreement between the Parties—as if "there is no judge"—is valid and enforceable or is a depredation of the Judgment Fund and an illegal conferral of immunity is not before this Court. (DE 89 at 15) ("Regardless of whether Plaintiffs had ever filed this action, the Government and the Plaintiff still had the power to resolve all disputes between the parties.").

Although Rule 11 limits imposing monetary sanctions following a voluntary dismissal, the Court's inherent authority remains available to address conduct that abuses the judicial process. *Trump v. Clinton*, 161 F.4th 671, 688 (11th Cir. 2025) ("Federal courts have the inherent authority to fashion an appropriate sanction for conduct which abuses the judicial process."); *Peer*, 571 F. App'x at 844 ("And the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct . . . for these rules are not substitutes for the inherent power.") (citations and quotation marks omitted).

Independent of Rule 11, federal courts possess inherent authority to protect the integrity of judicial proceedings. *See Kleiner v. First Nat'l Bank of Atl.*, 751 F.2d 1193, 1209 (11th Cir. 1985) ("Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal.") (citing *Roadway Ex., Inc. v. Piper*, 447 U.S. 752, 764–65 (1980)). "The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Id.* (citations omitted). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (citations and quotation marks omitted). "A court's inherent power is both broader and narrower than other means of imposing sanctions . . . . [w]hereas each of the other mechanisms reach only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices." *JTR Enter., LLC v. An Unknown Entity*, 93 F. Supp. 3d 1331, 1367 (S.D. Fla. 2015); *see also Peer*, 571 F. App'x at 844 ("Whereas rule-based sanctions can reach only 'certain individuals or conduct, the

inherent power extends to a full range of litigation abuses' and serves to fill [in] the gaps left by rule-based sanctions.") (quoting *Chambers*, 501 U.S. at 46).

As the Supreme Court discussed in *Chambers*, "[N]othing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct." 501 U.S. at 50. Furthermore, "[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Id.* Thus, while "the court ordinarily should rely on the Rules rather than the inherent power . . . if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* The Court does so here. *See* FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("Rule 11 is not the exclusive source for control of improper presentations of claims . . . [and therefore] does not inhibit the court . . . in exercising its inherent powers[.]").

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) (citations omitted). This is a subjective standard. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017) ("As a starting point, the inherent-powers standard is a subjective bad-faith standard."). "Once unlocked, the power carries with it the authority to assess attorney's fees as a sanction for bad faith conduct." *Sciarretta v. Lincoln Nat'l. Life Ins. Co.*, 778 F.3d 1205, 1212 (11th Cir. 2015) (citing *Chambers*, 501 U.S. at 45–46). Bad faith is present if a court determines "that fraud has been practiced upon it, or that the very temple of justice has been defiled," or where a party is responsible for "delaying or disrupting the

litigation[.]" *Chambers*, 501 U.S. at 46 (citations and quotation marks omitted); *Barash v. Kates*, 585 F. Supp. 2d 1347, 1362 (S.D. Fla. 2006). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. (citations omitted).

"When the court uses its inherent powers to punish a party with attorneys' fees, there must be a direct causal link between the condemned conduct and the resulting costs." *ByoPlanet Int'l, LLC v. Johansson*, 792 F. Supp. 3d 1341, 1352 (S.D. Fla. 2025) (citing *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017)). "Sanctions under the Court's inherent powers are compensatory, not punitive." *Id.*

The conduct of the Parties triggers the Court's inherent authority. As to Plaintiffs, they filed a multibillion-dollar lawsuit asserting claims that they knew, or should have known, were time-barred and for an amount of damages unsupported by facts or law.[64] Plaintiffs could make no connection between the billions of dollars they sought, and the recovery authorized under the governing statute. *See* 26 U.S.C. § 7431(c)(1) (providing for damages in the amount of "$1,000 for each act of unauthorized inspection or disclosure."). Generally, the "central purpose" of a lawsuit must be to "vindicate rights through the judicial process." *In re Kunstler*, 914 F.2d 505, 520 (4th Cir. 1990). This lawsuit was not brought to vindicate rights; it was brought to manipulate the judicial process to pursue benefits unavailable in litigation because the Parties were not adverse.

Defendants' conduct is equally untenable. It is telling that the DOJ, which is tasked with enforcement of United States law, has remained conspicuously absent and silent

---

[64] Even the Fund amount—$1.776 billion—speaks of a "branding" effort rather than a deliberate and thoughtful calculation of damages.

when serious questions about this matter have been raised. *See generally Ponzi v. Fessenden*, 258 U.S. 254, 262 (1922) (explaining that the Attorney General is the head of the DOJ and that he, acting through United States Attorneys, "is the hand of the President in taking care that the laws of the United States in protection of the interests of the United States in legal proceedings . . . be faithfully executed.") (citations omitted). And when representatives did choose to expound on the Department's conduct, they offered misleading explanations of the facts and the law.[65] In abdicating its responsibility to zealously defend the interests of the United States, the Government entered into a "settlement" that deviated from its litigation posture in similar actions, disregarded DOJ policies, and accomplished objectives beyond those authorized, as well as those specifically prohibited, by law. Under these circumstances, the Court may reasonably infer that the Government failed to defend this lawsuit or to respond to the Court's jurisdictional inquiry because its position would not withstand judicial scrutiny and because resolution of the threshold issues identified by the Court would not have favored its preferred outcome to this case.[66]

---

[65] *See supra* pp 7–8.

[66] *See generally Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) ("The adverse inference rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him.") (citations and quotation marks omitted); *In re Bailey*, 451 B.R. 640, 645 (Bankr. N.D. Ga. 2011) ("This Court draws an adverse inference from [d]efendants' concealment and assumes that truthful answers to those questions and production of documents would have been unfavorable to [d]efendants" and ultimately concluding that "the concealment of that information was intentional . . . and possibly motivated by a desire to perpetrate fraud on the [c]ourt."); *see also In re Mart*, 75 B.R. 808, 810 (Bankr. S.D. Fla. 1987) ("Furthermore, the failure of a party to provide evidence peculiarly available to that party supports the inference that the truth revealed by that evidence would be damaging to the party.") (citations omitted).

The Parties used the existence of federal litigation as a means of conferring legitimacy upon a course of action that they were unwilling to subject to judicial review. The context of the "settlement," the relationships of the people involved in negotiating and approving it, the ethical implications of their conduct, and the Parties' swift efforts to dismiss this case after the Court raised fundamental jurisdictional questions all support this conclusion. Accordingly, the Court expressly finds that Plaintiffs acted in bad faith. *See Sofaly v. Portfolio Recovery Assocs., LLC*, 155 F.4th 289, 295 (3d Cir. 2025) (monetary sanctions were proper under the court's inherent power where the lawyers acted in bad faith and committed fraud on the court by using "their clients to bring contrived lawsuits"). That finding is enough to invoke the Court's inherent authority. *See JTR Enter., LLC v. Columbian Emeralds*, 697 F. App'x 976, 986 (11th Cir. 2017) ("The key to invoking a court's inherent power to sanction is a finding of bad faith.") (citation omitted).

The Court finds monetary sanctions appropriate under its inherent authority and prerogative to police the matters and litigants who avail themselves of its jurisdiction. *See Purchasing Power, LLC*, 851 F.3d at 1223 ("Courts have the inherent power to police those appearing before them.") (citing *Chambers*, 501 U.S. at 46).[67] These monetary sanctions would include the attorneys' fees incurred by Court-appointed *amici*[68] in

[67] Although the Court's inherent authority extends to sanctioning all parties and counsel who engaged in bad-faith conduct, *see Spolter*, 403. F. App'x at 390 (noting that district "courts have the inherent power to impose sanctions on parties and lawyers"), the Court assesses monetary sanctions only against Plaintiffs and Plaintiffs' counsel.

[68] Court-appointed *amici* include John Gleeson and David A. O'Neil of Debevoise & Plimpton LLP; Donald B. Verrilli, Jr. of Munger Tolles & Olson LLP; and Faith E. Gay, Philippe Z. Selendy, and Corey Stoughton of Selendy Gay PLLC, who were all appointed by the Court on April 29, 2026. (DE 43).

appearing before the Court and briefing the jurisdictional questions identified by the Court. *See Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998) ("Where, as here, the district court fashions a sanction which is a direct response to the harm that the bad faith conduct of the attorney causes, it is clearly acting within its discretion.").

As one leading treatise has explained:

> Ordinarily, an amicus curiae who participates in a proceeding by leave of court or by court appointment is not entitled to compensation when he or she serves the interests of litigants, witnesses or any other private party . . . However, **where the court appoints an amicus curiae who renders services which prove beneficial to a resolution of the questions presented, the court may properly award compensation and direct it to be paid by the party responsible for the situation which prompted the court to make the appointment**.

4 Am. Jur. 2d Amicus Curiae § 12 (emphasis added); *see also Morales v. Turman*, 820 F.2d 728, 731 (5th Cir. 1987) (attorneys' fees may be awarded to appointed amici if the amici's services were highly beneficial and defendants were properly considered the parties who made the services necessary). Nonetheless, the Court-appointed *amici* have declined any reimbursement for their important service to the Court. [69]

There remain the initial *amici*—whose appearance was not contested by any Party—and the thirty-five former Federal Judges, whose briefing precipitated this Order. Accordingly, these *amici*, if they wish, may file, within fourteen (14) days of this Order, a memorandum regarding any appropriate reimbursement. Plaintiffs may file any response seven (7) days thereafter. Finally, the Clerk of Court is **DIRECTED** to mail a copy of this

---

[69] The Court acknowledges and thanks Court-appointed *amici* and their firms for their willingness to review the unprecedented jurisdictional questions presented by this case. Their thorough and well-reasoned scholarship, and uncompromising commitment to the rule of law—along with those of the organizations and lawyers referenced *supra*—are hallmarks of a vigorous, independent legal profession critical to sustaining a vigorous, independent judiciary.

Order to the State Bar of New York, of which Acting Attorney General Blanche is a member (No. 4192456), **AND** to the District of Columbia Bar, of which Associate Attorney General Woodward is a member (No. 997320), where disciplinary proceedings are currently ongoing.[70]

## III. CONCLUSION

John Adams warned, "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence." Thus, whatever may be the Parties' wishes, inclinations, or the dictates of their passion, they cannot alter the state of the facts or evade the rule of law. Contrary to Plaintiffs' concern, the Court did not have to "sally forth" to look for a wrong to right. *See* DE 89 at 17 (citing *Margolin v. Nat'l Ass'n of Immig. Judges*, 608 U.S. __ (2026)). The Court need only look to the uncontroverted facts here:

1. Donald Trump is President.
2. President Trump controls the actions of the Secretary of the Treasury Department Scott Bessent, IRS CEO Frank Bisignano, and all Executive Branch actors.

[70] Ethics complaints have been filed in New York and the District of Colombia against Acting Attorney General Blanche and Associate Attorney General Woodward. *See* Letter to Attorney Grievance Committee Re: Ethics Complaint Against Todd Blanche, https://dea5edf3-e27d-4adc-a42a-b9c082bc3167.usrfiles.com/ugd/dea5ed_b024aad49d1049c1ab03f01e8f1aa7fc.pdf; *see also* Request for Investigation of Stanley E. Woodward, Jr. D.C. Bar No. 997320, https://www.documentcloud.org/documents/28264896-cfa-dc-bar-complaint-stanley-woodward/.

3. President Trump, through Executive Order § 7, also controls the litigation strategy and interpretation of the laws guiding the Department of Justice. *See supra* note 28.
4. For the 109 days that this case was pending, no attorney representing the United States filed a notice of appearance or any document indicating the government's position, interest, or awareness of this matter.
5. Defendants' actions are consonant with the dictates of Executive Order § 7.

These facts lead to the inexorable conclusion that the "settlement" terms, the individuals who signed the "settlement" as well as the putative beneficiaries of the "settlement," demonstrate a shared, unitary interest. And the unilateral revision and renunciation of the "Fund" component of the "settlement" demonstrate the fact that all Parties were aligned, and ultimately, undifferentiated. This action was never about a party seeking judicial resolution of a legal issue or a factual dispute. The nature of the suit itself and the conduct of the Parties and counsel from its filing make plain that this was an attempt to use the Court to provide some legitimacy to an agreement to confer immunity to people and entities affiliated with the President and to earmark billions of dollars from American taxpayers to redress grievances not defined in the law. The President may be the functional "dominus litus" of the Executive Branch, but as a party to a civil suit, he, as well as all the parties and lawyers before a court, are bound by the rules. Ensuring that our courts are used only for the express purpose created by the Constitution is the obligation of every judge and an obligation that this Court must discharge in light of the matter before it.

In sum, the facts before this Court demonstrate there was never adverseness between the Parties; there was never a case or controversy; and there was never a question as to who would prevail.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 13th day of July, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 113

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP JR., ERIC TRUMP, AND THE TRUMP ORGANIZATION, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>INTERNAL REVENUE SERVICE AND U.S. DEPARTMENT OF THE TREASURY,<br><br>*Defendants*. | No. 1:26-cv-20609-KMW |

**JOINT NOTICE OF APPEAL**

Pursuant to Fed. R. App. P. 4(a), Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC (collectively, "Plaintiffs") and Plaintiffs' Attorneys Alejandro Brito and Daniel Epstein, by and through their undersigned counsel, hereby file this Joint Notice of Appeal to the United States Court of Appeals for the Eleventh Circuit from the Court's July 13, 2026 Order on Plaintiffs' response to the Court's May 29, 2026, Order on the non-party movants' Motion for Relief from Judgment or Order, or, in the Alternative, for Leave to Appear as *Amici Curiae* (D.E. 106), and all prior adverse orders merged therein.

Dated: July 31, 2026

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN 0122080)
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Telephone: (305) 423-8522
Facsimile: (305) 437-8131
chris.oprison@dlapiper.com

*Counsel for Plaintiffs President Donald J. Trump, Donald J. Trump Jr., Eric Trump, The Trump Organization, LLC, Alejandro Brito, and Daniel Epstein*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 31, 2026, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF. I further certify that the foregoing document is being served on Defendants by U.S. Mail at the following addresses:

U.S. Department of the Treasury
Attention: Secretary of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220

U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

U.S. Attorney's Office Southern District of Florida
99 N.E. 4th Street
Miami, FL 33132

Internal Revenue Service
Attention: Commissioner of Internal Revenue
1111 Constitution Avenue, NW
Washington, D.C. 20224

*/s/ Christopher G. Oprison*
Christopher G. Oprison

# TAB 120

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
______________________________________/

**ORDER**

**THIS MATTER** is before the Court on the Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114) ("***Motion***"). Upon review of the Motion, the record, and applicable law, the Court finds that Plaintiffs have not shown good cause for an expedited ruling under Southern District of Florida Local Rule 7.1. *See* S.D. Fla. L.R. 7.1(d)(2) (requiring an expedited motion to "set forth in detail" . . . "the reason the ruling is needed by the stated date"); *see also Levine v. Bradshaw*, No. 22-cv-80321, 2022 WL 22859168, at *3 (S.D. Fla. April 1, 2022) (declining a plaintiff's expedited request where the court found "no basis to justify [p]laintiff's request"). Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' request for an expedited ruling is **DENIED.**

2. Court-appointed *amici* shall file a response to the Motion (DE 114) on or before **August 14, 2026**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 5th day of August, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 123

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
______________________________________/

## ORDER

**THIS MATTER** is before the Court on the Motion of Court-Appointed *Amici Curiae* for Leave to File Response in Excess of Page Limit (DE 122) ("***Motion***"). Through their Motion, court-appointed *amici curiae* request leave to file a response in excess of forty (40) pages to Plaintiffs' and Their Attorneys' Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114) ("***Motion to Stay***"). Upon review of the Motion and the record, it is **ORDERED AND ADJUDGED** that the Motion is **GRANTED**. Court-appointed *amici curiae*'s response to the Motion to Stay shall not exceed forty (40) pages in length.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 13th day of August, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# TAB 130

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 26-20609-CV-WILLIAMS**

PRESIDENT DONALD J. TRUMP, *et al.*,

Plaintiffs,

v.

INTERNAL REVENUE SERVICE, *et al.*,

Defendants.
_____________________________________/

**ORDER**

**THIS MATTER** is before the Court on Plaintiffs' and their Attorneys' Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114) ("***Motion to Stay***"). For the reasons set forth below, the Motion to Stay (DE 114) is **DENIED**.

## I. BACKGROUND[1]

On January 29, 2026, Plaintiffs President Trump ("***Lead Plaintiff***"), Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC (collectively, "***Plaintiffs***") filed their complaint against the IRS and the Treasury Department (collectively, "***Defendants***"). On April 17, 2026, three days before Defendants' time to respond to the Complaint lapsed, Plaintiffs filed a consent motion seeking to extend Defendants' response time by 90 days, which the Court granted. (DE 40; DE 41). Shortly thereafter, the Court *sua sponte* inquired into the Court's subject matter jurisdiction, requiring the Parties to file memoranda detailing whether a case or controversy existed between the parties. (DE 41). The Court

[1] The terms defined in the Court's Order (DE 106) are adopted herein. The term "Parties" refers to Plaintiffs and Defendants.

also appointed *amici curiae* "to assist the Court in identifying the applicable law governing an analysis" of its jurisdiction.[2] (DE 43). *Amici* filed their memorandum of law on May 14, 2026. (DE 45). Notably, the Parties did not file any memoranda to address the Court's concern regarding subject matter jurisdiction, nor did counsel for Defendants ever file an appearance.

Instead, on May 18, 2026, Plaintiffs filed a Notice of Voluntary Dismissal with Prejudice (DE 52). On that same day, the Department of Justice issued a press release, noting that a "settlement" had been reached in this matter.[3] The DOJ also published a purported "settlement agreement"[4] ("***settlement agreement***") where the Parties agreed to certain terms, including the creation of a $1.776 billion-dollar Anti-Weaponization Fund to redress the claims of individuals who "suffered weaponization and lawfare."[5] A day later, in a standalone memorandum signed only by Defendants' counsel, then-Acting Attorney General Todd Blanche ("***then-AAG Blanche***")[6] granted Plaintiffs and various affiliates blanket immunity from various matters including those that were currently

---

[2] The Court again acknowledges and thanks Court-appointed *amici* for their continued willingness to review the unique issues presented by this case. The comprehensive memorandum (DE 127) submitted to the Court is a testament to their unwavering dedication to the rule of law.

[3] *Press Release*, *Justice Department Announces Anti-Weaponization Fund* (May 18, 2026), https://www.justice.gov/opa/pr/justice-department-announces-anti-weaponization-fund.

[4] *Settlement Agreement, Trump v. Internal Revenue Serv.*, U.S. DEP'T OF JUSTICE (May 18, 2026), https://www.justice.gov/opa/media/1441201/dl?inline.

[5] *See supra* n.4.

[6] Todd Blanche was sworn in as the 88th Attorney General of the United States on August 10, 2026. *See* Staff Profile, *Attorney General Todd Blanche*, U.S. DEP'T OF JUSTICE (Aug. 14, 2026), https://www.justice.gov/ag/staff-profile/meet-attorney-general.

pending or could be pending before Defendants or other agencies and departments of the federal government.

In light of the serious irregularities presented by this matter, on May 27, 2026, thirty-five non-party movants ("***Thirty-Five Former Federal Judges***") filed an amicus brief urging the Court to reopen this case pursuant to Federal Rule of Civil Procedure 60 and investigate whether there was a genuine underlying case or controversy. (DE 63). On May 29, 2026, rather than reopen the case pursuant to Rule 60, the Court ordered, pursuant to its authority under Federal Rule of Civil Procedure 11, that Plaintiffs detail their position on "(1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the victim of a fraud." (DE 65 at 3).[7] Plaintiffs responded on June 12, 2026. (DE 89). On July 13, 2026, the Court issued its Order setting forth its findings and imposing sanctions for Plaintiffs' bad faith conduct and misuse of the judicial system. (DE 106) ("***Sanctions Order***").[8] Thereafter, Plaintiff and their attorneys—Alejandro Brito and Daniel Epstein (together with Plaintiffs, the "***Movants***")—filed the instant Motion to Stay.

## II. LEGAL STANDARD

"A stay [pending appeal] is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (internal quotation marks

[7] The Court uses the CM/ECF pagination, which appears in the headers of all filings.

[8] The Movants primarily challenge the Court's imposition of three sanctions: (1) Attorney Brito's referral to the Florida Bar; (2) Attorney Epstein's ability to seek *pro hac vice* admission; and (3) the restriction limiting reference to the "settlement agreement" as evidence of a "settlement" reached in this matter. (DE 114 at 7–20).

omitted). Instead, it is "an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Id.* (internal quotation marks omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433–34 (internal quotation marks omitted). The factors a court must weigh when analyzing a request for a stay pending appeal include: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434. "The first two factors of the traditional standard are the most critical." *Id.* (citations and internal quotation marks omitted).

## III. DISCUSSION

The Court disagrees with the Movants' assertion that a stay pending appeal of the Sanctions Order is warranted. The Motion to Stay does not demonstrate the requisite likelihood of success or irreparable harm to grant such extraordinary relief. Nor does the Motion to Stay undermine the Court's conclusion and detailed findings set forth in the Sanctions Order as to the Parties' lack of adverseness and their bad faith. As discussed below, the Court considers the factors relevant to its determination.

### *A. The Movants have not demonstrated the likelihood of success on the merits.*

First, the Motion to Stay and the Movants' Reply do not demonstrate that the Sanctions Order is immediately appealable. Second, "[i]t is not enough that the chance of success on the merits be better than negligible." *Nken*, 556 U.S. at 434 (internal quotation marks omitted). The Movants advance three main arguments to demonstrate a likelihood of success on the merits: (i) the Sanctions Order is substantively flawed in its conclusion

regarding lack of adverseness; (ii) the Sanctions Order is procedurally defective; and (iii) the Sanctions Order imposes an overbroad speech injunction. (DE 114 at 7–17). The Court finds each argument unpersuasive. Accordingly, for the reasons set forth below, the Court finds that the Movants have not demonstrated a likelihood of success in their appeal.

**1. The Movants have not satisfactorily demonstrated that the Sanctions Order is Immediately Appealable.**

To establish a likelihood of success on the merits of their appeal, the Movants must first show that the Sanctions Order is immediately appealable. *See Ross v. Chisolm*, 2006 WL 8432325, at *5 (S.D. Fla. Mar. 23, 2006) ("Whether Defendants are likely to prevail on the merits in their appeal turns on whether the Eleventh Circuit Court of Appeals has jurisdiction over the appeal."). To be appealable, an order must be a final decision. 28 U.S.C. § 1291. The party seeking to appeal has the burden of establishing finality and appellate jurisdiction. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1423 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) (dismissing the plaintiffs appeal for "having shown no applicable exception to the final judgment rule . . . ."). The Movants have not made a satisfactory showing that the Sanctions Order is immediately appealable.

To start, the Movants assert that the "Sanctions Order contains an operative injunction," making it immediately appealable under 28 U.S.C. § 1292(a)(1). (DE 128 at 3). The Court disagrees. The sanction limiting reference to the "settlement agreement" does not qualify as an "injunction-related order" because it does not impose "serious, perhaps irreparable consequence[s]." *S.E.C. v. Complete Business Sol. Group, Inc.*, No. 24-12350, 2024 WL 4785772 at *1 (11th Cir. 2024) (citing *Positano Place at Naples I*

*Condo. Ass'n v. Empire Indemnity Ins. Co.*, 84 F.4th 1241, 1249 (11th Cir. 2023)). As noted below, *see infra* sections A(4) and B(3), the sanction is narrowly tailored to only affect *how* the Parties refer to the "settlement agreement" purportedly arising from this docket. It is not a categorical restriction prohibiting any reference to any agreement of the Parties. Accordingly, because the Sanctions Order imposes minimal harm, if any, the Movants have not demonstrated immediate appealability to confer appellate jurisdiction.

Additionally, the Sanctions Order is non-final as it contemplates further fee proceedings. *See Hibiscus Assoc. Ltd. v. Bd. of Trustees of Policeman and Fireman Ret. Sys. of City of Detroit*, 50 F.3d 908, 921–22 (11th Cir. 1995) ("The amount of the fee award has not been determined and, therefore, the award is not final."). The Sanctions Order did not determine the fee award and instead invited *amici*[9] to brief whether they were entitled to an award.[10] (DE 106 at 53). *Amici* filed motions for attorneys' fees outlining the basis for their request and the resources they had expended (DE 111; DE 112), and the Movants filed an Opposition (DE 116). The Court has not made a final determination regarding the amount of fees, if any, to be awarded. Thus, the Movants

---

[9] Several groups of *amici curiae* have sought leave to address the unique issues presented by this case. The initial group of *amici curiae* moved for leave to file a brief on February 5, 2026. (DE 7). On February 27, 2026, the Court granted their motion, noting that it was uncontested. (DE 28). On April 29, 2026, the Court also appointed its own *amici curiae*. (DE 43). Then, on July 27, 2026, initial *amici* and the Thirty-Five Former Federal Judges filed their briefs seeking attorneys' fees. (DE 111; DE 112). Court-appointed *amici* did not seek fees.

[10] Indeed, a court deciding whether to award "reasonable compensation" to *amicus curiae* may consider whether the *amicus* is "vitally interested in the issues which were before the Court" and whether "[i]ts counsel" contributed to the resolution. *See Russell v. Bd. of Plumbing Examiners of Cty. of Westchester*, 74 F. Supp. 2d 349, 351 (S.D.N.Y 1999). "Participation as *amicus curiae* . . . is appropriate when the party cares only about the legal principles of the case, and has no personal, legally protectable interest in the outcome of the litigation." *Id.* (citing Moore's Federal Practice Digest 3d § 24.23 [2]).

have only challenged entitlement to fees and not the as of yet undetermined amount, or even eligibility.[11]

### 2. The Parties lacked the requisite adverseness to satisfy Article III.

As detailed in the Sanctions Order, the Parties were not sufficiently adverse to satisfy Article III's case or controversy requirement. (DE 106 at 17–38). The Movants assert that adverseness exists because Lead Plaintiff "sued in his personal capacity to vindicate a personal statutory right, while the IRS and Treasury represented the sovereign's distinct interests." (DE 114 at 9). In doing so, the Movants mischaracterize the Sanctions Order as establishing a brightline rule "that a President who sues the Executive agency is necessarily suing himself." (*Id.*) This is incorrect; the Sanctions Order established no such categorical rule. On the contrary, the Sanctions Order acknowledged that Lead Plaintiff did have a right to sue and could have done so, without issue, during the lawfully specified time and while a private citizen. (DE 106 at 37). The Order limited its analysis to the specific individuals named in this matter; their current occupations; and their novel relationships.[12] (DE 106 at 13 n.21). The Sanctions Order detailed the

---

[11] Although the Movants oppose the fees requested by the Thirty-Five Former Federal Judges because "they are not parties," *see* (DE 116), the Movants seem to acknowledge the significance of *amici's* contribution by filing an appeal which names the Thirty-Five Former Federal Judges as "Interested Parties - Appellees." *See President Donald J. Trump, et al. v. Thirty-Five Former Federal Judges, et al.*, No. 26-12692 (11th Cir. docketed Aug. 3, 2026). The Court notes that the case style reflected on the Eleventh Circuit docket names the Thirty-Five Former Federal Judges instead of Defendants; this appears to be a clerical error arising from Plaintiff's initial mischaracterization of the docket.

[12] The Sanctions Order also cited the unique familial and corporate control Lead Plaintiff has over all the other plaintiffs. As observed in the Order, the additional plaintiffs do not have a divergent interest from Lead Plaintiff and do not present separate claims necessitating independent treatment. (DE 106 at 22 n. 29).

unprecedented control that Lead Plaintiff currently has over Defendants not only under longstanding Constitutional principles, but through newly issued mandates—namely, Executive Order 14215 and the recent decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026)—both of which significantly expand Presidential oversight of the Executive branch. (DE 106 at 18–19, 21–24). In addition, the Sanctions Order discussed the President's relationship to three key individuals who oversee Defendants—Treasury Department Secretary Scott Bessent, IRS CEO Frank Bisignano, and then-AAG Blanche—and the dooming effect that his control of these individuals had on adverseness. (*Id*. at 19–21).

The Court's conclusion was underscored by the litigation strategy, or lack thereof, martialed by Defendants in this case. The Sanctions Order identifies the various ways that this lawsuit was handled in stark juxtaposition to cases involving the same defendants, the same defense counsel, and for the most part, the same issues. (*Id*. at 22–26) (discussing *Griffin v. Internal Revenue Serv.*, No. 22-cv-24023 (S.D. Fla. filed Dec. 13, 2022) and *Safe Harbor Int'l, LLC v. Booz Allen Hamilton, Inc.*, No. 25-cv-00139, (D. Md. filed Jan. 14, 2025)). Such conduct, taken together with Lead Plaintiff's uncircumscribed control over Secretary Bessent, IRS CEO Bisignano, and the DOJ, and the subsequent actions of then-AAG Blanche, regarding the creation and recission of the Anti-Weaponization Fund, demonstrate that the Parties lacked adverseness from the inception of this case.

As recognized in the Sanctions Order, the Court has an affirmative duty to evaluate its subject matter jurisdiction at every stage of litigation. *See Ebrahimi v. City of Huntsville Bd. of Educ.*, 114 F.3d 162, 165 (11th Cir. 1997) (noting that courts have "an independent obligation to police the constitutional and statutory limits on [its] jurisdiction"). Based on

the record before the Court, the Parties were not sufficiently adverse to maintain this suit. Accordingly, the Motion to Stay does not successfully show the Movants' likelihood of success on this issue.

**3. The Sanctions Order is not procedurally defective.**

The Movants complain that the Court improperly imposed sanctions without the requisite notice and individualized findings. (DE 114 at 13–15). The Movants also take issue with the materials the Court judicially noticed. (*Id.*) The Court finds these arguments unpersuasive. As noted in the Sanctions Order, "this case presents unusual circumstances that distinguish it from the ordinary Rule 11 dispute." (DE 106 at 45). The Sanctions Order also states:

> In assessing the adequacy of a show cause order under Rule 11, the Eleventh Circuit applies a "flexible standard." *DaimlerChrysler, A.G.*, 331 F.3d at 1257. Therefore, "in many cases substantial compliance may suffice." *Id.* Here, Plaintiffs received notice of the conduct at issue and a full opportunity to respond. *See Johnson*, 9 F.4th at 1311 ("Due process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why.") (quoting *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)).

(*Id*. at n. 62).

The Movants were on notice that sanctions were being contemplated when the Court explicitly stated that Rule 11 empowered the Court to determine "whether **an attorney** has abused the judicial process." (DE 65 at 1) (emphasis added) (citing *Didie v. Howes*, 988 F.2d 1097, 1103 (11th Cir. 1993)). Indeed, the Movants' own response to the Court's inquiry as to the issues raised by the Thirty-Five Former Federal Judges—all of which inform the basis of the Court's sanctions—invoked a Rule 11 discussion. (DE 89 at 6, 13–15).

Likewise, the Court is unconvinced that the Movants' appeal will be successful

because the Court took "judicial notice of articles reporting on relevant events attendant to this case, dockets of other cases, and statements the Parties made."[13] (DE 106 at 3 n.3). The Court did not rely on news articles to arrive at its conclusion. As recited in the Sanctions Order, the Court relied upon the uncontroverted facts.[14] However, the Court did appropriately refer to the docket of other cases, as well as social media statements and news accounts, to provide the architecture of this matter to give context to what transpired. *See* (DE 106 at 3 n.3). Indeed, the Parties had eschewed the opportunity to create their own record and respond to the Court's jurisdictional inquiry by dismissing this case three days before their response was due. The Movants cannot now protest citation of sources properly noticed by the Court and argue that they were not afforded due process on the very issue that compels sanctions.

The Movants also do not acknowledge that the Court's findings were made after consideration of various statements and other evidence that are unquestionably admissible. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 264–67 (1954),

---

[13] It is unclear whether the Federal Rules of Evidence apply to sanctions proceedings. *See* (DE 127 at 42). Although the Eleventh Circuit has not decided this issue, several other courts have determined that the Federal Rules of Evidence do not apply to sanctions proceedings. (*See id.*) (citing *Sentis Grp. v. Shell Oil Co.*, 559 F.3d 888, 901 (8th Cir. 2009); *Cook v. Am. S.S. Co.*, 134 F.3d 771, 774–75 (6th Cir. 1998); and *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 349 F. Supp. 3d 298, 307 (S.D.N.Y. 2018)).

[14] The uncontroverted facts include: (1) Donald Trump is President; (2) President Trump controls the actions of the Secretary of the Treasury Department Scott Bessent, IRS CEO Frank Bisignano, and all Executive Branch actors; (3) President Trump, through Executive Order § 7, also controls the litigation strategy and interpretation of the laws guiding the Department of Justice; (4) For the 109 days that this case was pending, no attorney representing the United States filed a notice of appearance or any document indicating the government's position, interest, or awareness of this matter; and (5) Defendants' actions are consonant with the dictates of Executive Order § 7. *See* (DE 106 at 54–55).

*superseded by statute on other grounds as recognized in Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020) (acknowledging the impact of public statements on pending litigation where "the Attorney General announced at a press conference that he planned to deport certain 'unsavory characters,'" and determining that the "public announcements clearly reveal[ed] that the Attorney General did not regard the listing as a mere preliminary to investigation and deportation"). For example, the Court considered explicit party admissions from Lead Plaintiff, congressional testimony, relevant filings from other cases, and official government records (i.e., Executive Order 14215, public-facing government websites, and DOJ official communication), admissions whose accuracy has never been challenged. Additionally, the Court appropriately noticed unsworn public statements of the Parties and counsel, notice that was expressly countenanced by Defendants. *See Floyd v. Dep't of Just.*, No. 26-cv-01399, DE 62 at 4, n.1 (E.D. Va. filed June 5, 2026) ("Because the Acting Attorney General's statements were recorded, this Court can take judicial notice of them.") (citing FED. R. EVID. 201(b)(2)); *see also D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 n.12 (D.D.C. 2020) (taking judicial notice of sworn congressional testimony and "the existence of" newspaper articles).

As it relates to the Movants' assertion that the Sanctions Order required individualized findings for all sanctioned, *see* (DE 114 at 14–15), the Court is unconvinced. District courts have broad discretion to tailor appropriate and reasonable sanctions under Rule 11. *See Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1295 (11th Cir. 2002) (citing *Donaldson v. Clark*, 819 F.2d 1551, 1557 (11th Cir. 1987)). And where individuals acted in concert and did not present separate and distinct courses of action, individualized findings were not a prerequisite to imposing sanctions. *Cf. In re Kunstler*,

914 F.2d 505, 525 (4th Cir.1990) ("Issues of individual culpability do not arise where each sanctioned party has committed the same Rule 11 violations"). Under Rule 11, "each attorney has a duty to ensure that the pleading he signed comports with Rule 11." *Id*. Notably, the Movants do not attempt to distinguish their action (or *inaction*) from one another.[15]

**4. The Sanctions Order does not impose an overbroad speech injunction.**

The Sanctions Order restricts the Parties from "referring to the purported 'settlement agreement,' or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding **as evidence of a 'settlement' reached in this matter**, Case No. 26-cv-20609-KMW (S.D. Fla. 2026)." (DE 106 at 47) (emphasis added). The Movants assert that the sanction is an unconstitutional restriction on speech and litigation conduct. (DE 114 at 15–17). However, the Movants fail to recognize that individuals do not have unfettered First Amendment protections. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32–33 (1984) (acknowledging that a litigant's First Amendment rights may be limited in the litigation context). The challenged speech must be weighed against the government's significant interest. *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) ("The presence of protected activity, however, does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances.")

[15] Attorney Epstein and Attorney Brito regularly practice in concert on behalf of Lead Plaintiff. *See Trump v. British Broadcasting Corporation et al*, No. 25-cv-25894 (S.D. Fla. filed Dec. 15, 2025); *Trump v. New York Times Co., et al.*, No. 25-cv-02487 (M.D. Fla. filed Sept. 15, 2025).

As illustrated by Rule 11, speech intended to mislead the judiciary and other official tribunals is not protected by the First Amendment. *See* FED. R. CIV. P. 11(b) (circumscribing the type of representations to be presented to a court). And "[a]lthough litigants do not 'surrender their First Amendment rights at the courthouse door,' . . . those rights may be subordinated to other interests that arise in this setting." *Seattle Times Co.*, 467 U.S. at 32 n.18; *see also Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1071 (1991) ("It is unquestionable that . . . whatever right to 'free speech' an attorney has is extremely circumscribed" in a judicial setting). Here, the Parties' desire to reference the "settlement agreement" in any way they choose must be weighed against the Court's significant interest in protecting the integrity of the judicial process and the public from misleading statements by lawyers and their clients. Allowing the Parties to rely on the "settlement agreement" as *evidence of* a "settlement" in this matter would perpetuate the false narrative that the agreement resolved a controversy between adversarial litigants in this Court. Such a narrative deceives the public, impedes official proceedings, and undermines confidence in the courts. Accordingly, the Court's significant interest outweighs the Parties' desire to make inaccurate assertions under the cloak of the First Amendment. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983) ("[F]alse statements are not immunized by the First Amendment right to freedom of speech.").

Moreover, the Motion to Stay misconstrues the text of the Sanctions Order by applying an overbroad reading. Specifically, the Movants argue that the sanction prevents the Parties "from asserting legal rights in future proceedings" if they ever need to invoke the "settlement agreement" as "a release, defense, compromise, satisfaction, or other

legally operative fact."[16] (DE 114 at 16). However, as previously noted, the provision narrowly prevents the Parties from referring to the "settlement agreement" **as evidence of** a "settlement" reached **in the matter brought before this Court**. (DE 106 at 47). In other words, the Parties are at liberty to reference a private agreement and the terms of that agreement because the limitation only governs *how* the Parties reference a "settlement agreement" purportedly arising from this docket. Additionally, the limitation only applies to official proceedings such as judicial, administrative, regulatory, or arbitration. Therefore, because the proscribed speech is limited in scope and context, the Sanctions Order is consonant with Constitutional principles that prohibit the restriction from being "broader than necessary to achieve its desired goals." *See Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994).

The Sanctions Order also satisfies Rule 11 as the speech restriction is carefully "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." FED. R. CIV. P. 11(c)(4). It identifies the sanctionable conduct—Plaintiffs' improper filing of a lawsuit to validate a collusive "settlement"—and finds that the Parties acted in bad faith by using "the existence of a federal litigation as a means of conferring legitimacy upon a course of action that they were unwilling to subject to judicial

[16] The Court does not find this argument meaningful especially where Defendants have expressly repudiated the existence of the fund. *See Attorney General Nominee Todd Blanche Testifies at Confirmation Hearing, Day 1 Part 2*, C-SPAN (July 15, 2026), https://www.c-span.org/program/senate-committee/attorney-general-nominee-todd-blanche-testifies-at-confirmation-hearing-day-1-part-2/682984; *Questions for the Record the Nomination of the Honorable Todd Blanche to be Attorney General of the United States*, U.S. Senate Committee on the Judiciary (July 17, 2026), https://www.judiciary.senate.gov/imo/media/doc/98781d53-bdcc-75d8-c507-1b1bca492142/2026-07-15_QFR-Responses_Blanche_687007f1-363d-40d9-b7da-356b52dc448d.pdf ("As I testified at my confirmation hearing, **the Fund is dead**.") (emphasis added).

review." (DE 106 at 43, 52). To that end, the sanction imposed deters repetition of such conduct by frustrating the legitimacy imputed to the document and demonstrating the consequence of similarly contemplated actions by any other litigant before any other court. Accordingly, under Rule 11, the Court was entitled to sanction improper references to the "settlement agreement." *See Riccard*, 307 F.3d at 1295 ("The selection of the type of sanction to be imposed lies with the district court's sound exercise of discretion.").

***B. The Movants have not established irreparable harm.***

To prevail, the Movants must demonstrate more than a possibility of irreparable harm. *See Nken,* 556 U.S. 434–35 ("By the same token, simply showing some 'possibility of irreparable injury,' . . . fails to satisfy the second factor.") (citation omitted). The contemplated harm must be "actual and imminent." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Here, the Motion to Stay argues that the Sanctions Order "is already inflicting immediate constitutional, professional, and reputational" harm. (DE 114 at 17). However, the Movants do not demonstrate actual or imminent harm warranting a stay.

The Motion to Stay focuses on three aspects of the Sanctions Order: (1) the Court's referral of Attorney Brito to the Florida Bar; (2) Attorney Epstein's ability to seek *pro hac vice* admission; and (3) the restriction limiting reference to the "settlement agreement" as evidence of a "settlement" reached in this matter. The Court addresses each in turn.

1. <u>Referral to the Florida Bar</u>

The Court's decision to refer Attorney Brito to the Florida Bar does not establish actual and imminent reputational harm. Indeed, it does not establish the possibility of

reputational harm because a referral "simply indicates that in its view, conduct of the attorneys merits further examination by the disciplinary committee, which may or may not result in a sanction." *Adkins v. Christie*, 227 Fed. App'x 804, 806 (11th Cir. 2007). The Movants merely posit the possibility of irreparable harm. *See* (DE 114 at 18) (noting that the "mere pendency of a bar complaint . . . **may** create malpractice insurance consequences, and **may** affect the attorney's ability to retain existing clients or attract new ones.") (emphasis added). Such speculation about the possible ramifications of an undetermined outcome does not meet the threshold of "actual and imminent" harm. *Siegel*, 234 F.3d at 1176.

2. *Pro hac vice* admission.

The one-year ban on Attorney Epstein's *pro hac vice* admission likewise does not cause irreparable harm. The Movants generally assert that the sanction "has already resulted in significant, unfounded public attacks on his reputation and professional standing" but have not provided any evidence to substantiate their assertion. The Motion to Stay does not establish actual and imminent harm to Attorney Epstein, as the Sanctions Order applies only to "future applications" and does not affect Attorney Epstein's current representation of clients. (DE 106 at 47). Furthermore, the Motion to Stay does not establish that Attorney Epstein is impacted by the Sanction Order because it does not address whether he has sought, or intends to seek, *pro hac vice* admission into the Southern District of Florida. Even so, the Sanctions Order is narrowly tailored. Attorneys not admitted into the Southern District of Florida cannot engage in "general practice," which the district presumes to be "more than three motions to appear pro hac vice within

a 365-day period." S.D. Fla. L. R. 4(b)(2).[17] Therefore, Attorney Epstein's representation would be affected by the sanction in three matters, at most, and would not result in irreparable harm. This conclusion is underscored where the Parties do not assert that Attorney Epstein plans to seek pro hac admission in any additional matters within the next year.

3. <u>Restriction relating to the "settlement agreement."</u>

The prohibition on referring to the "agreement" as evidence of a "settlement" of this matter falls short of causing irreparable harm. The Movants have not identified a concrete and ongoing harm that flows from the present restriction. And though the Movants assert that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," (DE 114 at 17) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976), as noted above, *supra* § A(4), they cannot demonstrate that such freedoms are at risk under the First Amendment where the Court has a significant interest in protecting the integrity of the judicial process. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1206 (11th Cir. 1985) ("In the realm of litigation, a fair and just result often presupposes restraints on the speech of the parties."). The Movants do not assert that they are experiencing imminent harm because there are ongoing official proceedings in which they seek to refer to the "settlement agreement" *as evidence of* a "settlement" in this matter. Without such evidence, the Movants fail to establish irreparable harm.

***C. The remaining two factors do not support imposition of a stay.***

The Court finds that the remaining factors also counsel against granting a stay

---

[17] Attorney Epstein has already appeared once in this district on behalf of Lead Plaintiff. *See Trump v. British Broadcasting Corporation et al*, No. 25-cv-25894 (S.D. Fla. filed Dec. 15, 2025). This representation remains unaffected by the Sanctions Order.

pending appeal. The Movants have the extraordinary burden of establishing whether issuance of the stay will substantially injure other parties interested in the proceeding and where the public interest lies. *Nken*, 556 U.S. at 434. Since the Movants have not satisfied the two most critical factors (success on the merits and irreparable harm), *see id.*, the Court's analysis of these factors will be brief.

First, the factor concerning injury to other parties does not support a stay. The Movants have not identified any other parties who may be impacted by the Court's decision. Nor have the Movants identified what type of harm, if any, will befall these unidentified parties were the Movants' request for a stay be denied. Second, Individuals seeking to vindicate their rights through the judicial system have a significant interest in knowing that the judiciary is fair and that the same rules apply equally to all litigants, regardless of one's title, position, economic circumstances, or political affiliation. Imposing a stay does more harm to the public than good, because a stay pending appeal undermines the legal effect of a court order and diminishes the public's confidence in the judiciary's ability to impose binding legal consequences.

## IV. CONCLUSION

For the reasons set forth above, it is **ORDERED AND ADJUDGED** that Plaintiffs' and their Attorneys' Expedited Motion to Stay the Sanctions Order and Related Proceedings Pending Appeal (DE 114) is **DENIED**.

**DONE AND ORDERED** in Chambers in Miami, Florida, on this 14th day of September, 2026.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

## **CERTIFICATE OF SERVICE**

I certify that on October 5, 2026, I caused the foregoing document to be electronically filed using the Court's CM/ECF system, which will send notification of such filing to all current counsel of record.

*/s/ Christopher G. Oprison*
Christopher G. Oprison

October 5, 2026