**No. 26-12692**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**PRESIDENT DONALD J. TRUMP, DONALD J. TRUMP, JR., ERIC TRUMP, THE TRUMP ORGANIZATION, LLC,**
**Plaintiffs-Appellants/Cross-Appellees,**

**ALEJANDRO BRITO, DANIEL EPSTEIN,**
**Interested Parties-Appellants/Cross-Appellees**

**v.**

**INTERNAL REVENUE SERVICE, U.S. DEPARTMENT OF THE TREASURY,**
**Defendants-Appellees/Cross-Appellants,**

**THIRTY-FIVE FORMER FEDERAL JUDGES,**
**Interested Parties-Appellees.**

---

**On Appeal from the United States District Court**
**for the Southern District of Florida, No. 1:26-cv-20609 (Kathleen M. Williams)**

---

# DEFENDANTS-APPELLEES/CROSS-APPELLANTS' FIRST BRIEF ON APPEAL

---

R. TRENT MCCOTTER
*Acting Deputy Attorney General*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2105*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Defendants-Appellees/Cross-Appellants certifies that the following have an interest in the outcome of this appeal:

1) Aburos, Tal – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

2) America First Legal Foundation – Amicus in the Court of Appeals

3) Biazzo, Corey J. – Pro se Amicus in the District Court

4) Bingham, Lauren C. – Counsel for Amicus in the District Court CREW

5) Bird, Brenna – Iowa Attorney General and Signatory for Amici States

6) Bissell, Retired Chief Judge John W. – Appellee and Amicus in the District Court

7) Blanche, Todd – Attorney General, U.S. Department of Justice

8) Boisture, Pooja A. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

9) Bonta, Rob – Amicus, Attorney General of California, Lead Signatory for Twenty-Three State Attorneys General Amici

10) Bradley, Conor – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

11) Bridgman, Glenn – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

12) Brito, Alejandro – Appellant and Counsel for Plaintiffs in the District Court

13) Brito, PLLC – Counsel for Plaintiffs-Appellants

14) Brook, Davida – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

15) Brown, Retired Judge Geraldine Soat – Appellee and Amicus in the District Court

16) Cai, Angela – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

17) Carullo, Nick – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

18) Castillo, Retired Chief Judge Rubén – Appellee and Amicus in the District Court

19) Citizens for Responsibility and Ethics in Washington (CREW) – Amicus in the District Court

20) Clark, Sr., Jeffrey Bossert – Counsel for Proposed Amicus The Oversight Project

21) Clemon, Retired Chief Judge U.W. – Appellee and Amicus in the District Court

22) Common Cause – Amicus in the District Court

23) Corp, Ian Michael – Counsel for Plaintiffs-Appellants

24) Cox, Retired Judge Susan E. – Appellee and Amicus in the District Court

25) Debevoise & Plimpton LLP – Counsel for Amicus in the District Court

26) Democracy Defenders Action – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

27) Democracy Forward Foundation – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

28) Denlow, Retired Judge Morton – Appellee and Amicus in the District Court

29) Dewhirst, David M.S. – Florida Solicitor General and Counsel for Amici States

30) DLA Piper LLP (US) – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

31) Dow, Randy R. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

32) Duncan, Retired Judge David K. – Appellee and Amicus in the District Court

33) Eisen, Norman L. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

34) Epstein & Co. LLC – Counsel for Plaintiffs-Appellants

35) Epstein, Daniel Z. – Appellant and Counsel for Plaintiffs in the District Court

36) Farchadi, Kayvan A. – Counsel for Amicus in the District Court CREW

37) Finnegan, Retired Chief Judge Sheila – Appellee and Amicus in the District Court

38) Fitch, Lynn – Mississippi Attorney General and Signatory for Amici States

39) Fogel, Retired Judge Jeremy – Appellee and Amicus in the District Court

40) Foley, Elizabeth Price – Counsel for Proposed Amicus The Oversight Project

41) Forys, Matthew C. – Counsel for Amicus in the Court of Appeals Landmark Legal Foundation

42) Francis IV, Retired Judge James C. – Appellee and Amicus in the District Court

43) Gay, Faith E. – Amicus in the District Court

44) Gelber Schachter & Greenberg, P.A. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

45) Gertner, Retired Judge Nancy – Appellee and Amicus in the District Court

46) Gleeson, John – Amicus in the District Court

47) Gold, Retired Judge Steven M. – Appellee and Amicus in the District Court

48) Goldgar, Retired Judge A. Benjamin – Appellee and Amicus in the District Court

49) Green, Nicholas R. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

50) Greenberg, Gerald E. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

51) Grimm, Retired Judge Paul W. – Appellee and Amicus in the District Court

52) Haier, Aaron E. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

53) Halpern, Josh – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

54) Henderson, Retired Judge Thelton – Appellee and Amicus in the District Court

55) Henry, Retired Chief Judge Robert Harlan – Appellee and Amicus in the District Court

56) Hewitt, Jillian – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

57) Hilgers, Michael T. – Nebraska Attorney General and Signatory for Amici States

58) Holtzman Vogel Baran Torchinsky & Josefiak PLLC – Counsel for Proposed Amicus The Oversight Project

59) Holwell, Retired Judge Richard J. – Appellee and Amicus in the District Court

60) Horton, Rachel A.H. – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

61) Hoshijima, Tsuki – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

62) Hutchison, Richard P. – Counsel for Amicus in the Court of Appeals Landmark Legal Foundation

63) Huvelle, Retired Judge Ellen Segal – Appellee and Amicus in the District Court

64) Internal Revenue Service – Defendant

65) Jackley, Marty – South Dakota Attorney General and Signatory for Amici States

66) Jasrasaria, Jyoti – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

67) JH Legal PLLC – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

68) Jonas, Stephen A. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

69) Jones III, Retired Judge John E. – Appellee and Amicus in the District Court

70) Joshi, Nandan – Counsel for Amicus in the District Court Public Citizen

71) Kambli, Abhishek – Counsel for Proposed Amicus The Oversight Project

72) Keneally, Kathryn – Amicus in the District Court

73) Khan, Ayesha – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

74) Kirn, Harald H. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

75) Klugh, Richard C. – Counsel for Plaintiffs-Appellants

76) Koskinen, John – Amicus in the District Court

77) Landmark Legal Foundation – Amicus in the Court of Appeals

78) Lett, Hon. Enjolique A. – U.S. Magistrate Judge

79) Liao, Cynthia – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

80) Luttig, Retired Judge Michael – Appellee and Amicus in the District Court

81) Lynn, Retired Judge Barbara M. G. – Appellee and Amicus in the District Court

82) Mann, Retired Judge Roanne L. – Appellee and Amicus in the District Court

83) Manne, Neal S. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

84) Marshall, Steve – Alabama Attorney General and Signatory for Amici States

85) Matz, Retired Judge A. Howard – Appellee and Amicus in the District Court

86) McCotter, R. Trent – Counsel for Defendants

87) Michel, Retired Chief Judge Paul – Appellee and Amicus in the District Court

88) Milelli, Rosario – Nonparty

89) Mills, Christopher – Counsel for Amicus in the Court of Appeals America First Legal Foundation

90) Muehlhoff, Jason J. – Florida Chief Deputy Solicitor General and Counsel for Amici States

91) Murrill, Liz – Louisiana Attorney General and Signatory for Amici States

92) Munger Tolles & Olson LLP – Counsel for Amicus in the District Court

93) Nelson, Justin A. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

94) Newman, Lisa – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

95) O'Malley, Retired Judge Kathleen – Appellee and Amicus in the District Court

96) O'Neil, David A. – Amicus in the District Court

97) O'Neill, Michael J. – Counsel for Amicus in the Court of Appeals Landmark Legal Foundation

98) Ogden, David W. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

99) Olson, Nina – Amicus in the District Court

100) Oprison, Christopher G. – Counsel for Plaintiffs-Appellants President Donald J. Trump, Donald J. Trump Jr., Eric Trump, and The Trump Organization, LLC, and Interested Parties-Appellants Alejandro Brito and Daniel Epstein

101) Owsley, Retired Judge Brian – Appellee and Amicus in the District Court

102) Paxton, Ken – Texas Attorney General and Signatory for Amici States

103) Perryman, Skye L. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

104) Pinkert, Mark – Counsel for Proposed Amicus The Oversight Project

105) Platkin LLP – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

106) Platkin, Matthew J. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

107) Pro, Retired Judge Philip M. – Appellee and Amicus in the District Court

108) Project On Government Oversight – Amicus in the District Court

109) Public Citizen – Amicus in the District Court

110) Ramanathan, Ravi – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner, and Amici in the District Court 93 Members of the U.S. House of Representatives

111) Rennie, Russell – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

112) Rivero Mestre LLP – Counsel for Appellees Thirty-Five Former Federal Judges, and Amici in the District Court 93 Members of the U.S. House of Representatives

113) Rivero, Andrés – Counsel for Appellees Thirty-Five Former Federal Judges, and Amici in the District Court 93 Members of the U.S. House of Representatives

114) Roberts, Retired Judge Victoria A. – Appellee and Amicus in the District Court

115) Rokita, Theodore E. – Indiana Attorney General and Signatory for Amici States

116) Rothenberg, Gilbert – Amicus in the District Court

117) Savage, Zach – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

118) Scheindlin, Retired Judge Shira A. – Appellee and Amicus in the District Court

119) Selendy Gay PLLC – Counsel for Amicus in the District Court

120) Selendy, Philippe Z. – Amicus in the District Court

121) Shackelford, Jr., Stephen – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

122) Sheehan, Daniel C. – Counsel for Amici in the District Court Twenty-Three State Attorneys General

123) Shih, Daniel J. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

124) Smith, Retired Judge Fern M. – Appellee and Amicus in the District Court

125) Stephens III, Glenn – Requested Intervenor in District Court

126) Stoughton, Corey – Amicus in the District Court

127) Sus, Nikhel S. – Counsel for Amicus in the District Court CREW

128) Susman Godfrey L.L.P. – Counsel for Appellees Retired Judges Michael Luttig and Nancy Gertner

129) Tenjido-Eljaiek, Daniela – Counsel for Appellees Thirty-Five Former Federal Judges, and Amici in the District Court 93 Members of the U.S. House of Representatives

130) The Oversight Project – Proposed Amicus

131) The Trump Organization, LLC – Plaintiff-Appellant

132) Thurston, Robin F. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

133) Tinder, Retired Judge John D. – Appellee and Amicus in the District Court

134) Trump Jr., Donald J. – Plaintiff-Appellant

135) Trump, Eric – Plaintiff-Appellant

136) Trump, President Donald J. – Plaintiff-Appellant

137) Ungaro, Retired Judge Ursula – Appellee and Amicus in the District Court

138) United States Department of the Treasury – Defendant

139) Uthmeier, James – Florida Attorney General and Counsel for Amici States

140) Verrilli, Jr., Donald B. – Amicus in the District Court

141) Walsh, Daniel R. – Counsel for Amici in the District Court Former Government Officials & Public Interest Organizations

142) Ward, Retired Judge T. John – Appellee and Amicus in the District Court

143) Williams, Hon. Kathleen M. – U.S. District Judge

144) Wilson, Alan – South Carolina Attorney General and Signatory for Amici States

145) Wolf, Retired Judge Mark L. – Appellee and Amicus in the District Court

146) Woodward, Jr., Stanley E. – Associate Attorney General, U.S. Department of Justice

147) Yeakel, Retired Judge Lee – Appellee and Amicus in the District Court

I am unaware of any publicly traded company that has an interest in the outcome of this appeal. Counsel for Appellant The Trump Organization, LLC has certified that The Trump Organization, LLC has no parent organization, and that no publicly traded company or corporation holds a 10% or more interest in The Trump Organization, LLC.

Dated: October 28, 2026

*/s/ R. Trent McCotter*
R. Trent McCotter

## STATEMENT REGARDING ORAL ARGUMENT

Defendants-Appellees/Cross-Appellants request oral argument. The District Court issued an unprecedented sanctions order based on a bevy of clear legal and factual errors.

## TABLE OF CONTENTS


Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .......... C-1

TABLE OF AUTHORITIES .......... iv

INTRODUCTION AND SUMMARY .......... 1

JURISDICTIONAL STATEMENT .......... 3

STATEMENT OF ISSUES .......... 3

STATEMENT OF CASE .......... 4

A. The Littlejohn Leak of Sensitive IRS Information. .......... 4

B. Prior Proceedings .......... 5

STANDARD OF REVIEW .......... 11

SUMMARY OF ARGUMENT .......... 12

ARGUMENT .......... 14

I. The District Court's Improper-Purpose Ruling Fails As A Matter Of Law. .......... 14

A. The Department Of Justice Routinely Settles Cases Before Litigation Commences. .......... 15

B. The District Court Could Not Have Been Misled Because The Parties Never Asked The District Court To Do Anything Regarding The Merits Or Settlement. .......... 17

C. Accepting The District Court's Offer To "Review" The Settlement Agreement Would Have Violated Article III. .......... 18

II. Supreme Court Precedent Confirms There Was An Article III Case Or Controversy. .......... 20

A. There Was Adversity Under Longstanding Supreme Court Precedent ..... 20

B. The Undisputed Facts Confirm Adversity ..... 24

C. The District Court Could Not Reject The Complaint's Allegation That President Trump Was Suing In His Personal Capacity. ..... 29

III. The Stay Panel Did Not Meaningfully Address The District Court's Flawed Reasoning. ..... 30

IV. In Any Event, Sanctions Are Unavailable. ..... 32

A. Even In The District Court's View, The Case Raised Novel Legal Questions About Article III. ..... 32

B. The IRS And Treasury Could Not Possibly Have Violated Rule 11 ..... 34

C. The District Court's Gag Order Is Unlawful. ..... 37

D. Reassignment Is Warranted. ..... 39

CONCLUSION ..... 41

CERTIFICATE OF COMPLIANCE ..... 42

CERTIFICATE OF SERVICE ..... 43

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. South Carolina State Conference of the NAACP*,
144 S. Ct. 1221 (2024) ............ 12, 24, 30

*Aloe Vera of Am., Inc. v. United States*,
699 F.3d 1153 (9th Cir. 2012) ............ 27

*Biden v. IRS*,
No. 1:23-CV-02711, ECF 39 (D.D.C. Sept. 27, 2024) ............ 28

*Bost v. Illinois State Bd. of Elections*,
607 U.S. 71 (2026) ............ 28

*Carney v. Adams*,
592 U.S. 53 (2020) ............ 19

*Clinton v. Jones*,
520 U.S. 681 (1997) ............ 29

*Davis v. Carl*,
906 F.2d 533 (11th Cir. 1990) ............ 33

*Delta Air Lines, Inc. v. August*,
450 U.S. 346 (1981) ............ 25

*Estate of W. v. Smith*,
9 F.4th 1361 (11th Cir. 2021) ............ 17

*FEC v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) ............ 20

*Griffin v. IRS*,
730 F. Supp. 3d 1312 (S.D. Fla. 2024) ............ 26

*Guerrero-Lasprilla v. Barr*,
589 U.S. 221 (2020) ............ 25

*Heckler v. Chaney*,
470 U.S. 821 (1985) ............ 35

*Hyde v. Irish*,
962 F.3d 1306 (11th Cir. 2020) ............ 32

*Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*,
141 F.3d 1434 (11th Cir. 1998) ........................................................................ 16

*INS v. Chadha*,
462 U.S. 919 (1983) .............................................................................20, 21, 33

*Jones v. Governor of Florida*,
975 F.3d 1015 (11th Cir. 2020) ........................................................................ 12

*Kaplan v. DaimlerChrysler, A.G.*,
331 F.3d 1251 (11th Cir. 2003) ........................................................................ 12

*Kem Mfg. Corp. v. Wilder*,
817 F.2d 1517 (11th Cir. 1987) .......................................................................... 7

*Kentucky v. Graham*,
473 U.S. 159 (1985) ........................................................................................ 29

*Kokkonen v. Guardian Life Ins. Co. of America*,
511 U.S. 375 (1994) ........................................................................................ 19

*Lynn's Food Stores, Inc. v. United States*,
679 F.2d 1350 (11th Cir. 1982) ........................................................................ 18

*National Park Service v. National Trust for Historic Preservation in the United States*,
609 U.S. ----, 2026 WL 2564318 (Aug. 31, 2026) .............................................. 37

*Nelson v. Montgomery Ward & Co.*,
312 U.S. 373 (1941) ........................................................................................ 25

*Northfield Ins. Co. v. North Brook Indus., Inc.*,
176 F.4th 1268 (11th Cir. 2026) ......................................................................... 3

*Patterson v. Lew*,
265 F. App'x 767 (11th Cir. 2008) .................................................................... 32

*Purchasing Power, LLC v. Bluestem Brands, Inc.*,
851 F.3d 1218 (11th Cir. 2017) ........................................................................ 32

*Safe Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*,
No. 25-CV-00139-LKG, 2026 WL 900051 (D. Md. Apr. 2, 2026) ......................... 26

*Sec'y of Agric. of U.S. v. United States*,
347 U.S. 645 (1954) ........................................................................................ 23

*Tello v. Dean Witter Reynolds, Inc.*,
410 F.3d 1275 (11th Cir. 2005) ........................................................................ 27

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) .......... 30, 35

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... 24

*U.S. ex rel. Chapman v. Fed. Power Comm'n*,
345 U.S. 153 (1953) .......... 23, 24

*United States v. Conn. Nat'l Bank*,
418 U.S. 656 (1974) .......... 23

*United States v. ICC*,
337 U.S. 426 (1949) .......... 21

*United States v. Marine Bancorp., Inc.*,
418 U.S. 602 (1974) .......... 23

*United States v. Nixon*,
418 U.S. 683 (1974) .......... 21, 22, 24, 33

*United States v. Shaygan*,
652 F.3d 1297 (11th Cir. 2011) .......... 36

*United States v. Torkington*,
874 F.2d 1441 (11th Cir. 1989) .......... 39

*United States v. Windsor*,
570 U.S. 744 (2013) .......... 21, 22, 23, 31

**Constitutional Provisions**

U.S. Const. art. II .......... 23-24

U.S. Const. art. III .......... *passim*

**Statutes**

5 U.S.C. § 552a(g)(1)(D) .......... 3

26 U.S.C. § 6103(b)(8) .......... 5

26 U.S.C. § 7122 .......... 15

26 U.S.C. § 7431(a) .......... 3

26 U.S.C. § 7431(c)(1) .......... 5

28 U.S.C. § 1291 .......... 3

28 U.S.C. § 1292(a)(1) .......... 3

28 U.S.C. § 1331 .......... 3

28 U.S.C. § 1340 .......... 3

28 U.S.C. § 1346 .......... 3

28 U.S.C. § 2414 .......... 15, 35

28 U.S.C. § 2672 .......... 15

28 U.S.C. § 2677 .......... 15

**Rules**

Fed. R. App. P. 28.1(e)(2)(B)(i) .......... 42

Fed. R. App. P. 32(a)(5)(6) .......... 42

Fed. R. App. P. 32(a)(6) .......... 42

Fed. R. Civ. P. 11 .......... 2-4, 10-11, 13, 33-35, 37-38

Fed. R. Civ. P. 23 .......... 18

Fed. R. Civ. P. 41 .......... 6, 14, 17

11th Cir. R. 26.1-1 .......... C-1

**Other Authorities**

*Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*,
23 Op. O.L.C. 126 (1999) .......... 15

Code of Conduct for United States Judges, Canon 5 .......... 40

Executive Order 14215 (Feb. 18, 2025) .......... 23

Michael A. Fragoso, *Blanche, Cornyn, and the Weaponization Fund*,
Nat'l Rev. (July 22, 2026) .......... 39

Reps. Jim Jordan & Darrell Issa,
Letter to Judge Robert Conrad, Jr. (Oct. 22, 2026) .......... 40-41

Rob Luther (@RobLutherLawyer),
X (July 23, 2026, at 4:05 PM) .......... 40

Rob Luther (@RobLutherLawyer),
X (Aug. 14, 2026, at 11:05 AM) .......... 40

Walter Dellinger, Assistant Attorney General, Office of Legal Counsel,
Memorandum for the Associate Attorney General,
*Re: Inslaw Claims and Attorney General's Settlement Authority*
(Nov. 2, 1993) ........................................................ 15

Wright & Miller, *Federal Practice and Procedure*,
§ 1337.3 ........................................................ 36

§ 3530 ........................................................ 8, 18, 23, 24

## INTRODUCTION AND SUMMARY

After concluding an arm's-length settlement in which they received no money at all, Plaintiffs voluntarily dismissed this case before Defendants—the Internal Revenue Service and the Department of the Treasury—ever appeared, filed a document, or otherwise took any action in the District Court. Yet, in an Order riddled with legal and factual errors, the District Court purported to sanction all "Parties." As a result, the IRS and Treasury are apparently "prohibited from referring to the purported 'settlement agreement'" that preceded Plaintiffs' voluntary dismissal, "or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a 'settlement' reached in this matter." That extraordinary Order cannot stand for multiple reasons.

To start, the District Court's theory—that Plaintiffs brought this litigation "to provide cover for a collusive settlement"—makes no sense. The government frequently settles claims that are never presented in court. And here, the District Court had no role to play with respect to the Parties' agreement. The Parties could not have sought to trick the court into lending credibility to that agreement; the Parties never asked the court to do *anything* regarding the substance of the case. Contradicting itself, the District Court also faulted the Parties for *not* asking the court to approve the Settlement Agreement—even though the court plainly lacked jurisdiction to do so.

Much of the District Court's Order consists of an incorrect analysis concluding that there was no Article III jurisdiction because the Parties were not sufficiently

adverse. As an initial matter, Article III does not limit the Department of Justice's ability to settle claims. Regardless, the court brushed aside the facts that President Trump had sued (among other private Parties) in his *personal* capacity (not official capacity) and that Defendants had not given Plaintiffs the relief they sought prior to the lawsuit (and did not ever agree to give Plaintiffs that relief or anything close to it).

Longstanding Supreme Court precedent—which the District Court steadfastly refused to address—confirms that is enough to make the Parties adverse under Article III, and any prudential concerns can be addressed by appointing amici. The District Court's conclusion that the President (in his official capacity) could have directed Defendants to grant his requested relief is a red herring, because it is undisputed that did not happen here. Plaintiffs sought at least $10 billion in this lawsuit but settled without receiving any money. Oddly, the District Court repeatedly characterized the Parties' agreement as awarding Plaintiffs "billions of taxpayer dollars"—even though the agreement expressly barred Plaintiffs from receiving any funds.

Even if there were anything to the District Court's collusion theory, and even if there was no Article III jurisdiction, sanctions would not have been proper. It cannot be that a complaint or settlement is sanctionable just because the plaintiffs are ultimately found to lack standing when even the sanctioning court admits the question is novel.

The District Court's legal errors are even more glaring as to the IRS and Treasury. The court purported to issue its gag order pursuant to Rule 11 of the Federal Rules of Civil Procedure. But the Rule's text extends only to representations to a court by an

attorney or unrepresented party. The IRS and Treasury never represented anything to (or otherwise took action in) the District Court. The court identified no authority to sanction them anyway—least of all in the form of a gag order—for entering a private settlement, which is a decision committed to agency discretion by law. There is none. The District Court's Order is unsupportable and must be reversed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1340, 1346, 26 U.S.C. § 7431(a), and 5 U.S.C. § 552a(g)(1)(D). As explained in part II below, the District Court also had jurisdiction under Article III.

Under 28 U.S.C. § 1291, this Court has jurisdiction to hear appeals from "final decisions" of the District Court. And under 28 U.S.C. § 1292(a)(1), this Court has jurisdiction to hear appeals from "interlocutory orders . . . granting . . . injunctions." At least to the extent it imposed a sanction on Defendants in the form of a gag order, the District Court's Order is appealable because it "has the necessary 'practical effect of granting an injunction.'" Dkt. No. 68 (quoting *Northfield Ins. Co. v. North Brook Indus., Inc.*, 176 F.4th 1268, 1272 (11th Cir. 2026)).

## STATEMENT OF ISSUES

1. Whether the District Court's theory of improper purpose, on which the sanctions were premised, fails as a matter of law.

2. Whether the District Court's conclusion that there was no Article III case or controversy, on which the sanctions were also premised, was legally erroneous.

3. Whether the District Court could impose a sweeping gag order on Defendants under Rule 11 even though Defendants never took any action in the District Court, and the District Court never provided Defendants with notice that they might be sanctioned.

## STATEMENT OF CASE

### A. The Littlejohn Leak of Sensitive IRS Information.

In 2019 and 2020, Charles Littlejohn, who Plaintiffs allege was jointly employed by the IRS and one of its contractors, illegally obtained access to and disclosed significant amounts of sensitive tax returns and return information to numerous media outlets. ECF1, ¶ 7. Littlejohn obtained his position for the express purpose of targeting President Donald J. Trump. ECF1, ¶¶ 21, 67, 72. His disclosure resulted in dozens of articles, including articles containing false claims, about President Trump's sensitive tax information. ECF1, ¶ 74.

Littlejohn was eventually identified as the leaker, and he was charged, convicted, and sentenced to the statutory maximum for unlawful disclosure of tax information. In 2024 and 2025, the IRS sent letters to President Trump, Melania Trump, Eric Trump, Donald Trump Jr., and The Trump Organization stating that "[a]n Internal Revenue Service (IRS) contractor has been charged with the unauthorized inspection or disclosure of your tax return or return information, between 2018 and 2020." ECF1, ¶¶ 76-85.

### B. Prior Proceedings

On January 29, 2026, Plaintiffs—President Trump, Donald Trump Jr., Eric Trump, and The Trump Organization—filed suit for breaches of their statutory privacy rights. ECF1. President Trump expressly sued in his private capacity. ECF1, ¶ 1. Plaintiffs filed their Complaint on the two-year anniversary of when President Trump received the above-identified notice from the IRS. ECF1, ¶ 76. Plaintiffs alleged that they previously had no reason to believe the unauthorized disclosure came from someone within the IRS, particularly given the IRS Commissioner's representation that he had investigated and found that the disclosure did not come from the IRS. ECF1, ¶ 77.

Plaintiffs collectively sought at least $10 billion in damages. ECF1 at 26. Federal law provides for damages of "$1,000 for each act of unauthorized . . . disclosure." 26 U.S.C. § 7431(c)(1). The statute defines "disclosure" broadly, to mean "the making known to any person in any manner whatever a return or return information." *Id.* § 6103(b)(8). Beyond President Trump, his sons, and The Trump Organization, Plaintiffs' claims encompassed leaks of the returns of at least 418 entities affiliated with The Trump Organization. ECF1, ¶ 84. And Plaintiffs theorized that there had been an astronomical number of "disclosures" within the meaning of the statute given the nature of Littlejohn's leak to media outlets with the purpose and expectation of further national and global dissemination of Plaintiffs' tax return information in particular. ECF 1, ¶¶ 103-04.

On April 17, 2026, Plaintiffs asked the District Court for a 90-day extension of all deadlines because the Parties were "engage[d] in discussions designed to resolve this matter and to avoid protracted litigation." ECF40 at 2.

On April 24, 2026, rather than rule on that motion, the District Court instead ordered the Parties "to address the question of the Court's subject matter jurisdiction," with briefs due by May 20, 2026. ECF41 at 1, 4. On April 29, 2026, the District Court appointed three different sets of amici to address jurisdiction. ECF43. On May 14, 2026, the amici filed their brief and contended that the Article III "adversity inquiry likely cannot be concluded at this time." ECF45 at 14.

On May 18, 2026, before any responsive filing was due, Plaintiffs filed a Rule 41(a) notice of dismissal, which automatically divested the District Court of jurisdiction. ECF52. That same morning, the Department of Justice announced that the case had been settled and made the Settlement Agreement publicly available.[1]

Plaintiffs agreed to accept no money for the dismissal of their tax claims, as well as for withdrawing two Federal Tort Claims Act claims that were pending in administrative proceedings. Rather, Plaintiffs accepted an apology from the government. The Settlement Agreement contemplated the creation of the "Anti-Weaponization Fund," mirroring President Obama-era settlement commissions that let aggrieved individuals submit claims for compensation. But Plaintiffs were "forever

---

[1] https://www.justice.gov/opa/media/1441201/dl.

barred and precluded" from seeking "any relief" related to the claims they asserted in this litigation. The Department later announced a mutual release of claims between the Parties.[2]

Because the case had settled, Defendants did not file an appearance. The same day that Plaintiffs filed their notice of dismissal, the District Court closed the case, acknowledging the court had lost jurisdiction and canceling all deadlines. ECF62. Nine days later, however, a group of retired judges with no cognizable legal interest in the matter filed a motion to reopen the case, relying in part on an improper characterization of precedent about when a non-party with no legal interest could move to reopen. ECF63 at 6; *see Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1521 (11th Cir. 1987) ("[A] nonparty only has standing to raise a challenge of fraud on the court if the nonparty's interests are directly affected by the final judgment.").

On May 29, 2026, the District Court issued an order directing only "Plaintiffs" (not Defendants, or all Parties) to address "(1) the charges of collusion and whether the Parties are truly adverse; (2) the assertion that the dismissal in this case was premised on deception by the Parties; and (3) the question of whether the case should be reopened because the Court was the 'victim of a fraud.'" ECF65 at 3. Plaintiffs filed a detailed response on June 12, 2026. ECF89.

[2] https://www.justice.gov/opa/media/1441216/dl.

On July 13, 2026, the District Court issued a 56-page Order sanctioning all Parties, including the IRS and Treasury. ECF106 at 47. In the court's view, Plaintiffs had "improperly employed this lawsuit to justify a particular award in this matter—access to taxpayer funds and exemption from audits and other investigations—which was accomplished by leveraging control over Defendants." ECF106 at 18. The court repeatedly characterized the Parties' agreement as including "an award of billions of taxpayer dollars and conferral of immunities to plaintiff [sic], his family, and affiliates." ECF106 at 24 n.31. At the same time, the court acknowledged "that President Trump had a legal right to bring a suit for the unlawful disclosure." ECF106 at 37. And the court acknowledged that the Parties could have settled the case without any complaint having been filed. ECF106 at 37. But the court stated that the Parties could not "do so by claiming to be adverse and engaging the legitimacy of a court proceeding." ECF106 at 37.

Much of the District Court's Order addresses a purported lack of Article III case or controversy. The court invoked the principle that "adjudication may be refused" if "one party is actually and formally in control of the other party." ECF106 at 16 (quoting 13 Wright & Miller's Fed. Prac. & Proc. § 3530 (3d ed. 2026)). The court then held that "Plaintiffs and Defendants are not adverse because one party controls this litigation." ECF106 at 17. The court relied on the fact that the IRS and Treasury are "part of the Executive Branch and ultimately answer to its Chief Executive, President Trump." ECF106 at 19. The court specifically pointed to the President's ability to remove the

Secretary of the Treasury, as well as the President's and Attorney General's primacy on questions of law within the Executive Branch. ECF106 at 20-22.

The District Court further held that President Trump had exercised "actual control" over Defendants. ECF106 at 26. But the court did not point to any evidence that the President had directed Defendants in this litigation. Instead, the court relied on the fact that Defendants had not "advanced any legal position or interpretation" in defense before the court, though the court also acknowledged that the case had concluded "before the Government was required to explicate its position." ECF106 at 22-24.

Regardless, to the court, this purported "deviation from basic litigation strategies pursued in similar cases" supported the conclusion that "Defendants chose not to advance" arguments that were contrary to "President Trump's opinion regarding this lawsuit." ECF106 at 26. The court described other cases involving multi "billion-dollar civil settlements" that "involved more time, effort, and advocacy than that expended in the instant case" as evidence of a lack of adversity. ECF106 at 25 n.32.

The court also pointed to the purported "circumstances surrounding the execution" of the Parties' agreement. ECF106 at 30. As relevant here, the court emphasized that the agreement was signed by Associate Attorney General Stanley Woodward, who had previously "represented several individuals charged in connection with the events of January 6, 2021," and took issue with the fact that then-Acting Attorney General Blanche had previously "served as President Trump's criminal

defense attorney." ECF106 at 31. The court also stated inaccurately (and repeatedly) that the relevant Department of Justice officials included President Trump's "former White House Counsel." ECF106 at 34, 35, 37. Finally, the court relied on the fact that then-Acting Attorney General Blanche had "repudiate[d] part of th[e] agreement," which in the court's view suggested that "[t]here was only one party whose interests were being represented throughout this case." ECF106 at 36.

Having concluded that this litigation "was presented for an improper purpose," the District Court "turn[ed] to the question of sanctions." ECF106 at 38. The court explained that "Rule 11 authorizes a court to sanction a party who submits a pleading for an improper purpose." ECF106 at 39 (quotation omitted). The court recognized that "[w]hen assessing *sua sponte* Rule 11 sanctions," a court "must employ . . . a show cause order to provide notice and an opportunity to be heard." ECF106 at 44 (quotation omitted). But the court stated that "Plaintiffs received notice of the conduct at issue and a full opportunity to respond." ECF106 at 44 n.62. The court did not address whether Defendants received notice. The court nevertheless "impos[ed] non-monetary sanctions under Rule 11" on all "Parties." ECF106 at 46-47.

Specifically, the District Court reported one of Plaintiffs' attorneys to the Florida bar, barred another from pro hac vice practice for a year, and then issued a gag order on all Parties—including Defendants:

> The Parties are prohibited from referring to the purported "settlement agreement," or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official

> proceeding as evidence of a "settlement" reached in this matter, Case No. 26-cv-20609-KMW (S.D. Fla. 2026).

ECF106 at 47. The court separately ordered that a copy of its Order be sent to the bars of New York and the District of Columbia, where then-Acting Attorney General Todd Blanche and Associate Attorney General Stanley Woodward are admitted to practice, respectively. ECF106 at 53-54.

On September 29, 2026, a panel of this Court denied a stay pending appeal. Dkt. No. 68. The stay panel held that the gag order is appealable. *Id.* at 17. The stay panel then assessed the gag order, but most of its short analysis does not bear on Defendants' arguments on appeal. As relevant here, the stay panel characterized the District Court's "[f]indings of collusion and bad faith" as "factual ones subject to the clear error standard of review," held that Plaintiffs "ha[d] not made a strong showing that the district court committed clear error in its collusion and bad faith findings," and held that the gag order is "not . . . a prior restraint" because it prevents the Parties referring to their agreement only "as evidence of a settlement reached in the matter brought before this [District] Court." *Id.* at 20-21 (formatting modified).

## STANDARD OF REVIEW

Rule 11 sanctions are reviewed "under the abuse-of-discretion standard," but because "[t]he initiating court must employ . . . a higher standard" when imposing "[s]ua sponte Rule 11 sanctions," such sanctions "must be reviewed with particular stringency." *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003).

Although the entry of a permanent injunction is also reviewed "for an abuse of discretion," "the underlying legal conclusions" are reviewed "*de novo*." *Jones v. Governor of Florida*, 975 F.3d 1015, 1028 (11th Cir. 2020). Factual findings are generally reviewed "for clear error." *Id.* But if a "trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander v. South Carolina State Conference of the NAACP*, 144 S. Ct. 1221, 1240 (2024).

## SUMMARY OF ARGUMENT

The District Court's Order rests on numerous reversible errors.

To start, the District Court's improper-purpose ruling is legal error. The District Court theorized that the Parties used the court to lend cover to a collusive settlement. But the court overlooked the fact that the Department of Justice can (and often does) settle cases without any court involvement. The Parties could not have attempted to trick the court into blessing the Settlement Agreement, because they never asked the court to do anything with respect to the agreement (over which the court lacked jurisdiction). The court's contradictory criticism—that the Parties did not ask it to review the Settlement Agreement—also falls flat because the court lacked Article III jurisdiction to do so.

The District Court misunderstood its jurisdiction at every turn. It relied heavily on its conclusion that there was no Article III case or controversy because, in its view, the Parties were not sufficiently adverse. But that conclusion is inconsistent with

Supreme Court precedent that confirms a case or controversy exists when a plaintiff has not received the damages he seeks from a defendant. The court's unprecedented rule that because the President controls the Executive Branch, he can never sue the Executive Branch (even in his personal capacity) flouts Supreme Court precedent. And the undisputed facts here—namely that Plaintiffs never received what they sought from the IRS and Treasury—confirm that the Parties were adverse. The District Court's contrary reasoning fails as a matter of law, and the stay panel did not address these manifest legal errors.

Sanctions would be unavailable regardless. The District Court repeatedly acknowledged the novelty of the Article III question presented. But a court cannot rest sanctions on an admittedly complex legal conclusion. And applying Rule 11 to the IRS and Treasury is especially egregious. Rule 11 pertains to filings, representations, and arguments made to court. The IRS and Treasury never did anything before the District Court. Rule 11 also requires notice to a party before a court imposes sanctions. The District Court did not provide adequate notice to any party—but certainly not the IRS and Treasury. Indeed, the order that supposedly provided notice expressly referenced only "Plaintiffs."

This Court should reverse on any or all of those grounds. And given the lack of notice, the overheated and inaccurate criticism of Defendants in the sanctions Order, and the seemingly calculated timing of the Order in the lead-up to the Attorney General's confirmation hearing, reassignment is warranted.

## ARGUMENT

The District Court's improper-purpose ruling and standing analysis are rooted in multiple fundamental legal errors. The stay panel's opinion is not binding—and its cursory analysis did not address any of the dispositive points discussed below.

### I. The District Court's Improper-Purpose Ruling Fails As A Matter Of Law.

One of the two fundamental premises of the District Court's Order is that Plaintiffs filed this suit with an "improper purpose" because the Complaint was a "vehicle to achieve a predetermined outcome." ECF106 at 43. That makes zero sense. There is no improper purpose in suing and settling. A party need not file a lawsuit at all in order to obtain a full settlement with the federal government. The District Court's theory is also illogical even on its own terms. If there had been some plan to collude (there wasn't), filing a complaint would be the last thing that Plaintiffs would do, as it would draw more attention to the resulting settlement, which the Parties immediately made public in the interest of transparency.

Nor can the District Court claim that it was somehow tricked into blessing or lending credibility to the lawsuit or settlement, for the simple reason that the Parties never asked the District Court to do anything regarding the merits or settlement. In fact, the District Court lost jurisdiction over this case the moment that Plaintiffs voluntarily dismissed it with a self-executing Rule 41(a) notice. It was the District

Court—not the Parties—that improperly insisted on interposing itself in a matter over which it had no jurisdiction and no authority.

### A. The Department Of Justice Routinely Settles Cases Before Litigation Commences.

The government has broad authority to settle claims under the Federal Tort Claims Act, and it does so countless times a year, even absent the formal filing of a suit. Indeed, the FTCA expressly authorizes settlement absent litigation. *See* 28 U.S.C. §§ 2672, 2677. Further, the Attorney General has express authority to make "compromise settlements" of suits and even of "imminent litigation" against the United States. 28 U.S.C. § 2414; *see also* 26 U.S.C. § 7122 (tax matters).

The Attorney General may "exercise broad discretion in determining when, and on what terms, settlement would best serve the interests of the United States." *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 135 (1999). And that broad settlement power extends to prospective claims that have not even been filed. *See* Memorandum for the Associate Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Inslaw Claims and Attorney General's Settlement Authority* (Nov. 2, 1993).

The notion that Plaintiffs needed to formally file a lawsuit in order to obtain a settlement is thus wrong as a matter of law—and also logic. In reality, if the Parties here wanted to obtain a collusive settlement (they didn't), then that could have—and indeed, would have—occurred completely outside the purview of a pending lawsuit, and

completely outside the specter of immediate public review. They could have done so either by submitting an administrative claim under the FTCA, or by simply threatening litigation. The fact that Plaintiffs nonetheless filed a public lawsuit and then (after arm's-length negotiations) Defendants published the subsequent Settlement Agreement is a powerful indicator that the suit was not commenced for a collusive purpose. There is also no indication that Defendants even knew the lawsuit was going to be filed in the first place.

Relatedly, the District Court concluded that suing with the purpose of obtaining a settlement is itself an "improper purpose." ECF106 at 39. That will come as a surprise to every civil litigator in the country. Nobody files suit intending to lose, and most civil cases settle, so most suits are filed with the intent of yielding a settlement.

To be sure, it could be an "improper purpose" to demonstrate "excessive persistence in pursuing a claim or defense in the face of repeated adverse rulings." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1448 (11th Cir. 1998) (overruled on other grounds). But the lawsuit here was the first ever filed by Plaintiffs on this issue, and nobody can dispute that they indeed suffered significant harm from the unlawful acts of an individual who was convicted and sentenced to prison. Further, as explained below, in the prior cases where other plaintiffs sued over the same underlying conduct, the government's motions to dismiss were *denied*. And because President Trump and his family were the express targets of Littlejohn's criminal actions, the allegations here created significant litigation risk and liability exposure for the

government. There certainly can be no improper purpose in suing with the goal of obtaining a settlement—let alone doing nothing before the District Court and settling out of court—in such a case.

### B. The District Court Could Not Have Been Misled Because The Parties Never Asked The District Court To Do Anything Regarding The Merits Or Settlement.

Perhaps recognizing this illogic, the District Court surmised that Plaintiffs filed suit to cloak the not-yet-existent Settlement Agreement in a "patina of legitimacy" from the court itself. ECF106 at 2. Of course, the court offered zero direct evidence of this, and for good reason: it is impossible for the court to have been tricked into participating in any supposed charade—or lending a patina—for the simple reason that the Parties *never asked the court to do anything* regarding the merits or settlement.

Plaintiffs filed the Complaint and voluntarily dismissed it with prejudice before any responsive filing was due. As such, the Parties did not ask the District Court to take any action regarding the merits or settlement, and Plaintiffs' Rule 41 notice stripped the court of jurisdiction before it could have opined on any aspect of the case or settlement. *See Estate of W. v. Smith*, 9 F.4th 1361, 1367-68 (11th Cir. 2021). Rule 41 is so absolute that even the District Court's order purporting to close the case, ECF62, was technically a "nullity," *Estate of W.*, 9 F.4th at 1367-68.

The District Court's theory seems to be that by fully resolving the case *before* the District Court could have taken any substantive action, the Parties somehow caused the

District Court to get involved and lend "cover" to their private settlement. ECF106 at 43. Respectfully, that is incoherent.

### C. Accepting The District Court's Offer To "Review" The Settlement Agreement Would Have Violated Article III.

There is obvious tension between the District Court's central critique that the Parties supposedly sought to enlist the District Court to legitimize their agreement and one of the District Court's key rationales in support of that critique—that the Parties had *not* "provided" the Settlement Agreement to the District Court "for review." ECF106 at 8; *see* ECF106 at 29 n.38. But judicial approval or disapproval of the agreement was not required. In fact, it would actually have violated Article III of the Constitution, because the District Court would have been providing a prohibited advisory opinion.

For starters, the Parties were under absolutely no obligation to submit the Settlement Agreement to the District Court for review—either before the Plaintiffs dismissed their Complaint, or anytime after. Generally, "[j]udicial power is not exercised . . . to review and confirm the wisdom of private settlements." Wright & Miller, *supra*, § 3530. Only in rare circumstances is court approval required for a settlement. Most notably, a certified class action under Rule 23, which requires court approval because settlement will extinguish the rights of individuals not before the court; and certain settlements under the Fair Labor Standards Act. *See Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1353 (11th Cir. 1982).

As for other settlements (like the one here), a district court can exercise jurisdiction over issues arising from a settlement agreement *only* if the district court "embod[ies] the settlement contract in its dismissal order" or where the court "retain[s] jurisdiction over the settlement contract, if the parties agree." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381 (1994). In other words, courts lack all authority over settlements unless those agreements are already adopted by the court or expressly give power to the court.

The District Court never suggested that the Settlement Agreement fell within the narrow category of settlements that require court approval—and it doesn't. Accordingly, proffering the Settlement Agreement for the District Court's "review" would have yielded only the District Court's thoughts on a matter over which it lacked authority and jurisdiction. In other words, it would have yielded a classic advisory opinion, which is prohibited under Article III. *See Carney v. Adams*, 592 U.S. 53, 58 (2020).

The District Court's approach was also internally inconsistent. Elsewhere in its Order, the court claimed that seeking "to obtain the opinion of the court, upon a question of law which a party desires to know for his own interest or for his own purposes, when there is no real and substantial controversy …, is an abuse which courts of justice have always reprehened [sic]." ECF106 at 14. In other words, the District Court insisted in one breath that the Parties should have let the court opine on the Settlement Agreement, while implying in the next breath that even attempting to

involve the court in such a review would be sanctionable, all while accusing the Parties of trying to use the court as cover for their agreement. "This 'heads I win, tails you lose' approach cannot be correct." *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 471 (2007). It confirms that the District Court was insistent on criticizing the Parties' actions, even when it resulted in an obvious Catch-22.

## II. Supreme Court Precedent Confirms There Was An Article III Case Or Controversy.

The second core premise of the District Court's Order is that the suit was improper or collusive because there was not sufficient adversity between the Parties. To be clear, this Article III question is irrelevant. Because the Department of Justice can settle claims in the absence of any lawsuit at all, Article III is not a limitation on its settlement authority. And the notion that a complaint is sanctionable merely because the plaintiffs are ultimately found to lack standing is plainly wrong. *See* Part IV.A, *infra*. In any event, the District Court's premise is incorrect: There *was* adversity here, both as a matter of law and as a matter of the basic facts on the ground—even viewed through the warped lens of the District Court.

### A. There Was Adversity Under Longstanding Supreme Court Precedent.

Even when "the Attorney General of the United States agree[s] with the legal arguments asserted" by a plaintiff, "[a] case or controversy is presented" so long as a "decision will have real meaning" for the parties' legal rights. *INS v. Chadha*, 462 U.S. 919, 939 (1983). In this case, a decision would obviously have meaning for the Parties'

legal rights because the IRS and Treasury had not given Plaintiffs the relief they sought when the case was initiated (and never gave them anything close to full relief).

The District Court nevertheless held that there could not be adversity in this suit as a matter of law because the President was suing the Executive Branch. ECF106 at 54-55. But the Supreme Court rejected that argument fifty years ago in *United States v. Nixon*, 418 U.S. 683 (1974), where President Nixon sought to contest a subpoena issued against him by the Special Prosecutor. The Court held that such a dispute was justiciable—even though the Special Prosecutor was "subordinate" to the President, and even though the Executive "has exclusive authority and absolute discretion to decide whether to prosecute a case"—because the Special Prosecutor was wielding his existing authority in a manner adverse to the President's interests. *Id.* at 692-97.

The existence of adversity is even more obvious here, where the underlying dispute did not involve executive power but instead involved a tort committed against the President as a private citizen. An "ongoing claim for funds that the United States refuses to pay . . . establishes a controversy sufficient for Article III jurisdiction." *United States v. Windsor*, 570 U.S. 744, 758 (2013). And "refusal of the Executive to provide the relief sought suffices to preserve a justiciable dispute." *Id.* at 759 (citing *Chadha*, 462 U.S. at 939-40 & n.12); *accord United States v. ICC*, 337 U.S. 426, 429, 430 (1949) ("proceedings to settle who is legally entitled to sums of money" are "traditionally justiciable," even where, unlike here, "[t]he Attorney General appeared for the Government as both plaintiff and defendant" as a formal matter).

There was thus an Article III case or controversy as a matter of law. And as a practical matter, as discussed more below, the clearest indicator that the Parties were genuinely adverse was that Plaintiffs did not get what the Complaint demanded. The Complaint sought at least $10 billion, and the Settlement Agreement provided them no money but rather an apology. Typically, the defining feature of a collusive lawsuit is that the plaintiff gets exactly what he initially demanded; by contrast, a defining feature of a case or controversy is when the defendant does not acquiesce to the plaintiff's demands.

Even though Plaintiffs raised *Nixon* below, the District Court ignored it entirely, instead insisting that one "need only look" to the fact that Donald J. Trump is President, and the President controls the Executive Branch under our system of government. ECF106 at 54-55. That simplistic approach is irreconcilable with *Nixon*. President Nixon (in his official capacity) could have ordered the Attorney General to rescind the Special Prosecutor's authority to issue the subpoena. But he didn't, and the Special Prosecutor was not giving President Nixon what he wanted, so there was adversity. Here, the IRS and Treasury had not given Plaintiffs (including President Trump in his private capacity, but also including other private Parties) what they wanted, so there was adversity.

Notably, the District Court's adversity concerns would not have impacted the court's jurisdiction anyway. Even when "the Executive's unusual position" may raise questions about "concrete adverseness," that does not eliminate "a justiciable controversy under Article III." *Windsor*, 570 U.S. at 759-60. Instead, it raises "prudential

considerations" that can be addressed by, for example, "the participation of *amici curiae*." *Id.* at 760. That is the solution when the identity of the parties presents novel questions of adversity—not dismissal for lack of Article III jurisdiction, and certainly not sanctions for bringing the case in the first place (or being a named Defendant who does nothing before the court).

Rather than address these controlling Supreme Court precedents, the District Court invoked generalized platitudes about adversity. *See* ECF106 at 13. But the authorities that it cited do not negate the District Court's jurisdiction. To support its rationale that the structure of the Executive Branch automatically eliminated its jurisdiction, the court pointed to Executive Order 14215 (Feb. 18, 2025), which merely restates the President's constitutional supervision of the Executive Branch in the context of litigation. That document plainly cannot carry the weight the District Court placed on it any more than the mere existence of Article II can defeat jurisdiction here.

Some of the authorities the District Court cited directly undermine its conclusions. The District Court relied on a treatise stating that "adjudication may be refused" when "one party is actually and formally in control of the other party." ECF106 at 16 (quoting Wright & Miller, *supra*, § 3530). But the same treatise emphasizes, consistent with numerous Supreme Court decisions, that "litigation may be maintained between different agencies of the federal government" because "genuine controversies may emerge." Wright & Miller, *supra*, § 3530; *accord United States v. Conn. Nat'l Bank*, 418 U.S. 656 (1974); *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 614

(1974); *Sec'y of Agric. of U.S. v. United States*, 347 U.S. 645, 650 (1954); *U.S. ex rel. Chapman v. Fed. Power Comm'n*, 345 U.S. 153, 154 (1953). That is why, when the Supreme Court addresses challenges to removals of Executive Branch officials—brought by such officials against the President—the Court speaks in terms of Article II power over such subordinates, not Article III jurisdiction. *See, e.g.*, *Trump v. Slaughter*, 146 S. Ct. 2283, 2292-97, 2304-06 (2026). The District Court's heavy reliance on *Slaughter* (which the Supreme Court had not issued when Plaintiffs sued) is thus self-defeating, and its formal control test cannot be right. *See Nixon*, 418 U.S. at 693 (courts look "behind names that symbolize the parties" when assessing whether there is a case or controversy). The same treatise confirms that "adversarial presentation of the issues by amici curiae" can "suppl[y] the requisite adversariness." Wright & Miller, *supra*, § 3530.

Once again, the District Court's analysis was internally inconsistent and unsupported by the very authorities it cited. Because the District Court "base[d] its findings upon a mistaken impression of applicable legal principles," those legal errors are necessarily reversible. *Alexander*, 144 S. Ct. at 1240.

**B. The Undisputed Facts Confirm Adversity.**

Although at times the District Court appeared to treat the mere "ability to control" the Parties as dispositive, ECF106 at 13 n.21, the court elsewhere purported to rely on "the conduct of Executive Branch actors" as demonstrating such control, ECF106 at 27 (formatting modified). But the undisputed facts of this case demonstrate adversity under any definition. The District Court's conclusion is thus reversible

because the evaluation of undisputed facts is a legal question (and in any event, the District Court's conclusion would be clearly erroneous). *Cf. Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 227 (2020) ("The effect of admitted facts is a question of law" (quoting *Nelson v. Montgomery Ward & Co.*, 312 U.S. 373, 376 (1941))).

"In all litigation, the adverse consequences of potential defeat provide both parties with an incentive to settle[.]" *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 352 (1981). The mere existence of a settlement obviously cannot defeat adversity. And, once more, the clearest marker of adversity is that one side doesn't get what it demanded. Here, while Plaintiffs sought $10 billion in damages, it is undisputed that under the Parties' agreement, Plaintiffs would "not receive any monetary payment or damages of any kind," but rather an apology and a mutual release of claims (despite the District Court's inexplicable repeated assertions that Plaintiffs received billions of taxpayer dollars). If the lawsuit was just a collusive, foregone conclusion, then Plaintiffs would have immediately received what they demanded. But they didn't. And it certainly would not have taken 109 days to reach a settlement. If the lawsuit had been filed with collusive intent, it would have promptly settled, but instead negotiations dragged on until months after the case was filed.

Tellingly, even the District Court stumbled into recognizing this. After the court insisted for page after page that the President had "direct, unassailable control over" Defendants, ECF106 at 6, the court later observed that then-Acting Attorney General Blanche had apparently issued a "unilateral repudiation" of the Anti-Weaponization

Fund, ECF106 at 36. But if Defendants were under the "unassailable control" of the President, then it makes no sense that Mr. Blanche could make any "unilateral" decision. The District Court again tried to have it both ways: at first, the court insisted Defendants must do whatever Plaintiffs say; but by the end, the court insisted Plaintiffs must do whatever Defendants say. That incoherence is a critical flaw given the District Court's foundational theory that the President dictated the outcome here.

For its part, the District Court relied on inconsequential or incorrect assertions that—as a matter of law—could not possibly deprive it of jurisdiction (let alone give rise to sanctions). The court relied heavily on the fact that no attorney appeared for Defendants. ECF106 at 27-38. But it is undisputed that the case settled before Defendants ever needed to appear.

The District Court also emphasized that Defendants did not move to dismiss the Complaint as the government had in other cases. ECF106 at 4-5.[3] Again, the case was settled before any such motion would have been due. Further, those motions in other cases were all *denied*, resulting in extensive discovery. It is not the least bit unusual to settle a case early to avoid a repeat of prior losses on similar underlying facts. And here, the facts were much *worse* for the government given the outsized harm that Plaintiffs suffered from near-universal disclosure of their tax returns, which was primarily aimed at damaging *them* (and especially President Trump) in particular. Regardless, courts have

---

[3] *Safe Harbor Int'l LLC v. Booz Allen Hamilton, Inc.*, No. 25-CV-00139-LKG, 2026 WL 900051 (D. Md. Apr. 2, 2026); *Griffin v. IRS*, 730 F. Supp. 3d 1312 (S.D. Fla. 2024).

no authority (or competence) to second-guess how the Department of Justice approaches litigation strategy in different cases.

The District Court further opined that Defendants should have moved to dismiss the Complaint as untimely. The District Court did not grapple with Plaintiffs' theory of repeated global disclosures, each of which could have reset the limitations period under Plaintiffs' untested legal theory and the novel facts of this case. *See Aloe Vera of Am., Inc. v. United States*, 699 F.3d 1153, 1160 (9th Cir. 2012). Regardless, and more to the point, the District Court's approach would have violated this Court's precedent holding that a motion to dismiss "on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005) (citing authorities). The Complaint included factual allegations demonstrating timeliness, ECF1, ¶ 86, but the District Court instead improperly looked to materials outside the Complaint, ECF106 at 4-5. The District Court therefore would have committed reversible error if it had dismissed the Complaint as untimely. Yet somehow the court believed the Department's decision not to raise that argument—at a premature stage, no less—was evidence of improper behavior.

Grasping at straws to find evidence of the non-existent collusion, the District Court also stressed that certain Department of Justice attorneys have been affiliated with the President. ECF106 at 31-32, 36-37. But this is both overstated—the court repeatedly insisted one of the Department lawyers was the "former White House

Counsel," ECF106 at 34, 35, 37, which is just false—and immaterial in that attorneys regularly move between public and private service.

Finally, the District Court failed to give weight to the presence of numerous Plaintiffs in this case who are *not the President*. There surely was still Article III adversity as to those other Plaintiffs, and it is blackletter law that Article III requires "only one plaintiff" with adversity. *Bost v. Illinois State Bd. of Elections*, 607 U.S. 71, 76 n.3 (2026). The District Court, however, gave this a backhand, stating—in unexplained footnotes—that these other Plaintiffs' presence was "parenthetical" to the analysis. ECF106 at 22 n.29, 36 n.58. The District Court offered no basis, let alone a persuasive one, for that dispositive, erroneous conclusion. And its elaboration when denying a stay that the other Plaintiffs did not warrant "independent treatment," apparently because they are related to or affiliated with the President, only confirms the error. ECF130 at 7 n.12. If a President's family members cannot be adverse to the federal government or vice-versa, then courts have mistakenly adjudicated many such cases. *See, e.g.*, *Biden v. IRS*, No. 1:23-CV-02711 ECF 39 at 2 (D.D.C. Sept. 27, 2024) (declining to dismiss Hunter Biden's "unlawful disclosure claims" against the IRS while his father was President).

Any one of these bases is sufficient to reverse, as each amounts to legal error and also a clearly erroneous interpretation of core, undisputed facts. At the very least, however, considering all of these errors together makes this an easy case for reversal.

### C. The District Court Could Not Reject The Complaint's Allegation That President Trump Was Suing In His Personal Capacity.

There is a well-established difference between "the unofficial conduct of the individual who happens to be the President" and the official office of the President. *Clinton v. Jones*, 520 U.S. 681, 701 (1997). And the District Court noted that the Complaint expressly stated that President Trump was bringing this suit in "his personal capacity." ECF106 at 2. Nobody disputes that the injuries he incurred were as a private citizen. Even the District Court recognized "that President Trump had a legal right to bring a suit for the unlawful disclosure." ECF106 at 37. But the court's reasoning would deny any President that right—and indeed sanction them and their attorneys even for trying to exercise it. The District Court stated in a conclusory half-sentence that it "declines to adopt or accept" the use of personal capacity here. ECF106 at 2. That allowed the District Court to premise its Order on the view that the President must be seen as suing in his official capacity, which the District Court then concluded meant he was suing himself.

The District Court cited no precedent authorizing a court to "decline[]" to recognize the official/personal capacity distinction as expressly pleaded. ECF106 at 2. The Supreme Court has held that a court can make that determination for itself where the complaint does not "clearly specify" whether a party is named "personally, [or] in their official capacity." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). The Complaint here "clearly specif[ied]" that President Trump was suing in his personal

capacity. And lest there be any doubt, the Supreme Court has noted that the President can sue and be sued in his personal capacity. *See Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020).

The District Court implied that President Trump is suing in his official capacity because the Complaint labels him as "President" Trump. ECF106 at 2. But the title is a matter of fact and respect: he is the President. This is no different from referring to a judge as "Judge" even when she is not actively performing judicial duties.

## III. The Stay Panel Did Not Meaningfully Address The District Court's Flawed Reasoning.

Plaintiffs sought an emergency stay in this Court, but the stay panel did not address the presence or absence of Article III jurisdiction at all. Instead, it framed the District Court's analysis as factual in nature and held that Plaintiffs had not made a strong showing of clear error as to the District Court's "collusion and bad faith findings." Dkt. 68 at 20. That non-binding analysis does not purport to grapple with the flaws in the District Court's logic described above.

If a "trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Alexander*, 144 S. Ct. at 1240. Here, the District Court legally erred when it failed to appreciate the Department of Justice's broad and unreviewable settlement authority, which undercut the court's entire theory of collusion. The bulk of the court's analysis rested on a mistaken view of Article III jurisdiction, which is obviously a legal question

not subject to "clear error" review. The District Court's theory of "control" was rooted in a legal misunderstanding about how "unusual" Executive Branch positioning can impact (or not) justiciability and what "prudential" options are available to mitigate such concerns. *Windsor*, 570 U.S. at 759-60. And the court legally erred by inexplicably treating President Trump as having sued in his official capacity.

All these errors tainted the District Court's purported "findings." In fact, the District Court's conclusion that the Parties had somehow colluded expressly relied on the errors. Otherwise, there would have been no reason for the court's lengthy analysis of whether the Parties were adverse within the meaning of Article III. The court did not point to any direct evidence of bad faith or collusion. To be sure, the Order contains various factual assertions. But many of those assertions—like those addressing different litigation strategies and outcomes in distinguishable cases, and past affiliations between Department of Justice lawyers and the President—cannot establish bad faith or collusion *as a matter of law*. After all, such circumstances will exist in a large number of cases.

Further, many of the court's subsidiary factual assertions (most of which were based on unverified, biased, and disputed online articles) *were* clearly erroneous. For example, to the extent the court was inexplicably operating under the wrong impression that Plaintiffs received billions of taxpayer dollars (instead of no financial compensation at all), that false premise alone compels reversal because it undermines the District Court's collusion narrative—Plaintiffs received nothing that their Complaint asked for.

Likewise with the District Court's refusal to grapple with the fact that the case did not settle for more than 100 days after it was filed, which would make little sense if there were a scheme to file a suit and collusively settle. The District Court ignored undisputed facts and then relied on news articles to conjure a world that simply never existed. If that is not reversible error, nothing is.

## IV. In Any Event, Sanctions Are Unavailable.

Even if everything in the analysis above is wrong, the District Court's Order is still reversible for numerous independent reasons. The stay panel did not address these additional legal errors.

### A. Even In The District Court's View, The Case Raised Novel Legal Questions About Article III.

"[O]nly the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." *Patterson v. Lew*, 265 F. App'x 767, 768 (11th Cir. 2008) (cleaned up). And for the court to exercise its sanctioning authority, there must be clear and convincing evidence of subjective bad faith. *See Hyde v. Irish*, 962 F.3d 1306, 1310 (11th Cir. 2020). This "inherent power must be exercised with restraint and discretion." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017).

When it comes to sanctioning parties or attorneys for their legal positions, this Court has held that "we prefer that an attorney feel free to exercise [his] judgment

without fear of reprisals should his lawsuit miscarry. As we see it, Rule 11 is intended to deter claims with *no* factual or legal basis at all; creative claims, coupled even with ambiguous or inconsequential facts, may merit dismissal, but not punishment." *Davis v. Carl*, 906 F.2d 533, 538 (11th Cir. 1990).

The District Court failed to comply with those binding standards. In fact, it unwittingly proved there is no sanctionable conduct here by characterizing the legal questions as novel and difficult. The District Court viewed this case as "sui generis," ECF106 at 2, and acknowledged that "[a]t first glance, the Complaint seemingly satisfies Article III," ECF106 at 17. The District Court then spent dozens of pages purporting to distinguish otherwise on-point caselaw (and ignoring other on-point caselaw like *Nixon* and *Chadha*). And its improper-purpose finding expressly hinged on this complicated (and incorrect) analysis.

The District Court previously found the issue sufficiently complex that the court appointed three different sets of amici to opine on whether there was subject-matter jurisdiction. Even those cherry-picked amici concluded the Article III question was sufficiently difficult that "the adversity inquiry likely cannot be concluded at this time." ECF45 at 14. Yet the District Court later found the issue so obvious that anyone who disagreed—which would apparently include the court's own appointed amici—was deserving of sanctions.

Thus, even accepting that the District Court was right on the merits of the Article III analysis, sanctions cannot be imposed because the court was creating new legal

theories on the fly. Again, regardless of the standard—de novo or clear error—the District Court's analysis is indefensible. Nobody can be sanctioned for bringing a suit that *the District Court itself acknowledged* was premised on difficult and novel legal questions.

**B. The IRS And Treasury Could Not Possibly Have Violated Rule 11.**

The District Court issued its gag order as to all "Parties," including "Defendants," "under Rule 11." ECF106 at 46, 47. Unlike with Plaintiffs, the District Court's sanction of Defendants did not reach any agents or officers. But in any event, Rule 11 clearly does not reach the IRS and Treasury's "inaction . . . in this case." ECF106 at 26.

Under Rule 11(b), "[b]y presenting to the court a pleading, written motion, or other paper" to a court, "whether by signing, filing, submitting, or later advocating it," "an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing or argument "is not being presented for any improper purpose." Fed. R. Civ. P. 11(b)(1). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).

Under the plain text of Rule 11, the District Court exceeded its authority by sanctioning the IRS and Treasury. Those agencies did not present any filings or

advocate any positions to the District Court. No attorney did so on their behalf. And even accepting the District Court's bogus theory that Plaintiffs were in control of this litigation, that would not mean the Defendant agencies were in control of or otherwise responsible for other Parties or their filings.

Beyond the text of Rule 11, there is no conceivable basis to conclude that Defendants engaged in misconduct of any sort before the District Court. Tautologically, if a party does not do *anything* before a court, that party cannot possibly have committed misconduct before that court. And although the Department of Justice entered into an out-of-court agreement with Plaintiffs, the District Court was not involved in that settlement at all (as explained above), and the Department of Justice's authority to do so is "committed to [the] agency's absolute discretion." *Cf. Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see* 28 U.S.C. § 2414; *supra* pp. 15-17.

There is accordingly no legal basis or administrable standard for a court to sanction the federal government for settling a lawsuit—even a lawsuit that a court believes is meritless or not sufficiently adverse—given the obvious "unsuitability for judicial review" of settlement decisions. *Heckler*, 470 U.S. at 831. Instead, such concerns are best "hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump*, 591 U.S. at 859 (quotation omitted).

Furthermore, under Rule 11(c), the IRS and Treasury never received notice that the court was contemplating sanctions as to them—let alone a reasonable opportunity to respond. Before sanctioning a party, a court must provide notice of "the precise rule,

standard, or law that he or she is alleged to have violated *and* how he or she allegedly violated it." *United States v. Shaygan*, 652 F.3d 1297, 1319 (11th Cir. 2011). Here, the District Court's Order relies on all sorts of disputed alleged conduct that its prior (May 29) Order did not describe. *Compare* ECF106, *with* ECF65. And, putting aside the question whether the court gave *any* party adequate notice of the sanctions the court would impose, the relevant court order referenced Plaintiffs only. ECF65 at 3. It did not remotely suggest that the IRS or Treasury violated any rule or standard, let alone how either could have done so without taking any action in the litigation. The District Court apparently went out of its way to direct that only Plaintiffs respond, then again went out of its way to criticize Defendants, ensuring there would be no possibility of a response before the court issued its Order. That independent error likewise is "an abuse of discretion warranting reversal." Wright & Miller, *supra*, § 1337.3.

The timing of the District Court's Order makes the lack of notice to the IRS and Treasury all the more problematic. The Order was issued just two days before the confirmation hearing of then-Acting Attorney General Todd Blanche. And the Order, which was clearly rushed given the number of errors and typos it contained, criticized the actions and ethics of the Department of Justice and Mr. Blanche in particular, and directed the clerk to send a copy of the Order to the New York Bar, where Mr. Blanche is admitted. That course of conduct appears to have been by design. The District Court's Order elsewhere recognized that "[d]ue process requires that the attorney (or party) be given fair notice that his conduct may warrant sanctions and the reasons why."

ECF106 at 44 n.62. Yet the court never provided the least bit of notice before making repeated, gratuitous, and false accusations against the Department and Mr. Blanche in the immediate lead-up to his confirmation hearing. "[C]ourts may not exceed the bounds of their lawful authority simply because they may think another branch has exceeded its own." *National Park Service v. National Trust for Historic Preservation in the United States*, 609 U.S. ----, 2026 WL 2564318, at *3 (Aug. 31, 2026). Yet in this case, the District Court went far beyond Rule 11, seemingly intentionally and for the purpose of inflicting political damage on Executive Branch officials.

### C. The District Court's Gag Order Is Unlawful.

Setting aside everything else, the District Court's gag order is simply indefensible under the separation of powers. Even though no counsel for Defendants ever appeared in the case—and even though the Settlement Agreement was reached entirely outside the District Court—the court purported to enjoin all "Parties" from "referring to the purported 'settlement agreement,' or using, offering, admitting, or citing any of its provisions in any judicial, administrative, regulatory, arbitration, or any other official proceeding as evidence of a 'settlement' reached in this matter." ECF106 at 47.

The exact scope of this garbled restriction is unclear. But even in its narrowest conceivable form, it must be vacated. For starters, the District Court does not have the Orwellian authority to gag how the Parties "refer" to historical facts. The court's attempt to do so is also untethered from its theory of improper purpose and is thus not "limited to what suffices to deter repetition of the conduct or comparable conduct by

others similarly situated." Fed. R. Civ. P. 11(c)(4). Even the District Court does not dispute that the Parties could have reached an agreement out of court (and referred to it however they want). The court instead took issue with the fact a complaint was filed then dismissed. But whether anyone "manipulate[d] the judicial process" (they didn't), ECF106 at 2, has nothing to do with what the Parties can call their agreement.

More fundamentally, the District Court lacks the authority to collaterally attack a government settlement—by barring its general use in other matters over which the court has no jurisdiction—under the guise of sanctions proceedings. Again, the Parties never needed to put the settlement before the District Court, and they never did so. Under the precedent described above, the court emphatically lacked jurisdiction to address, criticize, review, or limit (even indirectly) the Settlement Agreement in any way.

The stay panel's purported narrowing construction of the gag order, in reliance on the District Court's post-hoc interpretation of its own Order, makes no difference—except to indirectly prove how far beyond the realm of normal the District Court's initial Order was. According to the panel, the District Court properly narrowed the restriction as preventing the Parties from referring to their agreement "as evidence of a settlement reached in the matter brought before this Court." Dkt. No. 68 at 21. So what? Any reference to the agreement as a settlement begs the question: what was settled? And the agreement itself refers to the District Court litigation. So any reference to the agreement as a settlement risks being tantamount to "referring to" the agreement "as evidence of" a settlement "in the matter" before the District Court. The stay panel

did not grapple with any of this. Yet now, the IRS and Treasury—although perhaps not any of their agents or officials, who were not identified in the District Court's gag order—must wonder whether they will be held in contempt simply for referring to historical facts.

### D. Reassignment Is Warranted.

"Reassignment is appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989). The District Court's actions have rightfully already given rise to the view among reasonable members of the public that the District Court was acting in an improper political manner. As the former Chief Counsel to the Senate Judiciary Committee has explained, the "timing [of the Order] is suspicious — it came out two days before Blanche's hearing. [The District Court] also took numerous swipes at Blanche without the Department of Justice ever having appeared in the case. Indeed, her prior order was expressly addressed only to plaintiffs, so she seems to have gone out of her way to attack Blanche here. More tellingly still, the opinion includes the kinds of errors that would be caught with apparently neglected proofreading. … In other words, it was a rush job, and the rush job got out just in time for the hearing. What a coincidence." Michael A. Fragoso, *Blanche, Cornyn, and the Weaponization Fund*, Nat'l Rev. (July 22, 2026) https://www.nationalreview.com/bench-memos/blanche-cornyn-and-the-weaponization-fund/.

Similarly, judicial ethics scholar Professor Rob Luther has questioned whether the District Court "engaged in judicial misconduct" by deliberately timing the Order for political purposes, in violation of Canon 5 of the Judicial Code of Conduct, which "prohibits political activity." Rob Luther (@RobLutherLawyer), X (July 23, 2026, at 4:05 PM), https://x.com/RobLutherLawyer/status/2080383705940377654; *see also* Rob Luther (@RobLutherLawyer), X (Aug. 14, 2026, at 11:05 AM), https://x.com/RobLutherLawyer/status/2088280804984295839 ("I continue to believe Judge Williams may have violated Canon 5 by issuing this opinion on the eve of @AGToddBlanche's confirmation hearing.").

Most recently, the Chairman of the House Judiciary Committee, Representative Jim Jordan, and the Chairman of the Subcommittee on Courts, Intellectual Property, Artificial Intelligence, and the Internet, Representative Darrell Issa, sent a letter to Judge Robert Conrad, Jr., the Secretary of the Judicial Conference of the United States, requesting that the Judicial Conference examine the District Court's conduct. Reps. Jim Jordan & Darrell Issa, Letter (Oct. 22, 2026), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/2026-10-22-jdj-dei-to-judicial-conference-of-the-us-conrad-re-judge-williams.pdf. The letter states that the Order "appears to be an abuse of judicial authority and motivated by partisan animus." *Id.* at 2. Among other points, the letter explains that "two days before then-Acting Attorney General Todd Blanche's confirmation hearing in the Senate," the District Court

"unnecessarily maligned Attorney General Blanche in her order, which partisan actors subsequently used against him during the confirmation hearing for political advantage." *Id.* at 3.

This Court need not conclude that the District Court's actions were improperly motivated, but rather only that reasonable members of the public would view them that way. That standard has certainly been satisfied. This Court should order reassignment. To be sure, no remaining proceedings are needed or appropriate in the District Court: the Order should be vacated, and the District Court lost jurisdiction months ago. The District Court is the only one insistent on trying to keep the lower-court proceedings going, on the flimsiest of bases. But for precisely that reason, this Court should order reassignment.

## CONCLUSION

This Court should reverse the District Court's Order. This Court should also reassign this case in the District Court.

Respectfully submitted,

R. TRENT MCCOTTER
*Acting Deputy Attorney General*

*/s/ R. Trent McCotter*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2105*

*Counsel for Defendants-Appellees/Cross-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because it contains 10,526 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ R. Trent McCotter*
R. Trent McCotter
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2105*

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ R. Trent McCotter*
R. Trent McCotter
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2105*